UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT                    FILED

| | | |
|---|---|---|
| MCCARTHY, ET AL, | : | DOC. NO. 3:03 CV00431(SRU) |
| Plaintiffs, | : | US DISTRICT COURT<br>BRIDGEPORT CT |
| v. | : | |
| Dun & Bradstreet, ET AL, | : | |
| Defendants. | : | NOVEMBER 7, 2003 |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### I. APPLICABLE FACTS.

The following facts, taken essentially verbatim from paragraphs 59-85 of the Amended Complaint, must, for the purposes of the pending motion, be accepted as true. See infra at 9 (motion to dismiss standard of review).

Dun & Bradstreet traces its origins to the mid-nineteenth century. The first business activity of the ancestor of the present company was receivable management services (debt collection). The modern Dun & Bradstreet was created in 1933 when R.G. Dun & Company merged with its chief competitor, the Bradstreet Company. The core business activities of the newly merged companies consisted of credit reporting services and receivable management services. The plaintiffs in this action were all employed in the RMS operation of the core Dun & Bradstreet business.

Beginning in the early 1960s, Dun & Bradstreet acquired or merged with several companies outside of its original core business activities, including A. C. Nielsen (media ratings), Cognizant (technology solutions), Reuben H. Donnelley (publishing) and Moody's Corporation (bond ratings). At all relevant times herein, Dun & Bradstreet offered employees of its core company and subsidiaries, employee benefits including a conventional defined benefit pension plan known as the Master Retirement Plan ("MRP") and stock option plans known as the Dun & Bradstreet Stock Incentive Plan ("SIP") and the Dun & Bradstreet Corporation 2000 Employee Stock Purchase Plan ("ESPP"). The plaintiffs participated in all three plans. Under the terms of the SIP, when a participant's employment is terminated, any vested and exercisable options must be exercised within 30 days of the termination. Terminated employees also lose the ability to acquire any new rights under the SIP and ESPP plans. Effective December 31, 2001, Dun & Bradstreet replaced the MRP pension plan with a cash balance defined benefit pension plan known as the Dun & Bradstreet Corporation Retirement Account Plan (the "2001 Plan"). Pursuant to Article IV, paragraphs 4.8 and 4.9 of the 2001 Plan, plan participants who participated in the MRP Plan remain entitled to benefits under that plan, including those provided for early retirement as early as age 55 for former employees who had vested benefits at the time their employment terminated.

Section 6 of the MRP Plan provides that a plan participant who retires from

employment as early as the age of 55 receives 70% of the participants' normal retirement benefit. However, Section 9 of the MRP Plan, describes a lesser benefit for a plan participant who retires as a former employee, providing such a participant "a reduced early vested retirement benefit which is the Actuarial Equivalent of his deferred vested benefit". "Actuarial Equivalent" as defined under Section 1 of the MRP Plan "means a benefit of approximate equivalent value based on interest at the rate of 6-3/4 percent per annum, compounded annually..."[1]

According to a reduction table distributed to a plan participant by Dun & Bradstreet managers following a request, a former employee aged 55 seeking to commence early retirement benefits under the MRP Plan is eligible to receive just 38% of the participant's normal retirement benefit, an amount 32% less than the participant would have received if still employed at the time of retirement. The reduction table is not contained in the Plan. Neither the reduction table for former employees retiring early nor the definition of "Actuarial Equivalent" are contained in the Summary Plan Description ("SPD") that was distributed to plan participants. The SPD states only that "the amount will be reduced actuarially, resulting in a lower Plan benefit than if the reduction table in the 'Early Retirement Benefit'

---

[1] Plaintiffs accept Dun & Bradstreet's stipulation that the number is 6-3/4, not 6-3/5 as stated in the Amended Complaint.

section was used."

At all relevant times herein, "Eligible Employees" at Dun & Bradstreet also participated in an employee benefit program known as the Dun & Bradstreet Career Transition Plan ("CTP"). Under Section 1.3 of the CTP, "Eligible Employee" is defined as follows:

> a full-time salaried employee or regular part-time salaried employee of any Participating Company who is:
>
> (a)   on the United States payroll of a Participating Company and earning a Salary of less than $100,000 at the time of an Eligible Termination, in which case Schedule A hereto shall apply; or
>
> (b)   on the United States payroll of a Participating Company and earning a Salary equal to or greater than $100,000 at the time of an Eligible Termination, in which case Schedule B hereto shall apply.

