reached.'" Woo v. Deluxe Corp., 144 F.3d 1157, 1161 (1998).[8] Whether Dun & Bradstreet's denial of benefits was influenced by its enormous financial stake in the outcome cannot be decided on a motion to dismiss and in the absence of discovery. Suozzo v. Bergreen, 2002 U.S. Dist. LEXIS 11726 (S.D.N.Y. 2002)("It cannot be decided as a matter of law on this motion to dismiss that there was no conflict that affected some or all of the Committee's decision."); Nagele v. Electronic Data Systems Corp., 193 F.R.D. at 103-104 (W.D.N.Y. 2000)("The mandate of ERISA that denials of claims by plan fiduciaries be reviewed by federal courts could not have been carried out effectively without benefit of . . . discovery."); Harris v. Rueben H. Donnelly, 2000 U.S. Dist. LEXIS 17911, 24-25 (S.D.N.Y. 2000)("Even if the Court were to find that the plan(s) governing Plaintiff's benefits contained discretionary authority' language, Plaintiff may be entitled discovery to determine if Met Life's decision to deny her benefits was influenced by a conflict of interest."). Accordingly, in the present case, if all plaintiffs' other grounds for de novo review fail, they are entitled to discovery on the conflict of interest issue before the Court finally determines the standard of review.

---

[8] Other circuits follow variations on the same approach, either granting de novo review if the conflict influenced the decision or simply granting less and less deference based upon the magnitude of the conflict. See e.g. Doe v. Group Hospitalization & Medical Services, 3 F.3d 80 (4th Cir. 1993)(less deferential review); Sweatman v. Commercial Union Ins. Co., 39 F.2d 594, 599 (5th Cir. 1994)(heightened scrutiny); Woo, 144 F.3d at 1161.

## IV. DUN & BRADSTREET'S INADEQUATE SUMMARY PLAN DESCRIPTION.

## A. OVERVIEW.

For purposes of the pending motion, Dun & Bradstreet admits that by illegally juggling its corporate affairs it saved millions of dollars at the expense of a large group of long-time employees whose early retirement benefits it slashed by as much as one third of their value. Dun & Bradstreet now asks the Court's to make it possible for it to get away with this scheme even if it also broke the law by keeping secret the plan provisions responsible for the extent of plaintiffs' losses. Specifically, despite ERISA's fundamental commandment that companies tell employees what their benefits are in a SPD written in plain English, Dun & Bradstreet asks the Court to declare "reasonable as a matter of law", its decision to omit for so-called "unsubsidized" retirements a benefit explanation like a simple chart illustrating benefit reduction percentages when, a few pages away it used precisely such a chart to illustrate benefit reduction percentages for its so-called "subsidized" retirements, leaving every Dun & Bradstreet SPD reader knowing that a Dun & Bradstreet employee retiring at age 55 can receive 70% of his normal retirement benefits, but leaving an ex-Dun & Bradstreet employee seeking his retirement at the same age and with the same years of service knowing only that his retirement percentage will be "lower" than that of the active employee. How much lower? Dun & Bradstreet

20

claims, regardless of circumstances, SPD readers have no right to know how much they lose for retiring after leaving the company.

### B. AN SPD CANNOT COMPLY WITH ERISA AND CONCEAL THE AMOUNT OF BENEFITS PROVIDED.

A former Dun & Bradstreet employee and plan participant cannot read the MRP SPD and find out what his age 55 retirement benefit is even though a similarly situated current Dun & Bradstreet employee can easily do so. The SPD at issue in the present case fails the most basic test for compliance with the law: it does not inform participants what their benefits are.

Adequate disclosure to employees is the sole purpose of SPD's and one of the major purposes of the ERISA statute as a whole. Burstein v. Ret. Account Plan for Emples. of Allegheny Health Educ. & Research Found., 334 F.3d 365, 378 (3d Cir. Pa. 2003)(citing Barker v. Ceridian Corp., 122 F.3d 628, 633 (8th Cir. 1997) ("Summary plan descriptions are considered part of ERISA plan documents. . . . Adequate disclosure to employees is one of ERISA's major purposes. . . . Because of the importance of disclosure, in the event of a conflict between formal plan provisions and summary plan provisions, the summary plan description provisions prevail.")). "The primary method by which an employer communicates to its employees with respect to an ERISA welfare plan is through a summary plan description, Moore v. Metropolitan Life Ins. Co., 856 F.2d 488, 492 (2d Cir.

