Companies. Exhibit "A" (CTP SPD). On the date plaintiffs' employment was terminated by Dun & Bradstreet, RMS Corp., the entity involved in the transaction with Dun & Bradstreet, did not enjoy "affiliated entity" status with Dun & Bradstreet and had not "elected to participate in the Plan by action of its board of directors", but, instead, when incorporated in April 2001, RMS Corp. was (according to both plaintiffs and defendant) not owned directly or indirectly by Dun & Bradstreet but was owned privately by persons employed in RMS work at the company. <u>Amended Complaint</u> ¶80. RMS Corp. is not listed as a Participating Company in the CTP SPD either. Under both the plain language of the CTP plan document and the plain language of the CTP SPD, RMS Corp. is not a Participating Company for CTP purposes and neither the sale of RMS operations to it nor the plaintiffs' receipt of employment from it bring their terminations under the exceptions listed to "Eligible Terminations."[15] Accordingly, plaintiffs respectfully submit that the plain language of the CTP plan entitles them to CTP benefits.

Dun & Bradstreet nevertheless argues plaintiffs should not be granted CTP based upon what is sometimes called the "Sale of Business Rule". According to Dun & Bradstreet, plaintiffs are not entitled to benefits under the CTP because, following the sale of the RMS business, they did not suffer unemployment:

---

[15] Even if it could be argued that there is a conflict between the CTP plan and the CTP SPD, the SPD, which is most favorable to plaintiffs of the two, must prevail. See <u>supra</u> at 22.

37

> Nonpayment of severance in the context of a sale is consistent with the purpose of the severance plan to provide assistance to employees whose employment terminates and who find themselves temporarily without compensation due to circumstances beyond their control. Assistance is not required where, as in the instant Claim, employees do not incur an interruption in their compensation after the sale of a business.

Op. Br. at 27 (quoting Exhibit "F" (letter dated June 17, 2003)). According to Dun & Bradstreet, this view has been endorsed by the Second Circuit: "Similar determinations have been repeatedly upheld in this Circuit as reasonable." Id. (citing Schwartz v. Newsweek, 827 F.2d 879 (2d Cir.1987); Reichelt v. Emhart Corp., 921 F.2d 425 (2d Cir. 1990); Accardi v. Control Data Corp., 836 F.2d 126 (2d Cir. 1987)). However, the cases cited by Dun & Bradstreet are inapposite.

The employer in Schwartz v. Newsweek, 827 F.2d 879 (2d Cir. 1987) did provide severance benefits to plaintiffs but the benefits were to be paid only if plaintiffs were terminated from successor employment within three months of termination from Newsweek, and plaintiffs were terminated nine months after commencing successor employment. Id. at 880-81. Having held that the policy was adopted and publicly announced as an interpretation of a published supervisor's manual in order to make supervisor benefits equal to union benefits, the Court, reviewing only under the arbitrary and capricious standard, held that Newsweek's interpretation did not abuse its discretion. Id. at 882. In Reichelt v. Emhart Corp., 921 F.2d 425 (2d Cir. 1990), it was conceded that the severance benefits sought

were expressly excluded by the plan in force during plaintiffs' termination, but plaintiffs claimed they were entitled to benefits consistent with pre-plan practices anyway because they had acquired vested rights to the benefits that barred defendant's substitution of a less favorable severance plan. Id. at 427-429. In light of the well-established rule that severance benefits (being "welfare benefits") do not vest and can be modified or terminated at will, the Court held plaintiffs' claims were properly denied. (2d Cir. 1990). In Accardi v. Control Data Corp., 836 F.2d 126 (2d Cir. 1987) the severance plan at issue explicitly listed three narrow and exclusive grounds upon which separation pay would be granted and they did not include termination upon a sale: (1) voluntary resignation, (2) mutual agreement resignation, and (3) dismissal - defined as discharge for cause. Id. at 128. Moreover, the Court found the company's obligation to pay severance in any given case was discretionary, not automatic. Id. Ultimately, the Court reached the limited conclusion that, regardless of the fact that "other interpretations may also be plausible" the plan administrator's interpretation was not arbitrary and capricious.

