UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARY McCARTHY, CLAYTON BOROWSKI, individually and on behalf of others similarly situated, and individually, GAIL ADAMS, DONALD BAKERT, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE DUN & BRADSTREET CORPORATION, THE DUN & BRADSTREET CORPORATION RETIREMENT ACCOUNT, and THE DUN & BRADSTREET CAREER TRANSITION PLAN,<br><br>Defendants. | CIVIL ACTION NO.<br>3:03 CV 0431 (SRU)<br><br><br><br>NOVEMBER 19, 2004 |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AS TO COUNT FOUR

The sole question before the Court on this Motion for Summary Judgment is whether a rate of 6.75 percent is a reasonable rate of interest to use to calculate actuarially reduced early retirement benefits under a defined benefit pension plan like the Dun & Bradstreet Master Retirement Plan. Plaintiffs contend in Count Four of the Amended Complaint that such a rate[1] is impermissibly high and results in an unlawful forfeiture of benefits under ERISA for former employees who elect to retire early. As Plaintiffs' own expert confirms, however, a 6.75 percent interest rate falls within the range of reasonable rates authorized by statute and regulation.

---

[1] Plaintiffs incorrectly allege that the interest rate used in calculating early retirement benefits is "6-3/5 percent per annum", or 6.6 percent. Amend. Compl. ¶ 95. In fact, the interest rate set forth in the retirement plan is 6-3/4, or 6.75, percent. See Master Retirement Plan, Section 1.1 at 4, attached as Ex. A to the Affidavit of Patrick W. Shea. Defendants will, in this instance, assume that the Court will consider the higher interest rate.

Unlike with certain other interest rate assumptions for pension plans that are fixed either by statute or regulation, both Congress and the Secretary of the Treasury have specifically determined that interest rates in this particular context need only fall within a range that is "reasonable." The best evidence of reasonableness is a consistent industry practice that has regularly and uniformly received IRS approval. And on this point the facts are clear and undisputed.

Indeed, both parties' experts agree that an interest rate of 6.75 percent falls well within the industry norm of 5 to 7 or 8 percent utilized by countless other pension plans, including the thousands of plans that Plaintiffs' expert has reviewed over the years. Plans containing interest rates within that industry range have uniformly been approved by the IRS as reasonable for purposes of calculating actuarial equivalence. In fact, the IRS specifically approved the Master Retirement Plan, along with all of its actuarial assumptions and methods (including the interest rate), as reasonable. Plaintiffs for their part are unable to point to a single decision by a court or by the IRS invalidating such a rate as unreasonable. Furthermore, Plaintiffs cannot avoid the inescapable conclusion that the Master Retirement Plan's interest rate is reasonable by attacking new assumptions (such as the mortality table) or suggesting new methods for establishing interest rates that are not recognized and are utterly unworkable (such as the novel variable interest rate method that Plaintiffs' expert advocates, but admits would create significant complications and uncertainties).

Because there is no genuine issue of material fact as to the reasonableness of a 6.75 percent interest rate, the Court should dismiss Count Four with prejudice. Any other result would invalidate large numbers of defined benefit pension plans, create hopeless conflict with

the innumerable IRS determination letters that have found the interest rate assumptions of such plans to be reasonable, and flood the courts with every manner of baseless actuarial challenge.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

Each of the Plaintiffs in this case were, for varying periods of time, employees of The Dun & Bradstreet Corporation's ("Dun & Bradstreet") receivables management and debt collections operation, known as Receivable Management Services ("RMS"). Amend. Compl. ¶¶ 4-49. As employees of Dun & Bradstreet, Plaintiffs were eligible to participate in the Company's Master Retirement Plan,[2] a defined benefit pension plan that provides full or reduced benefits based on years of service, earnings, age at retirement, and employment status at retirement as follows:

- Normal Retirement. Dun & Bradstreet pays 100 percent, full accrued benefits based on years of credited service and earnings at the time of retirement to employees who (1) retire from Dun & Bradstreet at the normal retirement age of 65, or (2) terminate their employment with Dun & Bradstreet, become employed elsewhere, and subsequently take normal retirement at age 65. Amend. Compl. ¶ 62; Master Retirement Plan, Section 5, ("Normal Retirement") at 30-34 (Ex. A[3]); and Master Retirement Plan Summary Plan Description ("SPD"), at pp. 3, 8-10 (Ex. B).

