## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MCCARTHY, ET AL, | : | DOC. NO. 3:03:CV 431 (SRU) |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| DUN & BRADSTREET, ET AL, | : | |
| | : | |
| Defendants. | : | December 20, 2004 |

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**Summary.**

This is a would-be class action under ERISA brought on behalf of early retirement eligible Dun & Bradstreet employees against Dun & Bradstreet's pension plan. To determine the amount of these employees' early retirement benefits requires discounting the normal retirement benefits they would get at 65 for early commencement. Discounting requires the selection of a discount rate which is supposed to predict long term investment returns. The discount rate is used with mortality tables that predict how long the employees will collect their benefits; the rate and the tables ensure --as ERISA requires-- that the employees' early retirement benefits actuarially equal their normal retirement benefits. While Dun & Bradstreet has used the same rate and the same mortality tables for many

years, long-term investment returns have plummeted and people have begun to live longer. Does ERISA require that Dun & Bradstreet change these rates and tables?

Yes, it does. Ten years ago it may have been reasonable to assume that retirees could get a long term return of 6.75% on their pension money. Today it isn't. The long term – 30 year – interest rates used to predict safe long-term investment returns haven't been at 6.75% since just after Dun & Bradstreet adopted the rate 10 years ago; instead recently they've gone as low as 4.3%. Based upon the most accurate predictors available today, employees who can expect to live 20 to 30 years after retirement have no reasonable prospect of yielding the returns Dun & Bradstreet assumes for that period of time. When Dun & Bradstreet uses an artificially high interest rate, it decreases the size of its employees' pensions. Moreover, the mortality table Dun & Bradstreet uses makes the problem worse; actuaries no longer use it to calculate pensions. It also decreases the size of the employees' pensions by assuming they will live artificially short lives. To give the employees early retirement benefits that are actuarially equivalent to their normal retirement benefits, Dun & Bradstreet must use interest rates in line with current – not ten year old – long-term interest rates and must use mortality tables consistent with current life expectancies. It is no excuse that some other companies haven't updated their interest rates and mortality tables either, nor is it relevant that

10 years ago the IRS determined that the Dun & Bradstreet pension plan qualified for favorable tax treatment.

**Early Retirement Benefits and Actuarial Equivalency.**

If an employer decides to offer its employees a traditional pension plan that promises employees a minimum regular payment for life (a "defined benefit plan" under ERISA §3(25)), ERISA §3(23) says the plan's basic benefit must be an annuity payment (usually a monthly payment) that begins at age 65 and continues for the remainder of the employee's life. Thus, as the Second Circuit pointed out in 2000 in *Esden v. Bank of Boston*, the starting point for all pension calculations in a defined benefit plan is the normal retirement benefit provided under the plan.[1]

The "normal retirement benefit" under ERISA Sections 3(22) means the benefit that begins at "normal retirement age" which under ERISA §3(24) is typically age 65. ERISA does let employers pay pension benefits in forms other than the basic annuity beginning at normal retirement, but ERISA Sections 204 (c)(3) and 206 (a)(3) say these other forms – such as one time lump sum payments and early retirement annuities – must be calculated by starting from the age 65 annuity and adjusting it to reflect the difference between normal retirement and the alternative benefit form. Immediate lump sums are calculated by taking the sum of all the annuity payments employees would get for life and reducing them to a

---

[1] 229 F.3d 154, 159 (2d Cir. 2000).

smaller sum because employees will be getting their money up front – the sum is smaller in other words to reflect the time value of money.  Payments made before the normal retirement age – the early retirement payments at issue here – are calculated by reducing the annuity payments made at normal retirement to stretch them over a longer period of time. ERISA Sections 204 (c)(3) and 206 (a)(3) describes all of this the way actuaries do: these alternate forms of payments must be the "actuarial equivalent" of the normal retirement benefit.

