# EXHIBIT A

1      UNITED STATES DISTRICT COURT

2      DISTRICT OF CONNECTICUT

3  * * * * * * * * * * * *
  MARY McCARTHY, CLAYTON BOROWSKI,
4  individually and on behalf of  *
  others similarly situated, and
5  individually, GAIL ADAMS, DONALD *
  BAKERT, et al,
6       Plaintiffs,    *
      VS.        CIVIL ACTION NO.
7        *  3:03 CV 0431
  THE DUN & BRADSTREET CORPORATION,   (SRU)
8  THE DUN & BRADSTREET CORPORATION *
  RETIREMENT ACCOUNT, and THE DUN
9  & BRADSTREET CAREER TRANSITION  *
  PLAN,
10      Defendants.    *
  * * * * * * * * * * * *

11

12           Stamford, CT

13           May 27, 2004

14           9:30 a.m.
        – – –

15     DEPOSITION OF CLAUDE POULIN
         – – –
16
  APPEARANCES:
17
    FOR THE PLAINTIFFS:
18

MOUKAWSHER & WALSH, LLC
19    BY: THOMAS G. MOUKAWSHER, ESQ.
         21 Oak Street, Suite 209
20       Hartford, CT 06106


21

      FOR THE DEFENDANTS:
22
      PAUL HASTINGS, JANOFSKY & WALKER, LLP
23    BY: PATRICK W. SHEA, ESQ.
         1055 Washington Boulevard, 9th Floor
24       Stamford, CT 06901-2217


25

                            2

1        Deposition of CLAUDE POULIN, taken on behalf

2   of the Defendant herein, for the purpose of

3   discovery and for use as evidence in this cause,

4   pending in the United States District Court for the

5   District of Connecticut, pursuant to Notice, before

6   Lorraine Calegari, Licensed Shorthand Reporter, No.

7   SHR.172, and a Notary Public within and for the

8   State of Connecticut, at the law offices of PAUL

9   HASTINGS, JANOFSKY & WALKER, LLP, 1055 Washington

10   Boulevard, Stamford CT on May 27, 2004 at 9:30 a.m.

11   at which time counsel appeared as herein before set

12   forth . . .

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1    Thereupon:

2    CLAUDE POULIN, whose business address is

3    11083 John Marshall Highway, Delaplane, Virginia,

4    being first duly sworn, as hereinafter certified,

5    was examined and testified as follows:

6    DIRECT EXAMINATION BY MR. SHEA:

7    Q.  Good morning, Mr. Poulin.

8    A.  We met already.  My name is Patrick

9    Shea.  I represent the Defendant in the case

10   of Mary McCarthy versus Dun & Bradstreet.

11       You have been disclosed as an

12   expert witness.  I'm here to ask you some

13   questions about your expert opinion in this

14   matter.

15       Before we get there, I assume since you're

16   an expert witness, you had your deposition taken

17   before, correct?

18   A.  Yes, I did.

19   Q.  I would just briefly like to review

20    some ground rules, which I'm certain are

21    familiar to you.

22          We're here in informal surroundings in a

23    law office conference room.  You recognize the oath

24    you just took that was administered with the same

25    force and effect as if you were testifying in a

4

1    court of law?

2    A.  Yes.

3    Q.  Likewise, you are subject to the

4    same penalties for perjury.

5    A.  Yes.

6    Q.  If I ask you a question and you

7    don't hear the question, would you please so

8    indicate and ask me to repeat it?

9    A.  Yes.

10    Q.  Is that acceptable?

11    A.  Yes.

12    Q.  If I ask you a question and

13    something is unclear about my question,

14    would you indicate that, and I'll try to

15    rephrase the question and make sure you do

16    understand it.  Is that acceptable?

17    A.  Yes.

18    Q.  If I ask you a question and you

19    answer it, it can reasonably be assumed that

20    you have both heard and understood the

21    question, correct?

22    A.  Yes.

23    Q.  Are you under the influence of any

24    medication or drugs?

25    A.  No.

5

1    Q.  Are you aware of anything that

2    would prevent you from testifying fully and

3    completely and accurately here today?

4    A.  No.

5    Q.  When were you retained in this

6    matter?

7    A.  I believe I was retained at the end

8    of last year 2003.

9    Q.  And how did that come about?  Could

10   you describe the process for me, please?

11   A.  I believe Mr. Moukawsher sent me

12   some documents and explained to me what the

13   issues were in this case and asked me to

14   review the documents and whether I could

15   provide an opinion on the issues.

16   Q.  Was that in a telephone

17   conversation?

18   A.  I believe it was, yes.

19   Q.  And what documents did he send you?

20   A.  I received copies of the Dun &

21   Bradstreet pension plan, 1994 and 2001 plan.

22   I also received a copy of the complaint.

23        I don't know how to qualify it or

24   describe it, a motion that was submitted by

25   the Defendant.

6

1    Q.  Memorandum of law, perhaps?

2    A.  I believe so.  Memorandum of law

3    submitted by the Defendant.  There may have

4    been other documents, but I don't recall.

5    Q.  Okay.  What specific issue or

6    issues were you asked to provide an opinion

7    by Mr. Moukawsher?

8    A.  I was asked to ascertain whether

9    the interest rate used by the Dun &

10   Bradstreet pension plan to calculate early

11   retirement reductions for deferred vested

12   employees was a reasonable rate.

13        And whether the values computed with these

14   rates were actuarially equivalent to normal benefit

15   provided under the plan.

16    Q.   Okay.  And in that initial phone

17   call, when you were asked whether you could

18   provide an opinion on that, did you tell Mr.

19   Moukawsher that you could or did you reserve

20   that until you had seen the documents?

21    A.   I believe I told him that I needed

22   to review the documents in order to

23   formulate an opinion.

24    Q.   In that initial phone call with Mr.

25   Moukawsher, did he tell you what the

7

1   interest rate was that the Dun & Bradstreet

2   plan employed to calculate early retirement

3   benefits for the deferred vested retirees?

4      A.  He probably did, but I do not

5   recall the tenor of that very first

6   conversation.

7      Q.  That first conversation?

8      A.  Precisely.

9      Q.  Would it refresh your recollection

10  to ask you if he used the figure either 6

11  3/5ths percent or 6 3/4s percent?

12     A.  I do not recall this particularly,

13  but I do recall that after I reviewed the

14  documents we had a telephone conversation

15  where I do not recall whether I raised the

16  issue or Mr. Moukawsher raised the issue,

17  but where the rate was, in fact, 6 3/4s

18  percent.

19     Q.  You recall, if not being discussed

20  in the first phone call, you recall it being

21  discussed in a subsequent phone call after

22  you had a chance to review the documents?

23          MR. MOUKAWSHER:  Let me

24    interpose an objection.  I think I know

25    where you're going with this.  I don't have



                              8



 1    a problem with your attempting to discern

 2    when he first learned whether it was 6

 3    3/5ths or 6 3/4s, but I do have a problem

 4    where this may take you with respect to

 5    attorney-client privilege and attorney work

 6    product.

 7              And so, with respect to when he

 8    found out what the rate was, I don't have

 9    any objection to that question.  If it's

10    deeper and it goes into what I did and what

11    we discussed, I'm going to have an objection

12    to that.

13        MR. SHEA:  I think we may have

14    to sort that out.

15        MR. MOUKAWSHER:  I just suggest

16    if you ask whether he knew the rate --

17        MR. SHEA:  I do intend to go

18    into conversations with counsel and as an

19    expert witness that bears on the formation

20    of the expert witness's opinion.  I don't

21    think you can assert the privilege on that.

22    You're welcome to do so.  We can sort that

23    out.

24        MR. MOUKAWSHER:  Again, we can

25    avoid that if you ask when he learned of

9

1    certain things as opposed to asking what he

2    and I said, what he and my clients discussed

3    together.  I'm just trying to avoid a

4    problem.

5    BY MR. SHEA:

6        Q.   Your best recollection is either in

7    the first conversation or in the second

8    conversation that occurred, after you

9    reviewed the documents, you were aware that

10    the interest rate was 6 3/4s percent,

11    correct?

12        A.   Yes.

13        Q.   In either of those initial

14    conversations with Mr. Moukawsher, did you

15    express a view as to the reasonableness of

16    using 6 3/4s percent as an interest rate?

17        A.   I don't believe I did initially.

18        Q.   Do you recall making any comment

19    whatsoever as to the use of a 6 3/4s

20    interest rate in either that initial

21    conversation you had with Mr. Moukawsher or

22    in the subsequent conversation you had with

23    him following the review of the documents?

24        A.   Would you repeat the question.

25          (Question read.)

                              10

1    A.  Well, first, I discussed the

2    6 3/5ths as opposed to 6 3/4s.

3    BY MR. SHEA:

4    Q.  Okay.

5    A.  And we ascertained by reviewing the

6    documents that the actual rate was 6 3/4s

7    percent.  And I believe that I told Mr.

8    Moukawsher that in order to formulate an

9    actuarial opinion, I had to also make some

10   tests and compute actuarial present values

11   based on not only the interest rate, but

12   also the mortality table that is used by the

13   plan in order to determine the actuarial

14   deduction factors.

15     Q.   Do you recall anything else you

16     said in either of those conversations about

17     the 6 3/4s percent rate?

18          MR. MOUKAWSHER:  I guess I've

19     got to object on the grounds of work product

20     and attorney-client privilege, because I

21     think if the conversations between Mr.

22     Poulin and I are subject to discovery, then

23     everything I ever talked to him about and

24     everything he and I discussed about as far

25     as the stocks would be subject to your

11

1     examination.

2          Because it would intrude upon

3     attorney-client privilege and work product,

4     I'm going to instruct him not to answer and

5    encourage that you phrase it some other way.

6        If you ask how he acquired

7    knowledge, I have no problem.

8        MR. SHEA:  We probably need to

9    make a record.  I'm not saying that

10   everything the two of you had discussed

11   would be discoverable, but I certainly think

12   that expert opinions and off-the-cuff

13   opinions of an expert witness are subject to

14   discover what he's testifying about and is

15   not a privileged communication.

16       MR. MOUKAWSHER:  I agree with

17   your right to go into when did he formulate

18   his opinion and when did he first render an

19   opinion, but when you phrase it in a way

20   which calls for him, basically, to recount

21   his discussion with me, I have a problem.

22       If you focus on when did he

23   first formulate an opinion, I have no

24   problem, because that's just when did he

25   formulate his opinion.  Did he form an

12

1    opinion during that conversation or earlier,

2    I have no problem with it.

3         MR. SHEA:  I understand.

4         MR. MOUKAWSHER:  Or did he

5    render an opinion, I have no problem.

6         If it is phrased in a broad

7    way, what did you talk about, I have a

8    problem.

9         MR. SHEA:  I think we need to

10   make a record and I'll go ahead and ask the

11   question and you give your instructions and

12   we'll see how we proceed from there.

13   BY MR. SHEA:

14     Q.  Did you say anything to Mr.

15   Moukawsher about the prevalence of interest

16    rates in this range as used in defined

17    benefits plans in that conversation?

18          MR. MOUKAWSHER:  Objection.

19    Attorney-client privilege and attorney work

20    product.

21          I instruct the witness not to

22    answer the question as phrased, but

23    encourage it to be rephrased.

24    Q.   Did you have any discussions at all

25    about entry standards with respect to the

13

1    use of interest rates in the range to

2    calculate the actuarial equivalence of early

3    retirement benefits as defined?

4          MR. MOUKAWSHER:  Same

5    objection.  Instruct the witness not to

6    answer the question and encourage it to be

7    rephrased to focus on when he formed an

8    opinion and when he rendered an opinion.

9    BY MR. SHEA:

10    Q.   How many communications have you

11    had with Mr. Moukawsher related to this

12    representation?

13    A.   I don't know.

14    Q.   Well, you recall at least an

15    initial phone conversation in which you were

16    retained, correct?

17    A.   Yes.

18    Q.   Was that followed by a written

19    communication from Mr. Moukawsher?

20    A.   Confirming the retainer.

21    Q.   I assume you sent something in

22    writing after the first phone call, correct?

23    A.   Yes.

24    Q.   And that was the materials you

25    previously identified, correct?

14

1    A.  This is correct.

2    Q.  A retainer agreement?

3    A.  No.

4    Q.  Was there a letter or other written

5    documents enclosing the materials or

6    discussing them?

7    A.  I do not recall.

8    Q.  Other than getting the materials,

9    which you received in one written

10   communication, have you had other written

11   communications from Mr. Moukawsher?

12        MR. MOUKAWSHER:  Objection to

13   the form.

14        MR. SHEA:  Let me try

15   rephrasing it.

16   BY MR. SHEA:

17   Q.  With the exception of the initial

18   documents that were sent to you, have there

19   been any other written communications from

20   Mr. Moukawsher to you?

21         MR. MOUKAWSHER:  Objection to

22   form.  Let me say why.

23         He works with me in more than

24   one case.  We want to make it clear.

25   BY MR. SHEA:

15

1    Q.  Let me clarify, with respect to

2   this matter, unless I tell you otherwise, we

3   can assume the questions relate to this

4   matter.

5        Other than that first communication in

6   which written communication with Mr. Moukawsher

7   provided you with materials that you've testified

8    about, have you had any other written communications

9    from Mr. Moukawsher?

10       A.   I do recall a fax or an e-mail that

11   may have been sent six weeks later, and I

12   only recall the emphasis on Count 3 and

13   perhaps Count 4 of the amended complaint.

14       Q.   What do you understand the

15   reference to Count 3 to mean?

16       A.   It's been a long time, but I

17   understand that it is related to actuarial

18   reasonableness of the interest rate.  And

19   the fact sometimes there might be actuarial

20   reasonableness and actuarial equivalence.  I

21   might have also used the term actuarial

22   equivalence.

23       Q.   Did the communication draw a

24   distinction between actuarial reasonableness

25   and actuarial equivalence?

1          MR. MOUKAWSHER:  Objection.

2     A.  No.

3  BY MR. SHEA:

4     Q.  What did you understand the

5  reference to count 4?

6          MR. MOUKAWSHER:  Let me

7  interpose an objection.

8          I instruct the witness, to the

9  extent that you're testifying of what you

10  understood, what you believed and came to

11  believe and what you understand the

12  complaint to mean, that's fine.

13          I instruct you not to testify

14  as to what I said to you, what you said to

15  me, or anything else in these

16  communications.

17          Just confine it to what your

18  statements were.  That's what the question

19   calls for, so I don't have to object to it.

20         THE WITNESS:  I would not be

21   able to distinguish at this point without

22   looking at the document.

23      Q.   Other than the issue of the matter

24   that you've testified you were asked to form

25   an opinion or initially, i.e. to ascertain

17

1   whether the interest rate used by Dun &

2   Bradstreet to calculate early retirement

3   benefits for the deferred vested retirement

4   was a reasonable rate, were you asked to

5   form an opinion on any other aspect of this

6   case?

7      A.   I believe it follows after

8   ascertaining whether the interest rate is

9    reasonable, whether the values produced by

10   this interest rate would represent actuarial

11   equivalence of the normal retirement

12   benefit.

13        But as I mentioned earlier, I also

14   said that this determination has to be done

15   in conjunction with the mortality table that

16   is used by the plan in order to compute

17   these factors.

18   Q.  Other than that, have you been

19   asked to form an opinion on any other issue

20   in this case?

21   A.  I don't think so.

22   Q.  Back to written communication.

23   Other than this -- well, let me ask the

24   question, just to make a record?

25        What was the substance of the communication

18

1  in the fax or e-mail that you received from Mr.

2  Moukawsher approximately six weeks later?

3       MR. MOUKAWSHER:  I didn't hear

4  the whole question.

5       MR. SHEA:  What was the

6  substance of the communication contained in

7  the fax or e-mail the expert witness, Mr.

8  Poulin, received from Mr. Moukawsher six

9  weeks later?

10       MR. MOUKAWSHER:  Objection.

11  Attorney-client privilege.  Attorney work

12  product.