At all relevant times, Plaintiffs were all "Eligible Employees" for purposes of the CTP.

Under Section 1.5 of the CTP, "Participating Company" is defined to include employees of the Dun & Bradstreet and "any other affiliated entity more than 50% of the voting interests of which are owned, directly or indirectly, by the Company [Dun & Bradstreet] and which has elected to participate in the Plan by action of its board of directors." The CTP summary plan description ("SPD") specifically names the following as the "Participating Companies":

        A.C. Nielsen Company
        American Credit Indemnity Company
        Clark-O'Neill, Inc.
        Dataquest Incorporated
        Dun & Bradstreet, Inc.
        Dun & Bradstreet International, Ltd.
        Dun & Bradstreet Pension Services, Inc.
        Dun & Bradstreet Software Services, Inc.
        Erisco, Inc.
        IMS America, Ltd.
        I.M.S. International, Inc.
        Interactive Data Corporation
        Lexecon Health Service, Inc.
        Moody's Investors Service, Inc.
        NCH Promotional Services, Inc.
        Pilot Software, Inc.
        Sales Technologies, Inc.
        The Dun & Bradstreet Corporation
        The Reuben H. Donnelly Corporation

Under Section 2.1 of the CTP, severance benefits are paid upon the occurrence of an "Eligible Termination". Under Section 1.4 the terms of the CTP an "Eligible Termination" is defined as follows:

> "Eligible Termination" shall mean (a) an involuntary termination of employment with a Participating Company by reason of a reduction in force program, job elimination or unsatisfactory performance in the execution of an Eligible Employee's duties or (b) a resignation mutually agreed to in writing by the Participating Company and the Eligible Employee. Notwithstanding the foregoing, an Eligible Termination shall not include (w) a unilateral resignation, (x) a termination by a Participating Company for Cause, (y) a termination as a result of a sale (whether in whole or in part, of stock or assets), merger or other combination, spinoff, reorganization or liquidation, dissolution or other winding up or other similar transaction involving a Participating Company; or (z) any termination where an offer of employment is

made to the Eligible Employee of a comparable position at a Participating Company concurrently with his or her Eligible Termination.

During the mid-to-late 1990s through 2000, Dun & Bradstreet separated from all of the non-core businesses it had acquired or merged with, including A.C. Nielsen (media ratings), Cognizant (technology solutions), Reuben H. Donnelly (publishing) and Moody's Investors Service (bond ratings). In 2001, the company was reduced to the core business that existed prior to 1960.

In 2001, named Plaintiffs were all near but under the age of 55, had vested rights under the MRP Plan, and participated in the CTP plan. In 2001, RMS employees of Dun & Bradstreet included a number of employees over the age of 45 years and a number of employees approaching eligibility for early retirement benefits that was disproportionate to the rest of the employee population remaining at Dun & Bradstreet. On March 13, 2001, Dun & Bradstreet announced that it would sell its RMS operations to the managers of these operations. In April, the RMS operation incorporated under the name The Receivables Management Service Corporation ("RMS Corp.") Dun & Bradstreet thereafter declared that all of its RMS employees were terminated from employment at Dun & Bradstreet and were employees of RMS Corp., which now does business as "Dun & Bradstreet Receivable Management Services". Under Section 1.4 of the CTP, Dun & Bradstreet's termination of its RMS employees was an "Eligible Termination",

entitling them to benefits under Section 2.1 of the CTP.