1988), which 'must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries' with respect to a plan's provisions. 29 C.F.R. § 2520.102(b)." James v. New York City Dist. Council of Carpenters' Benefits Funds, 947 F. Supp. 622, 628 (E.D.N.Y. 1996). The centrality of the SPD to the ERISA statutory scheme and the care with which an SPD must be crafted has been thoroughly explained by the Second Circuit:

> ERISA requires that the participants and beneficiaries of any employee benefit plan be provided with a summary plan description ("SPD"), a thorough and easy to understand summary of the benefit plan. 29 U.S.C. § 1022(a). The SPD must be "written in a manner calculated to be understood by the average plan participant" and must "be sufficiently accurate and comprehensive to apprise such participants and beneficiaries of their rights and obligations under the plan." Id. ERISA "contemplates that the summary [plan description] will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary." Heidgerd v. Olin Corp., 906 F.2d 903, 907-08 (2d Cir. 1990).
>
> Generally, for a SPD to meet the disclosure requirements of 29 U.S.C. § 1022, "the limitation or elimination of technical jargon and of long, complex sentences [and] the use of clarifying examples" is required. 29 C.F.R. § 2520.102-2(a). The SPD must include, among other things, a description of the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b); *see also* 29 C.F.R. § 2520.102-3(l) (an SPD must contain "a statement *clearly identifying* circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture or suspension of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of the description of benefits") (emphasis added). Regulations promulgated under ERISA prescribe the format of a SPD.

> The format of the summary plan description must not have the effect [of] misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, [or] restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant . . . [and] shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. 29 C.F.R. § 2520.102-2(b); see also Chambless v. Masters, Mates & Pilots Pension Plan, 772 F.2d 1032, 1040 (2d Cir. 1985) (requiring SPD to explain "full import" of provisions affecting employee); Pompano v. Michael Schiavone & Sons, Inc., 680 F.2d 911, 914 (2d Cir. 1982) (stating that the plan at issue "was written up in summary form in simple and unmistakable language easy enough for the average plan participant to be reasonably appraised of his rights and obligations under the Plan."). In analyzing Layaou's claim, we are mindful that Congress intended that ERISA function as a comprehensive remedial statute designed to safeguard pension benefits. See Geller v. County Line Auto Sales, 86 F.3d 18, 22 (2d Cir. 1996) (citing 29 U.S.C. § 1001) (statement of Congressional purpose).

Layou v. Xerox Corp., 238 F.3d 205, 209-10 (2d Cir. 2001).

SPD language that "obscures" or tends to "minimize" benefit limitations is prohibited by ERISA. Burke v. Kodak Retirement Income Plan, 336 F.3d 103, 110 (2d Cir. 2003). The "full import" of benefit-related consequences must be set forth or an SPD will be deemed out of compliance with ERISA. Chambless v. Masters, Mates & Pilots Pension Plan, 772 F.2d 1032, 1040 (2d Cir. 1985); Layou v. Xerox Corp., 238 F.3d at 211 (citing also, Bowerman v. Wal-Mart Stores, Inc., 226 F.3d 574, 587 (7th Cir. 2000) (holding that because "the explanations provided in the SPD . . . did not provide the critical information needed by employees in [plaintiff's] circumstances[,] . . . the [ ] SPD lacked the clarity and completeness

23

required by § 1022")).

Despite ERISA's mandate concerning SPD's Dun & Bradstreet argues it has fulfilled its duties as a matter of law. Dun & Bradstreet characterizes plaintiffs' claim as a demand that the MRP actuarial assumptions be set forth in the plan's SPD. Dun & Bradstreet claims, however, that it is not required to set forth actuarial assumptions in the plan, and, thus, it has no obligation to summarize the information in the SPD. For support, Dun & Bradstreet looks to Stamper v. Total Petroleum, Inc., 188 F.3d 1233 (10th Cir. 1999). In Stamper, the Tenth Circuit concluded that there is no ERISA relief for a plan's violation of Internal Revenue Code ("Code") provisions and regulations that require plans to set forth actuarial assumptions in plan documents. Id. at 1239-40. See 26 U.S.C. §401 (a)(25); 26 C.F.R. §1.401-1 (b)(1)(i). According to the Stamper Court, this is so because the Code requirements are not explicitly imposed upon plans by the text of ERISA and, thus, plan participants suing under ERISA cannot claim that plan administrators are bound to administer the plans in accordance with Code requirements. Dun & Bradstreet's reliance upon Stamper fails, however, because Dun & Bradstreet ignores that, in its case, the plan document itself requires the company to administer the MRP plan in accordance with the Code provisions:

> 20.7 The Plan shall be administered in accordance with the requirements of ERISA and the Code as the same shall be interpreted by the applicable United States agencies and the

court.