Id. at 129.[16]

In addition to relying upon inapplicable decisions, Dun & Bradstreet ignores the applicable case law. In Heidgerd v. Olin Corp., 906 F.2d 903 (2d Cir. 1990), the Second Circuit faced circumstances far more similar to those in the present case than the cases relied upon by Dun & Bradstreet. Plaintiffs in Heidgerd lost their Olin employment when Olin sold plaintiffs' division to U.S. Repeating Arms Company. Like Dun & Bradstreet's plan, Olin's severance plan was not silent about severance and the sale of operating units. Like Dun & Bradstreet's plan, in cases where an operating unit was sold, Olin's plan granted severance benefits, but made a limited exception. While in Dun & Bradstreet's case, the exception concerns sales involving Participating Companies, in Olin's case, where an offer of employment is made at the acquiring company, the exception modifies the general grant as follows: "you won't be eligible for severance payments if you decide to leave [the acquiring company] instead". Id. at 909. The Second Circuit agreed with the District of Connecticut, rejecting Olin's argument that the modifying language

---

[16] Other cases sometimes cited for this proposition are equally inapplicable here. Sly v. P.R. Mallory & Company, Inc., 712 F.2d 1209, 1212-13 (7th Cir.1983)(plan specifically referred to reduction in force layoffs and benefits were subject to individual approval.); Holland v. Burlington Indus., 772 F.2d 1140, (4th Cir. 1985)(plan addressed, not loss of employment at company, but "job elimination" which court deemed did not happen)(Dun & Bradstreet agrees plaintiffs' jobs were "certainly eliminated". Op.Br.at 27); Jung v. FMC Corp., 755 F.2d 708, 712 (9th Cir. 1985)(plan explicitly applied to "Lay-Off" and termination caused by "lack of work").

assumes that it would not pay benefits to those accepting employment offers (because they had not lost their jobs), instead holding the plan language entitled plaintiffs to benefits even if they continued in employment without interruption. Id. at 906-7. Moreover, while granting de novo review because, like the CTP SPD, the Olin plan SPD did not confer discretion on the company, the Court of Appeals also held plaintiffs would be entitled to benefits because Olin's failure to consider plaintiffs' reliance claim meant Olin's resolution of the claim was not "a reasonable resolution of the controversy and thus was arbitrary and capricious." Id.[17] On remand to consider the remaining issue of whether SPD reliance was required, the District of Connecticut held it was not and rendered summary judgment for the plaintiffs. O'Connell v. Olin Corp., 1991 U.S. Dist. LEXIS 19824 (D.Conn., May 2, 1991).

In Blau v. Del Monte Corp., 748 F.2d 1348 (9th Cir. 1984) plaintiffs were employed by a Del Monte subsidiary (Granny Goose) that was sold as a going concern to a group of private investors. Id. at 1351. All plaintiffs became employees of the new operations, suffering no interruption of employment. Id. Del Monte's undisclosed "Separation Allowance Policy" provided severance pay when jobs are

---

[17] Similarly, here, Dun & Bradstreet's refusal to address the substance of plaintiffs' claims would render its refusal to grant benefits arbitrary and capricious if, not withstanding plaintiffs' claims for de novo review, such was deemed the applicable standard. See also Bartucca v. Katy Indus., Inc., 1990 U.S.Dist. LEXIS 13958 *8-*12 (D.Conn., July 12, 1990)(denying summary judgment for lack, *inter alia*, of a full and fair review).

"eliminated" and "alternative employment opportunities are unavailable within the Corporation." Id. at 1354. When plaintiffs filed a claim for benefits, Del Monte, like Dun & Bradstreet, ignored the claim until a suit was filed. Id. at 1351. Once in court, like Dun & Bradstreet, Del Monte argued, *inter alia*, that the plan should not pay benefits because plaintiffs suffered no loss of income. Compare, Op. Br. at 27 with Blau, 748 F.2d at 1354-55. The Court of Appeals sharply disagreed:

> Del Monte imposed several standards not required by the severance policy. The plan provides for severance pay when jobs are *"eliminated"* and "alternative *employment opportunities are unavailable within the Corporation."* (emphasis supplied). The plan does not condition receipt of severance benefits upon elimination of positions from the face of the earth, but upon job elimination and unavailability of "appropriate alternative employment opportunities within *the Corporation."* (Emphasis supplied). The plan does not condition receipt of benefits upon employees' subsequent unemployment, but upon job "elimination". The plan does not condition receipt of benefits upon failure of a successor corporation to offer employees jobs after their employment with Del Monte ceases, but upon job "elimination."