---

[2] Effective December 31, 2001, after the sale of the RMS division in April 2001, Dun & Bradstreet replaced the Master Retirement Plan with a cash balance defined benefit pension plan called the Dun & Bradstreet Corporation Retirement Account Plan. Amend. Compl. ¶ 64. Plaintiffs, whose employment with Dun & Bradstreet terminated prior to the effective date of the new plan, seek benefits only under the terms of the Master Retirement Plan.

- <u>Subsidized Early Retirement</u>. Employees with at least 10 years of service may elect to retire directly from Dun & Bradstreet as early as age 55 with reduced benefits to account for the longer period of benefit payments. Because Dun & Bradstreet subsidizes these early retirement benefits, payments are reduced by a rate of only three percent for each year of early retirement,[4] less than the actuarial reduction rates that would normally apply. Ex. A, Section 6 ("Early Retirement") at 34-35; Ex. B at 11-12; June 27, 2003 Determination and Letter, Ex. C, at unnumbered p. 4 of Letter. <u>See</u> <u>also</u> Amend. Compl. ¶ 66.

- <u>Unsubsidized Early Retirement</u>. Employees with at least five years of service whose employment with Dun & Bradstreet terminates prior to retirement can still elect early retirement, but are not eligible for subsidized payments. Instead, the Plan provides these retirees with early retirement benefits at actuarially reduced rates. Application of these rates, according to the summary plan description, "[will] result[ ] in a lower Plan benefit than if the [three percent] reduction table in the 'Early Retirement Benefit' section was used." Ex. B at 17. <u>See</u> <u>also</u> Ex. A, Section 9 ("Vesting") at 54-56; Ex. C at unnumbered p. 4 of Letter; Amend. Compl. ¶ 67.

For unsubsidized early retirement benefits, the Plan provides that a former employee may elect to receive benefits "in an amount which is the Actuarial Equivalent of his deferred vested

---

[3] Exhibits A through K referenced throughout Defendants' Memorandum are attached to the Affidavit of Patrick W. Shea.

benefit." Ex. A, Section 9.3 at 56. The Plan defines "Actuarial Equivalence" as "a benefit of approximate equivalent value based on interest at the rate of 6-3/4 [or 6.75] percent per annum, compounded annually" and certain specified mortality rates. Id., Section 1.1 at 4-5.

In 1995, the Internal Revenue Service issued a favorable determination letter approving the Master Retirement Plan as a qualifying pension plan for tax purposes. As part of this determination, the IRS approved the Master Retirement Plan's underlying actuarial assumptions, including the interest rate of 6.75 percent used to calculate actuarially equivalent benefits. See July 20, 1995 Internal Revenue Service Notice (Ex. D).

On or about March 13, 2001, "Dun & Bradstreet announced that it would sell its RMS operations to the managers of these operations." Amend. Compl. ¶ 80. On April 30, 2001, Dun & Bradstreet sold the RMS division to a group of senior management employees, who established a new corporation: The Receivables Management Service Corporation ("RMS Corporation"). Id.; Ex. C at unnumbered p. 1 of Letter. As of the closing date of the sale, Plaintiffs' employment with Dun & Bradstreet terminated and they became employees of RMS Corporation; each of the Plaintiffs was less than 55 years old at the time of the sale. Amend. Compl. ¶¶ 79-80; Ex. C at unnumbered p. 1 of Letter.

On June 30, 2003, Plaintiffs filed the Amended Complaint under ERISA alleging four counts: Count One for severance benefits to which they were allegedly entitled under a separate Career Transition Plan; Count Two for alleged interference with protected benefits under ERISA Section 510 ("Section 510 claim"); Count Three for alleged failure to include an actuarial

---

[4] Under the subsidized early retirement scenario, if an eligible participant retired from Dun & Bradstreet at, for example, age 55 – ten years before the normal retirement age of 65 – he or she

-6-

reduction table in the Master Retirement Plan summary plan description; and Count Four for allegedly applying an unreasonable rate of interest (6.75 percent) to actuarially reduce early retirement benefits. On September 18, 2003, Defendants moved to dismiss all but the Section 510 claim and, on February 27, 2004, the Court held a hearing on the motion. During the hearing, the Court indicated that it did not believe it would be appropriate to resolve the interest rate issue on a motion to dismiss and instead ordered the parties to conduct expert discovery with respect to this issue, to be followed by the filing of a summary judgment motion.[5] Expert discovery on that issue having been concluded, Defendants now move for summary judgment as to Count Four.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Rule 56(c), Fed. R. Civ. P., provides that summary judgment "shall be rendered" if the Court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. An issue is "genuine" if there is sufficient evidence such that a reasonable jury could return a verdict for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the suit under governing law. Id. In determining whether any genuine issues of material fact exist, the Court must resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

---

would incur a 30 percent reduction in retirement benefits. See Amend. Compl. ¶ 66.