Claude Poulin, the employees' expert actuary explained that actuaries use two things to calculate these stretched early retirement benefits:  mortality tables to predict how long employees will live and be paid their pensions and interest rates to adjust for the change in the period over which the assets supporting the benefits will earn investment income.[2]

As Poulin explained, the interest rates and mortality tables work in tandem to achieve actuarial equivalency:  in other words, a higher interest rate can be offset by lower mortality assumptions and vice versa.[3]  Most important, as Dun & Bradstreet's own consultant Edward Brown conceded, the higher the interest rate and morality assumptions, the lower the payments that get made to the employees.[4]

---

[2] Exhibit A (Deposition of Poulin) at 17.
[3] *Id.* at 17, 54,60, 132.
[4] Exhibit B (Deposition of Brown) at 42, 71-74.

Choosing an interest rate to apply to an early retirement calculation requires a couple of things. First, the interest rates should look like long-term interest rates because the relevant period of time being considered is the predicted life span of the employees receiving the benefits. Using rates similar to short-term rates would ignore that the plan is predicting what rates of return will be over a number of years in the future, not what rates of return are today. Second, as Poulin points, out only relatively risk free investments such as those in government securities are relevant when choosing a rate.[5] This is so since pension plan returns are ultimately risk free because the Pension Benefit Guarantee Corporation insures the underlying benefits.[6] Accordingly, the rates most relevant to pension plan discount rates are those paid by long-term government securities.

**The Contrast between Dun & Bradstreet's Rate and Current Rates.**

Dun & Bradstreet uses the 6.75% interest rate stated in its pension plan to compute actuarial equivalency for early retirement purposes.[7] According to Dun & Bradstreet, the rate has been the same at least since the company received its last IRS determination letter nearly ten years ago.[8] Ten years ago, of course, Dun & Bradstreet's 6.75% rate fit comfortably among the rates on long term government

---

[5] Exhibit A (Deposition of Poulin) at 74.
[6] *Id.* at 74-75.
[7] Exhibit C (D&B Plan Excerpt).
[8] Dun & Bradstreet Br. at 5.

securities: the average rate on 30-year Treasury securities in 1995 was 6.88%.[9]
Today, however, this rate is an aberration: the rate on 30-year Treasury securities
for November 2004 was 4.89%, nearly two full percentage points below Dun &
Bradstreet's 6.75% rate.[10]  In fact, in the 28 years of historical data available from
the Federal Reserve, the rate on 30-year Treasury securities has never been lower
than it is today.[11]

**Dun & Bradstreet's 6.75% Interest Rate Violates ERISA.**

Because of changing interest rates, Dun & Bradstreet can't produce an
actuarially equivalent pension for early retirees using its 6.75% interest rate.
Thinking otherwise defies simple logic.  If the purpose of the interest rate
calculation is to approximate the long-term returns that can be realized from safe
investment of the assets supporting the benefit payments, the interest rates should
at least get close to the rates on risk-free long-term government securities the way
Dun & Bradstreet's rate did in 1995 when its rate was 6.75% and the average rate
on 30-year Treasury securities was 6.88%.[12]

But how close is close enough for ERISA? ERISA doesn't dictate the
interest rates Dun & Bradstreet must use for early retirement calculations.  The
Treasury Regulation at 26 C.F.R. 1.411 (a)-4T only says that if Dun & Bradstreet

---

[9]  Exhibit D (Historic Interest Rates).
[10] *Id.*
[11] *Id.*
[12]  Exhibit D (Historic Interest Rates).

uses an unreasonable rate of interest the difference in dollars between the pension derived using a reasonable rate and the pension derived using an unreasonable rate are vested accrued benefits forfeited by plan participants – and ERISA §203 (a) prohibits plans from allowing vested accrued benefits to be forfeited. So, in today's interest rate environment, how can Dun & Bradstreet's at least 10-year old rate still be reasonable?