13       Instruct the witness not to

14  answer.

15  BY MR. SHEA:.

16    Q.  Did the fax or e-mail received from

17  counsel contain any information that you in

18  any way considered in formulating your

19  opinion in this case?

20    A.  No, I don't think so because I

21    already had the documents --

22       Q.   The pension plan documents?

23       A.   -- that were necessary for me to

24    formulate the opinion vis-a-vis the

25    actuarial reasonableness, slash, actuarial

19

1    equivalent value.

2       Q.   Nothing said in that communication

3    had any bearing on your opinion?

4       A.   I don't think so.

5       Q.   What other written communications

6    -- by written I mean, obviously, paper

7    communication, but also included within that

8    e-mails and faxes -- have you received from

9    Mr. Moukawsher in connection with this

10    matter?

file:///Z|/D/Dun%20&%20Bradstreet/Claude%20Poulin.txt

11      MR. MOUKAWSHER:  Objection to

12   the form.

13      A.   Besides the documents that I

14   enumerated before and those listed in my

15   report, I don't think I received any other

16   communications from Mr. Moukawsher.

17   BY MR. SHEA:

18      Q.   What written communications -- by

19   written I mean the broad definition we

20   talked about -- have you made to Mr.

21   Moukawsher in connection with this matter?

22      A.   I believe the only communication

23   was my April 30th report.

24      MR. SHEA:  Let's have this

25   marked as Poulin Exhibit 1, please.

20

file:///Z|/D/Dun%20&%20Bradstreet/Claude%20Poulin.txt (28 of 209)12/16/2004 5:01:34 AM

1          (Defendant's exhibit for

2     identification marked No. 1:  Disclosure and

3     Report.)

4     BY MR. SHEA:

5        Q.   Showing you a document, Mr. Poulin,

6     we marked as Poulin Exhibit 1, is this the

7     report you're referring to?  I should say

8     attached to this disclosure, is this the

9     report you're referring to.

10        A.   Yes, it is.

11        Q.   And that is your signature that

12    appears on page 7?

13        A.   Yes, it is.

14        Q.   And did you not verify the

15    accountings in this report under penalties

16    of perjury?

17        A.   Could you repeat the question?

18        Q.   You verified what is stated here in

19    this report under penalty of perjury, did

20    you not?  If you look right above your

21    signature on page 7.

22    A.  Yes.

23    Q.  And before you did that, you read

24    the report over carefully, correct?

25    A.  Yes, I did.


21


1    Q.  And you assured yourself that

2    everything in the report was true, did you

3    not?

4    A.  Yes.

5    Q.  Did you prepare any drafts of this

6    report?

7    A.  I type my reports myself, so that's

8    been a working document and I don't keep any

9    drafts.

10    Q.  Before finalizing this report, did

11    you share a draft of the report or any

12    portion of the report with anyone?

13        A.  I believe the day before I sent

14    this report I e-mailed the report to Mr.

15    Moukawsher.  And there were some

16    typographical errors that were corrected,

17    but the substance of the report does not

18    change, has not been altered.

19        Q.  So as a result of the review by

20    Attorney Moukawsher, the only changes that

21    were made were corrections of typographical

22    errors; is that correct?

23        A.  Substantially, yes.

24        Q.  When you say "substantially," that

25    makes me wonder, do you recall any changes

22

1    other than the corrections of typographical

2    errors as a result of the review by Attorney

3    Moukawsher?

4            MR. MOUKAWSHER:  I'm going to

5    object to the question as phrased, and I

6    instruct him not to answer as it was

7    phrased, because it asks what I did about my

8    work product or whether it was the cause of

9    something.

10           I wouldn't object to it if it

11   were phrased:  After the conversation did

12   you make changes and what kinds of changes

13   did you make?

14           MR. SHEA:  Well, I think the

15   question as phrased is proper, but I

16   understand the instruction and I will ask a

17   follow-up question, not withdrawing the

18   earlier question.

19           We'll deal with that when we

20   sort out all the issues of privilege you're

21   raising.

22           Without withdrawing the

23   question that you've been instructed not to

24    answer, let me ask you this question.

25    BY MR. SHEA:

23

1    Q.  Following the transmittal of the

2    draft the day before to Attorney Moukawsher,

3    what changes were made in the draft report,

4    if any, other than corrections of the

5    typographical errors?

6    A.  I do not see anything except the

7    emphasis in paragraph 21, "... a reduction

8    of the annuity by as much as 6 percent per

9    year ..." the italics, I don't see any words

10    that were changed.

11    Q.  All right.  When was the first time

12    you met face-to-face with Mr. Moukawsher in

13    connection with this matter?

14    A.  I have met Mr. Moukawsher before,

15   but I do not think we met face-to-face in

16   connection with this matter.

17    Q.  Until this morning?

18    A.  Until this morning.

19    Q.  Can you give me an estimate of the

20   number of telephone conversations you've had

21   with Mr. Moukawsher concerning this matter?

22    A.  Five or six, perhaps.

23    Q.  We've covered the first two.  Do

24   you have a specific recollection of any

25   other telephone conversations you had with

24

1   Mr. Moukawsher concerning this matter?

2    A.  I do recall a telephone

3   conversation as related to a deadline as to

4    when the report had to be filed or would be

5    ready.

6        Q.   Other than the first two

7    conversations, do you recall in these five

8    of six phone calls any other conversations

9    in which the substance of your opinion was

10    discussed with Mr. Moukawsher?

11        A.   I do recall a conversation where I

12    mentioned that --

13             MR. MOUKAWSHER:  I'm going to

14    interpose an objection and instruct the

15    witness that the question calls for a yes or

16    no answer.

17             I'll let you give that yes or

18    no answer as to whether you had any

19    substantive discussions.

20             But as to the contents of those

21    substantive discussions, I instruct you not

22    to disclose the contents of those

23    discussions because they're privileged.

24             But you can answer the

25    question:  Do you remember any other

25

1    conversations where the substance of your

2    opinion was discussed?

3        THE WITNESS:  Yes, I do.

4    BY MR. SHEA:

5        Q.  On how many additional

6    conversations do you recall substantive

7    discussions with Mr. Moukawsher?

8        A.  Perhaps two.

9        Q.  I'm just trying to make my record

10    here.  Give me your best and fullest

11    recollection of the discussions you had with

12    Mr. Moukawsher concerning your opinions in

13    this matter?

14        MR. MOUKAWSHER:  I object on

15    the grounds of attorney-client privilege and

16    attorney work product and instruct Mr.

17    Poulin not to answer the question.

18            Counsel is making a record on

19    this too.  Then if counsel wants to discuss

20    authority for the position that these

21    questions are appropriate, either in some

22    break or at some point during the

23    deposition, I would be happy to do so.

24            But no articulation for

25    allowing what I think is intrusive of work

26

1    product and attorney-client privilege has

2    been made.  I'm not saying you have to.

3            MR. SHEA:  Why don't we hold

4    that for a break.  May simply be an issue we

5   have to resolve.

6   BY MR. SHEA:

7       Q.  Did Mr. Moukawsher say anything to

8   you in any of these phone calls which you in

9   any way considered in forming your opinion

10   in this matter?

11          MR. MOUKAWSHER:  I'm going to

12   object and give the same instruction.

13      Q.  All right.  What did you do to

14   prepare for today's deposition?

15      A.  I reviewed my report.  I perused

16   the other documents such as the plan, part

17   of the complaint and part of the Defendant's

18   motion as well as sections of the ERISA code

19   and the Internal Revenue Code.

20          And the documents that I referred to in my

21   report, I believe, the American Benefits Council

22   testimony or briefs submitted to the IRS lab two

23   months ago or last month.

24      Q.  Did you do anything else to prepare

25   for today's deposition?

27

1     A.  No.

2     Q.  Did you have any telephone or

3  in-person conversations with counsel to

4  prepare for today's deposition?

5     A.  Yes, we did, yesterday.

6     Q.  You said that was yesterday?

7     A.  Yes.

8     Q.  That was a telephone conversation?

9     A.  Yes.

10     Q.  And approximately how long did it

11  last?

12     A.  Maybe half an hour.

13     Q.  Do you recall what section of ERISA

14  and the Internal Revenue Code you reviewed

15  in preparation for today's deposition?

16     A.  I did review the section of the

17    code that deals with the applicable

18    mortality table and applicable interest rate

19    prescribed by the IRS for purposes of

20    Section 417(e).

21         And I did review the sections of ERISA and

22    the code dealing with the vesting requirements,

23    namely section 203 of ERISA and 411 of the code,

24    which I understand encompasses both sections 203 or

25    204 of ERISA.

28

1    Q.  Did you review any other sections?

2    A.  Section 206 of ERISA, I believe.

3    Q.  Anything else?

4    A.  I often refer to ERISA and the

5    code.  I don't recall referring to other

6    sections than the ones I mentioned.

7    Q.  And when you say you referred to

8    those sections of ERISA and the code, did

9    you also refer to the treasury regulations

10   that interpret and implement those sections?

11   A.  Yes, I did.

12   Q.  Have we now, to the best of your

13   recollection as you sit here today,

14   disclosed all communications you had with

15   counsel, Attorney Moukawsher, concerning

16   this matter?

17   A.  I believe so.

18   Q.  Are you currently employed?

19   A.  Yes.

20   Q.  By whom?

21   A.  Poulin Associates, Inc.

22   Q.  As the name suggests, that's a

23   corporation?

24   A.  It is a corporation that I founded

25   in 1980 at which I am the president.

29

1    Q.  How many employees does Poulin

2    Associates have?

3    A.  Poulin Associates, Inc. has a

4    subsidiary in Canada called Poulin Actuarial

5    Services and in total the number of

6    employees is seven or eight.

7    Q.  Okay.  Where are the offices in the

8    United States located?

9    A.  The main office of Poulin

10   Associates in the United States for the last

11   ten years has been in Delaplane, Virginia

12   and we're in the process of relocating to

13   Atlanta, Georgia.

14   Q.  How many employees work out of that

15   office?

16   A.  Three.

17   Q.  And where is Poulin Actuarial

18    Services located in Canada?

19    A.  In Montreal.

20    Q.  And I take it it has four or five

21    employees there?

22    A.  Right.

23    Q.  Where do you reside?

24    A.  At the present time I have two

25    residences, one in Virginia, in Delaplane,

30

1    Virginia and Atlanta, Georgia.

2    Q.  Why is Poulin Associates in the

3    process of relocating to Atlanta?

4    A.  Because we feel it's a better

5    environment, better working environment.

6    Q.  Who is the "we" you're referring

7    to?

8     A.   The "we" is the second main

9   employee, my spouse.

10     Q.   What is her name?

11     A.   Shay McNeal-Poulin.

12     Q.   And what is her position with

13   Poulin Associates?

14     A.   She is the administrative

15   assistant.

16     Q.   You mentioned there is a third

17   employee in the Virginia office?

18     A.   Yes.

19     Q.   Who is that?

20     A.   Darla Rivi, who is senior employee

21   benefits consultant and a certified employee

22   benefits specialist.

23     Q.   If you'll take a moment and turn to

24   Exhibit A, the expert witness disclosure,

25   this is your curriculum vitae; is it not?

31

1     A.  Yes, it is.

2     Q.  And is all of the information

3  contained in your curriculum vitae true,

4  complete and accurate?

5     A.  Yes, it is.

6     Q.  You list under employment in

7  describing Poulin Associates, the last item

8  says, quote:  "Special expertise as a

9  consultant and an actuarial expert witness

10  in ERISA cases (pension and welfare

11  benefits)."  Do you see that?

12    A.  Yes, I do.

13    Q.  In the past year give me your best

14  estimate of what percentage of your time has

15  been devoted to acting either as a

16  consultant or as an expert witness in ERISA

17  cases or ERISA litigation?

18        MR. MOUKAWSHER:  Objection to

19  the form.

file:///Z|/D/Dun%20&%20Bradstreet/Claude%20Poulin.txt

20      A.   I define myself as an actuarial

21    consultant, and to that extent I spend a

22    hundred percent of my time as a consultant.

23           If we restrict your question to actuarial

24    expert witness, then there would be a different

25    answer because, for instance, I am the actuarial

32

1    trustee of the Connecticut State Employees

2    Retirement Commission of which I spend a certain

3    amount of time every month.

4      Q.   Well, let me see if I can sharpen

5    it up.  What I'm trying to do is get your

6    best estimate of the amount of time that you

7    spend acting as either a consultant or an

8    expert witness,

9           Sometimes, for instance, if you have a big

10   case, you'll retain somebody as a consultant just to

11   provide you advice, even though you're not going to

12   have that person testify.

13           So what I'm really looking for is the

14   amount of time, the estimate of percentage of time

15   in the past year you've devoted your work to ERISA

16   litigation matters that are actually in court or

17   consulting with attorneys who are bringing ERISA

18   litigation matters.  I would include in that if

19   someone is making an ERISA claim through an

20   administrative claims review process.

21           I'm trying to get that percentage of your

22   time as distinct, for example, to the time you

23   devote as actuarial trustee of Connecticut State

24   Employees, where you are not employed to assist in

25   litigation or litigation related matters.

33

1          With that clarification, can you give me a

2    percentage of time?

3        A.   The percentage varies all the time.

4    I do provide actuarial consulting services

5    in the collective bargaining process to a

6    number of labor unions and/or associations,

7    which are not really related to litigation.

8          But I would say that a percentage

9    of my time is devoted to litigation that

10   averages around 50 percent, 55 percent.

11       Q.   So roughly half or a little bit or

12   more of your time is devoted to litigation

13   related matters, correct?

14       A.   As I said, it varies.

15       Q.   But in terms of best estimate over

16   the past year?

17       A.   Some months may be 30 percent.

18   Some months may be 70 percent, depending on

19   the nature of the assignments.

20       Q.   Let me try it this way:  Does

21    Poulin Associates keep track of billable

22    hours?

23       A.  Yes.

24       Q.  Can you tell me for the last year

25    or the last calendar year -- is it more

34

1     convenient to examine approximately how many

2     billable hours you had?

3        A.  No, I can't tell you how many

4     billable hours, but I believe that the

5     income is probably around 50 percent.

6        Q.  So roughly 50 percent of the

7     revenues of Poulin Associates is generated

8     by litigation related matters?

9        A.  I believe so.

10       Q.  Do you have an estimate of the

11   number of times you've been retained as

12   either a litigation consultant or as an

13   expert witness?

14       A.   Do you mean the number of times or

15   the --

16       Q.   The number of times, number of, you

17   know, retentions.

18       A.   Over how long a period?

19       Q.   Let me ask you this foundational

20   question:  When did you start doing this?

21       A.   1967.

22       Q.   Let's start then -- I don't want to

23   go back that far.

24           I think you stated on your CV that Poulin

25   Associates was founded in 1980; is that correct?

35

1    A.  Yes.

2    Q.  Take that increment of time

3  estimate, the number of matters in which

4  you've been engaged since the 1980s as an

5  expert witness or litigation consultant.

6    A.  I don't have a number.  I have no

7  idea how many times.

8    Q.  How many cases have you been

9  involved in?  How about within the past ten

10  years?

11    A.  Fifteen or 20, perhaps, 15.

12    Q.  Of those roughly 15 to 20

13  engagements, how many of them involved ERISA

14  matters?

15    A.  I believe they all did in a certain

16  fashion.  I believe there is an exception.

17    About ten years ago -- well, the

18  last ten years perhaps not -- but I was

19  involved in a race discrimination case that

20  involved actuarial expert analysis, but I do

21  not believe it was an ERISA case.

22    Q.  Do you remember the name of the

23   case?

24       A.   I believe it was Blenconbaker and

25   it involved a railroad and its union, which

                              36

1   is now defunct.

2       Q.   Do you know the name of the

3   railroad?

4       A.   Name that comes to mind is CSX, but

5   I'm not sure of this because there have been

6   so many mergers and acquisitions.

7       Q.   Throughout your career -- I don't

8   want to restrict this to the past ten years

9   -- throughout your career in how many ERISA

10   cases have you testified on behalf of the

11   employer?