While the plaintiffs lost their Dun & Bradstreet employment and benefits, to the company, the reality of the RMS transaction was probably best described by Dun & Bradstreet's chief executive officer who, shortly before the transaction, declared: "I do not have to own a business to derive an economic benefit from it." In keeping with this philosophy, the transaction was structured so that it would essentially be transparent, with no change made in the day-to-day working relationship between Dun & Bradstreet and its RMS employees and no change in the public perception of the relationship between Dun & Bradstreet and RMS. Among other things, following the creation of RMS Corporation, RMS Corp.:

    a. Retained the Dun & Bradstreet name;

    b. Retained its part in the Dun & Bradstreet marketing program;

    c. Retained its existing management structure;

    d. Retained its existing facilities;

    e. Retained its existing client base;

    f. Retained its existing employees and the employees retained their existing duties.

The transaction produced for Dun & Bradstreet the best of both worlds. Dun & Bradstreet's RMS operations functioned almost exactly as before. However, it

enhanced its cash position by replacing a stream of RMS revenue with a lump sum of cash from the sales price. Most important for this action, the transaction produced millions of dollars in employee benefit savings because the termination of the RMS employees cut the value of their early retirement rights under the MRP Plan by more than fifty percent and prevented them from acquiring new rights under the Dun & Bradstreet stock option programs. The termination of RMS employees from the Dun & Bradstreet payroll also forced RMS employees to exercise Dun & Bradstreet stock options granted under the SIP plan within thirty days of the termination of their employment, causing them to incur tax liability that would have been much reduced had they been able to exercise the stock options upon retirement, and forcing them to sell their shares at unfavorable prices. The termination of RMS employees from the Dun & Bradstreet payroll also prevents RMS employees from receiving early retirement health insurance benefits.

Dun & Bradstreet's savings in employee benefit costs realized by terminating the plaintiffs' employment was not a merely incidental effect of a decision to sell the RMS operations, but was a substantial and motivating factor in Dun & Bradstreet's decision to sell the RMS operations rather than retain the operations and/or sell some other portion of Dun & Bradstreet's core business and/or it was a substantial and motivating factor in the decision to structure the sale of the RMS operations without holding RMS employees harmless for losses to their employee benefits.

## II. PROCEDURAL POSTURE.

Plaintiffs commenced this action in Four Counts: Count One: ERISA Section 502 (a)(1)(B) for failure to pay Career Transition Plan severance benefits; Count Two: ERISA Section 510 for Dun & Bradstreet's interference with protected benefits by engaging in the sale of its RMS operations; Count Three: ERISA Section 102 violation for inadequate SPD disclosures, and; Count Four: ERISA Sections 206 (a) and 203 (a) for using an unreasonably high rate of interest in discounting plan participants' early retirement benefits. Pursuant to Fed. R. Civ. P. 12 (b)(6) defendants move to dismiss all but Count Two, the Section 510 claim.

## III. APPLICABLE LEGAL STANDARD.

### A. MOTION TO DISMISS.

This Court has recently and succinctly stated the applicable legal standard for a motion to dismiss for failure to state a claim:

> When deciding a motion to dismiss for failure to state a claim, the court "must accept the factual allegations of the complaint as true and must draw all reasonable inferences in favor of the plaintiff." Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996); Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial, but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). A complaint is legally sufficient when it includes a "short and plain statement of the claim showing that the pleader is entitled to relief." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002) ("Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions."); Fed. R. Civ. P.

8(a)(2); cf. Fed. R. Civ. P. 9(b). "Such a statement must simply give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Id. (citing Conley v. Gibson, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)). If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding. Id. at 514. In addition, if a pleading lacks merit, a defendant can move for summary judgment under Rule 56. Id. Therefore, it is only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief," that it is appropriate to grant a motion to dismiss for failure to state a claim. Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994).

Connor v. McDonald's Rest., 2003 U.S. Dist. LEXIS 14108, *4-*6 (D.Conn. 2003).

## B. DUN & BRADSTREET'S DEFERENCE DEMAND.

Dun & Bradstreet claims that it has reviewed and denied the claims it seeks to dismiss in its capacity as plan administrator and is thus entitled under ERISA to prevail unless its denials were arbitrary and capricious. While consideration of how to review plaintiffs' claims on the merits is partially premature, for multiple reasons, plaintiffs respectfully submit that it can be determined, even at this early stage, that they are entitled to a de novo review of all the issues before the Court.