Exhibit "J" (MRP at 96). Having chosen to impose the requirements of the Code and its regulations upon itself in the governing plan document, Dun & Bradstreet can hardly argue now that it is freed by the <u>Stamper</u> decision from carrying out its freely adopted contractual obligations.

<u>Stamper</u> would also be inapplicable for several other reasons. First, the language at issue in the present case, describing benefits as "reduced actuarially", is considerably less forthcoming than <u>Stamper</u>'s language relying upon "standard tables", and the <u>Stamper</u> court never addressed whether language like Dun & Bradstreet's, or even the "standard tables" language before it, could, *regardless of the Code*, satisfy ERISA §102's mandate of a thorough and easy to understand summary of the benefits provided by the plan. Second, Dun & Bradstreet presents an entirely false dilemma based upon <u>Stamper</u> because Dun & Bradstreet claims that the actuarial assumptions of the MRP are, in fact, contained in the MRP plan document. Op.Br. at 12 n.8. Again, *regardless of the Code requirements*, Dun & Bradstreet, having included the actuarial assumptions in the plan document, cannot now use <u>Stamper</u> to avoid summarizing in an SPD what it chose to include in the plan document. Third, the <u>Stamper</u> court itself readily admits that its view of ERISA has not been adopted by other courts. <u>Id</u>. at 1239 n.5 (citing <u>Kiefer v. Ceridian Corp.</u>, 976 F. Supp. 829 (D. Minn. 1997); <u>Czyz v. General Pension Bd., Bethlehem</u>

25

Steel Corp., 578 F.Supp. 126 (W.D. Pa. 1983). See also <u>Lyons v. Georgia-Pacific Corp. Salaried Employees Retirement Plan</u>, 66 F. Supp. 2d 1328 (N.D. Ga. 1999)(applying Treas. Reg. §1.411 (a)-11 under ERISA). <u>Stamper</u>'s view has not been adopted by the Second Circuit and would almost certainly be rejected by it. See <u>Esden v. Bank of Boston</u>, 229 F.3d 154, 158-9, 166 (applying several Code provisions through ERISA, explaining Treasury authority over ERISA and noting the subject plan's compliance with Code section 401 (a)(25)).

The MRP summary plan description amply illustrates that Dun & Bradstreet knew what it should disclose to plan participants about early retirement, how to disclose it and how to illustrate it in a manner calculated to be understood by the average plan participant. The MRP SPD sets forth in a simple table the reduction to a current employee's normal pension benefit that occurs when the employee chooses early retirement. The table shows the percentage of a normal retirement pension that participants will receive if they choose to retire at any given age between 55 and 65. In contrast, for former employees (vested annuitants), the same document states merely that a benefit "reduced actuarially" will be made and that a former employee's early retirement will be "lower" than a current employee's early

retirement.[9] Depending upon a variety of factors including discount rates employed, benefits can be "reduced actuarially" by a small fraction or to nothing.[10] Dun & Bradstreet's omission is made worse by the simplicity of compliance. Dun & Bradstreet had prepared for its own use a reduction table in the same format as the early retirement chart used and published in the SPD for current employees. Dun & Bradstreet offers the Court no explanation why it omitted the chart from the SPD and why, omitting the chart, the SPD includes no statement, table or illustration of any kind to explain the extent of the actuarial reduction applicable to former employees seeking early retirement benefits. Dun & Bradstreet does not even defend why it did not, at a minimum, take the slightly more helpful but still inadequate step of at least informing SPD readers that they could determine the extent of the actuarial reduction by reading the plan. In the absence of any explanation, the information provided vested annuitants can hardly fulfill ERISA's requirement that the information be "comprehensive" and "easy to understand", nor can the

---

[9] Contrary to defendant's brief (at 12) the words used in the SPD "reduced actuarially" are not only undefined in the SPD (the only place that counts for participants) but are undefined in the plan, which refers instead in Section 1.1 to "Actuarial equivalence" and "similar" terms such as "Actuarial Equivalent" and "Equivalent Actuarial Value" all of which require conformity to professional actuarial standards that would render the two things calculated as equivalent.