748 F.2d at 1354-55. Reversing summary judgment, the Court declared that it would decline to enforce what it describes as Del Monte's "secret purpose" that "its severance benefit policy was to benefit only those employees who were without a job of any kind after termination." Id. at 1355. Consistent with plaintiffs' assertions here, the Del Monte Court noted that the company's contention was badly undercut by the undeniable fact that benefits would be granted in the absence of a sale where an employee was laid off but managed on his own to secure immediate alternative

42

employment. Id. at 1356 (See infra at 47). Finally, the Court noted that Del Monte's violations of ERISA procedural requirements, including the statute's SPD and claims administration requirements were themselves acts of arbitrary and capricious conduct that should be weighed in the balance (as they should be here) when considering a refusal to pay claimed benefits. Id. at 1353-54. On this issue, the Second Circuit adopted the Blau approach in Gilbert v. Burlington Industries, 765 F.2d 320, 328-9 (2d Cir. 1985).

In Rabin v. Chesebrough-Pond's, Inc., 1991 U.S.Dist. LEXIS 21754 (D.Conn., June 26, 1991), relying partly on Blau, the District of Connecticut granted severance benefits following a change of control in the face of an attempt to read additional terms into a plan. Chesebrough-Pond's attempt to defeat benefits on this basis was soundly rejected:

> Under ERISA, an employer will not be allowed to enforce undisclosed or ambiguous provisions of a plan that purport to limit a participant's eligibility for payment of benefits. Heidgerd v. Olin Corp., 906 F.2d 903, 907-08 (2d Cir. 1990)(employer cannot rely on undisclosed limitations to deny employees benefits due under plan summary); Chambless v. Masters, Mates & Pilots Pension Plan, 772 F.2d 1032, 1040 (2d Cir. 1985)(invalidating ambiguous amendment to plan), cert. denied, 475 U.S. 1012, 89 L. Ed. 2d 304, 106 S. Ct. 1189 (1986); Blau v. Del Monte Corp., 748 F.2d 1348, 1354-55 (9th Cir. 1984)(plan administrator may not enforce secret or undisclosed plan provisions); cf. Morse v. Stanley, 732 F.2d 1139, 1147 (2d Cir. 1984) (plan administrator's failure to disclose specific circumstances for distribution of accelerated benefits did not violate administrator's fiduciary obligations because acceleration is within his discretion).

Similarly, defendant is precluded from adding new provisions to the plan to justify denying benefits, Blau, 748 F.2d at 1356, or from interpreting unambiguous plan provisions to authorize such denial. Ulmer v. Harsco Corp., 884 F.2d 98, 103-04 (3d Cir. 1989).

Rabin v. Chesebrough-Pond's Inc., 1991 U.S. Dist. LEXIS 21754, 58-59 (D.Conn. 1991).

In Bennett v. Gill & Duffus Chemicals, Inc., 699 F.Supp. 454 (S.D.N.Y. 1988), the Court directly confronted Dun & Bradstreet's argument in favor of the "So-Called 'Sale of Business Rule'" which the defendant in that case, Chemicals, claimed denies severance benefits regardless of plan language in any instance in which employees suffer no actual job loss. Distinguishing the authorities cited for the rule in much the way plaintiffs do here (See Id. at 459), the Court rejected the Sale of Business rule in part because it recognized that severance pay should not be assumed to be solely about unemployment:

> In addition, we must note that severance benefits serve two purposes. Severance pay can be given to reward past service to a company as well as to provide protection against future unemployment. The Second Circuit recognized this dual function in Gilbert v. Burlington Industries, Inc., supra, in the course of deciding that state law is preempted by ERISA. Burlington had sold a division to a buyer who retained all the employees in their same jobs, and the employees brought suit under the provision of the severance policy that provided for benefits to those "involuntarily terminated" from the company. Discussing the purpose of severance pay, the court noted that "severance pay is often a reward for past service." 765 F.2d at 325. Cf. Local 879, Allied Industrial Workers of America v. Chrysler Marine Corp., 819 F.2d 786, 788 (7th Cir. 1987)(court's review of arbitrator's award of severance pay noted that "while one purpose of severance pay is to provide income between

44

jobs, it also compensates employees for their service and for termination for reasons unrelated to their conduct").