[5] The other aspects of the Motion to Dismiss directed to Counts One and Three were taken under advisement.

The burden of demonstrating the absence of a genuine dispute as to a material fact rests with the party seeking summary judgment (in this case, Defendants). Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). To meet their burden, Defendants must identify those portions of the pleadings, depositions, answers to interrogatories, admissions, and/or affidavits which they contend demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Celotex, 477 U.S. at 325. The party opposing summary judgment motion (in this case, Plaintiffs) must in turn present extrinsic evidence, *i.e.*, affidavits, depositions, answers to interrogatories, and/or admissions, sufficient to establish the existence of the essential elements on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. To meet their burden on summary judgment, Plaintiffs "must do more than present evidence that is merely colorable, conclusory, or speculative and must present 'concrete evidence from which a reasonable [fact finder] could return a verdict in [their] favor...'" Alteri v. General Motors Corp., 919 F. Supp. 92, 95-96 (N.D.N.Y. 1996) (quoting Anderson, 477 U.S. at 256). See, e.g., Hayes v. Compass Group USA, Inc., No. CIV. 300cv0973AHN, 2004 WL 2471640, at *8 (D. Conn. Oct. 8, 2004) (Ex. E) (granting summary judgment to defendant in ERISA case "because [plaintiff] has not provided sufficient evidence to support his claim" and "has not established the existence of a genuine factual dispute").

### III. AN INTEREST RATE OF 6.75 PERCENT USED TO ESTABLISH ACTUARIAL EQUIVALENCY IS REASONABLE AS A MATTER OF LAW

#### A. ERISA Requires Only That the Interest Rate Be "Reasonable."

It is undisputed that, in enacting ERISA, Congress did not prescribe a particular interest

rate or method to be used in calculating actuarially equivalent benefits.[6] See Declaration of Edward Brown ("Brown Decl.") at 4 ¶2 (Ex. F); Deposition of Claude Poulin ("Poulin Dep.") at 51 (Ex. G); Declaration of Claude Poulin ("Poulin Decl.") ¶20 (Ex. I) ("there are no prescribed interest or mortality table assumptions for the calculation of early retirement reduction factors"). Rather, ERISA Section 206(a) provides only that an eligible plan participant who elects to retire early must receive "the benefit to which he would be entitled at the normal retirement age, <u>actuarially reduced under regulations prescribed by the Secretary of the Treasury</u>." 29 U.S.C. Section 1056(a) (emphasis added). The Secretary of the Treasury has promulgated regulations under this Section, but in doing so elected not to specify a particular interest rate or range of interest rates to be used by employers. Brown Decl. at 4 ¶2 (Ex. F); Poulin Dep. at 51 (Ex. G) (Treasury Department has not specified use of any particular interest rate). Rather, Treasury Regulation Section 1.411(a)-4 provides only that "unreasonable" actuarial assumptions can result in a prohibited forfeiture of benefits.[7]

This stands in sharp contrast to other parts of ERISA and the Internal Revenue Code (the "Code") that spell out particular interest rate assumptions that must be used in different contexts. See Poulin Dep. at 50 (Ex. G) (agreeing that in other instances, "either Congress by statute or the Treasury regulations has specified the interest rate factor to be used in calculating equivalent

---

[6] The purpose of an actuarial reduction is to ensure that the early retirement benefit is no more and no less valuable as the later-commencing benefits from which it is derived. See STEVEN J. SACHER ET AL., EMPLOYEE BENEFITS LAW 229, 585 (BNA Books 2d ed. 2000); Brown Decl. at 4 ¶5 (Ex. F).