**The Evidence.**

**Employees' Expert Claude Poulin.**

Claude Poulin testified that Dun & Bradstreet's rate is not a reasonable rate because the rate is incapable of providing an actuarially equivalent value to the basic normal retirement benefit.[13]  According to Poulin:

> The fixed interest rates found in the Dun & Bradstreet 1994 Plan and 2001 Plan could have been acceptable twenty years ago and might even then included a certain amount of subsidy. But not recently. The interest rate assumption is meant to represent the kind of investment return retiring plan participants would experience in the marketplace. Since at least the year 2000, no plan participants would have a reasonable prospect of investing their money with an annual yield of 6 ¾%.[14]

Poulin says that because of where the 30-year Treasury rates have been (ignoring for the moment the effects of the applicable mortality table) a reasonable interest rate would be around 5% and a reasonable interest rate range would be between

---

[13] Exhibit E (Poulin Report) at 6-7.
[14] *Id*. at 4.

4.75% and 5.5%.[15] Poulin also said the same result is achieved a different way using a so-called "pure interest rate" approach. Despite attempted sleight of hand by defense counsel, Poulin showed at his deposition that he would achieve the same result using the "pure rate" method he had used as an expert in an earlier case uncovered by defense counsel.[16] According to Poulin the current pure interest rate is 3%.[17] Adjusting 2.5% for inflation as Poulin did in his earlier case, but not adjusting for risk (because of the PBGC guarantee), the pure rate method yields a reasonable rate of 5.5%.[18]

According to Poulin, pension plans can respond to changing interest rates three ways: (1) they can adopt a fixed rate and change it whenever it becomes unreasonable; (2) they can avoid changes for a longer period of time by adopting an artificially low fixed rate, or (3) they can adopt a variable rate and never have to change it again.[19] Recognizing that a plan could choose any of the three options,

---

[15] Exhibit A (Deposition of Poulin) at 63-64.

[16] Defense counsel tried to use Poulin's testimony about a 4% pure rate from a nearly 15 year old case that involved the appropriate level of a sponsor's funding of a plan, not the appropriate discount rate for an early retirement benefit. *Id.* at 78-79. As Poulin explained, in that case he used the now out-of-date notion of a pure rate of 4% and incorporated a risk factor since the question was funding. Poulin explained that risk factors aren't used for early retirement calculations and that the current pure rate is 3%. *Id.* at 73-74, 80, 126. This didn't stop Dun & Bradstreet from repeating its miscalculation of the pure rate approach in its brief. Dun & Bradstreet Br. at 12.

[17] *Id.* at 126.

[18] *Id.* at 73-74. Dun & Bradstreet also falsely suggests Poulin's own retirement plan uses a 6.5% rate. Dun & Bradstreet Br. at 13 n.11. Poulin actually said: "Q: As you sit here today, can you tell me whether it's greater, less than or equal to 6.5% in its most recent report? A. I don't recall." *Id.* at 112.

[19] *Id.* at 122-4.

Poulin prefers adopting the 30-year Treasury rate that IRS Code §417 (e)(3) already requires plans to use when reducing pension benefits to a lump sum.[20]  He sees a variable rate as the most effective way of dealing with volatile interest rates and believes it would allow plans to get closest to actuarial equivalence.[21]

Poulin's opinion is entitled to considerable weight.  In addition to designing and reviewing thousands of pension plans during nearly 40 years as an actuary, Poulin has extensive experience consulting as a pension plan expert for clients including the UAW, the IRS, and the State of Connecticut Pension Fund as well as experience as an expert witness in many important ERISA cases, including the recent highly publicized cash balance plan challenge in *Cooper v. IBM*.[22]  Dun & Bradstreet refers to him as "a distinguished expert in the field."[23]

**Defendants' Expert Edward W. Brown.**

Edward W. Brown, Dun & Bradstreet's expert, by contrast has never been hired as an ERISA expert before.[24] His expert witness experience is limited chiefly to consulting about pension matters in a hand full of divorce cases.[25] When they were read to him, Brown didn't recognize the citations of the ERISA and IRS

---

[20] *Id*.
[21] Exhibit E (Poulin Report) at 4.
[22] Exhibit E (Poulin Report) at Ex. A &B.
[23] Dun & Bradstreet Br. at 14.
[24] Exhibit B (Brown Deposition) at 40.
[25] *Id.* at 36-38.