12       A.   Testified --

13    Q.  Right.

14    A.  -- in court?

15    Q.  Right.  Or let's broaden it.

16        Throughout your career in how many

17   cases have you testified in an ERISA case on

18   behalf of an employer either in court or in

19   a deposition or by submitting sworn

20   testimony in the form of an affidavit?

21    A.  By employer do you mean defendants?

22    Q.  Yes.

23    A.  In the Blenconbaker case I did

24   prepare a report in favor of the defendants.

25        There was another case in Maryland

37

1   five or six years ago.  The name that comes

2   to mind is Obocarizi -- it was a difficult

3    name for me to remember -- where I did

4    prepare a report on behalf of the defendant.

5        Q.   Those are the only two occasions

6    that you can recall?

7        A.   As I recall, yes.

8        Q.   And I think you indicated earlier

9    that Blenconbaker was not actually an ERISA

10   case, was race discrimination?

11       A.   That is correct.

12       Q.   What was the issue in the Obocarizi

13   case?

14       A.   There was a multi-employer plan

15   which there had been and amendment in the

16   past providing for a cost of living increase

17   and it was later found out that it was based

18   on erroneous actuarial calculations.

19           A court canceled the amendment and it was

20   retained by the defendant to make some calculations

21   along with other actuarial firms that represented

22   various parties.

23       Q.   So the nature of your report went

24    to relief that was to be ordered as a result

25    of correcting or canceling the amendment

38

1    based on the erroneous actuarial

2    calculation?

3        A.   As I understand there were

4    negotiations between the parties based on

5    our collective actuarial analysis.

6        Q.   Which member of the unit did you

7    provide services to?

8        A.   I believe there were four groups,

9    some employers, some trustees and some

10    active employees and retirees.  As I recall,

11    the trustees had sued the employer.

12            And the retirees -- it's been a long time

13    -- I believe it was a particular group of retirees

14  who had been sued because they had received too many

15  benefits under the plan.

16      Q.  But if I understood your earlier

17   testimony, I think you indicated you had

18   given a report on behalf of the employer,

19   correct?

20      A.  This was in the Blenconbaker case.

21      Q.  Right.  Okay.

22         For the Obocarizi case you did not prepare

23  a report?

24      A.  Not on behalf of the employer.

25      Q.  So the only instance in your career

39

1   where you can recall testifying on behalf of

2   the employer, either in court or at a

3   deposition or submitting an affidavit, is

4    the Blenconbaker case?

5        A.   And there was another case

6    associated with Blenconbaker -- the name

7    escapes me -- starts a "V" -- I want to say

8    Volker -- that was also similar with similar

9    issues.

10       Q.   Part of the same case?

11       A.   I don't think so.

12       Q.   But in any event, the only instance

13    in which you testified on behalf of the

14    employer in your career involved non ERISA

15    issues; is that fair to say?

16       A.   I believe so.

17       Q.   And the 15 to 20 expert witness

18    engagements you referred to in the past ten

19    years have all been on behalf of employees

20    suing an employer, correct?

21           MR. MOUKAWSHER:  Objection to

22    the form.

23       A.   With the exception of the BB case,

24    I believe that's correct.

25       Q.   When you say "with the exception of

40

1   the BB case," you mean Blenconbaker?

2       A.   I believe you restricted your

3   question to ERISA.

4       Q.   What is the BB case that is the

5   exception?

6       A.   Well, it was not employees suing

7   the employer.

8       Q.   Got it.  That was a multiplier plan

9   dispute?

10      A.   This is correct.

11      Q.   On how many matters have you been

12   retained by Mr. Moukawsher or by Mr.

13   Moukawsher's law firm?

14      A.   I cannot answer this question

15   directly because I met Mr. Moukawsher in the

16   context of other litigation where I was not

17   retained by Mr. Moukawsher.

18      Q.  What litigation was that?

19      A.  CIGNA.

20      Q.  That is the Amara versus CIGNA

21   Corporation matter?

22      A.  That is correct.

23      Q.  That is the second last item on

24   Exhibit B, correct?

25      A.  Yes.

41

1      Q.  Who retained you in the CIGNA case?

2      A.  Attorney Steven Bruce.

3      Q.  And you met Mr. Moukawsher as one

4   of Mr. Bruce's co-counsel?

5      A.  This is correct.

6      Q.   And who is the party who was paying

7    your expert witness fees in the Amara case?

8      A.   Mr. Bruce.

9      Q.   With the exception of the Amara

10   case, on how many matters have you worked

11   with Mr. Moukawsher or his law firm?

12     A.   Well, besides this one, the other

13   instances were minor.  There was a case

14   involving an Aetna pension plan, a SNET

15   pension plan.  I don't recall any other

16   cases.

17     Q.   Was the Aetna case a lawsuit?

18     A.   I do not recall whether it was a

19   determination of benefits or an actual

20   lawsuit, but my involvement was minimal with

21   that case.

22     Q.   What is your expert witness fee

23   arrangement in this case?

24     A.   We bill our services on an hourly

25   basis.

42

1     Q.   And what is your hourly rate?

2     A.   My hourly rate is $375.

3     Q.   Has anyone worked on this

4   engagement for this matter other than

5   yourself?

6     A.   Darla Rivi, senior pension

7   consultant.

8     Q.   And what work has she done on this

9   matter?

10    A.   She assisted me in preparing the

11   exhibits, I believe, C and D.

12    Q.   And what is her hourly rate?

13    A.   One ninety-five

14    Q.   Has anyone else assisted you in

15   this engagement?

16    A.   I don't think so.

17    Q.  And approximately how many hours

18  have you spent?

19    A.  I don't know.

20    Q.  Do you have any estimate?

21    A.  I want to say 25 to 30 hours, but

22  my experience has been that I always spend a

23  little bit more time on a report.  I recall

24  maybe 25 to 30 hours, maybe more, not much

25  more.

43

1    Q.  Have you rendered a bill for

2  services in this matter?

3    A.  Yes, I did.

4    Q.  When did you render that bill?

5    A.  I believe a bill was sent earlier

6  in the month of May for prior work.

7       Q.   What was the amount of the bill?

8       A.   I do not recall.

9       Q.   Can you give an estimate?

10      A.   I don't know.  I don't recall.

11      Q.   Do you have an estimate of the

12   total of fees you've received from Mr.

13   Moukawsher's law firm from all the

14   engagements you've been employed by him?

15      A.   No.

16      Q.   You can't give me an estimate at

17   all?

18      A.   I have no idea.

19      Q.   Aside from preparing the report and

20   the exhibits attached thereto, what other

21   work have you done in this matter?

22      A.   Besides preparing this report?

23      Q.   Right, and doing the calculations

24   that are reflected in Exhibits C and D, what

25   other work have you done in this matter?

1    A.  I don't recall doing any work

2   besides preparing this report.

3    Q.  Have you done any calculations

4   other than the calculations reflected in

5   this report?

6    A.  No.  I have attempted to ascertain

7   the mortality table that was used by the

8   plan and comparing it to other mortality

9   tables, because the mortality table was not

10   identified.

11        As a matter of fact, the mortality table

12   was not part of the 2001 pension plan.  I could only

13   determine that it was a relatively old mortality

14   table with high mortality rates, but this was not

15   part of my report.  It was in the process of

16   formulating my opinion.

17    Q.  But never did identify the

18    mortality table that was used?

19    A.  No, to the exception that the rates

20    were close to a mortality table called Group

21    Annuity Mortality Table, 1971, as I recall.

22        Q.  Do you recall any other work that

23    you've done in this matter that you haven't

24    already testified about?

25        A.  This last section reminded me that

45

1    I may have asked for the actual mortality

2    table of the 2001 plan, if it existed, to be

3    told by Mr. Moukawsher that it did not

4    appear to be available.

5        Q.  Do you recall any other work you've

6    done in this engagement other than what you

7    testified to?

8        A.  I did the work related to the

9    preparation of Exhibits C and D, which

10   involved actual calculations based on

11   certain interest rates and mortality tables.

12       Q.  I understand that.  Anything else?

13       A.  No, not that I recall.

14           MR. SHEA:  All right.  Let's

15   take a break.

16           (Whereupon a break was taken.)

17   BY MR. SHEA:

18       Q.  Mr. Poulin, the ERISA plan we're

19   dealing with is a defined benefit plan,

20   correct?

21       A.  Yes.

22       Q.  Is it fair to say that over your

23   career you've seen many defined benefit

24   plans?

25       A.  Yes, it is.

46

1      Q.   Hundreds, perhaps thousands; isn't

2    that right?

3      A.   Probably thousands, yes.

4      Q.   And we're dealing here with a

5    provision for early retirement benefits to

6    be paid to deferred vested employees,

7    correct?

8      A.   Yes.

9      Q.   And that's a relatively common

10    feature of defined benefit plans; isn't it?

11    A.   Yes.

12     Q.   And in this particular case the

13    plan provides that benefits will be the

14    actuarial equivalent of the normal

15    retirement benefit; isn't that right?

16    A.   Yes.

17     Q.   And that is a fairly common

18    provision in ERISA defined benefit plans for

19    deferred vested retirees?

20    A.  Yes, it is.

21    Q.  Now, if I understand your opinion,

22    in this matter, as summarized in paragraph

23    22 of your report, you believe that the Dun

24    & Bradstreet plan should be calculating the

25    actuarial equivalent of that early

47

1    retirement benefit for deferred vested

2    retirees using a variable interest rate; is

3    that correct?

4         MR. MOUKAWSHER:  Objection to

5    the form.

6         THE WITNESS:  Sorry.  Can you

7    repeat the question?  I missed the

8    beginning.

9    BY MR. SHEA:

10    Q. Let me try it again. Your opinion

11    in this case is reflected in paragraph 22?

12    A. Yes.

13    Q. In calculating the actuarial

14    equivalent of the normal retirement benefit

15    for deferred vested retirees who retired

16    early at Dun & Bradstreet, you should be

17    using a variable interest rate, correct?

18        MR. MOUKAWSHER: Objection to

19    the form.

20    Q. Correct?

21    A. Yes.

22    Q. Of those hundreds or thousands of

23    plans, defined benefits plans that you've

24    seen that have a similar provision - -I

25    think you indicated it is relatively common

48

1  -- how many of those use a variable interest

2  rate in making that calculation?

3      A.  None that I know of.

4      Q.  You said none that you know of?

5      A.  None.

6      Q.  Not a single one that you can think

7  of?

8      A.  I cannot name one.  Over the years

9  there have been actuarial reductions based

10  on the index.  I could not name the plan.

11        And also, the important thing that

12  is evident in my report is the impact of the

13  interest rate assumption in conjunction with

14  the mortality table used by the plan.

15        MR. SHEA:  I move to strike the

16  second portion of that answer as

17  unresponsive.

18  BY MR. SHEA:

19      Q.  Mr. Poulin, is it fair to say that

20  at least the overwhelming majority of

21  defined benefit plans that have an interest

22   rate that is used to calculate an actuarial

23   equivalent for early retirement benefits

24   used a fixed rate used in the D & B plan; is

25   that right?

49

1     A.  Yes.

2     Q.  And are you familiar with the types

3   of fixed rates that plans employ?

4         MR. MOUKAWSHER:  Objection to

5   the form.

6     A.  Yes.

7   BY MR. SHEA:

8     Q.  The rate in this case is 6 3/4s

9   percent, correct?

10    A.  This is correct.

11    Q.  How does that compare with the rate

12    that most defined benefit plans employ?

13       A.   Well, many plan rates are lower or

14    maybe slightly higher.

15       Q.   Could you quantify that for me at

16    all?

17       A.   I cannot quantity it, but I've seen

18    the rates of 5 percent, 6 percent, 7

19    percent, maybe a little higher.

20       Q.   What is the highest you've seen?

21          MR. MOUKAWSHER:  Objection to

22    the form.

23       A.   I don't know.

24    BY MR. SHEA:

25       Q.   But you've certainly seen defined

50

1    benefit plans that use rates higher than 7

2    percent in this context?

3        A.   In the past, yes.

4        Q.   Now you said that to prepare for

5    the deposition you reviewed the relevant

6    provision of the ERISA code and the treasury

7    regulations?

8        A.   Yes.

9        Q.   In some instances either Congress

10   by statute or the treasury regulations has

11   specified the interest rate factor to be

12   used in calculating equivalent benefits;

13   isn't that right?

14       A.   Yes.

15       Q.   Most particularly in determining

16   what the lump sum benefit should be

17   associated with a particular benefit, there

18   is a rate specified; isn't that right?

19       A.   Yes.

20       Q.   Specified in the code or

21   regulations; if you remember?

22       A.   I believe it's both.

23    Q.   Okay.  By contrast there are also

24    regulations that deal with this interest

25    rate that we're discussing here today,

51

1    correct?

2            MR. MOUKAWSHER:  Objection to

3    the form.

4       A.  Precisely this rate?

5    BY MR. SHEA:

6       Q.  Maybe not this rate; as being an

7    optional benefit?

8       A.  Yes.

9       Q.  All right.  And in collating the

10    actuarial equivalent of an optional benefit

11    Congress hasn't specified any particular

12    interest rate to be used, hasn't it?

13    A.  No.

14    Q.  And the Department of Treasury has

15    promulgated regulations under those

16    sections; isn't that right?

17    A.  Yes.

18    Q.  And the Department of Treasury

19    hasn't specified that any particular

20    interest rate has to be used, have they?

21    A.  This is correct.

22    Q.  What the regulations say is that

23    you have to use a reasonable rate; isn't

24    that right?

25    A.  Not entirely.

52

1    Q.  What is your understanding of what

2    it says?

3       A.   I believe that the statutes and/or

4    the regulations stipulate that the benefits

5    must be actuarially equivalent or the

6    actuarial equivalent or actuarial

7    equivalencies are based on two factor:  One

8    being the interest rate; the other one being

9    the mortality table.

10          I understand that the statute does not

11    specify which mortality table or which interest rate

12    is to be used.  The requirement is that it be an

13    actuarial equivalent, and it could be that a certain

14    interest rate, that in isolation, in a vacuum, would

15    be unreasonable, would be tempered or the impact of

16    that rate would be mitigated by a mortality table

17    that would offset it.  If this happened, it would

18    offset the impact of the interest rate and

19    vice-versa.

20       Q.   But overall, the plan must use

21     reasonable assumptions of mortality and

22     interest to arrive at the actuarial

23     equivalent?

24       A.   Reasonable assumptions that would

25   lead to a benefit that would be actuarially

53

1   equivalent to normal retirement benefits.

2       Q.   Now all of those defined benefit

3   plans that use a fixed rate -- and I think

4   you said they range from 5 percent to 7

5   percent -- they have all been reviewed by

6   the Internal Revenue Service to determine

7   whether they comply with the Internal

8   Revenue Code, correct?

9           MR. MOUKAWSHER:  Objection to

10   the form.

11      A.   I would say most of them.

12   BY MR. SHEA:

13      Q.   And in all of the defined benefit

14   plans that you've seen that employ these

15    fixed rates, between 5 and 7, the IRS has

16    approved the plan; isn't that right?

17         MR. MOUKAWSHER:  Objection to

18    the form.

19    A.   Probably, I assume so, but I do not

20    know if the IRS has approved all these

21    plans.

22    Q.   Isn't it fair to say that the IRS

23    and Department of Treasury only specified

24    the use of reasonable assumptions, hasn't

25    restricted to specify a particular interest

54

1    rate, as they do in the case of lump sum

2    regarding the use of a fixed rate between 5

3    percent and 7 percent as reasonable?

4         MR. MOUKAWSHER:  Objection to

5    the form.

6      A.   I do not know when the Dun &

7    Bradstreet pension plan received its

8    favorable determination letter.

9        We do know that 20 years ago the interest

10   rates and, of course, also the mortality as

11   experienced by plan participants was different than

12   it is today.