First, under ERISA, to avoid de novo review of plan administrator decisions by the courts, deference must be granted to the plan administrator in the applicable summary plan description with an unequivocal grant. Heidgerd v. Olin Corp., 906 F.2d 903, 908 (2d Cir.1990)(grant of discretion must be in SPD). See also Burke

v. Kodak Retirement Income Plan, 336 F.3d 103, 113 (2d Cir. 2003)(SPD omission of plan requirement renders it inapplicable)(citing Maginaro v. Welfare Fund of Local 771, I.A.T.S.E., 21 F. Supp. 2d 284 (S.D.N.Y. 1998)(omission from SPD of two-year statute of limitations contained in plan renders it unenforceable); Montesano v. Xerox Corp. Retirement Income Guar. Plan, 117 F. Supp. 2d 147, 156 (D.Conn 2000)(SPD controls grant of discretion); James v. New York City Dist. Council of Carpenters' Benefits, 947 F. Supp. 622, 628 (E.D.N.Y. 1996)(absence in SPD of forfeiture provision contained in plan makes provision inapplicable). Moreover, in the event of conflict between language in the plan and language in the SPD, the SPD prevails. Heidgerd v. Olin Corp., 906 F.2d 903, 907-08 (2d Cir. 1990).[2] While the CTP SPD appears to confer discretion on Dun & Bradstreet as plan administrator (Exhibit "A" (CTP SPD at 11)), the MRP SPD, plainly does not. Exhibit "B" (MRP SPD). Accordingly, the MRP plan provisions relied upon by defendant do not apply, and plaintiffs' MRP related claims (Counts Three and Four) must be reviewed de novo.

Second, any deference due a plan administrator following a benefit claim decision assumes there is a timely decision to which deference can be granted. In the

---

[2] The relationship between the SPD and the plan are discussed in detail, infra at 22.

11

present case, however, no timely decision was ever made regarding plaintiffs' Count One claim for severance benefits under Dun & Bradstreet's Career Transition Plan (CTP). Plaintiffs submitted a claim under the CTP which was received on behalf of the Dun & Bradstreet Career Transition Plan on March 18, 2003 and acknowledged to plaintiffs' counsel in a letter dated April 10, 2003. Exhibit "C" (return receipt); Exhibit "D" (letter dated April 10, 2003). Pursuant to 29 C.F.R. §2560.503-1(f)(1)(2003) decisions on employee benefit plan claims must be *communicated* to claimants within 90 days after receipt of the claim. The claims procedure set forth in the Plan is identical. Exhibit "A" (CTP SPD at 14). Under the applicable ERISA regulations, if a plan administrator fails to communicate a decision in the time specified by the regulations, the regulations deem the plan review procedure to be complete and administrative remedies exhausted on the basis that, as a matter of law, "the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." 29 C.F.R. §2560.503-1(l)(2003). On June 30, 2003, after more than 90 days without a response to the CTP claim, plaintiffs' counsel notified Dun & Bradstreet's counsel that plaintiffs deemed their administrative remedies exhausted. Exhibit "E" (letter dated June 30, 2003). Plaintiffs filed their amended complaint adding the CTP claim the same day. Amended Complaint. On August 25, 2003, nearly a month after Dun & Bradstreet had been told plaintiffs had exhausted administrative remedies and

nearly a month after the amended complaint including the CTP claim was filed in court, plaintiffs' counsel received a letter from Dun & Bradstreet's counsel forwarding what he claimed to be a decision on the CTP claim dated June 17, 2003. Exhibit "F" (facsimile cover sheet dated June 17, 2003). The June 17, 2003 letter reflects a decision by the committee, *91* days after receipt of plaintiffs' CTP claims, denying them *in toto*. Exhibit "G" (June 17, 2003 decision). Thus, even assuming without conceding, that the letter is an authentic reflection of the date a decision was made, and, assuming the regulations required merely a *decision* within 90 days and not notice (which they do not), Dun & Bradstreet's decision *91* days after receiving the claim is still untimely. Under ERISA where a plan administrator fails to decide a plan interpretation issue within the time allowed by the plan and the law, the plan is deemed to deny participants a "reasonable claims procedure that would yield a decision on the merits of the claim." Under those circumstances, de novo review is granted to any claim for benefits because no exercise of discretion under the terms of the plan can be deemed to have taken place. "[W]here, according to plan and regulatory language, a claim is 'deemed . . . denied' on review after the expiration of a given time period, there is no opportunity for the exercise of discretion and the denial is reviewed de novo." Jebian v. Hewlett-Packard Co. Emple. Benefits Org. Income Prot. Plan, 310 F.3d 1173, 1177 (9th Cir. 2002); accord, Gilbertson v.