[10] The word "actuarially" means nothing more than "relating to statistical calculation especially of life expectancy". Webster's New Collegiate Dictionary (1977).

information be deemed to explain, as it must, the "full import" of the difference between early retirement for former employees and early retirement for current employees. A reasonable plan participant could look only to the one early retirement chart contained in the plan and expect his benefit was lower but close to what was set forth therein. Indeed, such an assumption would be perfectly reasonable given that Dun & Bradstreet also does not reveal anywhere in the SPD that early retirement for current employees is "subsidized" (not reduced to the present value of normal retirement) and that retirement benefits for former employees at the same time and the same age is not subsidized and thus is dramatically lower (70% vs. 38% at age 55). Accordingly, plaintiffs respectfully submit that benefit reductions for vested MRP annuitants seeking early retirement were inadequately disclosed in the plan's SPD.

Benefit reductions not adequately disclosed in a SPD cannot be enforced. In Burke v. Kodak Retirement Income Plan, 336 F.3d 103, 110 (2d Cir. 2003) the Second Circuit considered pension plan SPD language related to survivor benefits for domestic partners. The District Court held that Kodak's reference to the required filing of domestic partner affidavits for other benefits, its inclusion of the requirement at issue in the plan document and its inclusion of the requirement in a company newsletter permitted the company to enforce the requirement against the plaintiff, depriving her of survivor benefits. Id.105-7. Reversing and directing

judgment for the plaintiff, the Second Circuit ruled that ERISA prohibited enforcement of the affidavit requirement because only a SPD disclosure can satisfy the statute, and while contained in other sections of the SPD, the affidavit requirement was omitted from the section governing survivor benefits and failed, in the alternative, to refer the reader to the other SPD sections where the requirement was set forth. Id. at 110-11. Providing the missing information, the Court observed, would have required minimal diligence and effort from the plan administrator and would have eliminated guesswork by participants. Id. at 111. Settling a long standing question, the Court also ruled that plan participants can prevail in cases challenging flawed SPDs without proving reliance upon the flawed document. Id. at 112-14.[11] In Leyda v. AlliedSignal, 322 F.3d 199 (2d Cir. 2003) the Court of Appeals considered a District of Connecticut decision related to a plan's failure to disclose a reduction in life insurance coverage. Id. at 201-3. The Court of Appeals upheld the District Court's decision awarding a plan participant's widow the larger amount of benefits she thought she would receive based upon prior disclosures and refusing to enforce the new summary plan description containing the reduction because the company made inadequate efforts to distribute the SPD to plan participants. Id. at 201. Other Courts have routinely refused to enforce benefit

---

[11] Instead the Court merely requires a showing of prejudice, meaning "likely harm". Id. at 113.

reductions and limitations where they have not been adequately disclosed in the applicable SPD. "The SPD does not inform employees of the 'circumstances which may result in disqualification, ineligibility, or loss of benefits,' 29 U.S.C. § 1022(b) -- one of the primary concerns sought to be remedied by ERISA's disclosure requirements. Accordingly, the SPD is inaccurate and inconsistent with the language of the Plan, and Defendant is estopped to rely on the Plan in denying Plaintiff benefits." Moriarity v. United Technologies Corp., 947 F. Supp. 43, 52 (D.Conn. 1996)("It is the employer, not the employee, who must bear the cost of a poorly drafted SPD"); Jensen v. SIPCO, Inc., 867 F.Supp. 1384, 1391 (N.D. Iowa 1993)("If the SPD does not contain a benefit forfeiture clause, then such a forfeiture will not be enforced against a participant."(Citing Hillis v. Waukesha Title Co., Inc., 576 F. Supp. 1103, 1109 (E.D. Wis. 1983); Eardman v. Bethlehem Steel Corp., 607 F. Supp. 196, 209-214 (1984)). See also Veilleux v. Atochem North Am. Inc., 929 F.2d 74, 76 (2d Cir. 1991) (per curiam) (quoting Gilbert v. Burlington Indus., Inc., 765 F.2d 320, 328-29 (2d Cir. 1985), aff'd, 477 U.S. 901, 106 S. Ct. 3267, 91 L. Ed. 2d 558 (1986)); Clark v. Bank of New York, 801 F. Supp. 1182, 1195-1196 (S.D.N.Y. 1992)(inadequate disclosures make benefit denials arbitrary and capricious).