699 F. Supp. at 459-460. See also, Maryonovich v. Market Data Retrieval, Inc., 716 F.Supp. 343, 347-48 (N.D.Ill. 1989). Noting also the inconsistency of Chemicals' explanations for lack of coverage, the company's financial stake in the outcome, and the company's ERISA procedural violations, the Court declared Chemicals' severance benefit denials arbitrary and capricious. Id. at 457, 461-2.

In the end, regardless of the so-called "Sale of Business Rule", plaintiffs' position merely seeks to enforce the universally recognized proposition that the plain language of an ERISA plan must be enforced:

> ERISA plan contracts are construed according to federal common law. See Masella v. Blue Cross & Blue Shield of Conn., Inc., 936 F.2d 98, 107 (2d Cir. 1991); Katz v. Colonial Life Ins. Co. of America, 951 F. Supp. 36, 40 (S.D.N.Y. 1997). The federal common law governing ERISA "embodies common-sense canons of contract interpretation." Brooke v. Home Life Ins. Co., 864 F. Supp. 296, 299 (D. Conn. 1994). Thus, straightforward language in an ERISA policy must be given its natural meaning." Fischman v. Blue Cross & Blue Shield of Conn., Inc., 775 F. Supp. 513, 515 (D. Conn. 1991) (citation omitted). A court must consider contractual language within the context of the entire agreement, rather than focus on a particular term. See U.S. Fire Ins. Co. v. General Reins. Corp., 949 F.2d 569, 571-72 (2d Cir. 1991); Garza v. Marine Transport Lines, Inc., 861 F.2d 23, 27 (2d Cir. 1988). "Nor may an ambiguity be found where the contract has a definite meaning, and where no reasonable basis exists for a difference of opinion about that meaning." Brass v. American Film Techs., Inc., 987 F.2d 142, 149 (2d Cir. 1993). Contract language is only ambiguous "if, when considered objectively from the viewpoint of a 'reasonably intelligent person' it is subject to more than one meaning." Katz, 951 F. Supp. at 40 (quoting Sayers v. Rochester Tel. Corp.

Suppl. Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993).

Byrnes v. Empire Blue Cross & Blue Shield, 2000 U.S. Dist. LEXIS 15139, 14-15 (S.D.N.Y. 2000). ERISA simply does not permit Dun & Bradstreet to rewrite the plain language of the CTP to exclude from benefits any instance in which the terminated employee received immediate new employment. Dun & Bradstreet is obliged under ERISA to act only in accordance with the express terms of the policy. See ERISA § 404, 29 U.S.C. § 1104(a)(1)(D). A fiduciary cannot disregard plan provisions nor can it attempt to incorporate terms that do not expressly appear in the plan. See, e.g., Clarke v. Bank of New York, 687 F. Supp. 863, 867 (S.D.N.Y. 1988) (citing, e.g., Miles v. New York State Teamsters Conf., 698 F.2d 593, 599 (2d Cir.), cert. denied, 464 U.S. 829, 78 L. Ed. 2d 108, 104 S. Ct. 105 (1983)); Morgan v. Mullins, 643 F.2d 1320, 1321 (8th Cir. 1981); Kekis v. Blue Cross & Blue Shield, Inc., 815 F. Supp. 571, 579 (N.D.N.Y. 1993)(citing the above and Kulakowski v. Rochester Hospital Serv. Corp., 779 F. Supp. 710, 716-17 (W.D.N.Y. 1991); Dozsa v. Crum & Forster Ins. Co., 716 F. Supp. 131, 139 (D.N.J. 1989)).

If Dun & Bradstreet wished to impose an unemployment requirement in the CTP it should have imposed it within the express terms of the plan and disclosed it in an SPD. Then, following the layoff of any employee, the plan could provide for a determination whether the terminated employee had secured immediate

employment and, if employment was secure, benefits could be denied. The absurdity of such an arrangement, however, explains the likely reason why the plan makes no such provision. What if an employee got a new job two days after termination? A week? How would Dun & Bradstreet find out? Having written the CTP plan and its SPD, Dun & Bradstreet can hardly object to seeing its explicit provisions carried out.