[7] Furthermore, no cases or actuarial treatises have ever addressed this subject or the reasonableness of actuarial assumptions in other analogous situations. See Poulin Dep. at 95 (Ex. G) ("I don't think that there is a treatise that deals exclusively with a determination of the interest rate in actuarial equivalence."); Brown Decl. at 4 ¶2 (Ex. F).

benefits"). See Deposition of Edward Brown ("Brown Dep.") at 59-64 (Ex. K) (IRS made policy decision to specify interest rate for lump sum distributions; by contrast, IRS did not specify a reasonable rate of interest for determining actuarial equivalence).[8] It seems clear, therefore, that when Congress or the Treasury wishes to limit an employer's discretion in the selection of interest rate assumptions, it knows how to do so. The fact that neither Congress nor the Treasury did so in these circumstances evidences a clear legislative intent to allow employers greater latitude in selecting reasonable interest rate assumptions. In short, both Congress and the Treasury Department have left substantial discretion to employers to adopt any interest rate that is reasonable in calculating actuarially equivalent benefits. Brown Decl. at 4 ¶1 (Ex. F).

    B.    **An Interest Rate of 6.75 Percent Falls Well Within the Industry Standard for Defined Benefit Pension Plans, and Plans With Similar or Even Higher Interest Rates Have Continued to Receive IRS Approval.**

All pension plans seeking tax-qualified status must be reviewed and approved by the IRS for compliance with the qualification requirements set forth in Code Section 401(a), 26 U.S.C. §

---

[8] For example, Section 417(e)(3)(A)(ii)(II) of the Code provides that qualified retirement plans must use the annual interest rate yield on 30-year Treasury securities for determining certain lump-sum distributions. 26 U.S.C. § 417(e)(3)(A)(ii)(II). See also Treasury Regulation § 1.417(e)-1(d)(3); IRS Notice 2003-58 (Ex. J). The average historical rate for such securities has historically been higher than 6.75 percent. Specifically, the average annual yield on 30-year Treasury securities was 6.95 percent for the 15-year period ending December 31, 2002, and 8.41 percent for the 25-year period ending December 31, 2002. Averages based on historical data are published by the Federal Reserve at www.federalreserve.gov/releases/h15/data/a/tcm30y.txt. While Plaintiffs' expert admits that these rates "may be historically true," he contends that "plan participants are not in the position to experience these rates today and therefore do not receive a true actuarial equivalent of their normal retirement benefits." Poulin Decl. ¶ 17 (Ex. I). As discussed in this brief, however, the focus of a defined benefit plan is not on "today's rates," but on historical returns over the long-term. Brown Decl. at 4 ¶5; 5 ¶7 (Ex. F). Therefore, a 6.75 interest rate is even more favorable to plan participants in comparison to governmentally-endorsed interest rates for analogous purposes.

401(a)(14). One of those qualification requirements concerns actuarial reductions for early retirement benefits. In this regard, the relevant Code provision – Section 401(a)(14) – is a clone of ERISA Section 206(a). Just like ERISA Section 206(a), Section 401(a)(14) of the Code provides that a qualified defined benefit pension plan must provide early retirement benefits that are "not less than the benefit to which [the participant] would be entitled at the normal retirement age, <u>actuarially reduced under regulations prescribed by the Secretary [of the Treasury]</u>." 26 U.S.C. § 401(a)(14).

Here, in 1995, the IRS issued a favorable determination letter finding that the Master Retirement Plan met all of the qualification requirements under the Code. (Ex. D); Brown Decl. at 4 ¶ 3 (Ex. F). Implicit in this favorable determination was the IRS's approval of the interest rate and other actuarial assumptions used in the Plan as reasonable. Ex. D; Brown Decl. at 4 ¶ 3 (Ex. F) ("a review of the early retirement benefit provisions would have been included in the IRS review. There was no indication that the 6.75% interest rate was unacceptable or unreasonable."). Given the direct parallel between ERISA Section 206(a) and Code Section 401(a)(14), the IRS's approval of the Master Retirement Plan and its underlying assumptions (including the interest rate) provides compelling evidence that the Plan interest rate is in compliance, not only with the Code's qualification requirements, but with the parallel provision of ERISA as well.