Sections and the Treasury regulations that apply to this case.[26]  And, while one of

Brown's three conclusions was that the Dun & Bradstreet rate was "consistent with

IRS laws, rules and regulations", at his deposition Brown was unable to name any

of the specific IRS "laws, rules and regulations" he said the rate conformed with.[27]

**Pension Plan Assumptions May be Popular and Wrong at the Same Time.**

Most of Brown's report and testimony supports the undisputed fact that

some pension plans also still use rates like Dun & Bradstreet's 6.75% rate.  This

ignores the simple truth that a thing can be popular and wrong at the same time.

ERISA requires plans to choose interest rates that achieve actuarial equivalence.

Nothing in ERISA says that plans achieve actuarial equivalence so long as they use

rates used by other plans.  The popularity of the rates at issue is especially

unedifying because it can probably best be explained by self-interest.  As interest

rates have been dropping it has never been in any plans' interest to rethink its

interest rate assumptions – after all doing so would cost more money.  Both experts

agree that the rates are the way they are today, not because of repeated validation,

but because of benign (read "self-interested") neglect.  Poulin says the need to

lower pension plan interest rate assumptions has been "ignored" despite the

American Benefits Council's recommendation that pension plan assumptions may

---

[26] *Id.* at 58-60. By contrast, without prompting, Poulin cites several. *See e.g.* Exhibit A (Poulin Dep. at 27-28, (citing ERISA Section 203, 204, and 206 and IRC Sections 411 and 417(e)).
[27] *Id.* at 56-57.

now need to be updated.[28]  Brown agrees that today its "uncommon, if ever" to find plan sponsors discussing the interest rate assumptions of their defined benefit plans.[29] There is, of course, little reason for employers to discuss an interest rate trend that has saved them money at employees' expense. Moreover, whatever its significance, Dun & Bradstreet has grossly exaggerated the number of defined benefit plans that compute early retirement benefits using interest rates as high as Dun & Bradstreet's rate.  Brown admits that just 4 of the 84 defined benefit plans he consults for have interest rates as high as the Dun & Bradstreet's.[30]  And just 11 of the 149 other plans he surveyed have such rates.[31] These size rates are not nearly as widespread as Dun & Bradstreet would have the Court believe, and requiring companies to lower them in light of market changes would hardly cause the cataclysm Dun & Bradstreet predicts.[32]

## Brown Says Little About Actuarial Equivalence

What does Brown say about the real issue of whether Dun & Bradstreet's interest rate is a reasonable tool to achieve actuarial equivalency? In his report,

---

[28] Exhibit A (Poulin Dep.) at 67; Exhibit E (Poulin Report) at 6.

[29] Exhibit B (Brown Dep.) at 33-34.

[30] *Id*. at 5. As Brown reports, most of the plans don't offer actuarially reduced early retirement benefits at all. *Id*.

[31] *Id*. at 6.

[32] Brown says nothing about how many combine a high interest rate with high mortality assumptions.  Only a limited number of Dun & Bradstreet employees are affected too. Dun & Bradstreet has converted to a cash balance retirement plan. Because of their age, the plaintiffs were grandfathered and receive benefits under the old plan. The limited number of its employees covered under the old plan may also explain why Dun & Bradstreet hasn't paid attention to its assumptions.

Brown supported Dun & Bradstreet's claim that the only thing a plan has to do to predict future interest rates is to look at past interest rates.[33]   At his deposition, however, Brown conceded this is wrong, admitting that actuarial equivalency can't be calculated without taking account of current trends in long-term interest rates.[34] The fallacy of Dun & Bradstreet's reasoning apparently became obvious to Brown at his deposition. After all, at issue here is where interest rates will be over the long-term future, not where they have been in the long-term past. Readily at hand are a number of securities that by their nature attempt to pay interest at rates that will predict average investment rates of return over the long-term future.   The current 30-year Treasury rate is the prime example.   It is a prediction of risk free investment returns over the next 30 years.   Today that prediction is 4.89%.[35]   Short term rates naturally are far lower.   The one-month Treasury rate is 2.07% for December, 2004.[36]   The one-year Treasury rate is 2.59% for the same period. No safe long-term security is paying rates like Dun & Bradstreet's. Unsafe securities have obviously fared far worse: as Poulin notes, investments in those have recently produced, not gains, but losses of 20-30%.[37]   If there was a safe long-term security that would show how Dun & Bradstreet's rate achieves actuarial equivalence Brown, when pressed to do so, couldn't name one; indeed, he couldn't name any