13       There certainly was a time when a 6 3/4s

14   percent rate, even with this mortality table, may

15   have been deemed to be reasonable or was deemed to

16   be reasonable.  But I do not see this as a static

17   situation.

18       As I mentioned in the report, there are

19   many factors in pension plans that have not been

20   reviewed for several years and many factors that

21   have been accepted in the past, but in a fluctuating

22   environment may at one point not be reasonable or

23   not be acceptable.

24       When I reviewed this interest rate and

25   performed the calculation, in order to determine the

55

1   actual equivalency in conjunction with the mortality

2   table used by the old plan, 1994 plan, I realized

3   that there was a large discrepancy in the values and

4   in the reduction factors that needed to be looked

5   at.

6        MR. SHEA:  I'm going to move to

7   strike as unresponsive.

8   BY MR. SHEA:

9    Q.  Let me try the question again.

10       The IRS continues to review plans

11  and issue a determination letter?

12   A.  Yes, it does.

13   Q.  Have you been involved in the

14  determination processes for defined benefit

15  plans in the past two or three years?

16    A.  No.

17    Q.  To your knowledge, has the IRS

18  continued to issue favorable determination

19  letters with respect to plans that use a

20  fixed rate in the range we've been talking

21  about, 5 percent to 7 percent, to use as a

22  factor to determine actuarial equivalents?

23    A.  To my knowledge it does.

24    Q.  The IRS is the same agency that is

25  enforcing the regulation dealing with the

56

1  requirement that reasonable assumptions be

2  employed to determine the actuarial

3  equivalence; is that right?

4        MR. MOUKAWSHER:  Objection to

5  the form.

6      A.  Interesting question.  In my

7   experience the IRS has oftentimes issued a

8   favorable determination letter, even though

9   a plan was later found to be deficient in

10   some ways.  I am not saying that the IRS is

11   not responsible for supervising this issue.

12          It may not be responsive to your question,

13   but I understand that the mortality table that is

14   used by the plan in order to determine actuarial

15   equivalency was not attached or is not part of the

16   plan and may have been submitted to the IRS that may

17   have approved the plan, even though it's not part of

18   this issue.

19          But in order to qualify now under section

20   401A, I believe, 26 -- I'm not sure of the code --

21   the actual assumptions must be spelled out in order

22   for a person to be able to compute the benefit.  And

23   it may be missing and, yet, the plan would be

24   approved.

25          So for me it is not a determination that a

57

1   plan is fully kosher or acceptable --

2        MR. SHEA:  All right.  Mid way

3   through your answer, when I said it was

4   unresponsive, I move to strike the

5   unresponsive part.

6   BY MR. SHEA:

7       Q.   The simple question is:  The IRS

8   issues a determination letter and the

9   Department of Treasury issues the

10   regulations that sets forth the reasonable

11   requirements for assumptions used to

12   determine actuarial equivalence?

13      A.   Yes.

14        MR. MOUKAWSHER:  Objection to

15   the form.

16      Q.   Is it your testimony here today

17   that any plan that does not employ a

18    variable interest rate in determining

19    actuarial equivalence is not using

20    reasonable assumptions as required by ERISA

21    and the code?

22        A.  No.

23        Q.  If that were true, every single one

24    of these plans you reviewed would be out of

25    compliance?

58

1        A.  Yes.

2        Q.  What you're really saying about

3    variable interest rates in that regard is

4    the preferred method, but not one that is

5    required by ERISA or the code; isn't that

6    fair?

7        A.  For this particular case this

8    particular interest rate and this particular

9    mortality table, yes, it would be the

10    preferred approach by having a fixed

11    interest rate and old mortality table.

12        Q.   Okay.  And I just want to review

13    with you briefly some of the issues that

14    would arise if Dun & Bradstreet were now to

15    convert using a variable rate.

16            If it were to do that, and if that variable

17    rate were to rise above 6.75 percent, in that

18    situation Dun & Bradstreet would be required to do

19    additional calculations because there would be an

20    accrued benefit based on the old rate that would

21    have to be protected; isn't that right?

22        A.   Yes.

23        Q.   So if the interest rate goes above

24    6.75 percent and Dun & Bradstreet has

25    adopted a variable approach, that

1   calculation of benefits becomes

2   significantly more complicated; isn't that

3   right?

4       A.  It would be.

5       Q.  The other issue with this variable

6   rate approach is:  I'm 47 years old and I'm

7   planning to retire at age 55.  If I'm a

8   participant in a benefit plan that uses a

9   fixed rate, I could call up the recordkeeper

10   and have them do an estimate on my pension

11   benefits; isn't that right?

12      A.  Yes.

13      Q.  And with a fixed rate they can tell

14   me exactly how much of a reduction I'm going

15   to take by retiring on a deferred basis at

16   age 55; isn't that right?

17      A.  Yes.

18      Q.  If I made a similar inquiry as a

19   participant and Dun & Bradstreet were

20   employing this variable process, you

21   couldn't give me a definite answer, could

22   you?

23      A.  To the same extent at the time an

24   employee wants to elect a lump sum as a

25   range of answers, yes.

60

1      Q.  You'd have to say:  Well, Mr. Shea,

2   we can give you some ranges, but what you're

3   actually going to get at age 55 under the

4   circumstances is going to depend on what

5   interest rates look like when you turn 55,

6   eight years down the road; is that what you

7   have to say?

8      A.  This is correct.

9      Q.   In determining a reasonable

10     interest rate to use in this context, to

11     determine the actuarial equivalent of an

12     optional form of benefit, you would agree

13     with me that there is no one single fixed

14     rate that is the only reasonable rate; isn't

15     that right?

16          MR. MOUKAWSHER:  Objection to

17     the form.

18     A.   In order to make that determination

19     of actuarial equivalency, as an actuary I

20     cannot look at a rate in a vacuum, interest

21     rate in isolation, without also looking at

22     the mortality table.

23          And to the extent that the mortality under

24     a certain mortality table would offset the impact of

25     the interest rate, then the actual values that

61

1    result from the calculation is maybe, quote/unquote,

2    actuarially equivalent.

3         For instance, in 1994 I believe ERISA,

4    they got legislation that changed both the interest

5    rate and what is called the applicable interest rate

6    and applicable mortality table for lump sum

7    purposes.

8         Before 1994 there was a very old mortality

9    table called UP84, which, in fact, was based on the

10   experience of the '60s, which resulted in lower

11   values in conjunction with an interest rate that was

12   very low.  But in that case it provided higher

13   values like 4 percent.

14        But together for a number of years they

15   were deemed to be reasonable and they were replaced

16   by the GATT mortality table that provided higher

17   values in conjunction with a 30-year treasury rate

18   that provided lower values.  So in tandem they were

19   deemed to be reasonable.

20   Q.  Well, let me see if I can creep up

21    on the question this way.  Let's assume that

22    the mortality table that is being used is

23    the one employed by the Dun & Bradstreet

24    plan.  Okay?

25       A.  Yes.

62

1        Q.  Given that mortality table, you

2    would agree with me there is not just one

3    interest rate that constitutes a reasonable

4    interest rate to be used on a fixed basis in

5    calculating actual real equivalence; there

6    would be a range of interest rates that

7    would qualify as reasonable; isn't that

8    right?

9        A.  You said on a fixed basis.

10       Q.  I'm sorry.  Let me clarify.

11          I'm now setting aside the variable approach

12   that you've said is recommended but is not required.

13          I'm asking you in the context of the Dun &

14   Bradstreet plan and the mortality table that it

15   uses, is there only one fixed interest rate that

16   would be deemed reasonable in conjunction with that

17   mortality table, or are there a range of interest

18   rates that fall within the realm of reasonableness

19   in calculating actuarial equivalence?

20      A.   Fixed interest rate?

21      Q.   Right.

22      A.   No.  There is a range of interest

23    rates, not a single rate, like 6 1/4

24    percent.

25      Q.   In your expert opinion, using the

63

1    Dun & Bradstreet mortality table, what is

2    that range, if you know?

3            MR. MOUKAWSHER:  Objection to

4    the form.  The question doesn't have any

5    time in it.  Are you talking about today?

6            MR. SHEA:  Talking about his

7    opinion today, what is he giving the Dun &

8    Bradstreet mortality table that it uses.

9    BY MR. SHEA:

10       Q.   What is, in your expert opinion,

11   the range of reasonable fixed rates

12   associated with that that produces an

13   actuarial equivalent.

14       A.   Today?

15       Q.   Today.

16       A.   In order to answer that question I

17   have to look at what are the rates today

18   that are used in order to compute the lump

19   sum.  These are the prescribed rates.

20            For the last several years the interest

21   rate as a 30-year treasury rate has been hovering

22  around 5 percent and the mortality table was changed

23  two or three years ago to GAR94.

24        So today, I would say that the range of

25  interest rates that would gravitate around 5 percent

                            64

1  or a range that would more or less make the minimum

2  treasury rate would be reasonable.

3        So to corroborate from perhaps to venture a

4  number from 4.75 to 5.5, but I cannot ignore the

5  impact of the mortality table.

6    Q.  I'm saying:  Assuming the use of

7   D&B mortality table; that is implicit in my

8   question.

9    A.   Then the rate might even be lower

10   because this mortality table, I believe --

11   I think it's Exhibit E -- shows that the use

12    of that table produces even lower values.

13        Q.   With respect to the interest rate

14    and the issue, if you were to amend the plan

15    and put in a fixed rate based on, say, 5

16    percent, at least for accrued benefits, you

17    couldn't then change that if the interest

18    rates went up, could you?

19        A.   For already accrued benefits?

20        Q.   Yes.

21        A.   No.

22        Q.   And that's a little bit different

23    than a lump sum calculation, because a lump

24    sum calculation is something that varies

25    according to time when you collect a lump

65

1    sum; is that right?

2       MR. MOUKAWSHER:  Objection to

3   the form.

4   BY MR. SHEA:

5       Q.  Let me try to rephrase it.

6           If we're using the lump sum methodology

7   that takes a variable rate approach, correct?

8       A.  Yes.

9       Q.  Is it your testimony that even in

10  using a fixed rate approach, the approach

11  that is overwhelming in the majority of

12  these plans, you should select the same

13  variable rate as the long-term treasury bond

14  rate in setting a fixed rate as you would in

15  using a variable approach?

16      A.  I believe that this would be the

17  best indication of your best determinant of

18  actuarial equivalency.  I guess actuarial

19  equivalency is that concept that changes

20  over time.

21          The mortality table, that is if we use the

22  old mortality table and a high rate, we get a very

23  high early retirement reduction factor and very low

24  benefits.

25          Conversely, if we use the more recent GAR94

66

1  and, for instance, the PBGC rate for immediate

2  annuities, which is now 3 percent, this would

3  produce extremely high values.

4          So, I believe that what we see now is an

5  indication of the use of 30-year treasury variable

6  rate as an indication with this mortality, with the

7  GAR 94, of what actuarial equivalency is.

8      Q.   It would be using the fixed rate

9   for the foreseeable future; isn't that

10   right?

11          MR. MOUKAWSHER:  Objection to

12   the form.  Could you repeat that?

13   BY MR. SHEA:

14     Q.  I'll try it this way:  If you're

15     dealing with a defined benefit plan and

16     you're dealing with actuarial equivalence

17     and you're going to have one fixed rate in a

18     plan, not going to vary up or down, you need

19     to select a fixed rate that would be

20     appropriate, not just today but for many

21     years down the road; isn't that fair?

22          MR. MOUKAWSHER:  Objection to

23     the form.

24     A.  This has been perceived as being

25     mere fanfare, and I agree with the

67

1     perception of fairness.

2          The economic situation has changed over the

3     last 25, 30 years and we have experienced

4    historically low interest rates that require us to

5    review this assumption.

6          To the same extent, that for 15-year cash

7    balance plans that had received a favorable

8    determination letter were deemed to be non

9    discriminatory vis-a-vis age, when in fact there

10   might have been other problems that hadn't been

11   looked at.  The American Benefits Council says that

12   some factors may need to be updated.

13      Q.  But at least the general concept,

14   as you described it, you said has been

15   perceived to be fair and you need to take a

16   look at the long run, as you described; is

17   that fair?

18          MR. MOUKAWSHER:  Objection to

19   the form.

20      A.  I believe that the more accurate

21   statement would be it has been ignored.

22   BY MR. SHEA:

23      Q.  A defined plan represents a

24   long-term undertaking?

25    A.  Yes.


68


1    Q.  And, indeed, when we're doing an

2    actuarial equivalency calculation, I'm

3    retiring now at age 55 as opposed to waiting

4    ten years to take my normal retirement

5    benefit, what the interest rate assumption

6    is really trying to capture is a time value

7    of money over a period of payment that will

8    extend out a considerable length of time;

9    isn't that right?

10    A.  Yes.

11    Q.  And nobody in this room or anyplace

12    else could tell us where interest rates are

13    going to be during the 10-year period of

14    time?

15    A.   No, we could not.  But there is an

16   existing instrument that is a 30-year

17   treasury rate that attempts to determine

18   what that risk-free rate is now for the next

19   30 years.

20    Q.   Attempts to, but that figure has

21   moved up and down over time as well; isn't

22   that right?

23    A.   That's right, yes.

24    Q.   And in deciding what would be an

25   appropriate time value of money to use over

69

1   the next 10, 15, 20, 30 years as a long-term

2   undertaking of employment benefit and what

3   factor that would be reasonable to consider

4   are historical interest rates; isn't that

5   right?

6       A.   No, because the employee retiring

7   today has no way to replicate historical

8   interest rates.

9           The current 30-year treasury rate is around

10  5 percent.  Even though the 30-year treasury rate

11  was at 8 percent ten years ago, 15 years ago, maybe

12  higher, does not represent for the retiring employee

13  the economic environment in which he would invest

14  this money today.

15          It's historical to the same extent that the

16  mortality tables are constantly revised because the

17  health of the population so far has been improving.

18      Q.   Well let's stick with interest

19  rates, because mortality is a little bit

20  different.

21      A.   There is a steady trend in

22  improving mortality, that this isn't the

23  right trend, and there are indications that

24  the trend is reversing because of the

25  problem of obesity in our nation.

70

1       In the adult generation the mortality rates

2  are not going up.

3    Q.  Certainly, you would agree with me

4  mortality rates have not had the variable of

5  interest rates?

6    A.  Yes.

7    Q.  What the actuarial assumption is

8  trying to determine is not just what the

9  employees can earn today on his or her own

10  money, but what they would be able to earn

11  tomorrow, five years from now and ten years

12  from now.  That is all part of what the

13  actuarial assumption is trying to capture;

14  is that right?

15     A.  The best indicator today of what

16  that rate will be five, ten, fifteen years

17    from now in a risk-free environment, because

18    the retirement benefit of this employee,

19    when the employee received the benefit, that

20    benefit is guaranteed by a pension benefit

21    guaranty corporation.

22        So that in order to replicate this, there

23    must be an investment-free risk and only one that

24    really is a 30-year treasury, so that that employee

25    who will retire at the age of 55, by investing this

71

1    money over a lifetime, would receive the actuarial

2    equivalent of what he or she would receive at age 65

3    unreduced.

4        Q.  Have you ever testified as a expert

5    as to reasonable interest rates in computing

6    actuarial equivalence in any other case that

7   you can recall?

8      A.   Yes.

9      Q.   What other cases have you testified

10  in on this subject?

11     A.   There was the IRS case.  There was

12  -- I believe it was called in generic terms

13  -- small plans, small pension plans cases.

14     Q.   And what was the issue in the small

15  plans cases?

16     A.   The issues were the use of an

17  interest rate and a retirement age by a

18  number of law firms or small businesses that

19  did provide for individual retirement plans

20  for partners, and they were using an average

21  retirement age of 55 and an interest rate of

22  5 percent in the '80s, when the economic

23  environment was exactly the opposite of what

24  we have been experiencing over the last

25  several years, and when the 30-year treasury

1   was much higher than 5 percent and the

2   average retirement and actual retirement age

3   overwhelmingly in the majority of cases

4   exceeded 55.