Allied Signal, Inc., 328 F.3d 625, 631 (10th Cir. 2003).[3]

Third, where deference is given by the courts it is given to the body granted discretion in the plan documents (with the SPD controlling any conflict). Where the decision at issue is not made by the entity granted discretion, de novo review is required. Rabin v. Chesebrough-Ponds, Inc., 1991 U.S. Dist. LEXIS 21754 *49 n.2 (D.Conn., June 26, 1991)(citing Soule v. Retirement Income Plan, 723 F.Supp. 1138, 1148 (W.D.N.C. 1989)); Rubio v. Chock Full O'Nuts Corp., 254 F.Supp.2d 413, 423-23 (S.D.N.Y. 2003). With respect to plaintiffs' Count One claim for CTP benefits, it is bad enough that Dun & Bradstreet asks the Court to defer to a decision it made beyond the legal time limits and post-commencement of litigation. Worse yet, however, it asks the Court to defer to a decision made by "Gary Wiklund, Human Resources Consultant" when the CTP Plan vests discretion in "The Board

---

[3] Failure to decide a claim has also been deemed to establish an arbitrary and capricious denial because it demonstrates a failure to provide the full and fair review required by statute. See 29 U.S.C. §1133(2); see also Tholke v. Unisys Corp., No. 01 CV 5495, 2002 U.S. Dist. LEXIS 6658, 2002 WL 575650, at *3 (S.D.N.Y. Apr. 16, 2002); Crocco v. Xerox Corp., 137 F.3d 105, 108 (2d Cir. 1998); Crocco v. Xerox Corp., 956 F. Supp. 129, 138 (D. Conn. 1997), aff'd in relevant part, 137 F.3d 105, 108 (2d Cir. 1998); Neely v. Pension Trust Fund of the Pension, Hospitalization & Benefit Plan of the Elec. Indus., 2003 U.S. Dist. LEXIS 12896, 21-25 (E.D.N.Y. 2003). Courts are also appropriately wary of post hoc, litigation pending, rationales created by administrators to avoid defeat in court. See Bartucca v. Katy Industries, Inc., 1990 U.S. Dist. LEXIS 13958 * (D. Conn. 1990)(deferring to post hoc explanations "diminishes the integrity of the Fund and its administrators.").

of Directors and the Compensation and Benefits Committee". Exhibit "H" (letter dated June 27, 2003); Exhibit "I" (CTP Plan at 3-4). Finally, to add insult to injury, the CTP SPD vests discretion in a third and different body described as "The Executive Compensation and Stock Option Committee of the Dun & Bradstreet Corporation's board of directors" which, in the SPD, delegates its rights to a fourth body, the "Administrative Committee, a committee of management employees of the Dun & Bradstreet Corporation established by the Committee." Exhibit "A" (CTP SPD at 11).[4] Because the CTP claim decision Dun & Bradstreet relies upon was not made by the body delegated discretion in either the plan document or the controlling SPD, no discretionary decision was made in accordance with the plan documents and, for this additional reason, compounded as it is with several layers of impropriety, de novo review of plaintiffs' CTP claims is appropriate.[5]

Fourth, consistent with the principle that deference is afforded because plan "interpretation" is involved, no deference is given to decisions involving the application of unambiguous plan language:

> However, even though a plan may give the administrator or fiduciaries discretion to interpret the terms of the plan generally, where the

---

[4] Unlike the CTP plan document (Exhibit "I" (CTP at 3, Section 4.2)) the SPD (which controls) expressly makes a delegation of authority and contains no provision for further delegation.