Plaintiffs respectfully represent that Count Three of their Amended Complaint clearly states an adequate claim under ERISA. Accordingly, defendant's motion to

dismiss Count Three should be denied.

## V. PLAINTIFFS' INTEREST RATE CLAIM.

Dun & Bradstreet also moves to dismiss Plaintiffs' Count Four, arguing that the 6.75% interest rate it uses when reducing normal retirement benefits to early retirement benefits is "reasonable as a matter of law." Op. Br. at 17.

The starting point for all pension calculations in a defined benefit is the normal retirement benefit provided under the plan. Esden v. Bank of Boston, 229 F.3d 154, 159 (2d Cir. 2000). Any distribution in an alternative form whether as a lump sum or an early retirement benefit must be the actuarial equivalent of normal retirement. Id. In short, to calculate an early retirement benefit one starts with the normal retirement benefit and actuarially reduces it to reflect its earlier commencement. This is accomplished using mortality tables and interest rates. When an interest rate is used as a discount factor, the higher the rate used, the smaller the resulting payment. District 65, UAW v. Harper & Row Publishers, Inc., 696 F. Supp. 29, 31 (S.D.N.Y. 1988).[12] For lump sum payment calculations the interest rate assumptions are dictated by IRS Code §417 (e)(3) to be: "the annual rate of interest on 30-year Treasury securities for the month before the date of distribution or such other time as the Secretary may by regulations prescribe." Id. For

---

[12] The Harper & Row case, a challenge to lump sum discount rates, was decided before adoption of the current interest rate rules. Id. (citing 29 CFR §2619.26).

31

calculating actuarially equivalent early retirement benefits, however, the existing regulations prescribe only that adjustments to plan benefits in excess of reasonable actuarial reductions can result in rights being forfeitable. 26 C.F.R. 1.411 (a)-4.

The choice of interest rate used in discounting can have a substantial dollar impact on both plan participants and plan sponsors. Plaintiffs expect to offer expert testimony that the choice of interest rate can reduce the value of an individual pension by thousands of dollars, and commensurately reduce a plan sponsor's financial outlay by millions. See Esden supra at 161 (dispute had enormous impact on cash balance plan funding despite individual forfeiture of $61.54).

While defendants correctly point out the lack of authorities ruling upon the reasonableness of discount rates used for early retirement purposes, courts have considered the reasonableness issue with respect to lump sums and have reached conclusions only following intensive analysis of expert testimony for market rates. See e.g. District 65 UAW v. Harper & Row Publishers, Inc., 696 F. Supp. 29, 37 (S.D.N.Y. 1988)(denying summary judgment); Dooley v. American Airlines, Inc., 1993 U.S. Dist. LEXIS 15667 (N.D. Ill. 1993)(granting summary judgment). Most important, no court has ruled that a reasonableness analysis can be ruled on as a matter of law. Indeed, plaintiffs would assume that the lack of applicable precedents concerning early retirement benefits militates strongly against deciding on the reasonableness of interest rates as a matter of law.

Dun & Bradstreet's arguments about how its 6.75% rate compares with judicially noticeable interest rates only makes a ruling as a matter of law more obviously inappropriate. Can the Court determine as a matter of law that the standard interest rate used by the IRS for judging whether a plan discriminates in favor of highly compensated employees serves the same purpose and is equally useful actuarially in reducing normal retirements to early retirements? See Op. Br. at 19. Plaintiffs contend this analogy is not actuarially useful to the Court and will present expert testimony to prove it is not so. Worse yet, Dun & Bradstreet's analysis of the interest rate issue twists an otherwise appropriate comparison to the discount rate required for lump sum conversions - the IRS Code §417 (e)(3) mandated rate of: "the annual rate of interest on 30-year Treasury securities for the month before the date of distribution or such other time as the Secretary may by regulations prescribe." After correctly reporting the IRS standard, Dun & Bradstreet supplies the Court with publicly available data showing rates not following that standard - using instead an *average* of 30-year Treasury rates for a 15-year and 25-year period, ending inexplicably on December 31, 2002. Had it reported the *current* annual rates as required by IRS Code §417 (e)(3) (which is what matters since none of plaintiffs have yet retired), Dun & Bradstreet would be comparing its 6.75% rate with a far less flattering rate of roughly 5.13%. Indeed, today's remarkably low rates and the changes that have occurred in rates over the last 15-20 years only

illustrate the impossibility of keeping a plan established interest rate both fixed and reasonable over long periods of time. Dun & Bradstreet did the Court no service by presenting the numbers it did without justifying why they have a bearing on the Court's decision.[13]