Dun & Bradstreet's position not also flies not only in the face of traditional ERISA analysis, but is also inconsistent with traditional contract analysis frequently employed in the ERISA context:

> As plaintiff concedes, "straightforward language in an ERISA plan should be given its natural meaning." Plaintiff's Memorandum at 11. Indeed, plaintiff cites <u>Burnham v. Guardian Life Ins. Co. of America</u>, 873 F.2d 486 (1st Cir. 1989), for the proposition that "the federal common law of ERISA must embody 'common-sense canons of contract interpretation.'" Plaintiff's Memorandum at 11. As Burnham further states, where the words of the applicable ERISA plan documents "are plain, we will 'refrain from conjuring up ambiguities' and likewise 'abjure unnecessary mental gymnastics which give the terms of the [plan] a forced or distorted construction.'" <u>Burnham</u>, 873 F.2d at 490-91 (citations omitted).

<u>Weingord v. Western Union World Communications, Inc.</u>, 1991 U.S. Dist. LEXIS 6963, 9-10 (S.D.N.Y. 1991). "The court must first attempt to interpret the language of the relevant document, in this case §1.1 of the New Plan (or "the plan"), by looking to its terms alone, and determine whether these terms are ambiguous." <u>Id</u>. 4-5 (citing <u>Burger King Corp. v. Horn & Hardart Co.</u>, 893 F.2d 525, 527 (2d Cir.

1990); Curry Road Ltd. v. K Mart Corp., 893 F.2d 509, 511 (2d Cir. 1990). Unambiguous plan terms are enforced as a matter of law. Id. See also Perreca v. Gluck, 295 F.3d 215, 223 (2d Cir. 2002).

Ambiguous terms, on the other hand, are construed against their drafters. Even if the Court were to determine that the CTP language does not obviously favor plaintiffs' interpretation but is ambiguous, plaintiffs should prevail because ambiguous language must be resolved in plaintiffs' favor. Contract language is ambiguous if a "reasonably intelligent person" would find it subject to more than one meaning. Sayers v. Rochester Tel. Co., 7 F.3d 1091, 1095 (2d Cir. 1993); John Hancock Mutual Life Ins. Co. v. Amerford Int'l Corp., 22 F.3d 458, 461 (2d Cir. 1994); Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993). Consistent with basic contract principles, where, as here, a court is obliged to conduct a de novo review under ERISA, plan ambiguities are to be construed against the plan and in favor of the claimant. Masella v. Blue Cross and Blue Shield, 936 F.2d 98, 107 (2d Cir. 1991). See also Heasley v. Belden & Blake Corp., 2 F.3d 1249, 1257-58 (3d Cir. 1993); Ingersoll Milling Mach. Co. v. M/V Bodena, 829 F.2d 293, 306 (2d Cir. 1987), cert. denied, 484 U.S. 1042, 108 S. Ct. 774, 98 L. Ed. 2d 860 (1988); Westchester Resco Co. v. New England Reinsurance Corp., 818 F.2d 2, 3 (2d Cir. 1987); National Grange Mutual Ins. Co. v. Continental Casualty Ins. Co., 650 F. Supp. 1404, 1408 (S.D.N.Y. 1986); Kekis v. Blue Cross

& Blue Shield, Inc., 815 F. Supp. 571, 583 (N.D.N.Y. 1993). Of course, for the CTP language concerning "Eligible Terminations" to be deemed ambiguous, the Court would have to conclude that plaintiffs' interpretation of the language is reasonable *and* Dun & Bradstreet's interpretation of the Plan exclusions is also reasonable. See Maryonovich v. Market Data Retrieval, Inc., 716 F.Supp. 343, 347-48 (N.D.Ill. 1989). Because Dun & Bradstreet's interpretation of the CTP language, is unreasonable on its face, the Court can enforce plaintiffs' reasonable interpretation without further analysis.