In an effort to downplay the import of the IRS's favorable determination, Plaintiffs and their expert have argued that the IRS's determination letter is not entitled to significant weight and that, in their view, a favorable determination "is not a determination that a plan is fully kosher or acceptable . . ." Poulin Dep. at 54-57 (Ex. G). <u>See also</u> Pls.' Opp. to Motion to

Dismiss at 34. Although Plaintiffs would prefer to disregard the IRS determination letter in this manner, the Second Circuit has expressly recognized that such letters do carry "some weight." Amato v. Western Union Int'l, Inc., 773 F.2d 1402, 1412-13 (2d. Cir. 1985); Esden v. Bank of Boston, 229 F.3d 154, 175-76 (2d. Cir 2000), quoting Amato. The determination letter is particularly significant where, as here, it is the only guidance the IRS has issued with respect to the Plan and there is no allegation that the letter was based on any misrepresentation or inaccurate information.

Plaintiffs' arguments concerning the IRS determination letter might at least be colorable if the Master Retirement Plan were the only defined benefit pension plan with an interest rate of 6.75 percent that the IRS had approved. But the parties' experts – two distinguished actuaries, each with over 30 years of experience reviewing thousands of pension plans[9] – both agree that (i) an interest rate of 6.75 percent is well within the industry norm for defined benefit pension plans, and (ii) the IRS continues to approve many plans with similar or even higher rates. Therefore, the IRS's approval of the Master Retirement Plan and its underlying assumptions was not some unconsidered, bureaucratic fluke, but entirely consistent with the IRS's recognition and approval of an industry interest rate of between 5 and 8 percent as reasonable.

Mr. Poulin, who alone has reviewed "probably thousands" of defined benefit plans over the years, admits that not only is it common for such plans to provide actuarially reduced benefits

---

[9] Both Messrs. Poulin and Brown are Fellows of the Society of Actuaries, Members of the American Academy of Actuaries, and Enrolled Actuaries under ERISA. Both have over 30 years of actuarial experience with pension plans, and have provided plan design, review, and other consultation services to hundreds of clients, including large, sophisticated employers and governmental entities. See Poulin Decl. ¶¶ 1-5 and Exs. A and B to Poulin Decl. (Ex. I to Shea Aff.); Brown Decl. at 1-2 ¶¶ 1-12 and attachment to Brown Decl. (Ex. F to Shea Aff.).

to early retiring former employees, but the plans he has seen utilize a fixed interest rate between 5 and 7 percent to calculate actuarially equivalent early retirement benefits: "I've seen the rate of 5 percent, 6 percent, 7 percent, maybe a little higher." Poulin Dep. at 45-46; 49-50 (emphasis added) (Ex. G). Furthermore, Mr. Poulin himself has advocated methodologies that support the reasonableness of a 6.75 percent rate. For example, in Vinson & Elkins v. The Commissioner of Internal Revenue, 99 T.C. 9, 15 Employee Benefits Cas. 1811 (July 14, 1992) (Ex. 2 to Poulin Dep.) (Ex. H to Shea Aff.) – a United States Tax Court case involving the reasonableness of actuarial assumptions with respect to a law firm partnership's defined pension plans – Mr. Poulin opined that interest rates generally consist of three components: (i) the "pure" rate of interest in an inflation-free environment (4 percent); (ii) the inflation rate (Mr. Poulin estimates the current inflation rate to be approximately 2 to 2.5 percent); and (iii) "a risk premium to compensate investors for the potential loss of capital" (1 to 2 percent).[10] Vinson & Elkins at *34-35 (Ex. H); Poulin Dep. at 77-78 (Ex. G). Based on Mr. Poulin's own methodology, a reasonable rate of interest in the current economic environment would range from 7 to 8.5 percent – higher than the 6.75 percent set forth in the Master Retirement Plan. Id. at 77-79 (Ex. G). Even excluding the risk premium from this formula, the range of reasonable interest rates would be 6 to 6.5 percent.

---

[10] Alternatively, Mr. Poulin recommended arriving at a reasonable rate of interest by taking the 30-year Treasury bond rate (currently approximately 5 percent) and factoring in 1 percent for the possibility of interest rates changing and another 1 percent for unforeseen circumstances. This formulation would yield an interest rate of 7 percent based on the current Treasury rate. Vinson & Elkins, 99 T.C. 9 at *35 (Ex. H); Poulin Dep. at 69, 83-84 (Ex. G).