---

[33] Exhibit F (Brown Report) at 4 ¶5.
[34] Exhibit B (Brown Dep.) at 55-56.
[35] Exhibit G (Federal Reserve Statistics).
[36] *Id.*
[37] Exhibit A (Poulin Dep.) at 113.

federal government securities, municipal bonds, 30-year mortgages, or any other safe long-term security earning 6.75%.[38]

**The IRS Determination Letter.**

The 1995 IRS determination letter is Dun & Bradstreet and Brown's second defense of the company's 6.75% interest rate.[39] This defense can be dismissed easily. As Brown admits, an IRS determination letter only indicates that the plan qualifies for favorable treatment under the tax code; it does not determine the effect of other statutes on the plans legality.[40] And in *Esden v. Bank of Boston* the Second Circuit said it gives determination letters little if any weight when deciding if pension plans violate ERISA.[41]   Here it shouldn't be given any weight at all. Even if the 1995 IRS tax approval of the plan once had any significance in determining the propriety of the rate as it stood in 1995, its approval doesn't suggest anything about whether, 10 years later, the rate is reasonably calculated to produce actuarial equivalence. The 6.75% rate was probably reasonable in 1995 when 30-year Treasuries were at 6.88%. That hardly means that 6.75% is a reasonable rate when 30-year Treasuries are at 4.89%. Dun & Bradstreet attempts to neutralize this fatal fact by suggesting that Brown and Poulin agree that the IRS

---

[38] Exhibit B (Brown Dep.) at 61-62.
[39] Exhibit H (Determination Letter).
[40] *Id.* at 77-78.
[41] 229 F.3d 154, 175-76 (2d Cir. 2000).

continues to approve rates as high as 8%.[42] But they do no such thing.  Brown doesn't say what the company says he does anywhere, including in his deposition at pages 40-42 as Dun & Bradstreet claims.[43] Poulin only agrees that the IRS is still approving rates in the range of 5% to 7% -- not 8% -- and maybe only at 5% as Poulin believes it should.[44] The question to Poulin was whether approved rates were in the range stated, not whether every rate in the range was approved. If Dun & Bradstreet wanted to know if the IRS had recently approved rates of 6.75% and higher it should have asked Poulin that question, not the nebulous (and now apparently fungible) question it did ask.

**How to Change the Rate.**

Dun & Bradstreet and Brown admit that when interest rates no longer yield actuarial equivalency plans have to change them.[45] If Dun & Bradstreet's rate must be changed, the employees should prevail here. The success of their claim doesn't turn on whether the rate should be changed to a variable rate or some fixed rate within the 4.75% to 5.5% range Poulin said was reasonable.  This aside, Poulin and Brown disagree about whether changes are best made by substituting another fixed rate or substituting a variable rate like the 30-year Treasury rate instead.

Poulin says the 30-year Treasury rate would work best:

---

[42] Dun & Bradstreet Br. at 13-14.
[43] *Id*. at 14.
[44] Exhibit  A (Poulin Dep.) at 55.
[45] Exhibit B (Brown Dep.) at 43-45.

> The best indicator of what the rate will be five, ten, fifteen years from now in a risk free environment is a 30 year treasury. It ensures that a person who retires at age 55 by investing his money over a lifetime would receive the actuarial equivalent of what he or she would receive at age 65 unreduced.
>
> The 30-year treasury rate is, obviously, a long term rate as opposed to a short term rate like a five-year rate or a one year that is short term. The short term rate is more indicative of the current money market conditions, whereas the 30-year treasury rate is more indicative of what the market feels will be the economic interest rate environment over the next 30 years. Of course, they're always fluctuating, but to the extent that the 30-year treasury rate, for instance, is an indicator of -- not an indicator – but there is a correlation between the 30-year mortgage fixed rate and 30-year treasury rate, that that it is not a perfect correlation, but there is an expectation that this is an acceptable rate for a long-term investor.