5        So that in my report I concluded that a

6   combination of the age 55 retirement age and 5

7   percent interest rate were unreasonable.  At that

8   time the 30-year treasury had never been below 7

9   percent.

10   Q.   If I have this correctly, they were

11   actually using very conservative assumptions

12   and that would have increased the funding

13   cost; is that right?

14   A.   Absolutely, yes.

15   Q.   So you said there were law firms

16   and there was a way for them to try to

17   maximize the amount of pretax income that

18    they could place into one of these plans.

19    Was that essentially the nub of the

20    controversy?

21        A.  Reduction.

22        Q.  Why was the IRS concerned that

23    these guys were putting too much money in

24    the pension?

25        A.  Deductions.

73

1        Q.  And which party did you testify on

2    behalf of?

3        A.  The IRS.

4        Q.  Did you express any opinion about

5    the different components of interest rates

6    in those cases?

7        A.  Oh, yes.

8        MR. MOUKAWSHER:  Objection to

9    the form.

10   BY MR. SHEA:

11       Q.   What components go into the

12   interest rate?

13       A.   It's been, I believe, 13 our 14

14   years since I prepared this report.

15   Theoretically, there is a pure interest rate

16   which may underline around 3 percent and to

17   which is added an inflation component which

18   varies.

19       Q.   But typically, how would you

20   calculate it?

21       A.   At the present time this rate would

22   be between 5 and 5 1/2 percent.

23       Q.   Today?

24       A.   You're asking me a question.  This

25   has not been part of my mental processes in

74

1    the preparation of this report, but I'm just

2    answering your question.

3        Q.   Sure.  You said 5.5 percent

4    inflation?

5        A.   No, I said in total the inflation 3

6    plus 2.5 or 3 plus 2, depends.

7        Q.   Do you recall any other component

8    of that calculation for interest rates?

9        A.   There is, obviously, a risk

10   component, which does not exist in the

11   30-year treasury rate, because the

12   assumption is that the federal government is

13   likely to not collapse financially.

14          And so that, in my opinion, is the reason

15   why a 30-year treasury rate has achieved its status

16   over the last 10, 15 years.

17       Q.   So you would add --

18       A.   It does represent the risk-free

19   rate that more or less is what represents

20    what participants could do with their money

21    in order to receive an actuarial

22    equivalence.

23        Q.  So you would add a no-risk premium

24    because you're dealing with a risk-free

25    instrument in performing this alternative

75

1    calculation?

2        A.  Yes, because, as I mentioned

3    earlier, the benefit that the participant is

4    receiving from the defined benefit plan is,

5    even if the employer goes out of business,

6    it is protected by the pension benefit

7    guaranty corporation.

8            So, in order to replicate that risk-free

9    benefit, this guaranteed benefit, then the 30-year

10    treasury rate would be a proxy for that.

11        Q.  I've probably been a little bit

12    unfair in asking you to recall that from

13    1992.  Let me see if I can refresh your

14    recollection.

15            MR. SHEA:  Let's have this

16    marked as Poulin 2.

17            (Defendant's exhibit for

18    identification marked No. 2:  Decision of

19    the United States Tax Court.)

20    BY MR. SHEA:

21        Q.  Do you recognize this as a decision

22    of the United States Tax Court, Mr. Poulin?

23        A.  Yes, but this is not the case I was

24    referring to.

25        Q.  Well, if you take a moment and just

76

1    look briefly at page No. 7, if you would,

2    please.

3        A.  Page 7.

4        Q.  In the upper right-hand corner

5    you'll see a reference in Judge Clapp's

6    opinion that Claude Poulin is an expert

7    witness in this case.

8        A.  I see my name right here.

9        Q.  Did the judge have it right, you

10   were an expert in that case or is he making

11   it up?

12       A.  Well, I was not involved in the

13   Vinson & Elkins case.

14       Q.  Do you know if that or a series of

15   cases were all associated with the Vinson &

16   Elkins case?

17       A.  Yes.  But I didn't have anything to

18   do with that.  The other expert Ronald

19   Haneberg was involved in that.

20       Q.  Apparently, the court relied on

21    testimony of all experts in the associated

22    cases including your testimony; is that

23    right?

24        A.  Yes.

25        Q.  If you take a moment and turn to --

77

1    let me see if I can find it -- page 12 -- if

2    you look at that page, in the left-hand

3    column at the bottom begins: "Respondent's

4    expert Poulin"; do you see that?

5        A.  Yes.

6        Q.  The judge actually recites the

7    three factors we were just talking about;

8    does he not?

9        A.  That's interesting, yes.

10        Q.  And in fact he recites your

11    testimony as not having a pure interest rate

12    of 3 percent, but one of 4 percent; isn't

13    that right?

14    A.  Yes.

15    Q.  Does that refresh your recollection

16    as to what you opine was a pure interest

17    rate?

18    A.  Yes.

19    Q.  And then the level of anticipated

20    inflation is the second component, right?

21    A.  Yes.

22    Q.  In which you said today would be

23    about 2.5 percent, correct?

24         MR. MOUKAWSHER:  Objection to

25    the form.

78

1      A.   I don't know what the inflation

2   rate is at the present time.  I think it's

3   been hovering around 2 percent, 2.5 percent

4   over the last several years.

5   BY MR. SHEA:

6      Q.   And then you talk about a risk

7   premium to compensate investors of between 1

8   percent and 2 percent.  That was the third

9   component that was used in this particular

10   case; isn't that right?

11      A.   Yes.

12      Q.   If we did all those calculations in

13   this case, we took your portion around 2.5

14   percent and some risk premium, you would

15   arrive at an interest rate that is about the

16   same as the 6.75 percent interest rate that

17   we're dealing with here using your

18   methodology; is that true?

19         MR. MOUKAWSHER:  Objection to

20   the form.

21      Q.   You can answer.

22         MR. MOUKAWSHER:  If you

23    understand the question, you can answer.

24          MR. SHEA:  Objection to a

25    speaking objection and coaching of the

79

1    witness.

2          THE WITNESS:  Could you repeat

3    the question?

4          MR. SHEA:  I'll try it again.

5    BY MR. SHEA:

6      Q.  Using the methodology that you used

7    in this particular case, that you just

8    described for us, produces a reasonable

9    interest rate that consists of three

10   components:  4 percent or pure interest

11   rate; approximately 2.5 percent for

12   inflation; and something, 1 or 2 percent, as

13    indicated here, for risk premium, and that

14    would indicate a reasonable interest that

15    would indicate that the 6.75 percent

16    interest rate used by Defendant's D&B in

17    this case is a reasonable one; isn't that

18    right?

19         MR. MOUKAWSHER:  Objection to

20    form.

21     A.   The purpose of this calculation

22    here or the various element was for funding

23    purposes.  It was not to determine actuarial

24    equivalency.

25         And this is why, in order to determine

80

1    actuarial equivalency, it is important to remove the

2    risk premium, because individual investors go from a

3   guaranteed benefit.

4        Then in order to replicate that guaranteed

5   benefit, then the risk premium must be taken out.

6   And if it's taken out, then the number would be less

7   than a fixed 6 3/4s percent, because for funding

8   purposes the rate that they were using was too low.

9     Q.  If we take out the risk premium,

10   your methodology in this case would still

11   yield a rate of approximately 6.5 percent as

12   a reasonable interest rate; isn't that

13   right?

14        MR. MOUKAWSHER:  Objection to

15   the form.

16     A.  I believe that later on in the same

17   paragraph I had reached the same conclusion

18   they had evaluated in this instant report,

19   that the investment instrument would be the

20   treasury obligation, I believe it was, in

21   fact, the treasury rate that was -- well, at

22   that point it was around 9 percent.

23     Q.  Right.

24    A.   And I must say I haven't read this

25    report since I wrote it, which is about 12,

81

1    13 years ago.  That the actuarial

2    reasonableness of the assumptions for

3    funding purposes there also was the

4    retirement age that was used, and I did

5    elaborate on that point as well.

6        Q.   But I'm now focusing on your

7    interest rate, discussing now in that

8    regard, if we used your methodology and even

9    exclude risk premium, we get a 6.5 percent

10    interest rate, don't we?

11            MR. MOUKAWSHER:  Objection to

12    the form.

13        A.   I don't know where the inflation

14    rate is.  I don't know whether it's 2.5 or 2

15    percent, but it would be around 6 percent

16    based on this methodology.

17    BY MR. SHEA:

18        Q.   If we can look at the next

19    paragraph, actually, in opining about the

20    reasonable interest rate, you elected not to

21    stand on what was then the 30-year treasury

22    rate, didn't you; isn't that right?

23        A.   Not to stand?

24        Q.   Right.  In coming up with a

25    reasonable interest rate for funding

82

1    purposes, you didn't say 9 percent was a

2    reasonable rate, even though that was a

3    30-year treasury rate?

4       A.  I don't think so.  I believe that

5    it says at the bottom of that page that I

6    concluded that such an investment instrument

7    exists as a treasurer obligation and I did

8    say that the 30-year treasury bond rate

9    would be an appropriate benchmark interest

10   rate.

11      Q.  If you look at the next column, you

12   noted at that point the treasury rate stood

13   at approximately 9 percent; isn't that

14   right?

15      A.  Yes.

16      Q.  That was a relatively high rate?

17      A.  Yes.

18      Q.  Correct?

19      A.  Yes, it was.

20      Q.  For that reason there was a

21   significant possibility that in the future

22   it would decline; isn't that right?

23      A.  In hindsight we know these rates

24   declined.

25      Q.  But to your credit, you were

83

1    already on it back in 1992, because as of

2    June it says here:  "He" -- meaning you --

3    "added, however, that one percentage point

4    might be deducted to take into account the

5    possibility of lower interest rates and

6    another percentage point deducted for

7    unforeseen contingencies such as 'unexpected

8    market reaction' of October 19, 1987."

9        That was your opinion back then?

10    A.  Where do you see that?

11    Q.  Top of the next column.

12    A.  I did write that.

13    Q.  And so, if we were to take a

14    similar approach here where we have the

15    opposite, as you said just a moment ago,

16    historically low interest rates, we take

17    that 5 percent treasury rate, add 1 percent

18    to reflect the possibility of interest rates

19    going up, add another percent for

20    contingencies -- and perhaps for October

21    1997 we would put September 11, 2001 -- and

22    you would arrive at 7 percent interest rate

23    as an appropriately reasonable interest

24    rate; is that right?

25        A.   This analysis was for funding

84

1    purposes.  It was not in the context of

2    actuarial equivalency for early retirement

3    reductions.  The rates for funding purposes

4    are now dictated and it's a different

5    process.

6      Q.   In both processes you're still

7    trying to track the likely time value of

8    money going forward; isn't that right?

9      A.   Yes.

10     Q.   Okay.  And just to clarify, you did

11    no similar calculation along those lines

12    when rendering this report?

13      A.   I would like to note that, however,

14    I deducted percentage points from the

15    30-year treasury rate.  I didn't add them; I

16    deducted them.  So that the result in the

17    rate was lower than the 30-year treasury

18    rate available at that time.

19        MR. SHEA:  Could you read my

20    question?

21        (Question read.)

22    BY MR. SHEA:

23     Q.   Along those lines, you didn't do

24    this type of calculation when you did your

25    report in this case?

85

1    A.  No.

2    Q.  Have you ever testified about the

3  reasonableness of interest rates in any

4  other case in terms of actuarial substance

5  or any other aspect of ERISA compliance?

6    A.  Not that I recall per se, but I

7  believe I was involved in a case that dealt

8  with the interest rate assumption and that

9  mortality table.  I believe that's the one I

10  listed in the Ameritech case, but it is

11  vague.

12    Q.  You said the Ameritech case; that's

13  Malloy?

14    A.  Yes.

15    Q.  And do you recall precisely what

16  the issue was in Malloy?

17      A.  I believe the issue that I alluded

18   to earlier, that when the prescribed

19   mortality table and prescribed interest rate

20   were changed back in 1994-95, the Ameritech

21   pension plan had selected a wrong factor,

22   the wrong mortality table or the wrong

23   interest rate, I believe it was.  I think it

24   may have been the mortality table.

25      Q.  By "wrong factor," are you saying

86

1   unreasonable factor or are you saying

2   someone just made a mistake?

3      A.  I think they made a mistake.

4      Q.  This had to do with determining the

5   previous appropriate relief from somebody

6   who admitted they had made a mistake?

7    A.  I don't believe they admitted they

8    had made a mistake.

9    Q.  Did they seek to defend the

10   interest rate and mortality table used as

11   reasonable?

12   A.  No.

13   Q.  Okay.  And that case was disposed

14   of through settlement; is that right?

15   A.  I believe so.

16   Q.  Do you recall any other cases in

17   which you've testified about reasonableness

18   of interest rates under any ERISA

19   requirements?

20   A.  No.

21   Q.  Okay.  Do you recall any instance

22   in which a court has rejected as too low an

23   interest rate proposed by you in any ERISA

24   context?

25   A.  No.

1    Q.  Do you recall a case with a

2  plaintiff named Walther; does that ring a

3  bell?

4    A.  Was that in the '80s?

5    Q.  I think so.  Does that refresh your

6  recollection?

7      Let me ask you the issue.  Do you recall a

8  case in which you testified about whether a plan was

9  underfunded following a spinoff?

10    A.  Yes, the Gulf & Western case.

11    Q.  You were in that one too!  I don't

12  think that's the one I'm talking about.

13    A.  But this is very old.

14    Q.  Didn't think it was going quite

15  back that far.

16      MR. SHEA:  Why don't we take a

17  lunch break.

18      (Whereupon, a lunch break was

19   taken.)

20   BY MR. SHEA:

21       Q.   Mr. Poulin, you recognize you're

22   still under oath, correct?

23       A.   Yes, I do.

24       Q.   We were discussing briefly before

25   we broke for lunch a case I was referring

88

1   to.  Do you recall serving as an expert

2   witness in a case in the Southern District

3   of Ohio Federal Court under ERISA, Walther

4   versus the Pension Plan For Salaried

5   Employees of Dayton-Walther Corporation?

6       A.   Okay.  I didn't recall the Walther

7   case, because before that case I had been --

8   this is in the '80s, I believe -- I had been

9    working on Dayton-Walther's pension plan

10   termination, Dacfon, and I believe Mr.

11   Walther was the president of the company or

12   chairman of the company.

13        MR. SHEA:  Let's mark the

14   opinion as an exhibit to refresh Mr.

15   Poulin's recollection.

16        (Defendant's exhibit for

17   identification marked No. 3:  Opinion of the

18   Court, 1994.)

19   BY MR. SHEA:

20   Q.   Showing you a copy of an opinion of

21   the court actually from 1994, and it deals

22   with a spinoff of an ERISA plan and issues

23   of the compliance with ERISA Section 208.

24        Let me find your name in this

25   opinion.  (Pause.)

89

1        If you turn to page 17, left-hand column,

2    third full paragraph, you'll see a reference to a

3    deposition of Claude Poulin.

4        It appears at the bottom of the page and

5    then there is a reference to a deposition that was

6    taken on December 22nd, 1993.  Is that you?

7    A.   It must be me, but I don't recall.

8    Q.   You don't recall the deposition?

9    A.   No.

10    Q.   Do you recall the issue being one

11    of the issues in which you were asked to

12    give an opinion whether requirements of

13    Section 208 of ERISA governing plan mergers

14    in spinoffs had been complied with?

15    A.   Frankly, I don't recall this case.

16    I see here it deals with retiree insurance

17    program.

18    Q.   That is one of several issues that

19    are out there.

20        Appears to me, from my review of the

21   opinion, that there are issues which you opined on

22   related to -- take a moment to review the opinion

23   and see if that doesn't help you refresh your

24   recollection.  Let me know when you've had an

25   opportunity to do that.

90

1     A.  (Pause)

2     Q.  Obviously, as the exhibit will

3   reflect, it's a 20-page double column

4   opinion, so you haven't had a chance to read

5   the entire opinion.  Have you had a chance

6   to peruse it?