[5] Because the MRP SPD contains no grant of deference, analysis of the MRP decision under this rule is not necessary.

specific section at issue contains categorical language which requires no exercise of discretion, the Court may use a de novo standard to review the fiduciaries' application of that section. See, Heidgerd v. Olin Corp., 906 F.2d 903, 908-909 (2d Cir. 1990). As the Second Circuit held in O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc., 37 F.3d 55, 59 (2d Cir. 1994), where "plan language categorically states that certain benefits will be provided, de novo review is appropriate because unambiguous language leaves no room for the exercise of discretion."

Boesel v. Chase Manhattan Bank, N.A., 62 F. Supp. 2d 1015, 1029 (W.D.N.Y.1999). In the present case, no exercise of discretion is at issue. As will be demonstrated below, the summary plan language of the Dun & Bradstreet Career Transition Plan unambiguously entitles plaintiffs to benefits. The adequacy of the MRP SPD is a matter of law, not plan interpretation, and plainly the legality of the interest rate applied is also a question for the courts, not a claim under the terms of the plan requiring interpretation by the plan administrator. Accordingly, the absence of ambiguous plan terms to be interpreted is another reason why de novo review is called for in the present case.[6]

Fifth, de novo review is specifically required where the decision turns on a question of law. Weil v. Retirement Plan Admin. Comm. of the Terson Co., Inc., 913 F.2d 1045, 1049 (2d Cir. 1990)(holding that even when a plan gives trustees

---

[6] As will be demonstrated below, deference is granted to a plan administrator's interpretation of ambiguous plan language under abuse of discretion review, but, under de novo review, conventional canons of construction call for them to be construed against their drafter.

discretionary authority, a reviewing court should apply a de novo standard of review where eligibility turns on a question of law). See also Board of Trustees of the Equity-League Pension Trust Fund v. Royce, 1999 U.S. Dist. LEXIS 11927 (S.D.N.Y. 1999)(citing Weil). Accordingly, the question whether the MRP SPD complies with ERISA §102 (Count Three) and whether the MRP interest rate violates ERISA §206 (a) and its regulations and causes and ERISA §203 forfeiture (Count Four) are questions that must be reviewed de novo.

Finally, no deference is given to a plan administrator whose interpretation of plan documents is affected by a conflict of interest. The courts have recognized that since discretionary authority is a self-serving right, deference should not be afforded where the decision-maker is operating under a conflict of interest. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989)("if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there has been an abuse of discretion."). In this circuit, a conflict of interest results in a de novo review based upon a two-prong test for determining the proper level of deference to accord the plan administrator:

> First, whether the determination made by the administrator is reasonable, in light of possible competing interpretations of the plan; [and] second, whether the evidence shows that the administrator was in fact influenced by such conflict. If the court finds that the administrator was in fact influenced by the conflict of interest, the

deference otherwise accorded the administrator's decision drops away and the court interprets the plan de novo.

Sullivan v. LTV Aero. & Defense Co., 82 F.3d 1251, 1255-56 (2d Cir. 1996).[7] The Second Circuit has yet to adopt a standard governing what must be shown in order to prove a causal relationship between the conflict and the decision. However, courts that have set such a standard have required only that a plaintiff show: "that the conflict or procedural irregularity has some connection to the substantive decision

---

[7] It was considered to be equally serious as an issue before the 1996 adoption of the present standard:

> In applying the arbitrary and capricious standard in this action, the Court will take into account the fact that Chemicals avoided a significant payment when it rejected the claim made against the unfunded severance plan. As explained in Jung v. FMC Corp., 755 F.2d 708, 711 (9th Cir. 1985): "Where, as here, the employer's denial of benefits to a class avoids a very substantial outlay, the reviewing court should consider that fact in applying the arbitrary and capricious standard of review. Less deference should be given to the trustee's decision." We cannot ignore completely Chemicals' interest in denying the payment when that fact could reflect on whether the denial was made in good faith.

Bennett v. Gill & Duffus Chemicals, Inc., 699 F. Supp. 454, 457 (U.S. Dist. , 1988).