Dun & Bradstreet's arguments in favor of a judgment as a matter of law on plaintiffs' interest rate claim only highlight why such a judgment is inappropriate. Plaintiffs respectfully submit that the reasonableness of Dun & Bradstreet's interest rate cannot be determined without factual development and an opportunity for expert testimony. Accordingly, Dun & Bradstreet's motion to dismiss Count Four should be denied.

## VI. PLAINTIFFS' CLAIM FOR CTP SEVERANCE BENEFITS.

In Count One, plaintiffs claim they are entitled to Career Transition Plan ("CTP") benefits because they were involuntarily terminated from employment by reason of job elimination and because their jobs, while eliminated in connection with a sale, were not eliminated in connection with a sale to one of Dun & Bradstreet's nineteen "Participating Companies" or an offer of employment within one. Despite having received precisely the same claim from plaintiffs as an administrative demand

---

[13] Dun & Bradstreet also overlooks that its additional claim that favorable IRS determination letters can be used to shield it from liability was clearly rejected by the Second Circuit in Esden v. Bank of Boston, 229 F.3d 154, 175-76 (2d Cir. 2000).

in March 2003, Dun & Bradstreet's brief, like its belated administrative decision, simply ignores the fact that the cited exceptions apply only to transactions with Participating Companies - a group which indisputably does not include the acquiring company in the present case, RMS Corp. See Exhibit "K" (March 12, 2003 administrative claim); Exhibit "F" (Letter dated June 17, 2003). By failing repeatedly to address the substance of plaintiffs' claim, Dun & Bradstreet fails to provide the Court information useful to the decision that it must make on Count One of Plaintiffs' complaint.

The Amended Complaint and the statement of facts above set forth the applicable CTP plan language in complete detail. At issue in Count One is whether the terminated plaintiff Dun & Bradstreet employees did not experience an "Eligible Termination" because they lost their jobs in connection with a sale and received jobs at RMS Corp. upon termination. The plan language directly addresses exceptions to termination benefits for employees involved in a sale or employees offered positions elsewhere upon termination. According to the pertinent part of the SPD, an "Eligible Termination shall not include (3) a termination as a result of a sale (whether in whole or in part, of stock or assets), merger or other combination, spinoff, reorganization or liquidation, dissolution or other winding up or other similar transaction *involving a Participating Company*; or (4) any termination where an offer of employment is made to the Eligible Employee of a comparable position

*at a Participating Company* concurrently with his or her Eligible Termination."(emphasis added).[14] The plan provides thus that where one of the Dun & Bradstreet companies engages with a Participating Company in any of the transactions enumerated in CTP subsection 3, including a sale, Dun & Bradstreet employees get no termination benefits regardless whether the deal yields them an offer of employment or not, and, if a termination from Dun & Bradstreet does yield an offer of employment in a comparable position at a Participating Company, Dun & Bradstreet employees get no termination benefits regardless of the nature of the transaction. Dun & Bradstreet thereby provides for two likely scenarios among Participating Companies: (1) where the agglomeration amassed by Dun & Bradstreet is reorganized or those spun in are spun back out, and (2) where employees of one Dun & Bradstreet owned company are shifted to another one. The pivotal fact is that, in both cases, whatever the transaction is, it must involve a Participating Company. The CTP plan document defines "Participating Company" as including:

> ...the Company or any other affiliated entity more than 50% of the voting interest of which are owned, directly or indirectly, by the Company and which has elected to participate in the Plan by action of its board of directors.

Exhibit "I" (CTP Plan). More important for ERISA purposes, the CTP SPD defines "Participating Companies" by attaching a schedule listing the Participating

---

[14] The CTP plan and its SPD contain identical definitions of "Eligible Termination". Compare Exhibit "I" (CTP at 1-2) with Exhibit "A" (CTP SPD at 2).