Dun & Bradstreet claims its interpretation is justified because "the purpose of the severance plan [is] to provide assistance to employees whose employment terminates and who find themselves temporarily without compensation due to circumstances beyond their control." Op.Br. at 27. Dun & Bradstreet's interpretation of the plan, however, is impossible to square with the actual plan language and is thus unreasonable as a matter of law. First, as previously noted, the plan creates no mechanism to determine in non-sale-of-business circumstances whether a terminated employee has independently obtained employment and thus, despite layoff, would suffer no actual loss of employment. Accordingly, some employees who lose their jobs with the company will receive severance benefits even if they suffer no loss of employment or even if they immediately secure employment with *better* compensation. Second, the language plainly contemplates circumstances

49

in which employees would be denied severance even though they did suffer loss of employment. Specifically, under the subsection 3 of the CTP SPD description of exclusions, where all or a part of the business is sold to a Participating Company, severance benefits are denied without reference to whether the employee retains a job with the Participating Company. Exhibit "A" (CTP SPD at 2). Given that the plan expressly allows circumstances where some employed individuals receive benefits while some unemployed individuals are denied benefits, it is impossible to deem reasonable the reading of the CTP plan language advocated by Dun & Bradstreet. In the absence of two reasonable interpretations, the language cannot be deemed ambiguous and plaintiffs must prevail because they have asserted a reasonable interpretation of the plan language in the face of Dun & Bradstreet's

manifestly unreasonable interpretation of the language.[18]

Dun & Bradstreet argues that unless the Court enforces its interpretation of the CTP that plaintiffs will reap "a windfall" because they will keep their jobs and receive severance. Op. Br. at 28. Dun & Bradstreet ignores, however, that a major part of plaintiffs' complaint is that by virtue of the transaction with RMS Corp., Dun & Bradstreet deprived plaintiffs of millions of dollars in pension benefits and stock options it would otherwise have had to grant early retiring employees. Far from a windfall, plaintiffs allege the net affect of the transaction was a windfall to Dun &

---

[18]

Dun & Bradstreet presented a similarly implausible, but self-interested interpretation of SPD language in Buckley v. Dun & Bradstreet, 1997 U.S. Dist. LEXIS 4689 (S.D.N.Y., April 11, 1997) where the company sought unsuccessfully to dismiss a claim by a pro se plaintiff by arguing that the Court should rule as a matter of law that the phrase "other disability benefits" means all other benefits, not just disability benefits. Id. at *10-*11.

> Commenting also on Dun & Bradstreet's SPD inadequacies the Court also noted:
>
>> Accuracy is not a lot to ask. And it is especially not a lot to ask in return for the protection afforded by ERISA's preemption of state law causes of action -- causes of action which threaten considerably greater liability than that allowed by ERISA.

Id. at *12 (citation omitted).

Bradstreet, yielding the company millions in employee benefits savings, millions in purchase money and no real change in its control of RMS operations. Amended Complaint ¶¶82-85.

Plaintiffs respectfully urge that the unambiguous language of the CTP entitles them to benefits and that this language should be enforced in their favor regardless of Dun & Bradstreet's assertion that it should enforce instead the company's secret intent, irreconcilable with the language, that the plan provided only unemployment benefits. Moreover, if the Court deems the language ambiguous, under de novo review, plaintiffs are entitled to have the language interpreted in their favor and against Dun & Bradstreet. Plaintiffs are plainly entitled to benefits under the CTP plan either way, and if judgment is to be rendered as a matter of law on this claim, plaintiffs respectfully submit it would be appropriate only in favor of plaintiffs.[19]

## VII. CONCLUSION.

For all of the foregoing reasons, plaintiffs respectfully request that defendants' motion to dismiss be denied.

---

[19] On the other hand, if the Court determines the issue cannot be determined as a matter of law plaintiffs believe discovery should be completed before any ruling is made.

THE PLAINTIFFS: Mary McCarthy, et al.

BY: _____
Thomas G. Moukawsher (ct08940)
Ian O. Smith (ct24135)
Moukawsher & Walsh, LLC
328 Mitchell Street
Groton, CT 06340
(860) 445-1809


## CERTIFICATION

I hereby certify that a copy of the foregoing has been mailed on this date to the following counsel of record:

>Patrick W. Shea
>Zachary R. Osborne
>Paul, Hastings, Janofsky & Walker LLP
>1055 Washington Boulevard
>Stamford, CT  06901-2216

Date: November 7, 2003        _____
                              Thomas G. Moukawsher

53