Id. at 85 (Ex. G) ("[excluding the risk premium], it would be around 6 percent based on this methodology.").[11]

Likewise, Defendants' expert – a Principal at Milliman (one of the ten largest actuarial consulting firms in the United States) who has personally reviewed and designed hundreds of pension plans – agrees that a 6.75 percent interest rate is "consistent with accepted actuarial standards" and is "a reasonable rate based on the consensus view" of professional plan managers. Brown Decl. at 4 ¶5, 5 ¶8 (Ex. F); Brown Dep. at 40-42 (Ex. K). ("The Dun & Bradstreet's 6.75 percent interest rate fits comfortably within the range of returns enjoyed by [pension plan portfolio] assets."). A recent survey conducted by Milliman of approximately 250 defined benefit pension plans confirms this conclusion. That survey found that of these 250 plans, 27 provided actuarially reduced early retirement benefits; of those 27 plans, the vast majority (21 plans) utilized an interest rate of between 6 and 8 percent. Brown Decl. at 5-6, ¶¶4-5 (Ex. F). Defendants' expert himself typically uses an interest rate assumption between 5 and 8 percent in calculating actuarial equivalence for pension plans. Brown Decl. at 5 ¶3 (Ex. F).

Consistent with this widely-accepted industry standard, the IRS (as both parties' experts agree) continues to issue favorable determination letters for plans containing interest rates as high

---

[11] Curiously, Mr. Poulin did not undertake a similar methodology in preparing his report for the current action. Poulin Dep. at 84-85. Mr. Poulin explains that "the purpose of this calculation here [for the Vinson & Elkins case] was for funding purposes. It was not to determine actuarial equivalency." Poulin Dep. at 79, 83-84 (Ex. G). At the same time, Mr. Poulin concedes (as he must) that the basis for the calculation in either situation is the same – that "[i]n both processes you're still trying to track the likely time value of money going forward." See Poulin Dep. at 84 (Ex. G). And when asked about the interest rate used for funding his own defined benefit pension plan (for employees of his firm, Poulin Associates), Mr. Poulin testified that he could not recall what interest rate he utilized for funding purposes, but indicated that the rate could possibly be 6.5 percent. Id. at 109-112.

as 8 percent. Poulin Dep. at 53-55 (Ex. G); Brown Dep. at 40-42 (Ex. K). Thus, not only is the Master Retirement Plan interest rate of 6.75 well within the industry standard, it also fits squarely within the range of rates consistently approved by the very agency entrusted to ensure that such rates are reasonable. In this regard, it is extremely telling that Plaintiffs, despite have retained a distinguished expert in the field, have failed to identify a single instance in which the IRS or any court has deemed a rate of 6.75 percent unreasonable.[12] To the contrary, the undisputed expert testimony and the overwhelming evidence point to the inescapable conclusion that an interest rate of 6.75 percent is reasonable as a matter of law.

### C. A Variable Interest Rate Would be Unworkable and Unreasonable.

Because Mr. Poulin cannot deny the reasonableness of an interest rate between 5 and 7 percent, he opines that the Master Retirement Plan rate of 6.75 percent "is an unreasonable rate of interest because it is incapable of providing <u>at all times</u> a truly actuarially equivalent value of the normal retirement benefit payable at age 65." Poulin Decl. ¶ 22 (emphasis added) (Ex. I). In other words, Mr. Poulin's issue with the 6.75 rate is not that it is unreasonable *per se*, but that it does not fluctuate with the market to reflect up-to-the-minute economic conditions. Such short-term vision, however, is squarely at odds with another universally-held notion – that a defined benefit plan represents a long-term undertaking whose goal is not to capture the latest market conditions, but to provide a stream of monetary payments over a long period of time, usually

---

[12] Lacking any real support for their claim that an interest rate of 6.75 is unreasonable, Plaintiffs and their expert resort to speculating that other factors, such as an allegedly out-of-date mortality table, could play a role in improperly reducing their benefits. Poulin Dep. at 10, 17 (Ex. G). Such a claim, however, is not properly before the Court. Plaintiffs never raised an issue with the mortality table or any other actuarial assumption in Count Four or in any of their multiple briefs filed in connection with the motion to dismiss. Any attempt by Plaintiffs to save Count Four from summary judgment by raising a new theory of the claim should therefore be rejected.

several decades.[13]  Poulin Dep. at 67-68 (Ex. G).  See also Brown Dep. at 56 (Ex. K); Brown Decl. at 5 (Ex. F) ("the actuary must determine the average investment return that the plan may reasonably expect to earn over the long term.").