Poulin also said that out-of-date rates can also be fixed by periodically amending the plan to change the rate when it becomes unreasonable.[46]

Brown's opposition to variable rates says a lot about the quality of his opinion in general. Brown claims that adopting a variable rate would mean that every time rates go up, a prohibited cutback in benefits happens because rising interest rates reduce benefits; according to Brown a company with a variable rate would always have to give employees the higher rates.[47] Brown apparently believes that a variable rate would be fruitless because it's unclear under his view how any increase in rate could ever apply to current employees. In any case, this is all because Brown thinks that for anti-cutback purposes, ERISA doesn't

---

[46] Exhibit A (Poulin Dep.) at 122-23.
[47] Exhibit B (Brown Dep.) at 49.

distinguish between rate changes that happen by plan amendment and rate changes that happen automatically through the plan's variable rate.[48]   If Brown were familiar with ERISA §204 (g), the anti-cutback rule, he would know ERISA requires no such thing. The rule is simple:

### Decrease of Accrued Benefits Through Amendment of Plan

(1) The accrued benefit of a participant under a plan may not be decreased by an *amendment* of the plan….[49]

As this Court put it in 2002 in *Lechleiter v. P&G Distrib. Co.*:   "Not infrequently, the best guide to what a statute means is what it says."[50] "It is beyond cavil, then, that Section 204(g) applies only to amendments, not otherwise approved by ERISA, which would change benefits."[51] It doesn't apply to benefit decreases caused by variable interest rates incorporated in the plan. That Brown didn't know about this well-understood rule, and relies on his misunderstanding for his attack on variable rates, confirms that his relevant expertise is fatally shallow. By contrast, Poulin had no such problem; he immediately rejected the idea that adopting a variable rate causes the same anti-cutback problems that are caused by periodically changing fixed rates by amending the plan.[52]

---

[48] *Id.* at 50-51.
[49] ERISA §204 (g)(emphasis added).
[50] Exhibit I (2002 U.S. Dist. LEXIS 8054 at *5 (D. Conn))(citations omitted) See also *Dooley v. American Airlines, Inc.*, 797 F.2d 1447 (7th Cir., 1986)(variable rate changes aren't plan amendments).
[51] *Id.* at *6.
[52] Exhibit A (Poulin Dep.) at 136-39.

Brown also says that a variable rate would create an administrative nightmare because it would prevent plans from providing definite benefit projections since fluctuating rates would change the amount of a pension from time to time.[53] Here Brown ignores ERISA reality again. As Brown should know, working with variable rates is routine for pension plans – IRS Code §417 (e)(3) already requires plans to use the 30-year Treasury rate Poulin favors when reducing retirement annuities to lump sums. Yet while Poulin believes the Code's use of the 30-year Treasury rate is a good indication of what the Treasury thinks is a reasonable discount rate, Brown claims it's not and that the adoption of the Treasury rate was merely the product of politics. Here he gets himself into trouble yet again. He says adopting the Treasury rate for lump sum calculations was intended as a subsidy to employees rather than a way to achieve actuarial equivalency; lump sums Brown says are "absolutely" exempt from ERISA's requirements that alternative forms of payment must be actuarially equivalent:

> Q. As far as you know a lump sum payout of a normal retirement benefit doesn't have to be the actuarial equivalent of the normal retirement benefit, is that your understanding?
>
> A.  That's absolutely my understanding.[54]

Again Brown just doesn't understand the underlying law. Lump sum payouts of normal retirement benefits are not exempt from being actuarially equivalent to

---

[53] Exhibit B (Brown Dep.) at 46.
[54] *Id*. at 52, 63-64.

normal retirement benefits. Quite the opposite is true under ERISA§204 (c)(3): "If an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age…[i.e., a lump sum] the employee's accrued benefit shall be the actuarial equivalent of such benefit…." The Second Circuit in *Esden v. Bank of Boston* removed any doubt that Brown is once again wrong:

> A defined benefit pension plan, including one adopting a cash balance format, need not offer a lump sum distribution as an optional form of benefit, but when it does so provide, that distribution must be the actuarial equivalent of the accrued benefit valued according to the statutory methodology.[55]

In the eyes of the Second Circuit to make a lump sum distribution the actuarial equivalent of the normal retirement benefit a plan applies the statutory methodology -- the 30-year Treasury rate. The Second Circuit agrees with Poulin -- to the IRS the 30-year Treasury rate is an example of a reasonable interest rate to use as a discount factor because it picked that rate to make lump sums actuarially equivalent to normal retirement benefits.[56]

**Mortality Tables.**

Claude Poulin's testimony that interest rates work in tandem with mortality tables is uncontested. Nor has Dun & Bradstreet disputed his conclusion that the

---

[55] 229 F.3d 154, 173 (2d Cir. 2000).
[56] At the risk of too much repetition, this doesn't mean that plans must use a variable rate. ERISA doesn't require it. Plans are free to use fixed rates and change them periodically to make sure they produce actuarial equivalence. The problem here is that Dun & Bradstreet hasn't done anything.

damage done to employee pensions by a high interest rate assumption is made worse when the plan also assumes unreasonably high mortality rates.[57]  Dun & Bradstreet's pension plan assumes mortality rates consistent with those in the Group Annuity Mortality Table, 1971.[58] Poulin and Brown agree that these mortality rates assume high rates of mortality no longer accepted as reasonable. Poulin testified that the GATT table (based on the 1983 Group Annuity Mortality Table) and the GAR 94 Table have supplanted these higher tables.[59] Brown agrees, but flubs one of the references – he isn't sure whether the other table used today is called "GAR 93" or "GAR 94" (there is no "GAR 93").[60]  In any case, to achieve actuarial equivalency Brown would choose the same tables as Poulin, not the table in Dun & Bradstreet's plan.[61]  So, according to Poulin, any doubt about whether Dun & Bradstreet's rate is reasonable is removed by its coupling with an outdated mortality table that, by assuming the company's employees will have an artificially high mortality rate, assumes Dun & Bradstreet will have to pay pensions for a shorter period of time.[62]  What's more, even if Dun & Bradstreet's interest rate were reasonable, its use of an unreasonable mortality table isn't, and the plan table is a second violation of 26 C.F.R. 1.411 (a)-4T.

---

[57] Exhibit E (Poulin Report) at 5; Exhibit A (Poulin Dep.) at 17, 54, 60, 64.
[58] Exhibit J (Dun & Bradstreet Mortality Table); Exhibit A (Poulin Dep.) at 44.
[59] Exhibit K (GAR 94 Table); Exhibit E (Poulin Report) at 5.
[60] Exhibit B (Brown Dep.) at 74.
[61] *Id.*
[62] Exhibit A (Poulin Dep.) at 54, 63-64.

**Dun & Bradstreet's Interest Rate and Mortality Table Cost Employees Pension Money.**

Dun & Bradstreet also doesn't dispute that its employees' early retirement benefits are smaller because of the interest rate and the mortality tables it uses. Poulin's report details the differences:

> for employees electing to receive their retirement benefits at age 55, normal retirement benefits under the Plan that would otherwise be paid at age 65 are reduced by more than 62%. If the interest rate used to compute "actuarial equivalence" had been 5% instead of 6 ¾%, the reduction would have been 57.4% instead of 62.6%. To the same extent that mathematically a 20% reduction is twice as large as a 10% reduction, the reduction in the early retirement factors from 57.4% to 62.6% is 9% greater using the Plan's interest rate of 6 ¾% than it would be using a 5% rate.  In percentage terms, the reductions are even more substantial at higher ages being as much a 12.7% greater at age 64.[63]

Worse consequences flow when the harm caused by Dun & Bradstreet's mortality and interest rate assumptions is contrasted with the results achieved with the 30-year Treasury rate and the GAR 94 mortality table:

> …if these two actuarial assumptions were used for computing the early reduction factors under the Plan, the reductions would be much lower, as much as 22% lower in the case of a participant electing to receive benefit payments commencing at age 64.[64]

The difference between the pension produced by a reasonable interest rate (between 4.75% and 5.5%) and reasonable mortality assumptions (GAR 94) is the amount of pension benefit currently being forfeited by Dun & Bradstreet early

---

[63] Exhibit E (Poulin Report) at 4.
[64] *Id.* at 6.

retirees.  Requiring Dun & Bradstreet's and its pension assumptions to join the rest of the world in the 21st Century means future retirees also won't be harmed.  But quantifying the harm done and preventing future harm must wait for another day.[65] The only issue before the Court now is whether Dun & Bradstreet is entitled to summary judgment.

**Summary Judgment is Inappropriate.**

In *Mills v. Connecticut Judicial Department* this Court recently said summary judgment is only appropriate under Fed. R. Civ. P. 56(c) where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[66]  As far as this motion is concerned, the Court also said it must construe the facts in the light most favorable to the employees and resolve all ambiguities and draw all reasonable inferences in their favor.[67]  Summary judgment is appropriate only when reasonable minds couldn't differ about the evidence.[68]

Summary judgment is inappropriate here. Indeed, because of the complexity of the judgment to be made and the factual disputes raised by expert testimony, the Southern District of New York refused to grant summary judgment in the closest

---

[65] The *Esden* Court granted relief for a disparity worth $61.54. 229 F.3d at 161.
[66] Exhibit L (2003 U.S. Dist. LEXIS 5664 *4 (D. Conn. 2003)).
[67] *Id.*
[68] *Id.*

analogous case in this circuit, *District 65 UAW v. Harper & Row Publishers, Inc.*[69] Questions about whether Dun & Bradstreet's interest rate and mortality table are "reasonable" are questions about the most important material facts in the case, and they are hotly disputed. Under its standard in *Mills*, for the Court to grant Dun & Bradstreet summary judgment despite this heated dispute, the Court would have to conclude that the employees have completely failed to prove that either of these plan assumptions is unreasonable.[70] There can be little doubt here that the employees have presented substantial proof concerning the interest rate violation and uncontested proof concerning the outdated mortality table. Accordingly, Dun & Bradstreet's motion for summary judgment should be denied.

**Conclusion.**

Dun & Bradstreet's use of an out-of-date interest rate and superseded mortality tables reduces the company's pension obligations at its employees' expense.  The case boils down to an uneven battle of expertise between Claude Poulin and Edward Brown about how actuaries make pension plans comply with ERISA. The employees hope that after trial the Court will agree with them that Dun & Bradstreet should update its actuarial assumptions.  But for now, the Court should clearly deny the company's motion for summary judgment. It is based on a failure to prove that a plan complies with ERISA by looking like a small number of

---

[69] 696 F. Supp. 29, 33 (S.D.N.Y. 1988).
[70] *Id.*

other plans and that a 1995 determination letter from the IRS means that Dun & Bradstreet's interest rate assumption is still reasonable ten years and many market changes later.  Dun & Bradstreet's motion rests on these two red herrings and ignores the real issue of whether the company's assumptions can produce actuarially equivalent values. Poulin's uncontradicted testimony shows they do not. Accordingly, the Court should deny Dun & Bradstreet's motion for summary judgment.

THE PLAINTIFFS: Mary McCarthy, et al.

BY:   /s/ Thomas G. Moukawsher
Thomas G. Moukawsher (ct08940)
Ian O. Smith (ct24135)
Moukawsher & Walsh, LLC
21 Oak Street
Hartford, CT 06106
(860) 278-7000

# CERTIFICATION

I hereby certify that a copy of the foregoing has been mailed on this date to the following counsel of record:

>Patrick Shea
>Paul, Hastings, Janofsky & Walker LLP
>1055 Washington Boulevard
>Stamford, CT  06901-2216

Date:  December 20, 2004                    /s/ Thomas G. Moukawsher
                                            Thomas G. Moukawsher