7     A.  I reviewed until the very end.  I

8   didn't really understand what the issue was

9   that I was involved in because the issues

10    are listed at the bottom of page 4 and I

11    don't recall any of those issues.

12         I understand that my deposition that they

13    referred to is not related to the allegations on

14    page 4.  It was some other issue, I believe.

15      Q.  But anyway, if you look at page 18,

16    does that refresh your recollection as to

17    the issues on which you're giving an expert

18    opinion in this case?

19      A.  Well, I now do remember vaguely

20    this particular portion.  I think it

21    involved a calculation of liabilities --

22      Q.  It actually involved calculation of

23    liabilities following the merger of the two

24    pension plans, correct?

25      A.  Yes.

91

1    Q.  And one of the requirements of

2    Section 208 is that following such a merger,

3    you cannot have a merger result in a reduced

4    benefit compared to what the employees would

5    have enjoyed prior to the merger, correct?

6    A.  Yes.

7    Q.  And so, the issue you were

8    specifically being asked to focus on in that

9    particular case was whether after that

10   merger the merged plan was underfunded from

11   a liability perspective; isn't that right?

12     A.   Reading this paragraph at the

13   bottom of page 18, I am not sure whether

14   this is accurate or not.  I have not

15   reviewed my deposition.

16        It seems that I made a calculation based on

17   an interest rate of 6.16 percent, and the another

18   actuary used 8 1/4 percent.

19        And to the extent that a lower interest

20   rate results in increased liabilities, then it says

21   here that based on my calculations -- well, doesn't

22    say that -- it says that I admitted that when using

23    the 8 1/4 percent interest rate, the plan was

24    overfunded.

25        But I don't recall the context, because for

92

1    these calculations I was using the PBGC rate.  And

2    the PBGC rate is, in my opinion, and is still my

3    opinion, the rate to be used to do this calculation.

4        The PBGC is a final arbiter in this

5    situation, so I don't quite understand.

6        Q.  Let me see if it is consistent with

7    your recollection.  You were offering an

8    opinion on the funding status of the plan;

9    isn't that right?

10       A.  I don't know that.  You say it's a

11       208 issue.  This means that the benefits

12    after the merger must be at least equal to

13    the benefits before the merger, which is

14    really another issue whether this is

15    overfunded or not, because if it's

16    overfunded, of course, there is no problem.

17        If it's underfunded, then there

18    must be additional payments made by the

19    employer of the plan that has a lower funded

20    ratio.

21    Q.   And in doing a calculation of

22    liabilities in this instance, you did a

23    calculation based on the PBGC rate?

24    A.   That's what it indicates.

25    Q.   Section 208 of ERISA doesn't

93

1    mandate the use of the PBGC rate?

file:///Z|/D/Dun%20&%20Bradstreet/Claude%20Poulin.txt

2      A.   I believe it doesn't mandate

3    anything.  Says the benefits are to be

4    provided.

5      Q.   And interpreted by the court or

6    IRS, and that means you can use any

7    reasonable rate in doing that calculation;

8    isn't that right?

9      A.   I don't know that.

10      Q.   Okay.  Let me put it to you this

11    way -- you may or may not know the answer:

12    Isn't it true that what happened in that

13    case is exactly what's going on here, there

14    was a statute in that case, 208 -- our case

15    the statutes deals with actuarial

16    equivalence -- did not specify any

17    particular rate.  It simply required the

18    rate to be reasonable.

19         And in answering that question you elected

20    to use the specific rate, the PBGC rate, and the

21    court rejected your use of the PBGC rate because

22    that was not a rate required by Section 208.

23    A.  Well, except, apparently, the court

24   concluded that the ERISA fiduciary standards

25   were not violated by the use of the rate of

94

1    8 1/4 percent.

2       Q.  But, likewise, the court concluded

3    -- at the bottom of that paragraph -- and I

4    quote again -- that:  "The merger of the two

5    plans satisfied ERISA Section 208

6    requirements"; did it not?

7         MR. MOUKAWSHER:  Objection to

8    the form.

9       A.  Where is that?

10   BY MR. SHEA:

11      Q.  You see the paragraph that reads

12   "Plaintiff's challenge?"

13    A.  Yes.

14    Q.  Go to the penalty sentence where

15    the court, in fact, concludes that ERISA

16    Section 208 was satisfied.

17    A.  Yes.

18    Q.  In reaching that conclusion the

19    court rejected the lower PBGC rate you had

20    proposed because it was not specified in

21    Section 208; isn't that right?

22         MR. MOUKAWSHER:  Objection to

23    the form.

24    A.  I do not know whether that is the

25    link that the court made.

95

1    BY MR. SHEA:

2    Q.  Is there any definitive treatise

3   employed by actuaries to tell us that you

4   arrive at a reasonable interest rate to be

5   used in calculating actuarial equivalence?

6      A.  I don't think that there is a

7   treatise that deals exclusively with a

8   determination of the interest rate in

9   actuarial equivalence.

10        In the Vinson & Elkins and Walther cases

11  there is indication that it is usually not just the

12  interest rate, but was also the retirement age.

13        Here the issue I do not recall whether

14  there were other factors involved in the Walther

15  case.  But in Dun & Bradstreet, this situation,

16  there is also the mortality table.

17     I believe that to say 15 percent rate is

18  per se unreasonable, but I think also that a rate

19  will be unreasonable if in conjunction with another

20  factor it produced results that are not actuarially

21  equivalent.

22        Actuarial equivalence means the premium is

23  the same value based on the interest rate and

24  mortality based on other benefits, and are two

25    actuarial assumptions.

96

1    Q.  But the question I asked was

2    focusing on specifically treatises.  Is

3    there any treatise or any other definitive

4    source that tells precisely how you arrive

5    at the assumptions you used to calculate the

6    actuarial equivalence that every actuary

7    would go to, or authoritative treatise

8    included in that process?

9    A.  The American Society of Actuaries

10   has an Actuarial Standards Board and

11   actuarial practice that deals with the

12   selections of all actuarial assumptions.

13        And the overall thrust of the

14   criteria is that the assumptions have to be

15    consistent with one another and have to be

16    considered in the aggregate.

17        Q.   Does the guidance provided by the

18    actuarial material standard posed provide

19    any other definitive guidance as to how to

20    arrive at assumptions in calculating

21    actuarial equivalence?

22        A.   Not that I recall.

23        Q.   Does the Actuarial Standards Board

24    have a particular standard addressed to this

25    like Financial Accounting Standards Board,

97

1    you know, Financial Accounting Standard

2    5-something, along those lines?

3        A.   I believe that there is a standard

4    on the selection of economic assumptions.

file:///Z|/D/Dun%20&%20Bradstreet/Claude%20Poulin.txt

5    Q.  Do you know what that standard is

6    called?  Does it have a number?

7    A.   Selection of economic assumptions.

8    I cannot be more precise than that.  They're

9    not numbered as they are in FASB.  The FASB

10   is one section that everyone knows.  As I

11   understand the, numbering system has changed

12   over the years.

13   Q.   Take a moment.  You should still

14   have available to you Poulin Exhibit 1, that

15   document right there.

16       Turning to page 3, paragraph 9.  Paragraph

17   9 states, and I quote:  "Early retirement benefits

18   are said to be 'actuarially reduced' or 'actuarially

19   equivalent' when the pension plan calls for

20   reductions of early benefits due to the fact that

21   the benefit payments begin earlier than at the

22   normal retirement age under the plan and, therefore,

23   extends over a longer period of time.

24       The assets supporting the benefits earn

25   less investment income before payments commence and

98

1   there will be no, 'gains' to the plan for

2   participants dying before benefit payments commence

3   (the benefit of survivorship)."

4        Do you see that?

5    A.  Yes.

6    Q.  What do you mean by the reference

7   to "assets including benefits income?"  How

8   does that relate to the definition of

9   actuarially reduced and actuarially

10   equivalent?

11    A.   Well, if I'm interested in benefits

12   payable at the age of 65, and I'm currently

13   age 55, there is, theoretically, a sum of

14   money representing the benefits that I will

15   receive upon retirement age starting ten

16   years from now.

17        If I decide that this benefit will start

18   immediately when I'm age 55, then the fund will not

19   have the benefit of the pension payments that I

20   receive for the next ten years.  And, therefore,

21   there must be reductions in the benefits that I

22   would get at normal retirement age.

23      Q.  To reflect the investment income

24    that the plan is not going to get because

25    those benefits left the fund earlier?

99

1    A.  Yes.

2    Q.  And what is the reference to -- you

3   explain the last reference to there being

4   gains to the plan from participants for

5   dying before the benefits commence; what do

6    you mean by that?

7        A.  Again, I'm 55 years old.  I'm

8    interested in benefits of a thousand dollars

9    a month starting age 65.  If I die two years

10   from now without receiving any benefits,

11   then I'll be a gain to the fund in that the

12   full amount of pension benefit will never

13   have been paid.

14           Whereas, if I start receiving benefits now

15   and I die in the interim, there would be a larger

16   liability to the fund for the payments that I will

17   have received between the date of retirement and my

18   date of death.  So that is the benefit of

19   survivorship.

20       Q.  So by actuarially reducing that

21   into account mortality, you would do that?

22       A.  The way that it would eliminate any

23   change in the gains from the plan from a

24   person dying, calculations of pension

25   liabilities and the determination of pension

100

1   benefits are based on actuarial assumptions.

2       To the extent that the actuarial

3   assumptions are not fully realized in the

4   actuarial parlance, there is an actuarial

5   gain and actuarial loss.

6       So that a 65-year old retiree dying one

7   month after the date of retirement generates an

8   actuarial gain, because in that case that person's

9   pension plan will not have paid the expected

10  benefit.

11      Conversely, a participant retiring at age

12  65 and living to age 100 would create an actuarial

13  loss.  So that actuarial equivalence eliminates

14  those gains and losses, if you will.

15    Q.  Okay.  Now, if somebody retires

16  early and you have a situation where the

17  discount rate, the interest rate you used to

18    determine actuarial equivalence is higher

19    than what that plan is actually earning, in

20    that situation, actually, it turns out to be

21    a loss to the participant.  That is a net

22    gain, using your definition for the plan,

23    which rate is higher than, if the percentage

24    rate you're using to discount those early

25    retirement benefits, is higher than what the


101


1    plan is actually earning?

2        A.  Yes.

3        Q.  That is going to be a loss on

4    principal and gain to the plan under the

5    analysis, correct?

6        A.  Yes.

7        Q.  Conversely, if the discount rate

8   you're using is less than what the plan is

9   earning, using your definition, that's a

10   gain to the participant and loss to the

11   plan; isn't that right?

12   A.  Yes.

13   Q.  And in this particular case are you

14   familiar with what the actuarial assumptions

15   were for the Dun & Bradstreet funding of the

16   D&B plan?

17   A.  No.

18        MR. SHEA:  Let's have that

19   marked as 4.

20        (Defendant's exhibit for

21   identification marked No. 4:  Dun &

22   Bradstreet Corporation Audited Financial

23   Statements.)

24   BY MR. SHEA:

25   Q.  Mr. Poulin, showing you a document

1    marked as Exhibit 4, I take it this was not

2    among the documents reviewed in formulating

3    your opinions in this case; is that correct?

4       A.  Yes.

5       Q.  You're familiar with the format;

6    are you not?

7       A.  Did you say that was the actuarial

8    report?

9       Q.  No.  This is the audited financial

10    statements.

11       A.  Yes.

12       Q.   And this is something that ERISA

13    plans by law prepare on an annual basis,

14    correct?

15       A.  Well, they have to file, yes, and

16    no, this is not complete.  This is not

17    really, strictly speaking, the actuarial

18    evaluation report.

19    Q.   Part of Form 5500?

20    A.   That could be part of form 5500.

21   This, I believe, is more for FASB 87

22   purposes, but I may be wrong.

23         MR. SHEA:  Let's have that

24   marked Poulin 5.

25         (Defendant's exhibit for

103

1   identification marked No. 5:  Actuarial

2   Information.)

3   BY MR. SHEA:

4    Q.   Is this the actuarial report for

5   calendar year 2002 for the D&B plan, Poulin

6   Exhibit 5?

7    A.   Exhibit 5 starts with a Schedule B

8   to Form 5500 for the year 2002, and there is

9    a statement of actuarial assumptions and

10   methods attached to Schedule B and a number

11   of actuarial assumptions follow.

12       Q.   That includes the actuarial

13   assumption used with respect to investment

14   return for the plan; isn't that right?

15       A.   Yes.

16       Q.   And directing you to page 1 of 17.

17       A.   This is page 7.

18       Q.   Page 7 of the fax, but looking at

19   the bottom --

20       A.   I'm sorry.

21       Q.   We're now literally all on the same

22   page.

23          The investment return that was the

24   actuarial assumption for the plan, at least for the

25   2002 plan year, was 8.25 percent compounded

104

1   annually, correct?

2      A.  Yes.

3      Q.  And that is signed off by an

4   enrolled actuary on the front page, correct?

5      A.  Yes.  It is signed off by the

6   actuary on the cover page.

7      Q.  The statement is signed by an

8   enrolled actuary.  You're familiar with the

9   term "enrolled actuary," are you not?

10     A.  Yes.

11     Q.  You are an enrolled actuary?

12     A.  Yes.

13     Q.  What is an enrolled actuary, for

14  the record?

15     A.  The title of enrolled actuary was

16  created by ERISA in 1974.  An enrolled

17  actuary is a pension actuary who has

18  experience with pension plans and is through

19  examination allowed to practice before the

20  IRS on pension matters.

21    Q.  Have you had occasion to execute

22    Schedule B in the same way that Mr. Gray did

23    in this case?

24    A.  Yes, I did.

25    Q.  And do you regard that as a serious

105

1    undertaking?

2    A.  Yes.

3    Q.  And in your experience, do enrolled

4    actuaries generally regard that as a serious

5    undertaking?

6    A.  Yes, they do.

7    Q.  Have you ever signed off on a

8    Schedule B where you were not comfortable

9    with the comp table and actuarial

10    assumptions used by the plan?

11    A.  No.

12    Q.  To return to the rest of the

13    questions I was asking in this situation

14    where the optional benefit form using a

15    discount rate of 6.75 percent.  The plan has

16    an investment return of 8.25 percent.  This

17    is a situation where the early payment

18    results in a gain for participants and a

19    loss for the plan, as you have defined it;

20    isn't that right?

21    A.  The 8 1/4 percent is the investment

22    assumption on full funding purposes of the

23    plan.

24        If a plan, in fact, experiences 8 1/4

25    percent, what you said is an accurate description.

106

1          The question is:  Does it represent an

2     accurate description of what happens to a

3     participant who is in a similar situation?

4          Q.  Do you have any basis to question

5      the accuracy or whether it is inconsistent

6      with generally accepted actuarial standards,

7      an 8.25 percent funding assumption in this

8      case?

9          A.  No.

10         Q.  If you'll turn and look at

11     paragraph 21, in the first sentence you say:

12     "A large number of pension plans still use

13     outdated interest rate and/or mortality

14     assumptions in the determining of optional

15     forms of benefit."

16          Is that a true statement?

17         A.  I believe so.

18         Q.  What is your basis for making that

19     statement?

20         A.  My experience with pension plans,

21      by reviewing pension plans on a monthly

22   basis.

23       Q.  Do you have an estimate of the

24   number or percentage of defined benefit

25   plans that you review on a monthly basis

107

1    that use outdated interest rates and/or

2    mortality assumptions?

3            MR. MOUKAWSHER:  Objection to

4    the form.

5        A.  No.

6    BY MR. SHEA:

7        Q.  You have a quotation in that

8    paragraph from a submission by the American

9    Benefits Council, correct?

10       A.  Yes.

11       Q.  And that had to do with something

12    called a relative value regulation; is that

13    correct?

14        A.  Yes.

15        Q.  The relative value regulation or

16    regulations that were designed to require

17    employers to explain and show to

18    participants the relative value of different

19    options that employees have, correct?