Once again ignoring established industry practices, Mr. Poulin instead recommends applying a variable interest rate to calculate actuarial equivalence.  Poulin Decl. ¶ 15 (Ex. I).  "A variable interest rate assumption adjusted yearly on the basis of a recognized index," Mr. Poulin muses, "is the most effective way of dealing with the volatility of the interest rates; it would provide a more meaningful actuarial equivalent value of the accrued pension benefit to which the retiring plan participant is entitled."  Id.  Mr. Poulin himself admits, however, that a variable interest rate approach would raise serious workability issues.  He concedes that it would make calculating benefits "significantly more complicated" and would make it difficult for plan participants or beneficiaries to receive definitely determinable benefits as the IRS requires.  Poulin Dep. at 58-60 (Ex. G); Brown Dep. at 46-47 (Ex. K).

More to the point, even Mr. Poulin admits that ERISA does not require the use of a variable interest rate.  Poulin Dep. at 57 (Ex. G).  Indeed, he concedes that of the thousands of defined benefit plans he has reviewed, he has never come across one that utilized a variable interest rate to make actuarial calculations.[14]  Poulin Dep. at 47-48 (Ex. G).  Rather, "the overwhelming majority" of defined benefit plans use a fixed rate of interest (as discussed, between 5 and 8 percent) to calculate actuarial equivalence.  Id. at 48-50.  Accordingly, Mr.

---

[13] Similarly, in the Vinson & Elkins case, Mr. Poulin testified that a defined benefit plan is "at least in theory, a long-term undertaking." 99 T.C. 9 * 35 (Ex. H).

Poulin's preference for a variable rate in no way supports a finding that the Master Retirement Plan's fixed 6.75 percent rate is unreasonable.

## IV. CONCLUSION

With nearly 70 years of combined actuarial experience designing and reviewing literally thousands of defined benefit pension plans, both parties' experts agree that most such plans utilize an interest rate of between 5 and 7 or 8 percent to calculate actuarially reduced early retirement benefits. Both parties' experts also agree that the IRS, the federal agency entrusted with the authority to enforce reasonable actuarial assumptions (including interest rates) for pension plans, continues to approve plans that utilize an interest rate within this industry standard. Given these undisputed facts, there can be no question that the Master Retirement Plan interest rate of 6.75 percent is reasonable as a matter of law. Not only does a rate of 6.75 percent fall squarely within the industry standard of 5 to 8 percent, but the IRS expressly approved the Master Retirement Plan (including its interest rate and other underlying actuarial assumptions) as complying with all necessary requirements. Therefore, no genuine issue of material fact exists as to the reasonableness of the 6.75 percent interest rate used in the Master Retirement Plan.

---

[14] Defendants' expert has likewise never encountered a defined benefit pension plan that uses a variable interest rate or an interest rate tied to a specific index to calculate early retirement benefits. Brown Decl. at 6 ¶ 7 (Ex. F); Brown Dep. at 46-49 (Ex. K).

-17-

For the foregoing reasons, Defendants respectfully request that the Court GRANT Defendants' Motion for Summary Judgment and DISMISS Count Four with prejudice.

DATED: November 19, 2004

Respectfully submitted,
THE DEFENDANTS
THE DUN & BRADSTREET CORPORATION,
THE DUN & BRADSTREET CORPORATION
RETIREMENT ACCOUNT, and
THE DUN & BRADSTREET CAREER
TRANSITION PLAN

By: _____
Patrick W. Shea (ct07071)
Sandra K. Lalli (ct25805)
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT 06901-2217
Telephone: (203) 961-7400
Facsimile: (203) 359-3031
patrickshea@paulhastings.com

Counsel for the Defendants

## CERTIFICATE OF SERVICE

This is to certify that on this 19th day of November, 2004, a copy of the foregoing Defendants' Memorandum in Support of Their Motion for Summary Judgment as to Count Four was served by overnight express mail on the following counsel of record:

> Thomas G. Moukawsher, Esq.
> Moukawsher & Walsh, LLC
> 21 Oak Street, Suite 100
> Hartford, Connecticut 06106

*Sandra K. Lalli*
Sandra K. Lalli

STM/285472.1

-i-