20        A.  Yes.

21        Q.  And the American Benefits Council

22    did not indicate in its submission anywhere

23    that a 6 percent interest rate was

24    unreasonable, did they?

25        A.  I don't think so.

108

1        Q.  You testified that you're the

2    actuary for the Connecticut pension plan?

3    A.  I'm sorry, could you repeat your

4    earlier question just before that about

5    American Benefits Council?  You referred to

6    6 percent interest rate?

7    Q.  Yes.

8    A.  That's right.  Okay.

9    Q.  You're the actuary for the pension

10    plan for state employees in the State of

11    Connecticut; is that true?

12    A.  Yes.

13    Q.  And, obviously, as a state plan

14    that is not governed by ERISA?

15    A.  That's correct.

16    Q.  Does the State of Connecticut plan

17    employ, with respect to any of its benefit

18    forms, the concept of actuarial equivalence?

19    A.  Yes.

20    Q.  In what context?

21    A.  Not unlike the Dun & Bradstreet

22    plan, the early retirement benefits for

23    active employees are subsidized.

24          It's been a very long time since I reviewed

25    the actuarial assumptions for the Connecticut State

109

1    Employees Retirement System regarding the deferred

2    vested employees and I cannot say which assumptions

3    are used by the plan for that purpose.

4          Q.   Okay.  So as you sit here today,

5     you can't tell me either the interest rate

6     or the mortality tables that are used to

7     calculate actuarial equivalence under the

8     plan for which you are the actuary?

9          A.   I'm the actuary trustee, not the

10    actuary of the plan.  I'm trustee.

11          Q.   So as you sit here today, you can't

12    tell me either the interest rate or

13    mortality table that you used to calculate

14    the actuarial equivalence under the plan for

15    which you are the actuarial trustee,

16    correct?

17        A.   Correct

18        Q.   Does Poulin Associates have a

19    pension plan?

20        A.   Yes, it does.

21        Q.   What kind of plan?

22        A.   It's a defined benefit plan.

23        Q.   How long has the Poulin Associates

24    defined benefit plan been in existence?

25        A.   Twenty-two years, I believe.

110

1        Q.   Does it have an early retirement

2    provision?

3        A.   Yes.

4    Q.   Is it subsidized or unsubsidized?

5    A.   It's only a lump sum.

6    Q.   Are there any optional benefit

7    forms under the Poulin Associates defined

8    benefit plan that require a calculation of

9    actuarial equivalence?

10    A.   No.  The plan consist of normal

11    retirement benefits or a lump sum in lieu

12    of.

13    Q.   How many employees are covered by

14    the Poulin Associates benefit plan?

15    A.   Five.

16    Q.   Who invests the funds of the trust

17    of that plan?

18    A.   There is an institutional investor,

19    Sullivan Smith Barney and I'm the named

20    fiduciary.

21    Q.   Does it file annual reports similar

22    to Poulin Exhibit 5?

23    A.   Yes.

24    Q.   And in doing that, does it use

25   funding assumptions?

111

1    A.   Yes.

2    Q.   What is the current funding

3   assumption for that plan?

4    A.   The funding assumptions that were

5   in effect for the year in question, which

6   there are various assumptions, as you can

7   see on Schedule B, depending on the purpose

8   of the evaluation, that is an RPA

9   evaluation.

10       So the rating is two decimal places.  I

11  don't recall now the exact amounts.

12   Q.   Was it somewhere in the

13   neighborhood of 8.25 percent?

14   A.   No.  It was lower.

15    Q.  Was it in the neighborhood of 6.75?

16    A.  Probably closer to 6 percent.  I

17    don't know exactly.  This is for, we're

18    talking about, funding purposes.

19    Q.  I understand that.  As you sit here

20    today, you can't tell us what the interest

21    rate assumption is for funding purposes in

22    the Poulin & Associates plan in its most

23    recent report?

24    A.  No, because they change every year

25    and there are several assumptions, as I

112

1    said, depending on the purpose.

2    Q.  Just to be clear, if we look back

3    at Exhibit 5, we would see that there is an

4    RPA assumption.

5        And if I understand correctly, that is

6    concerned with premiums and pension benefits to the

7    corporation --

8        A.   Correct.

9        Q.   -- that is specified by statute?

10       A.   Yes.

11       Q.   Is the top number specified by

12    statute, the 8.25 percent figure?

13       A.   I don't believe this one is

14    specified, but the other two are.

15       Q.   I'm focusing on the 8.25 percent

16    figure.  What is that figure for the Poulin

17    Associates plan?

18           MR. MOUKAWSHER:  Objection to

19    the form.

20       A.   I don't recall.

21    BY MR. SHEA:

22       Q.   As you sit here today, can you tell

23    me whether it's greater, less than or equal

24    to 6.5 percent in its most recent report?

25       A.   I don't recall.

113

1    Q.   Take a look at paragraph 14 of your

2    report.  You say in the last sentence:

3    "Since at least the year 2000, no plan

4    participants would have a reasonable

5    prospect of investing their money with an

6    annual yield of 6 3/4s percent."

7         What is the basis for that statement?

8    A.   The basis for that statement is in

9    the last three years since the year 2000

10    until recently the investment return in

11    general had been very low.

12         The rates of interest had been very low and

13    the pension plan investment performance has been

14    abysmal in the negative.

15         So that a number of pension plans have lost

16    between 20, 25 and 30 percent in 2001 and 2002.  So

17  that this is also true of plan participants,

18  employees participating in 401-K plans where there

19  has been a whole gamut from Enron, where they lost

20  everything, from many plans where they lost 10, 15

21  percent at best.

22      Q.   But if we're looking toward the

23   future, you don't have the ability to form

24   an expert opinion as to what pension plan

25   experience will be for this year, do you?

114

1      A.   No.

2      Q.   Or for five years from now?

3      A.   No.

4      Q.   Or for ten years from now?

5      A.   Your questions are about the

6   investment experience of pension plans.

7    Pension plan is a long term, as I mentioned

8    earlier, a long term project.  And over the

9    long-term, because of the law of large

10   numbers, there will be good years and bad

11   years.

12        And also, because of the economy of scale

13   of a pension plan, certain risks may be taken by the

14   plan that may result in a higher rate.

15        The participant who deals with a guaranteed

16   benefit does not have the benefit, if you will, of

17   having large sums of money to invest or being able

18   to temper the investment markets.

19    Q.  Certainly a participant can take

20   their money early and invest it, correct?

21    A.  They can invest it, but a

22   participant is not likely, especially over

23   the last six or seven years, to have enjoyed

24   the historical returns available to pension

25   funds.

115

1    Q.  But certainly we looked just at

2    your plan for five people's pension money

3    and you anticipate being able to earn over

4    the long haul -- don't recall the precise

5    rate -- 6.5 percent, something in that

6    neighborhood, don't you?

7         MR. MOUKAWSHER:  Objection to

8    the form.

9    A.  Over the long haul, in the life of

10   the pension plan, yes.

11   Q.  Okay.

12   A.  For a participant who retires today

13   the participant may not realize this

14   investment in the short haul.

15   Q.  The Amara case, that you were

16   involved with, where Mr. Moukawsher was

17   co-counsel, what was the issue in that case

18   about?

19      A.   The Amara case involves a pension

20   plan conversion, cash balance conversion of

21   the CIGNA plan.  The issue is that when a

22   traditional defined benefit pension plan is

23   converted to a cash balance plan, then there

24   is a problem in the level of future benefit

25   approval rates under the plan.


116


1       The issue in some cases is that the level

2   of benefit accruals in the conversion is less than

3   it was before.  And also that there are age

4   discrimination issues in the sense that the way the

5   pension plan, cash balance plan operates with the

6   structure of pay credits and interest credits, it

7   results in annual accrued benefits that reduce on

8   account of age, so there is an age discrimination

9   issue.

10      Q.   What has your role been in that

11   case?

12      A.   My role has been to ascertain the

13   level of benefit accruals before and after

14   the conversion for categories of

15   participants.

16      Q.   Were you required to apply any

17   interest rate assumptions in making those

18   calculations?

19      A.   Yes.

20      Q.   What kinds of interest rate

21   assumptions did you make in Amara?

22      A.   Well, in many of these cases the

23   assumptions are dictated by the plan.

24      Q.   Right, obviously.

25      A.   As I recall, the interest rate

117

1    assumption that was used in CIGNA was 5

2    percent.

3        Q.   But that was dictated by the plan?

4        A.   Well, the pay credit was definitely

5    dictated by the plan.  I believe that the

6    assumptions, the interest rate assumptions

7    were 5 percent.

8        Q.   As dictated by the plan, or did you

9    arrive at that independently as a reasonable

10    rate?

11        A.   I believe I arrived at that

12    independently.

13        Q.   What methodology did you employ to

14    get to 5 percent as a reasonable interest

15    rate to use?

16        A.   This was not an issue.  In similar

17    cases I believe the rate of 5 percent was

18    used.

19            Again, the issue here was not the interest

20   rate.  The issue was the possibility of age

21   discrimination that is or is not present

22   irrespective of the rate that is used.

23        So that at that point the interest rate

24   becomes a tool at your disposal.  But whether you

25   use 5 percent or 5 1/4 percent or 3 percent or 8

118

1   percent, you would arrive at similar results because

2   it's only a way to discount money, does not have an

3   impact on the general conclusions.

4        MR. SHEA:  Okay.  Subject to

5   the instruction not to answer on which I'm

6   reserving my rights and suggest we have a

7   meeting to confer on that, I have no further

8   questions of this witness at this time.

9        MR. MOUKAWSHER:  All right.  I

10    have a couple questions for him.  Before we

11    get to that, if the issue of the privilege

12    objection that remain are going to result in

13    a motion and possibly a recall of Mr. Poulin

14    to testify, I would suggest that you

15    articulate the reasons now to see if I

16    change my mind.

17          MR. SHEA:  In other words, if

18    you tell me, you're right and I believe

19    you're right, I don't want it to be the

20    cause of forcing a new deposition and I

21    certainly don't want to pay for it, I will

22    outline it in general.

23          Obviously, there is no

24    attorney-client privilege.  He's not your

25    client.  He's not relying on confidential

119

1    communications that he got from your client

2    and, therefore, the attorney-client

3    privilege is clearly not in the picture.

4          That there was a work product

5    issue, I believe there is a reputable split

6    in authority that suggests that testifying

7    expert witnesses, when they express an

8    opinion, open up for cross-examination any

9    and all communications they've had dealing

10   with their opinion, on which their opinion

11   is based.

12         I'm not saying in any way that

13   your objection is frivolous either.  Simply

14   saying that I don't think its crystal clear.

15         And to be sure, as you and I

16   both recognize, we both potentially assume

17   we go ahead and decide to have potential dog

18   fight in which you state your ground with

19   respect to privilege and I may decide to

20   study the authorities and say, by god, there

21   is a first time for everything and Mr.

22   Moukawsher was right.

23          But I'm just telling you I

24   understand this is not an attorney-client

25   issue where there is a dead bang loser.

120

1   Work product is debatable.

2          Yes, there are courts that say

3   any work product communication that attaches

4   is overcome.

5       MR. MOUKAWSHER:  As you sit

6   here today, there is no District of

7   Connecticut opinion that you're relying on

8   where a similar situation --

9       MR. SHEA:  No.

10       MR. MOUKAWSHER:  Let me finish.

11   I just want it on the record.  I've asked

12   the question in case there proves to be such

13   an opinion.

14          There is no District of

15   Connecticut opinion that you consider a

16   controlling authority in these precise

17   circumstances to which I should yield?  That

18   is the question.  I want to know.  I assume

19   the answer is no.

20          MR. SHEA:  Well, the truthful

21   answer is I don't know, because I did not

22   specifically research that question going

23   into this deposition.  I can tell you I

24   researched it in the past and at the time I

25   did not uncover that elusive issue.

121

1          MR. MOUKAWSHER:  I'm asking,

2    not to play a game with you, I'm asking if

3    there is such a thing, I want to know about

4    it now and have it articulated now.  And

5    then I can say, well, in the interest of not

6    trying to force our reconvening, I'll yield

7    to the point.

8          What I heard you say is you

9    think that it's a tough question.

10         MR. SHEA:  And I don't know the

11   answer.  Believe me, I'm not interested in

12   bringing Mr. Poulin back as much as I'm sure

13   he enjoys traveling to Connecticut.  So if I

14   had a dead bang, an all force opinion, I

15   would share it with you.  I'm not at that

16   stage yet.

17         MR. MOUKAWSHER:  I appreciate

18   that.  Obviously, with respect to reserving

19   your right on behalf of your client, I

20   wanted to make sure we had something on the

21   record to show I was interested in trying to

22   determine if there was some compelling

23   reason for me to change my position.

24        I have not been persuaded I should change

25   my position, therefore, I will not suggest that we

122

1   attempt to re-ask the questions today.  With that, I

2   have a couple questions.

3   CROSS-EXAMINATION BY MR. MOUKAWSHER:

4        Q.   Mr. Poulin, in Mr. Shea's questions

5   to you he spoke to you at one point about

6   what you considered the preferable approach

7   to making the calculations.  I want to ask

8   you a couple clarifying questions about

9   that.

10        Is it your opinion that the interest rate,

11   under the circumstances that it's applied here, is

12   reasonable or unreasonable?

13          MR. SHEA:  Objection to form.

14   Leading.  The federal rules are clear, you

15   can't lead in this situation.  I've made my

16   objection.

17          MR. MOUKAWSHER:  You already

18   said he's not my client.  Your objection is

19   on the record.

20          THE WITNESS:  I believe that

21   the interest rate in conjunction with the

22   mortality tables are unreasonable in

23   determining actuarial equivalency.

24   BY MR. MOUKAWSHER:

25   Q.  And other than through using the

123

1   30-year treasury rate, are there other ways

2   that could yield a reasonable interest rate?

3    A.  Well, as I said, I believe the

4   30-year treasury would be a preferred

5   approach.

6        It would be possible, for instance, to

7   choose such a rate, that it would include a slight

8   amount of subsidy to such an extent that it would

9   not necessitate amending the plan every five years

10   or ten years.

11        If the rate of interest were to be 3 1/2

12   percent, it is unlikely, although not certain, that

13   the rates will be that low over the next foreseeable

14   future.  It is not impossible, but it is unlikely,

15   and then this would provide a certain amount of

16   subsidy.

17        Alternatively, it would also be possible to

18   choose a rate that would be valid until the economic

19   environment changes.  So that it might necessitate

20   periodic amendments to the pension plan.

21        But as I said, my preferred approach would

22   be a variable index such as the 30-year treasury.

23    Q.  Do I understand then that, when you

24   say the 30-year treasury is a preferable

25   approach, that you're saying that is the

124

1   preferable approach among, say, the three

2   options that you said would derive a

3   reasonable rate?

4        MR. SHEA:  Objection to the

5   form.  Leading.

6      A.  Yes.

7   BY MR. MOUKAWSHER:

8      Q.  Did you understand my question?

9      A.  Yes.  My answer was yes.

10        MR. SHEA:  If I could suggest

11   to make it easier you give me a moment to

12   pause between the time Mr. Moukawsher

13   completes his question and you commence your

14    answer, that then lets me make my objection

15    before but start to answer and we'll produce

16    a cleaner record for all of us.

17        Q.   Do you believe that the approach

18    that Dun & Bradstreet employed here is a

19    reasonable approach in terms of achieving

20    actuarial equivalency?

21            MR. SHEA:  Objection to the

22    form.  Leading.

23        A.   As I said earlier, the use of a

24    single high rate and the use of a non dated

25    mortality table in tandem result in

125

1    unreasonable values that are not actuarially

2    equivalent, in my opinion, to the normal

3    retirement benefit.

4    BY MR. MOUKAWSHER:

5        Q.   Just so I understand your previous

6    testimony, you're not claiming that you have

7    a reasonable approach, the 30-year treasury

8    approach, and Dun & Bradstreet has a

9    reasonable approach, the 6.75 mortality

10   table; it's just that you prefer to use the

11   30-year treasury?

12           MR. SHEA:  Objection to the

13   form.  Leading.

14       A.   No.

15   BY MR. MOUKAWSHER:

16       Q.   Let me direct your attention to an

17   exhibit -- think it's Exhibit 2 -- which is

18   the Vinson & Elkin case.  Would you turn to

19   page 12 of that.

20           In the last full paragraph of the page

21   begins "Respondent's Expert Poulin"; you see that?

22       A.   Yes.

23       Q.   It discusses the steps of the

24   separate components.  One of them is the

25   pure rate; you see that?

126

1    A.  Yes.

2    Q.  Reflects a pure rate that you use

3  there of 4 percent?

4    A.  Yes.

5    Q.  If you were to state what the pure

6  rate is today, what rate would you use?

7    A.  Well, as I responded to that

8  question this morning, prior to reviewing

9  this report my answer was 3 percent, because

10  I understand that over the last decade, 12

11  years since I believe this report was

12  produced, economists have revised their

13  position downward, especially at the end of

14  the '90s where it seemed and it appears that

15  the economic environment was changing and

16    that we were entering an era of low interest

17    rates, low inflation and low unemployment

18    rate, which until 1995 was an abberation.

19        And that it appears that at the

20    present time the, quote/unquote, pure rate

21    of interest would be closer to 3 percent

22    than 4 percent.

23    Q.   Mr. Shea asked you questions that

24    related to the issue of protecting the

25    accrued vested benefits in a situation where

127

1    you adopted a variable rate of interest for

2    purposes discussed here.

3        Can you tell me, in your opinion, which

4    methodology would cause more problems with accrued

5    vested benefits, changing a plan language to adopt

6    variable rate, or changing to adopt a new fixed rate

7    and then periodically changing it after that to take

8    into account the changing market conditions, and

9    explain why, if you could?

10        MR. SHEA:  Objection to the

11    form.  Compound.

12      A.   I believe that amending the plan

13    periodically to change the rate would

14    potentially result in a protected benefit;

15    anti-cutback violation problem is not

16    recommended.

17        And that an amended plan, one with a

18    variable index, such as the 30-year treasury rate,

19    would not necessitate periodic amendments that would

20    lead to the same problem provided, of course, that

21    on the date of that particular amendment no

22    reductions in already accrued benefits occur,

23    because an index such as a 30-year treasury rate is

24    not subject to, quote/unquote, employer discretion.

25      Q.   The 30-year treasury rate that

128

1    you've discussed, is the 30-year treasury

2    rate intended to be a reflection simply of

3    current market conditions, or is it somehow

4    related to a projection of what interest

5    rates might be in the future?

6          MR. SHEA:  Objection to the

7    form.

8          MR. MOUKAWSHER:  I'll withdraw

9    that.

10   BY MR. MOUKAWSHER:

11      Q.   What is the 30-year treasury rate

12   predictive of?

13      A.   The 30-year treasury rate is,

14   obviously, a long term rate as opposed to a

15   short term rate like a five-year rate or a

16   one year rate that is short term.

17          The short term rate is more indicative of

18   the current money market conditions, whereas the

19   30-year treasury rate is more indicative of what the

20   market feels will be the economic interest rate

21   environment over the next 30 years.

22          Of course, they're always fluctuating, but

23   to the extent that the 30-year treasury rate, for

24   instance, is an indicator of -- not an indicator --

25   but there is a correlation between the 30-year

129

1   mortgage fixed rate and 30-year treasury rate, that

2   that it is not a perfect correlation, but there is

3   an expectation that this is an acceptable rate for a

4   long-term investor.

5      Q.   Attorney Shea was asking you about

6    the ability of companies to tell somebody on

7   a certain specific date what the value of

8   their benefits were, and he was asking about

9   that in the context of saying what happens

10   when that rate is variable to someone's

11   ability to predict the value of somebody to

12   receive a certain pension on a certain date.

13        Is there another type of calculation under

14   ERISA where the variable rate figures in and creates

15   difficulties in terms of giving someone a precise

16   value on precise dates?

17   A.   Yes, at the present time.

18   Q.   Where is that?

19   A.   The pension plan providing a lump

20   sum benefit.  The calculation of the present

21   value, the lump sum benefit has to follow

22   the mortality table and interest rate and

23   the interest rate is a 30-year treasury

24   rate, which is a variable rate.

25        So that a plan administrator at the current

1   time is not in a position to answer an employee's

2   question as to the exact amount that would be

3   payable five years from now, a lump sum that would

4   be payable even a year from now, because in the

5   course of a year interest rates may change.

6          They could be higher or lower and the plan

7   administrator cannot answer that question.  So there

8   is already some uncertainty regarding benefits.

9      Q.  Is it common in your experience for

10   defined benefit plans to offer lump sum

11   options?

12      A.  Until the event of cash balance

13   plans it definitely was not common.  And

14   when it comes to cash balance plans, you

15   have to distinguish between very large

16   plans, which may have adopted cash balance

17   plans, and smaller plans that have not gone

18   through a process.

19        And I don't know what the number is in

20   terms of the number of plans that do provide lump

21   sum, but it's an increasing number.

22        Q.   So would it be fair to say that

23    this is a lump sum issue of not being able

24    to know exactly the value on a certain day?

25    Is that that an increasingly common

                              131

1   experience?

2             MR. SHEA:  Objection to form.

3   Leading.

4        A.   Yes.

5   BY MR. MOUKAWSHER:

6        Q.   Depending on the mortality table

7   that was used in the Dun & Bradstreet plan,

8   is there any circumstance today, depending

9    on the use of deferring mortality tables,

10    that a 6.75 percent interest rate would be,

11    in fact, a reasonable rate?

12          MR. SHEA:  Objection.

13    Q.  Of the Dun & Bradstreet plan?

14          MR. SHEA:  Objection to the

15    form.

16    A.  Ignoring the impact of the

17    mortality table.

18    Q.  In other words, assuming you could

19    change the mortality table to anything you

20    wanted it to be right now, could the

21    combination under any circumstance,

22    depending on how you make up your own

23    mortality table, could a 6.75 percent

24    interest rate produce a reasonable actuarial

25    value in conjunction with at least some

132

1  mortality tables?

2      MR. SHEA:  Objection to the

3  form.

4      A.  Yes, it is possible to generate or

5  create a mortality table that combined with

6  a 6.75 percent interest rate would produce a

7  reasonable actuarial equivalent benefit.

8      Q.  What impact does the use of a

9  mortality table, that you discern was being

10  used here, have on reasonableness of an

11  attempt to get actuarial equivalence?

12      A.  I have not quantified the impact on

13  the mortality table per se, but I believe it

14  was Exhibit D that showed that it has a

15  significant impact on the size of the

16  actuarial reductions compared to a more

17  recent table.

18      Q.  So do the mortality tables applied

19  here make the situation better for employees

20    or worse for employees?

21          MR. SHEA:  Objection to the

22    form.

23      A.   The situation for employees is

24    definitely worse by the use of this

25    mortality table.

133

1    BY MR. MOUKAWSHER:

2      Q.   Given the mortality table that is

3    used here, if that mortality table were to

4    be used, would the 30-year treasury rate

5    still be a reasonable rate to use here with

6    those rates or could it be another rate that

7    might be reasonable?

8          MR. SHEA:  Objection to the

9    form.

10      A.  Both actuarial assumptions present

11   problems, in my opinion, but the fact that

12   this mortality table is there exacerbates

13   the problem in that it is possible to

14   imagine a situation where the continuing use

15   of this mortality table would necessitate an

16   interest rate assumption that would be even

17   more compensating then a 30-year treasury

18   rate.

19         Say 50 years from now, for instance, use of

20   this mortality table if, in fact, you know the

21   reductions in mortality rates, that Mr. Shea alluded

22   to this morning, continue without my caveat, then

23   there would be a problem.

24   BY MR. MOUKAWSHER:

25      Q.  What would you have to change to

134

1    make this plan have actuarially reasonable

2    assumptions for the purpose of generating an

3    actuarial equivalence?  What would you have

4    to do?

5        A.  Well, I would change the interest

6    rate that would reflect the current economic

7    environment and I would change to a

8    mortality table that is representative of

9    the expected mortality rates of

10   participants.

11       Q.  Is that the only way you can fix

12   it?

13       A.  It is not the only way.  It will

14   always be possible for a pension plan

15   sponsor to provide a rate that would be such

16   that a certain element of subsidy would

17   exist that would prevent the periodic

18   adjustments either through the use of a

19   30-year rate, for instance, or through an

20   amendment to the plan every four or five

21   years.

22          So as I mentioned earlier, if the interest

23    rate were 3 percent, it is unlikely it would have to

24    be amended, that the plan would have to be amended

25    frequently.

135

1          Q.   If you had significantly lower

2     interest rates than the current interest

3     rate environment, could you lower the rate

4     so much that, for instance, you could use an

5     out-of-date mortality table?

6              MR. SHEA:  Objection to form.

7          A.   At the present time perhaps.

8     BY MR. MOUKAWSHER:

9          Q.   Conversely, could you have a higher

10    interest rate than prevailing market

11    conditions, but have a mortality rate

12    assumption that would offset it?

13      A.   Yes.

14          MR. SHEA:  Objection to the

15    form.

16          MR. MOUKAWSHER:  I have no

17    further questions at this time.

18    REDIRECT EXAMINATION BY MR. SHEA:

19      Q.   First off, Mr. Moukawsher asked you

20    about the idea of using a lower interest

21    rate to subsidize your early retirement

22    benefits for deferred vested retirees.

23    That's not something ERISA requires?

24      A.   No.  That would be decided to

25    address the problem by providing additional

136

1    benefits to the plan participants above and

2   beyond what the law provides.  It provides a

3   certain element of subsidy.

4       Q.   The second alternative of adjusting

5   the rate every five years to continue the

6   use of a fixed rate, that would have

7   significant workability problems because

8   then you would conceivably have to calculate

9   the accrued benefit protected under the

10   anti-cutback rule and they have to do three

11   or four separate calculations to decide what

12   somebody's accrued benefit was; isn't that

13   right?

14       A.   Precisely, that is why we prefer an

15   index.

16       Q.   In terms of an indexing approach, I

17   just want to make sure I understand your

18   position.  Suppose I'm a D&B plan

19   participant and I've worked 30 years

20   accruing benefits with an interest

21   entitlement to retire at 55 as a deferred

22   vested retiree using the 6.75 percent

23   interest rate.  I'm 54 and turn 55 next

24   year.

25          Let's suppose that two things happen:  One,


                              137


1   I lose my job so I'm now a deferred vested retiree;

2   and two, that oil prices having gone through the

3   roof and the 30-year treasury bill, your index

4   benchmark, goes to 10 percent next year.

5          When I go to the deferred vested retirement

6   provision, is it your expert opinion that in that

7   situation, if D&B had amended their plan to use this

8   index, they could take a higher rate of 10 percent

9   and use it to reduce all of my benefits that were

10  earned when the rate was 6.75?

11      A.   This is exactly what is happening

12   today to the 30-year treasury rate, not in

13    the last two years, but when the rate went

14    from 5 1/2 to 6 1/4 percent three or four

15    years ago.  That's exactly the situation,

16    that some retirees' cash balance

17    environment, where in October of that year

18    they're entitled to 200,000, and then

19    because the lump valuation for next year is

20    based on the 30-year treasury of the

21    September preceding the date of the

22    determination, then the rate goes up, and

23    then instead of having $200,000 coming in

24    December, you may have $175,000 in January.

25    So the problem exists at the present time.


138


1        Q.   Well, setting the sum aside, there

2      is a separate statutory provision.  I'm

file:///Z|/D/Dun%20&%20Bradstreet/Claude%20Poulin.txt

3    talking about my context.

4         Are you saying in the hypothetical I've

5    given you that a deferred vested retiree who spends

6    30 years under the plan, the optional benefit forms

7    shall be calculated using the 6.75 percent interest

8    rate; the plan is then amended to use 8 as a

9    variable treasury bond rate, not pursuant to the

10   statutory requirement, the plan just decides to do

11   that.

12        If I then become a deferred vested retiree

13   and I'd like to retire after that amendment, when

14   interest rates have gone up to 10 percent, it's your

15   opinion there is no anti-cut back problem with the

16   employer using that higher interest rate to pay me

17   substantially less pursuant to the amendment that

18   was passed after all of the benefits accrued under

19   the old system?

20        A.   I believe that at the time of the

21   amendment there are no reductions in the

22   early retirement factors, there is no

23   violation at that time of the anti-cutback

24   rules.

25      And if by the working of the formula ten

139

1   years later there is a problem one year to the next

2   by the working of the 30-year treasury rate, there

3   is a reduction to the extent that this reduction is

4   not subject to employer discretion because it's a

5   formula, my understanding is that it would be

6   acceptable to the IRS and that it would not involve

7   a violation of the anti-cutback rules.

8       Q.   You testified that you thought the

9    pure rate of interest today would be closer

10   to 3 percent than 4 percent, correct?

11      A.   Yes.

12      Q.   And you said economists revised

13   their estimates?

14      A.   Yes.

15    Q.  Which economists revised their

16   estimates of pure interest rate?

17    A.  I had not addressed that question

18   until you raised it this morning and I don't

19   know which economists.

20    Q.  Do you know when they did?

21    A.  Over the course, as I said, of the

22   last decade.

23    Q.  But other than saying unnamed

24   economists have done it over the last

25   decade, can you provide me with anything

140

1   more specific to support your view that

2   economists have revised the pure interest

3   rate from 4 percent down to something closer

4   to 3 percent?

5          MR. MOUKAWSHER:  Objection to

6     the form.

7     A.   No.

8          MR. SHEA:  Nothing further.

9          (Whereupon, the deposition was

10     concluded at 2:30 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

file:///Z|/D/Dun%20&%20Bradstreet/Claude%20Poulin.txt

141

1          C E R T I F I C A T E

2
    STATE OF CONNECTICUT
3
    JUDICIAL DISTRICT OF NEW HAVEN
4

5          I, LORRAINE CALEGARI, Licensed Shorthand
    Reporter and Notary Public within and for the State
6   of Connecticut, duly commissioned and qualified, do
    hereby certify that pursuant to Notice, CLAUDE
7   POULIN, the deponent herein, was by me first duly
    sworn to testify to the truth, the whole truth and
8   nothing but the truth of his knowledge touching and
    concerning the matters in controversy in this case;
9   that he was thereupon carefully examined upon his
    oath and her testimony reduced to writing by me; and
10  that the deposition is a true record of the
    testimony given by the witness.
11
           I further certify that I am neither attorney
12  or counsel for, nor related to or employed by, any
    of the parties to the action in which this
13  deposition is taken, and further that I am not a
    relative or employee of any attorney or counsel
14  employed by the parties thereto or financially
    interested in the action.
15
           IN WITNESS WHEREOF, I have hereunto set my

16  hand and affixed my notarial seal on June 9, 2004,
    at Cheshire, Connecticut.

17

18

19

20

21  _____

22              Lorraine Calegari, LSR

23  My Commission Expires:    License No. SHR.172

24  April 30, 2005          Notary Public

25                  State of CT

142

1      I N D E X

2
    CLAUDE POULIN                    PAGE
3

4
    DIRECT EXAMINATION BY MR. SHEA          3
5
    CROSS-EXAMINATION BY MR. MOUKAWSHER      122

6   REDIRECT EXAMINATION BY MR. SHEA          136

7

8

9

10        E X H I B I T   I N D E X

11

12   No.        DESCRIPTION

13

1:  Disclosure and Report              20

14

2:  Decision of the U.S. Tax Court        75

15

3:  Opinion of the Court, 1994          88

16

4:  Dun & Bradstreet Financial

17

Statements                    101

18

5:  Actuarial Information          103

19

20

(Original exhibits retained by the Court
Reporter and attached to the original
21   copy of the deposition.)

22

23

24

25