# EXHIBIT B

1  UNITED STATES DISTRICT COURT

2  DISTRICT OF CONNECTICUT

3  ------------------------------------------ X

4  MCCARTHY, ET AL,

5                    Plaintiffs,

6      - against  -

7  DUN AND BRADSTREET, ET AL,

8
                    Defendants.
9  ------------------------------------------X

10                Examination of EDWARD W. BROWN
                  Milliman USA
11                4 Corporate Plaza
                  250 Washington Ave. Ext.
12                Albany, New York   12203

13                October 6, 2004 at 10:00

14  APPEARANCES:        By Phone:
                  MOUKAWSHER & WALSH, LLC
15                THOMAS MOUKAWSHER, Esq., of Counsel
                  21 Oak Street
16                Hartford, Connecticut 06106
                  Attorneys for Plaintiffs
17
                  PAUL, HASTINGS, JANOFSKY & WALKER,
18                PATRICK W. SHEA, Esq., of Counsel
                  1055 Washington Blvd - 9th Floor
19                Stamford, Connecticut  06901-2217
                  Attorneys for Defendants

20

21

22

23

24

25

2

1  EDWARD W. BROWN,

2  having been first duly sworn by a Notary Public, was

3  examined and testified as follows:

4  DIRECT EXAMINATION BY

5  MR. MOUKAWSHER:

6    Q.  Good morning, Mr. Brown.  I'm attorney Tom

7  Moukawsher.

8    A.  Morning.

9    Q.  Before we begin, I want to apologize for the

10  unusual posture of doing this by phone. This is our last

11  day to take your deposition, and the only way to make it

12  work for me was to do it by phone. I would certainly

13  rather do this in person, but we'll just try and do our

14  best.

file:///Z|/D/Dun%20&%20Bradstreet/Brown.txt

15    A.  This is fine.

16    Q.  Before we begin the questions --

17         MR. MOUKAWSHER:  And, Pat, you can answer

18    this.  Is there anybody else in the room besides Mr.

19    Brown, the court reporter, and you?

20         MR. SHEA:   There is not.

21         MR. MOUKAWSHER:  Okay. I ask the court

22    reporter -- I believe she has a copy of the deposition

23    notice and a copy of Mr. Brown's report. I would like to

24    mark the notice as Exhibit 1 to this deposition.  And

25    the report as Exhibit 2.

                              3


1    (Deposition notice and Brown's report marked Exhibits 1

2    and 2, respectively, for identification.)

3         MR. SHEA:  And just so we're clear what

4    we're actually marking, Tom, we marked the deposition

5    notice Exhibit 1, without any cover letter. And we've

6    marked the report without the face page, Defendant's

7    expert disclosure, as Exhibit 2. I take it that's how

8    you want it?

9        MR. MOUKAWSHER:  That's fine.

10  BY MR. MOUKAWSHER:  (Continuing.)

11      Q.  Mr. Brown, have you ever had your deposition

12  taken before?

13      A.  Yes, on a couple of occasions.

14      Q.  Two or more?

15      A.  Well, it's probably more, but I don't really know

16  how many times.  It hasn't been very frequent over the

17  course of my career.

18      Q.  I'll quickly go over the ground rules.  As you

19  know, there's a court reporter there and she's

20  attempting to take down what everybody says. She can

21  only take one person down at a time. So, of course, it

22  is important for us not to speak over each other. I'll

23  try to make a crisp, clear question and then stop. Give

24  me long enough to finish and then you can give your

25  answer.  If you give your answer while I'm still

4

1  speaking or I interrupt you, it will cause some trouble

2  for the court reporter. Obviously, since I'm on the

3  telephone, your answers have to be audible. A nod of the

4   head, a shrug or shake, not only can I not see them, but

5   the court reporter cannot take them down as clearly as

6   she can an audible answer.

7        If you don't understand any of my questions,

8   please feel free to say so as your answer, and I will

9   try to clarify them. If you don't say that you are

10  having trouble with my question, I'm going to assume you

11  understood it and you answered it to the best of your

12  ability.  Also, if you need to take a break for any

13  reason, feel free to ask for it.  And let me ask you,

14  Mr. Brown, if there's any reason today, physically or

15  mentally, that you can't give your best testimony?

16  A.  No.

17  Q.  Okay. I want to test in this deposition your

18  knowledge, basically, by asking questions and by you

19  telling me what's in your head. I certainly don't want

20  to test your reading ability. So unless I say so

21  otherwise, I ask you not to have anything in front of

22  you while I'm questioning you. Do you have any documents

23  in front of you now?

24  A.  I have the report that I prepared and the

25  documents that you had requested that I bring today.

5

1    Q.  I'm going to discuss with you those documents.

2  But the version of your report that I'd like you to have

3  in front of you now is Exhibit 2. If you could keep

4  Exhibit 2 in front of you, that's fine.

5    A.  Okay.

6    Q.  In other words, if I ask you something about your

7  report I'd like you to refer to Exhibit 2. But for all

8  purposes otherwise I want you to keep no documents in

9  front of you, including Exhibit 2, unless I ask you a

10  question about it.

11        MR. SHEA:  Right now you don't want Exhibit

12  2 in front of him?

13        MR. MOUKAWSHER:  No documents in front of

14  him until I ask him.

15        MR. SHEA:  Okay. We'll comply.

16    Q.  Mr. Brown, who contacted you about being

17  retained as an expert witness in this case?

18    A.  I think the initial contact came from one of my

19  partners in the Manhattan office.  Martha Moeller asked,

20  I think it was at a meeting of several people, to see if

21  anybody had a willingness, desire and ability to act as

22  an expert witness in a case.

23     Q.  Do you have an understanding of who contacted

24  Martha Moeller, or who from Dun & Bradstreet first

25  contacted your firm?

6

1     A.  I think the contact came in through an actuary in

2  our Melville office, Barry Marks, who works for Martha.

3  And I'm not sure who contacted him

4     Q.  Mr. Brown, do you advertise in any way your

5  availability as an expert consultant?

6     A.  In no way at all.

7     Q.  And how did Martha Moeller, or whoever, decide to

8  contact you about working on this case?

9        MR. SHEA:   Objection. Lack of foundation.

10     Q.  Do you have an understanding as to why she called

11  you, a belief why she called?

12     A.  Again, I believe it was at a meeting of several

13  of our partners where she said that she had this inquiry

14    about the willingness and availability of an expert

15    witness to testify in a case.

16      Q.  Okay.

17      A.  And I replied that I had done it a couple of

18    times and I'd be glad to look into it.

19      Q.  Does Milliman do any other work for D&B?

20      A.  Not that I know of.

21      Q.  So as far as you know the company does not now

22    nor has it ever in the past done any actuarial work for

23    Dun & Bradstreet?

24      A.  Not that I know of.

25      Q.  Mr. Brown, what did you do to prepare for this

                                    7

1    deposition?  And I want to distinguish between what you

2    did to prepare your report and what you did for your

3    testimony today. So please tell me what you did to

4    prepare for your testimony today.

5      A.  Okay.  Could you just clarify that a little bit?

6    You mean, after I prepared my report?

7      Q.  Yes, after you prepared your report.  At some

8    point someone told you you were going to have your

9  deposition taken?

10    A.  That's correct.

11    Q.  My question is, what did you do specifically to

12  prepare for the deposition as opposed to what you did to

13  prepare your report?

14    A.  Okay. I had a meeting on Monday with Pat Shea in

15  his office to review.

16        MR. SHEA:   The meeting is sufficient in

17  connection with the preparation of the deposition.

18    Q.  I'll clarify.  I don't want you to tell me what

19  you and Attorney Shea discussed. But if one of the

20  things you did was a meeting, that's one thing I want to

21  know.

22    A.  That's right, we had a meeting on Monday.

23    Q.  What else did you do to prepare?

24    A.  I read over my report. Looked at some of the

25  notes to refresh my memory.  And that's about it.

8

1    Q.  How much time did you spend preparing for the

2  deposition, would you estimate?

3    A.  I would say eight to ten hours on Monday.  And a

4    couple hours on Tuesday. Another hour this morning. And

5    now this phone call.

6    Q.  All right. And how much have you charged Dun &

7    Bradstreet for your services to date?

8        MR. SHEA:  I object as vague. You mean,

9    bills he's actually sent out?

10   Q.  How much in charges has Dun & Bradstreet incurred

11   for your work so far, as opposed to what you have billed

12   or collected?

13   A.  Okay.  I don't know how much the total incurred

14   would be.

15   Q.  Have you billed them?

16   A.  I have billed them. I know what I've billed them.

17   Q.  How much have you billed them?

18   A.  I billed them around $22,000.

19   Q.  And do you know when the terminal date of the

20   bill was?  In other words, how long through was that

21   bill covering?

22   A.  This would have covered my time charges for July

23   and August.

24   Q.  And other than your preparation for the

25  deposition, have you spent substantial amounts of time

9

1  on this matter since July and August?

2    A.  No, I haven't.

3    Q.  So that's basically most of your charges, right?

4    A.  That's right.

5    Q.  Okay. Mr. Brown, I'd ask you to put the notice of

6  deposition, Exhibit 1, in front of you.

7        MR. SHEA:  Done.

8    A.  Okay.

9    Q.  Referring your attention to paragraph one, it

10  asks you to bring all documents you consulted and/or

11  relied upon in the preparation of your report. Do you

12  see that paragraph?

13    A.  I do.

14    Q.  And did you bring all the documents that you

15  consulted and/or relied upon in the preparation of the

16  report?

17    A.  No. The only documents that I have today are the

18  ones that you had requested me to bring.

19    Q.  Well, you see that the request there is all the

20    documents you consulted and/or relied upon in the

21    preparation of your report, right?

22        MR. SHEA:   Just to clarify, Tom, on that

23    point, you asked for other than those documents

24    previously produced in this litigation.  Some of which

25    the witness wouldn't have knowledge of.  I think with

10

1    that clarification for the witness, I think the

2    documents you have in front of him are those consulted

3    or relied upon for the report.  Other than the thick set

4    of documents that were the documents previously

5    produced.

6    Q.  Is that correct, Mr. Brown?

7    A.  I guess I'm not sure --

8    Q.  Let me rephrase it for you. You'll see that

9    notice asks you to bring all documents consulted and/or

10   relied upon in the preparation of your report, other

11   than documents previously produced in this litigation.

12   For instance, you list in your report you read the

13   pleadings in the case, the motion to dismiss, and the

14   various documents associated with that. And those have

15   been previously produced in the litigation, so you

16   wouldn't be required to produce those things.

17        And my question is, other than those types of

18   things, did you bring with you all the documents you

19   consulted and/or relied upon in the preparation of your

20   report?

21   A.  Again, I think I probably used a lot of actuarial

22   literature, references, that I don't have with me. And

23   I'm not even sure I recall everything that I looked at.

24   But I did consult actuarial research material.

25   Q.  What kind of research material did you consult?

11

1   A.  I consulted actuarial standards papers. I

2   consulted, there's an actuarial standard for preparation

3   of expert testimony.  There are research papers or

4   textbooks on the methodology for choosing interest

5   rates.  Things like that.

6   Q.  What texts with respect to the methodology for

7   determining interest rates did you consult?

8    A. I don't recall. And it wouldn't be a textbook,

9  it would have been papers or discussions with people.

10    Q. So you think you looked at some documents

11  regarding the methodology for choosing interest rates?

12    A. Yes.

13    Q. But you can't remember any of them as you sit

14  here today?

15    A. Right. I know there was one, there's an actuarial

16  standard of practice that deals with the selection of an

17  interest rate.

18    Q. And by actuarial standard of practice what do you

19  mean?

20    A. It's a standard that's put out by the Actuarial

21  Standard Board, which is a part of the American Academy

22  of Actuaries.

23    Q. And you consulted that and relied on it for your

24  opinion, is that correct?

25    A. I consulted it in preparation for today's

                                12


1  testimony to refresh my memory of the standards. I don't

2  recall if I specifically consulted that document as I

3  was preparing my report, other than from previous

4  exposure to it.

5      Q.  Well, is that one of the things you were going to

6  rely upon for your opinion, the actuarial standard you

7  just referred to?

8      A.  Yes, right.  Yes, I do.

9      Q.  I take it you have a copy of it?

10     A.  I have a copy of it.

11     Q.  But you don't have one with you, is that what

12  you're telling me?

13     A.  I don't have it with me.

14         MR. SHEA:  Tom, we'll be happy to supply

15  that at a break.

16     Q.  So, is it correct, if we took a break at some

17  point you would be able to get that?

18     A.  That's correct.

19     Q.  What other standards or papers did you examine to

20  form your opinion?

21     A.  That covers it for professional documents, other

22  than my own experience and memory.

23     Q.  Okay. With respect to any documents that tell you

24  how to choose an interest rate under these

25  circumstances, the only one you consulted was the one

13

1  that we've just talked about, the standard put out by

2  the Actuarial Standards Board, is that correct?

3     A.  That's correct.

4     Q.  Okay. And what documents did you bring with you

5  in response to the notice?

6        MR. SHEA:  Do you want him to go document by

7  document, identify them for you, Tom?

8        MR. MOUKAWSHER:  Yes.

9        MR. SHEA:  I'm putting the documents in

10  front of the witness now.

11    A.  Okay. The first one is a printout of a

12  spreadsheet that summarizes the results of the interest

13  rates and methodology used to determine early retirement

14  benefits for the clients in the Albany office of

15  Milliman.

16    Q.  Okay. And does that document list those clients

17  by name?

18    A.  No.

19   Q. And who prepared that document?

20   A. It was prepared by the director of our retirement

21  benefits unit, Anna Mastroianni.

22   Q. Was it prepared at your request to assist you

23  with your opinion?

24   A. Yes.

25   Q. So it's not a document that your company

14

1  regularly generates?  You generated it, the company

2  generated it for your use in giving your opinion?

3   A. That's correct.

4   Q. How many pages is the document?

5   A. It's three pages.

6   Q. And is the version that you brought a copy, is

7  that extra and can be marked as an exhibit?

8   A. Yes.

9      MR. MOUKAWSHER:  Let's have that marked as

10  Exhibit 3.

11  (Spreadsheet marked Exhibit 3 for identification.)

12   Q. What's the next document?

13    A.  The next document is similar information from

14  other Milliman offices.  Mainly, the one in West

15  Paterson, New Jersey, and Melville, Long Island. And our

16  Manhattan office.

17    Q.  And has this document similarly been produced by

18  the company for your use in forming your opinion?

19    A.  That's correct.

20    Q.  So it's not a document that the company regularly

21  generates?

22    A.  Correct.

23    Q.  And this reflects results from three offices of

24  Milliman, is that correct?

25    A.  Well, it's three primary ones, plus two across

15

1  the country. We requested information from all Milliman

2  offices and we got two responses listing two plans from

3  two different offices.

4    Q.  And how many offices does Milliman have?

5    A.  32 offices in the United States.

6    Q.  How many pages is this document?

7    A.  It's 12 pages, which consists of some

8  spreadsheets, some emails.

9   Q.  Some of the responses are just somebody emailing

10  you, telling you their understanding of what some of

11  their clients do?

12   A.  That's correct.

13     MR. MOUKAWSHER:  Why don't we mark that as

14  Exhibit 4.

15  (Milliman offices information marked Exhibit 4 for

16  identification.)

17   Q.  What is the next document you brought?

18   A.  The next document is the Dun & Bradstreet

19  Corporation General Information About Your Benefits.

20     MR. SHEA:   Tom, let me note

21  parenthetically, this probably actually doesn't belong

22  in the pile because this is, I think, a document that

23  was produced in the litigation.

24     MR. MOUKAWSHER:  Right.  That's what I was

25  about to say.

16

1   Q.  Let's go to the next one, Mr. Brown.

2    A. Okay. The next one is called the Hewitt Results

3  Measurement Spec Book.

4    Q. Is this a book or an excerpt from a book?

5    A. I'm not sure. I think probably it's an excerpt

6  from a book. The first page number is 131.

7    Q. All right. And how many pages is this book?  How

8  many pages is this excerpt?

9    A. Goes from 131 to 259.

10      MR. SHEA:  I'm not sure that's consecutive.

11  That looks too small.

12    A. It's double sided.  It's approximately 100 pages.

13      MR. MOUKAWSHER:  Why don't we mark that then

14  as Exhibit 5.

15  (Hewitt excerpt marked Exhibit 5 for identification.)

16    Q. What's the next document, Mr. Brown, that you

17  brought with you?

18    A. That's it.

19    Q. That's everything you brought?

20    A. Uh-huh.

21    Q. All right. And are there any other documents that

22  you consulted or relied on with respect to your opinion

23  that you have not brought?

24          MR. SHEA:   I am aware of one other document

25   that he consulted.  I'm aware of.  I don't know if you

                            17


1   want the witness' best recollection right now or allow

2   me to refresh his recollection and take it up later.

3          MR. MOUKAWSHER:  Well, why don't we see what

4   his recollection is.

5          MR. SHEA:  Do you remember any other

6   documents you looked at in forming your opinion other

7   than the ones we looked at here?

8     A.  Of course, I looked at all the plan documents and

9   the initial stuff.

10          MR. SHEA:  Other things not produced in

11   litigation.

12    A.  We talked about the ASOP.

13    Q.  Not something we talked about.

14    A.  I can't recall.

15    Q.  As you sit here right now.

16    A.  If you refresh my memory.

17    Q.  We're going to start, Mr. Brown, with what you

18  remember.  It may be important as to its relevance,

19  significance. As you sit here right now, beyond the

20  things that have already been produced in the

21  litigation, such as the document associated with the

22  plan and the motions to dismiss, and etcetera. Beyond

23  those, is there anything else that you have consulted or

24  relied upon as a document that you haven't produced

25  here?

                                    18


1    A.  Again, I can't recall whatever.

2    Q.  You can't recall anything else, correct?

3    A.  Right.

4    Q.  Okay. Perhaps we'll come back to this. Mr. Brown,

5  I'll ask you to put Exhibit 2 in front of you.

6         MR. SHEA:  Done.

7    Q.  It's your report.  I'll ask you to turn to page

8  one.

9    A.  Okay.

10    Q.  At the bottom of page one there's a paragraph 7

11  which says:  I personally consult with over 50 clients.

12  What kind of work do you do for the 50 clients you

13  personally consult with?

14     A.  It's all pension related consulting. Much of it

15  is actuarial consulting, preparation of actuarial

16  evaluations. IRS 5500 forms, schedule B. Also included

17  in there would be some defined contribution pension

18  clients, 401K plans, money purchase plans. It would also

19  include non qualified plans as well as qualified plans.

20     Q.  What percentage of the work you do for the 50

21  clients you named is actuarial work related to defined

22  benefit plans?

23     A.  You know, I don't know exactly. I know in the

24  practice in the Albany office about 60 percent of our

25  business is actuarial and 40 percent is defined

19

1  contribution. And I would say that my split is

2  approximately 60/40.

3     Q.  So, 60 percent of the work that you do for these

4  50 clients is actuarial work for defined benefit plans,

5  is that correct?

6     A.  Approximately, yes.

7    Q.  And do you include in that actuarial work the

8  generation of form 5500?

9    A.  I would include that in the consulting work and

10  work that I do for the actuarial clients.

11    Q.  Are you saying that's part of the actuarial work

12  you do, the 60 percent figure, or is it not?

13    A.  Again, I don't know exact breakdown.  I spend

14  very little time on 5500s in total.

15    Q.  Well, since you gave that as an example of the

16  kind of work you do, what do you spend most of your time

17  doing?

18    A.  Most of my time would be reviewing valuations,

19  consulting on plan design issues.

20    Q.  What do you mean by reviewing valuations?

21    A.  Each actuarial client needs an actuarial

22  valuation once a year to evaluate the plan liabilities,

23  determining funding requirements, determining expense

24  requirements. This work is done by various people in the

25  office. And my job is to review the procedures used, the

20

1  assumptions used, the methodology and the reasonableness

2  of the result.

3    Q.  Why do you do this work once a year?

4    A.  It's required by IRS for funding purposes. It's

5  required by various accounting organizations for

6  disclosure and financial statements of companies.

7    Q.  And it's the basic goal of this work to determine

8  the assets and liabilities of these plans, is that

9  correct?

10    A.  Yes. With emphasis on the liability part.

11    Q.  Well, really what you're doing is trying to

12  determine if the plans are properly funded; is that the

13  goal?

14    A.  That's the primary goal of many of these

15  calculations.

16    Q.  Okay. So that's most of the work you do?

17    A.  On the actuarial clients, yes. As well as plan

18  design work.

19    Q.  Well, I believe you said that most of the

20  actuarial work you do is working with these and

21  reviewing valuations, is that correct?  Or do you do

22  more plan design than that?

23    A. I would say I spend more time or equal amount of

24  time on plan design as I do on actuarial evaluation.

25    Q. Okay.  So you spend an equal amount of time with

21

1  designing defined benefit plans, is that correct?

2    A. It's approximate.  And it's both defined benefit

3  and defined contribution plans.

4    Q. Right.  And in terms of plans you design, do you

5  design, have you been designing within the last couple

6  of years more defined benefit plans or more defined

7  contribution plans?

8    A. More defined contribution plans for sure. The

9  defined benefit plan would be changes in plan design,

10  not new defined benefit plans.

11    Q. All right. But you mostly do plan design for

12  defined contribution plans within the last couple of

13  years?

14    A. I wouldn't say that, because plan design includes

15  changes.  And there's been a lot of changes to defined

16  benefit plans.

17    Q. I asked within the last couple of years what

file:///Z|/D/Dun%20&%20Bradstreet/Brown.txt

18   you've done more work on.  And I thought you said more

19   work on defined contribution plans?

20       A.  Maybe I misunderstood the question. I thought you

21   meant new plans.

22       Q.  Okay.

23       A.  And if we consider existing plans it would come

24   out perhaps 50/50, 60/40 something.

25       Q.  Okay.

22

1       A.  Some of each.

2       Q.  I'm sorry. Apart from working on amendments to

3   existing defined benefit plans, if we just focus on new

4   plans that you've been designing, did I understand you

5   correctly that in the last couple of years you've been

6   designing more defined contribution plans than defined

7   benefit plans?

8       A.  I would say within the last couple of years --

9   and most of the plans I work on are existing plans, been

10   around for a long time.  We haven't set up a whole lot

11   of new plans in the last two years.  But the ones that

12  have been set up would be primarily defined contribution

13  plans.

14     Q.  Okay. And with respect to the defined benefit

15  plans that you've worked on in the last couple of years,

16  have any of those been cash balance plans?

17     A.  Yes, they have.

18     Q.  What percentage of the work on defined benefit

19  plans in the last couple of years has been related to

20  cash balance plans?

21     A.  Again, I don't have those statistics.  I know we

22  have cash balance plans that I work on.  Some of our

23  major clients are cash balance. It's certainly not a

24  hundred percent of the design work. It may be ten to

25  twenty percent, just a rough ball park.

23

1     Q.  Is there any particular type of plan amendment

2  work with respect to those plans that you -- withdrawn.

3  You said you have been working on defined benefit plans

4  in the last couple of years. And have worked on

5  amendments to those plans. Is there any particular type

6  of amendment that has predominated in the work you've

7  done in the last couple of years?

8    A.  I would say there's probably, they fall into two

9  categories. One are compliance type amendments.

10  Amendments that are required by federal legislation that

11  all plans have to comply with. That's more routine.  And

12  I'm not really involved in those kinds of amendments

13  other than from an oversight point of view.

14      The amendments that I would spend most of my time

15  with are planned design amendments, which would involve

16  not so much the drafting of the amendment itself, but

17  doing actuarial studies and benefit projections showing

18  the financial impact of a change if it was made.  And

19  helping to implement that change once the plan sponsor

20  decided they want to implement it.

21    Q.  Would those types of amendments involve the level

22  of benefits, is that what you mean?

23    A.  That's right.

24    Q.  Have any of your clients engaged you in the last

25  couple of years to examine their plans for compliance

24

1   issues related to interest rates?

2      A.  Again, I'm not sure what compliance issues you're

3   talking about.

4      Q.  Well, anybody that asked you, has any of your 50

5   clients in the last couple of years asked you to examine

6   their defined benefit plan to determine whether their

7   interest rate assumption in their plans are in

8   compliance with the law?

9      A.  I would say the answer is yes.

10     Q.  So what company specifically engaged you to

11  examine the interest rate assumption in their plan to

12  determine if they're in compliance with the law?  I want

13  to make it clear I want to ask you who engaged you to do

14  that.  Not someone who engaged you to generally look at

15  their plan.

16         MR. SHEA:  I'm going to object.  I think

17  that that raises, from the witness' perspective, serious

18  client confidentiality issues. Obviously, it's not a D&B

19  issue.  He wasn't doing it on D&B's behalf.  But I would

20  ask that he not be required to name names at this point.

21  I think he could, perhaps, describe -- first, he can

22  deal with your question.  To see if I understand, you're

file:///Z|/D/Dun%20&%20Bradstreet/Brown.txt

23   focusing on a specific engagement that asked that

24   specific question, not a more general review and that

25   was part of it.

25

1        MR. MOUKAWSHER:  Maybe we can resolve this

2   by my rephrasing it.

3        MR. SHEA:  Okay.

4    Q.  Mr. Brown, what I'm asking you, have any of the

5   50 clients that you described as being your

6   responsibility, your direct responsibility, engaged you

7   with the specific instructions to examine their defined

8   benefit plan to determine if their interest rate

9   assumption in these plans are in compliance with the

10   law?  By that I mean, that the interest rate was your

11   charge, not a general charge to look at the plan.

12    A.  So, you mean that's the only thing they asked me

13   to do and nothing else?

14    Q.  No. What I'm asking is whether they gave you a

15   specific instruction that named that issue. Let's say

16   they asked you to look at three things and one of them

17  was very specific to that, as opposed to take a look at

18  our plans.  See what I'm saying?

19     A.  I still don't get the distinction between doing

20  this as part of the our normal services and doing it as

21  some kind of a special project.

22     Q.  Well, because when someone raises the issue

23  specifically then you know that's a principal concern.

24  If what they ask you to do is just generally look at

25  their plans, that issue may come up or may not come up

26

1  depending on whether it's on your mind or their mind.

2  What I want to know is whether anybody specifically

3  raised that issue with you and asked you specifically

4  naming it to look at that issue.

5     A.  Let me just try to get it clear, because I do a

6  lot of this kind of work. For example, for determining

7  financial statement expense we look at the interest

8  discount rate assumption every single --

9     Q.  Let me interrupt you because you're not answering

10  the question.

11        MR. SHEA:  Tom, I think he's trying to

12    explain to you an important distinction.

13         MR. MOUKAWSHER:  What he's saying is that in

14    the course of all kinds of different work they do that,

15    they consider that issue. That's not what I asked him.

16    I ask the court reporter to read back my specific

17    question.  I ask you to pay specific attention to the

18    specific question I'm asking you. You can give any

19    explanation you want later, but I have a specific

20    question for you that I'm trying to get you to answer.

21    And I'll ask the reporter to read it back.

22    (Whereupon the pending question was read by the

23    reporter.)

24     Q.  Mr. Brown, can you answer that question?  And it

25    should be a yes or no answer.

                                27


1     A.  Let me rephrase it so I understand it. Are you

2    saying have I been retained by a client to look at an

3    interest rate assumption as the primary project?

4     Q.  What I'm asking you is, whether it was primary or

5    secondary, whether any client engaged you to do that by

6   name. In other words, a client contacted you and said,

7   Mr. Brown, we want you to look at our plan and we want

8   you to specifically look at the interest rate assumption

9   in our plan and tell us whether they're in compliance

10  with the law. In other words, naming that issue.

11  Whether it named it with three or four issues or not, I

12  want to know whether anybody named that issue and asked

13  you to look at it.

14    A.  It would be part of many issues.  But more than

15  three or four, it's part of our standard practice.

16    Q.  You're not answering my question.

17        MR. SHEA:  Objection.  I think he is.

18        MR. MOUKAWSHER:  No, he isn't.  He's telling

19  me it's part of standard practice.

20        MR. SHEA:  No. He is trying to answer and

21  explain, and you cut him off twice.

22        MR. MOUKAWSHER:  Because he's not answering

23  the question.  He begins with they do this as part of

24  the standard practice.  It's a standard thing that

25  happens all the time.  And he's not answering my

28

1  question, which is:  Has anyone raised that specific

2  issue with him.  And it's not a difficult question for

3  him to answer.

4       MR. SHEA:  Before you decide he hasn't

5  answered the question I ask you to let him complete the

6  answer.  That's the usual and courteous way.  You can

7  move to strike as unresponsive at the end if you believe

8  your question has gone unanswered.  You can't jump to

9  that conclusion and cut him off, which you've done twice

10  without letting him answer.

11       MR. MOUKAWSHER:  I don't agree.  It's a

12  specific question.

13       MR. SHEA:  You can try again.  But let the

14  witness complete his answer before you declare it

15  unresponsive.

16     Q.  I'll try it again. Mr. Brown, listen carefully to

17  me. I don't want you to tell me about your standard

18  practices. I know that you consider interest issues when

19  you do standard reviews of defined benefit plans. I'm

20  not asking you about that.  I'm not asking you to tell

21  me about any of the myriad of opportunities that you

22  have to consider the issues of interest rate assumption

23  in benefit plans. I'm asking you a very narrow and

24  specific question. And that very narrow specific

25  question is, whether any of the 50 clients you have

29

1  named in the last two years have asked you specifically

2  to look at the interest rate assumption in their plans

3  and used language that said, please look at the interest

4  rate assumption in our plan and determine whether

5  they're in compliance with the law. Have they?

6     A.  Again, I think just the question itself is

7  confusing to me because -- first of all, the "compliance

8  with the law" part. There's not laws that govern most of

9  our selection. There are different accounting standards.

10  Interest rates that are in compliance with the law are

11  set forth in the law, and that's the one we use. That's

12  a minor part of what we do. So, I can't --

13     Q.  Mr. Brown, did anyone ever write to you, any of

14  these 50 people write to you and raise, use the words

15  "please look at our interest rate assumption in our

16  plans and determine whether they're in compliance with

17  the law." Did you ever get a letter like that in the

18  last two years? Do you at least know whether you did or

19  not? And if you didn't, you can explain why you didn't.

20  But I want to know if you did or not. Can you tell me

21  whether you did or not? You didn't get any such letter,

22  did you?

23    A. I can say that I did not get a letter --

24    Q. You answered my question.

25        MR. SHEA: No. No. No, he didn't. You cut

                                30


1  him off in mid sentence. That's not proper. Complete

2  your answer. That's the way it works.

3        MR. MOUKAWSHER: No it's not the way it

4  works. He needs to answer the question asked.

5        MR. SHEA: He got out three words.

6        MR. MOUKAWSHER: I just wanted to know if he

7  received any such letter. It's a yes or no answer. And

8  any witness can answer that yes or no. Then I can ask

9  another question, or you can ask him on cross about how

10  he interpreted it some other way. But he's not being

11    responsive to my question.  And this is going to make

12    the deposition very long.

13          MR. SHEA:  Tom, you've got to let him

14    answer.  Complete your answer.

15       A.  I can say that, yes, clients have asked me to

16    look at their interest rate.  No client has ever said in

17    compliance with the law as part of that request.

18       Q.  All right.  Which of the 50 clients in the last

19    two years specifically asked, using the words "please

20    look at our interest rates," or something to that

21    effect?  Which client asked you that?  And there's no

22    such thing as actuary-client privilege, so I'm entitled

23    to know the name.

24          MR. SHEA:  I don't think you are.  And I'm

25    not claiming privilege, but I think, frankly, it's

31

1    confidentiality protected, trade secret information.  I

2    don't think it has any bearing on this deposition. I'll

3    tell you what I will do.  I will ask him to designate it

4    in some document.  If you want to, you can go look up a

5    file number, or something like that, to protect the

6  confidentiality.  And then if you really feel you need

7  to know the name of the client on this particular point,

8  which I can't see any basis for doing so, you and I can

9  meet and confer and decide what to do about it.

10      MR. MOUKAWSHER:  It's a real simple issue.

11  We've been round and round on a simple question.  I

12  don't think I've been given an honest, straightforward

13  answer.

14      MR. SHEA:  I think that's an inappropriate

15  remark for you to make.

16      MR. MOUKAWSHER:  Now you're interrupting me.

17  Don't interrupt me because I'm taking the deposition and

18  I'm asking the question.  I'm attempting to try and get

19  a simple answer to a simple question. He just told me

20  no, he never got a letter from anybody asking him to

21  look at interest rate assumptions for purposes of

22  compliance of the law.  I thought he answered my

23  question.  Now he says yes, he had such a request from

24  somebody.  And I want to know who it is, because I don't

25  think that's true, and I want to get -- I want to know

32

1  whether he's telling me the truth.

2      MR. SHEA:   That mischaracterizes his

3  testimony.  He said, not in compliance with the law.  He

4  had specific request from clients with inquiries about

5  interest rate.

6    Q.  Let me ask you this, Mr. Brown, what inquiries

7  about interest rate have you had?  What interest rate

8  inquiries are you referring to?

9    A.  For example, almost every one of my defined

10  benefits clients asks me every year to look at their

11  interest rate used for their financial statement

12  calculations because financial standards requires this

13  to be reviewed as of each statement date. And that's a

14  common request that I get and we discuss it a lot.

15    Q.  And is that part of the general work you do in

16  reviewing the financial statement?  Or are you saying

17  they would make a special request to have you do just

18  that?

19      MR. SHEA:  Objection to form, vague.  You

20  can answer.

21    A.  Okay. Again, I don't review financial statements.

22  I prepare information that's used in the financial

23  statements. And they request that, I guess, we discuss

24  the calculations that we use.  Particularly the interest

25  rate is a large discussion item with every one of these

33

1  clients because it changes every year and has a major

2  impact on the liabilities and expense.

3      Q.  So now are you telling me that with respect to

4  all 50 of these clients you discussed the interest rate

5  assumption in their defined benefit plan every year?

6      A.  For the clients --

7      Q.  Is that your testimony?

8      A.  No, that's not correct. First of all, I said the

9  50 clients, some of them are defined benefit plan, some

10  of them are defined contributions.

11      Q.  How many are defined benefit?

12      A.  I don't know exact.

13      Q.  Half?  Less than half?

14      A.  As I said before, something like 60 percent

15  defined benefit, 40 percent defined contributions.

16  That's a rough estimate.

17    Q.  Of those defined benefit plans, are you telling

18  me that with respect to each one of those defined

19  benefit plans every year you have a specific discussion

20  with them about the interest rate assumptions that they

21  use to calculate early retirement benefits?

22    A.  No, I'm not saying that.

23    Q.  How many of these defined benefit plans do you

24  every year have a discussion about the interest rate

25  assumption that apply to early retirement benefits?

34

1    A.  I would say it's very uncommon, if ever.

2    Q.  Okay. Mr. Brown, I want you to turn to page one

3  of Exhibit 2.

4       MR. SHEA:  We're there.

5    Q.  It states there, in paragraph three, that you

6  were the chief actuary for the New York State and Local

7  Retirement Systems from 1975 to 1984.  Do you see that?

8    A.  I think it says, yes, '75 to '84.  Right.

9    Q.  Who was your employer when you were the chief

10  actuary for the New York State and Local Retirement

11   Systems?

12      A.  New York State.

13      Q.  Was that Department of Insurance?

14      A.  It was the Department of Audit and Control.

15      Q.  And of the defined benefit plans, the 50 defined

16   benefit plans you describe, are any of those defined

17   benefit plans government plans?

18      A.  One of them would still be, New York State

19   Retirement Systems.

20      Q.  And what work do you do for the New York State

21   Retirement Systems?

22      A.  It's pure consulting work on the actuarial

23   aspects of proposed legislation.

24      Q.  Actuarial aspects of proposed legislation did you

25   say?

35

1      A.  Yes.

2      Q.  Is that all you do for them?

3      A.  That's all I do.

4      Q.  And since leaving government service, did you --

5   it appears you left in 1984, is that right?

6      A.  That's correct.

7      Q.  After that did you do any substantial actuarial

8   work for government plans?

9      A.  Just the consulting that I just referred to.

10     Q.  Just New York State?

11     A.  Just New York State.

12     Q.  And just on the legislative aspects, or anything

13  else?

14     A.  It was legislative aspects. It was proposed

15  legislation. It was possible proposed plan redesign. I

16  served on some ad hoc committees to review benefits as a

17  representative of the governor.

18     Q.  And did that ever make up a substantial part of

19  your business?

20     A.  No.

21     Q.  And was there ever any one particular industry

22  segment or one particular company that made up a

23  particular part of your business after you left in 1984?

24     A.  I would say we have a pretty broad practice area.

25  It doesn't specialize in one particular type of

36

1  employer.

2   Q.  And that was true while at Altman and Brown, and

3  Fleet as well?

4   A.  That's correct.

5   Q.  Mr. Brown, how many times have you testified in

6  court as an expert witness?

7   A.  Oh, boy. I can recall at least once.  Maybe

8  twice. It would have been several years ago.

9   Q.  How many years ago?

10   A.  Oh, I would say more than fifteen.

11   Q.  So, at least once somewhere around over fifteen

12  years ago you testified as an expert witness in court?

13   A.  I think so.

14   Q.  And do you remember what case that involved?

15   A.  It was a matrimonial case.

16   Q.  And what did you give expert testimony concerning

17  in that matrimonial case?

18   A.  It was concerning the actuarial present value of

19  pension benefits between the husband and wife.

20   Q.  And other than that trial do you recall

21    testifying in any other case in court?

22    A.  No, I can't recall.

23    Q.  And how many times has your deposition been taken

24    as an expert witness?

25    A.  Again, it's only a handful of times. Nothing

37

1    recently. But there have been, I think, maybe two cases

2    I can think of.

3    Q.  All right. What are the two cases?

4    A.  One, again, was back in the eighties sometime,

5    involving an accident on the railroad.  A person was

6    injured while working in the rail yard. I think they had

7    a serious injury, maybe lost an arm or leg.  I can't

8    recall what. And there was a question of the loss of

9    income of that person over his working life expectancy.

10    Q.  And what was the other case?

11    A.  I think the other case involved the government

12    again, back in, boy, it was probably the early eighties,

13    just after I left the state, concerning the calculation

14    of optional retirement benefits using sex distinct

15    versus non sex distinct factors.

16    Q. In neither of those cases did you testify in

17    court?

18    A. No.

19    Q. But those are two depositions you recall?

20    A. I did have depositions in each of those cases.

21    Q. How many times with respect to litigation have

22    you been employed as an expert witness but not either

23    deposed or testified in court?

24    A. Most of the time when I served as an expert it

25    was in matrimonial.  I don't know if you consider that

38

1    litigation.

2    Q. In a divorce case?

3    A. In a divorce case.

4    Q. So most of the time you've been an expert witness

5    has been in a divorce case, or retained as an expert was

6    in a divorce case?

7    A. Right. With the exception of the two I just

8    discussed.

9    Q. How many times have you been retained as an

10  expert in a divorce case?

11    A.  Again, it's been years since I've done it. But I

12  would say maybe ten.

13    Q.  Ten times?

14    A.  Uh-huh. Oh, there is one other current case I've

15  been retained to act as an expert, and prepared a

16  report.  But it hasn't gone to deposition or court.

17    Q.  And what case is that?

18    A.  It's a case that I'm working on right now.  Are

19  you asking who the client is?

20    Q.  Who are the parties and who retained you?

21        MR. SHEA:   Just a second. To make sure some

22  other lawyer's privilege is not invaded here, do you

23  know if you are formally designated as an expert in the

24  case?

25    A.  I have been.

39

1        MR. SHEA:  Then answer the question.

2    A.  I have to think of the client's name. I don't

3  want to give you a wrong name. It's ARC. There is one in

4  every county.  We work for several of them.

5    Q.  Is that a government entity of some kind?

6    A.  No.  They're quasi. They're private entities.

7  Each county has one. They deal with people with

8  disabilities.

9    Q.  Okay.

10    A.  You know, I would really need to check.  I know

11  they go by the name of CWC, is their name they use in

12  doing their work.  But they have an official name. It's

13  something county ARC. I work for several of them.  I

14  hate to give you the wrong county name. But the case,

15  it's a defined contribution case. And it's a plan

16  participant who thinks that she got the wrong amount

17  paid out from the plan because of the way investment

18  earnings were credited to her account.

19    Q.  And which side of the case retained you?

20    A.  I'm working for the company.

21    Q.  And have they asked you to determine whether the

22  person got the right payout, is that it?

23    A.  That was the purpose of my report.

24    Q.  Any other cases?

25    A.  I think that's all I can recall.

1    Q.  Have you ever been employed as an expert witness

2  in a case involving a challenge to an ERISA plan

3  actuarial assumption?

4    A.  I don't believe so.

5    Q.  Have you ever been an expert witness in a case

6  where a plan participant claimed the terms of their plan

7  violated ERISA?

8    A.  No.

9    Q.  Have you ever been retained as an expert witness

10  by a plan participant other than in a matrimonial

11  context?

12    A.  I think the answer would be no with the exception

13  of matrimonial, but that's not really ERISA or a plan.

14    Q.  Okay. Let's turn now to Exhibit 2, page five, if

15  you would.

16    A.  Okay.

17    Q.  And direct your attention to paragraph 8.

18    A.  Okay.

19    Q.  You say:  In my opinion the 6.75 percent interest

20  rate used to reduce the monthly early retirement

21  payments to former employees is consistent with accepted

22  actuarial standards.  It represents a reasonable rate

23  based on the consensus view of expected returns of

24  numerous professional plan managers. It also reflects a

25  reasonable rate that has been approved by the IRS

41

1  through the issuance of numerous determination letters.

2        I'm just trying to understand the gist of your

3  opinion here. If I wanted to know why you think it's

4  consistent with accepted actuarial standards, would I be

5  correct to say that, first, it's consistent with the

6  consensus view and that many professional plan managers

7  use these similar rates; and, two, that the rate has

8  been approved by the IRS in determination letters?

9        MR. SHEA:  Object to form.

10  Q.  Is that fair?

11        MR. SHEA:  Objection to form.  You can

12  answer.

13  A.  I think you said three things, not two things.

14  Q.  Well, I said if I wanted to understand why you

15  believe it's consistent with accepted actuarial

16  standards you think it's for two reasons. One, it's

17  consistent with the consensus view and that many

18  professional plan managers use similar rates. And two,

19  that the rate has been approved by the IRS from

20  determination letters, is that right?

21     A.  I don't think -- I wouldn't say it that way. I

22  would say there are three things for my opinion. Number

23  one is it's consistent with accepted actuarial

24  standards.  And that's independent of the other two. The

25  other two build on it.  Number two, it's also a

42

1  reasonable rate based on the consensus view.  And number

2  three, it's been approved by IRS.

3     Q.  So in paragraph eight, when you say:  Used to

4  reduce the monthly early retirement payments to former

5  employees is consistent with accepted actuarial

6  standards, you're not explaining why it's consistent

7  with the actuarial standards in the next two sentences,

8  is that right?

9     A.  That's right. I think they're independent.

10    Q.  This is three points.  Consistent with actuarial

11   standards.  It's a reasonable rate because of the

12   consensus view.  And it's reasonable because it's been

13   approved by IRS in determination letters.  Is that

14   correct?

15    A.  That's correct.

16    Q.  With respect to choosing interest rates for

17   purposes of creating actuarial equivalency in early

18   retirement benefits, can we agree that the higher the

19   interest rate a company uses the smaller the pension it

20   produces?

21        MR. SHEA:  Object to form.  You can answer.

22    A.  I think that we can agree on that, yes.

23    Q.  And would you also agree with me the interest

24   rate that a company chooses for this purpose is supposed

25   to reflect what a reasonable return would be in the

43

1   market over time?

2    A.  It should reflect the reasonable return that the

3   plan could earn over time.

4    Q. Is that different from what I said or basically

5    the same thing?

6    A. Well, the market is much broader than the plan.

7    Q. Well, what the plan could earn in the market, in

8    other words?

9    A. Yes, I would agree with that.

10    Q. Okay. And would you agree with me that interest

11    rate assumptions that are used in these, for these

12    purposes can at least reach some point at which they

13    become unreasonable?

14    A. I would think carried to the extreme they could

15    become unreasonable, yes.

16    Q. But in any case, when you're looking at these

17    rates what you're trying to do is to determine the

18    relationship between the rate you're looking at and what

19    the plan could earn in the market over time, right?

20    A. That's correct.

21    Q. And so it's an attempt, to a certain extent, of

22    being a predictor of the market, right?

23    A. It's a predicator of what the plan could earn.

24    Q. In the market?

25    A. In the market over time, over a long period of

1  time.

2    Q.  Okay. Let's say for a moment that you have an

3  interest rate that's stated by a plan to determine

4  actuarial equivalency for early retirement purposes, and

5  it becomes unreasonable in light of market conditions.

6  You can deal with that in two ways, can't you?  You can,

7  first of all, change the rate as you need it.  Or you

8  could react to that by adopting a variable rate,

9  couldn't you?

10   A.  Again, you could change the rate.  I'm not sure

11  how you could adopt a variable rate and comply with lots

12  of IRS rules. It would be very difficult, in my mind.

13   Q.  But assume, putting aside your opinion about the

14  law for a moment, the two ways you could figure out to

15  do that is you could simply, every time it became

16  unreasonable, you could change the rate.  That's one

17  way.

18   A.  I would disagree.  I would never recommend that

19  to a client.  Mechanically you could do it, yes.  But it

20  would create a lot of administrative problems within the

21  plan.

22     Q.  So what you're saying is that if you determined

23  that a rate was unreasonable at some point in time you

24  still wouldn't recommend it be changed?

25          MR. SHEA:  Objection to form. You can

                          45


1   answer.

2     A.  Okay. That's not what I said. That if the rate

3   was unreasonable and producing unreasonable results,

4   they could be changed, and I would make the

5   recommendation to change.  I just wouldn't make the

6   recommendation to change it to a variable rate.

7     Q.  That's what I'm asking, you would recommend that

8   it would be changed?

9     A.  I think you used the word variable rate. Maybe I

10  misunderstood.

11    Q.  I think you misunderstood, but that's okay

12  because I was going to ask you that question.  And then

13  setting aside legal concerns, one way you could

14  literally try to reflect changes in interest rates is to

15  adopt a variable rate, correct?

16    A.  If you ignore legal concerns and administrative

17  concerns.

18    Q.  All right. I want to give you a chance to address

19  that, but I wanted your answer that that is one way you

20  could do it.  But you have reservations and concerns

21  about administrative and legal compliance?

22    A.  Right.  Mechanically you could do it.

23    Q.  Okay.  Now, assuming again you're facing this

24  unreasonable rate, what would be the advantages, and you

25  can discuss the administrative and legal ones, of

                                46

1  periodically changing the interest rate assumption in

2  the plan as opposed to simply adopting a variable rate

3  in a plan?

4        MR. SHEA:  Objection to form, vague. You can

5  answer if you understand.

6    A.  What are the advantages of changing a rate

7  periodically versus adopting a variable rate?

8    Q.  Yes. I guess what I was giving you is a

9   hypothetical in which you have volatile interest rates,

10  they're going way up and way down.  And the question is,

11  how is it best to react to that?  Is it best to

12  periodically simply change a fixed rate in the plan or

13  is it best to adopt a variable rate?  Give your choice

14  and explain what your choice is.

15      A.  My choice would be definitely to adopt a fixed

16  rate and change it from time to time. The reason being

17  that this is part of a benefit calculation, and IRS

18  requires -- and you need it for proper plan

19  administration -- to be able to definitely determine

20  what a person's benefit is. A fixed rate allows you to

21  do that. A variable rate does not allow you to do that,

22  and it causes confusion among giving benefit estimates

23  and predicting what benefits would be paid from a plan.

24  So my preference would definitely be to have a fixed

25  rate and if it becomes unreasonable, to then change it.

47

1       Q.  In those circumstances, though, you're saying

2   there's some legal obstacle?  You seemed to suggest

3   that.

4    A.  And I'm not a lawyer, I'm an actuary.  But one

5    requirement that IRS has is that benefit be definitely

6    determinable. That means you can calculate them with

7    precision. And a fixed rate allows you to do that. A

8    variable rate does not.

9    Q.  But don't, in fact, plans confront that kind of

10   projection and calculation issue all the time when

11   they're asked to give estimates of what a person's lump

12   sum retirement would be?

13    A.  They do. And it creates a lot of problems.  But

14   IRS has specific rules for dealing with that. That the

15   lump sum that you quote, that I might quote today in

16   October for a benefit being paid out next March might in

17   fact end up being lower next March because I'm using

18   today's rate.  And IRS says that's okay. But that's one

19   of the few instances.  If we gave a person an estimate

20   of their early retirement benefit today and then decided

21   to use a different interest rate next March, I don't

22   believe that would be a permissible reduction in

23   benefits.

24    Q.  Okay.  So wouldn't that problem happen if you

25    simply decided on a new fixed rate, too?

48

1    A.  Right.

2    Q.  You run into the exact same problem, wouldn't

3    you?

4    A.  You would, but you would plan ahead. You would

5    know far in advance when you're going to change it. You

6    have to make sure you don't cut anybody's benefit.

7    Q.  Where you're changing responses to volatile

8    interest rates, where you're changing the actual fixed

9    rate in the plan, you have to do that by a plan

10    amendment, wouldn't you?

11    A.  That's right.

12    Q.  If you had a variable rate and it simply changed

13    because, let's say you're following the 30 year Treasury

14    rate, you wouldn't have to have a plan amendment, would

15    you?

16    A.  You would have to have a plan amendment to adopt

17    that variable rate, number one, right.

18    Q.  Right.

19    A.  And then every time that that variable rate

20  changed in a way that a participant's benefit went down.

21  I believe if you did this -- I've never seen this, and I

22  don't think IRS would approve it, in my experience.  So

23  it's kind of a hypothetical answer here.  But I would

24  think that if the benefit went down because of the

25  exercise of that variable rate, that you would be in

49

1  violation of IRS rules that prohibit reduction in

2  accrued benefits.  And you would have to pay the higher

3  rates.

4    Q.  Those reductions in benefits refer specifically

5  to plan amendments that do that?

6    A.  No.  To my understanding this variable rate would

7  apply as well.

8    Q.  So, in other words, you believe that it would be

9  a forfeiture of benefits, an unlawful forfeiture of

10  benefits every time a variable interest rate changed?

11    A.  I wouldn't say that. And I wouldn't use the word

12  forfeiture.  I would say if the exercise of that

13  variable rate resulted in a lower benefit, that it would

14  be very likely that the higher benefit would have to be

15  paid.

16      Q.  Okay. So you don't make any distinction between a

17  reduction of benefits that is caused by a plan amendment

18  and a reduction of benefits that would be caused under

19  that circumstance by the use of a variable rate?

20      A.  In your hypothetical case. If the variable rate

21  is required by law then there's other rules that deal

22  with that.

23      Q.  You think despite the fact that the IRS has

24  approved, and mandates in fact, the use of variable rate

25  elsewhere that reduces other peoples' benefits, it would

50

1   disapprove of a variable rate for purposes of

2   calculating early retirement benefits, is that right?

3       A.  I wouldn't phrase it just like that, that IRS

4   would disapprove of it.  I believe that if they approved

5   it -- and I'm not sure they would approve it or not

6   because I don't have any experience in that.  But if

7   they approved it I think they would require that a plan

8   pay the higher benefit based on a rate in effect prior

9  to the time it changed, if that was higher than after

10  the change.

11    Q. For whom?  For all plan participants?

12    A. For all plan participants.

13    Q. Wouldn't that negate the purpose, in your

14  scenario where you're just making an amendment to change

15  a fixed interest rate, wouldn't that in fact make the

16  interest rate change ineffective?

17    A. It would make it ineffective for a period of

18  time, that's correct.

19    Q. How long?

20    A. I can't answer that without looking at the

21  circumstances for a person who had terminated.  In other

22  words, I believe it would be forever.

23    Q. But you don't see any difference between --

24  withdrawn. You end up with the same problem by adopting

25  a variable rate as you do by constantly amending the

51

1  plan, in your opinion, to deal with interest rate

2  volatility, is that right?

3        MR. SHEA:  Objection to form.  You can

4   answer.

5     A.  Again, I wouldn't express it that way because the

6   problem can be managed with a periodic change, because

7   it wouldn't happen frequently.  In my experience,

8   there's not a need to change this frequently. If you had

9   a variable rate, and I'm assuming under your scenario

10  this would be a rate that would change fairly

11  frequently, it would create severe administrative

12  problems, communications problems.

13    Q.  So what you're saying is simply that they're the

14  same problems, but the problems wouldn't occur as

15  frequently with a fixed rate change as they would with a

16  variable rate?

17    A.  I'd say they were similar problems, but at a much

18  bigger magnitude.

19    Q.  Well, and the size of the problem you're saying

20  is caused by the frequency of the changes, right?

21    A.  The frequency and the degree of the change.

22    Q.  By the degree of the change do you mean the

23  amount of the interest rate change?

24    A.  That's right.

25     Q.  Do you have an opinion as to why the Treasury

52

1     requires a variable rate to be used to calculate the

2     present value of lump sums?

3     A.  Yes.  I can just speak from my experience, that

4     some people -- and I don't know whether IRS or within

5     the legislative bodies -- felt that participants needed

6     to be protected or to, you know, have the government

7     watch out for them. That they couldn't understand to

8     evaluate a lump sum payout versus an annual annuity.

9     They didn't have the necessary information or education

10     or background to do this.

11           In my opinion, they adopted a very conservative

12     approach in the sense that the rates adopted the current

13     rules for determining lump sums generally always result

14     in a larger payout than if we used the ongoing plan

15     assumptions. And the IRS felt, again, they had to

16     protect employees because often times an employee would

17     take a lump sum regardless of the amount or how it was

18     calculated.  And they wanted to prevent that.

19    Q.  I'm not sure what you mean in the sense that, you

20   said something like they wouldn't understand it and that

21   the Congress wanted to protect them.  Is what you're

22   saying, that Congress wanted to make sure that the

23   interest rates being applied were fair?

24          MR. SHEA:  Objection to form. You can

25   answer.

53

1    A.  I wouldn't use the word fair.

2    Q.  How about reasonable?

3    A.  I wouldn't use the word reasonable.

4    Q.  What did you think that Congress was trying to do

5   with respect to the interest rates to protect plan

6   participants?

7    A.  They wanted to use a rate that would assure that

8   the lump sum provided was actually higher than the plan

9   liability.  That the participant wasn't getting

10  something that is lower than the liability. And they

11  erred on the side of being very conservative.

12   Q.  Conservative in what way?

13   A.  In that it results in a larger benefit to the

14  participant.

15     Q.  And how does it always do that?

16     A.  It does it because the rates used, the interest

17  rates used for lump sum is, I think "always" is a little

18  strong, but is close to always as you could get, are

19  lower than the ongoing plan interest rates.

20     Q.  What do you mean by the ongoing plan interest

21  rates?

22     A.  These would be the interest rates that the plans

23  used to value its liabilities.  And that actuaries use

24  to expect the plan assets.

25     Q.  So it's lower than the assumptions that the

                                54


1  companies are using, is that right?

2     A.  It's lower than the assumptions and the expected,

3  expectations of the earnings.

4     Q.  Isn't the expectation of earnings an assumption?

5     A.  That's right.

6     Q.  So it's lower than the assumption that the

7  company adopts is what you're saying.  And that that

8  gives plan participants more money, right?

9   A.  That's right.

10   Q.  And in terms of a pension plan trying to pay out

11  as little as it can to plan participants, the higher the

12  interest rate it uses the lower the payout, right?

13       MR. SHEA:  Objection to form.  You can

14  answer.

15   A.  Could you repeat the question?

16   Q.  In other words, the higher the interest rate that

17  a company uses for those assets you just described, the

18  lower payout that goes to plan participants, right?

19   A.  That's correct.

20   Q.  So plans that are trying to reduce as much as

21  possible the payouts to plan participants would want to

22  adopt the highest rate they could safely adopt in order

23  to achieve that, right?

24   A.  In your example where you assume that plan wants

25  to minimize or pay out as low as possible, that's true.

55

1   Q.  Now, we just went through a period where interest

2  rates plummeted over the course of several years to

3    historic lows. In trying to come up with a reasonable

4    interest rate for these purposes during a time like that

5    would you agree with me that a development such as this

6    has to be taken into account when predicting or when

7    adopting an interest rate assumption?

8        A.  When you say a development such as this, what's

9    "this"?

10       Q.  Historically low interest rates.

11       A.  Okay.  We haven't had historically low interest

12   rates.  We had a temporary period.  We haven't had a

13   long history of low rates, we had a short time.

14       Q.  We had historically low interest rates in the

15   last couple of years, though?

16       A.  Right.

17       Q.  What I'm asking you, don't you think in setting a

18   reasonable interest rate that current historically low

19   interest rates should be taken into account?

20       A.  Well, there are many factors that are taken into

21   account.  One of them would be the interest rates earned

22   today and yesterday and the last couple of years. But we

23   look at a much longer term period in setting interest

24   rates.

25   Q.  That's right. And when you're looking at what may

56

1   happen over the next long period of time during a period

2   of historically low interest rates it would be true that

3   one of the things that you should consider is the fact

4   that current rates are extremely low?

5   A.  That would be one factor.

6   Q.  Okay. So when you have any period where there's

7   dramatic changes in rates like that, it wouldn't be

8   reasonable to look solely at rates that predated the

9   interest rate downturn, would it?

10   A.  No, not to look solely at some other period.

11   Q.  Okay. Because the job, of course, is to predict

12   future rates, not past rates?

13   A.  It is easy to predict past rates.

14   Q.  The point is, the job is to predict the future

15   rates, correct?

16   A.  That's right.

17   Q.  Now, I ask you to turn to page six of your

18   report. And you state in paragraph two, where you're

19  summarizing your ultimate opinion, it's consistent with

20  IRS laws, rules and regulations.  What IRS laws, rules

21  and regulations did you consider in forming your

22  opinion?

23    A.  You know, I can't like quote you chapter and

24  verse on the whole Internal Revenue Code and

25  regulations, they fill many volumes of books. But the

57

1  laws and rules and regulations that deal with qualified

2  pension plans and plan design.

3    Q.  So as you sit here right now, anyway, you can't

4  name any law, rule or regulation that you referred to?

5    A.  Well, it would be by the Internal Revenue Code,

6  if you consider that a law.

7    Q.  It's a pretty big code, isn't it?

8    A.  Right, very big.

9    Q.  I'm asking, can you name any specific IRS, ERISA

10  rule, law or regulation that you considered and

11  determined that Dun & Bradstreet's interest rate was

12  consistent with?

13   A.  I relied on my experience working with the IRS,

14   the Code, and the code that applies to pension plans. I

15   can't quote you chapter and verse. Most of them start

16   with 401, 401A, they give the rules for qualified plans.

17   And I know the sections that mandate certain interest

18   rates and ways to use interest rates.

19   Q.  If I wanted to ask you any specific regulation,

20   rule or law that you could name and say, look, this is

21   what the law says, this is what I considered, and here's

22   how it effected my opinion; as you sit here right now

23   you couldn't give me a single example, right?

24   A.  Right.  But if you asked me --

25   Q.  Let me finish.  I want to make sure I understood.

                              58


1   A.  If you asked me --

2   Q.  Please let me finish.  I'm going to let you fully

3   answer.  I just want to understand for the record

4   because now we've got two people talking at once. And

5   you answered before I had finished my question.  Let me

6   just get the question clearly on the record. As you sit

7   here right now you cannot name any specific IRS or ERISA

8  law, rule or regulation that you claim that you

9  consulted and ultimately determined that Dun &

10  Bradstreet's conduct was consistent with, right?

11    A.  If you're asking me to give you a specific

12  reference code, number, section, subsection, that's

13  correct.

14    Q.  Okay. But what you said was that, generally

15  speaking, you're talking about provisions concerning

16  qualified plans and you're talking about the IRS

17  provisions on that.

18    A.  IRS, which would include ERISA, and from my

19  experience in working with plan design.

20    Q.  Are you familiar with the Treasury regulation at

21  26 CFR 1.411(a-4a)?

22    A.  If you showed it to me and let it me read it I

23  probably would be. But I don't know the reference off

24  the top of my head.

25    Q.  So just hearing it, hearing the section

59

1  referenced, you don't know what it is?

2    A.  That's right.

3    Q.  Okay.  But do you agree with me that it's an

4    assumption underlying your report that adjustments in

5    excess of reasonable actuarial reductions can result in

6    benefits being forfeitable?  In other words, interest

7    rate adjustments.

8    A.  Again, my understanding is that if you do have

9    unreasonable assumptions resulting in benefits that

10   become unreasonably low because of those assumptions,

11   that that would be a non permissible forfeiture of

12   benefits.

13   Q.  Are you familiar with the ERISA section 206(a)?

14   A.  I don't know the chapter and verse off the top of

15   my head, again.  But if you showed it to me --

16   Q.  If I cite the section you don't know what it is,

17   right?

18   A.  No.

19   Q.  How about ERISA Section 203(a)?

20   A.  Again, if you showed it to me I probably would

21   be.  But not off the top of my head, I don't know the

22   section and chapter and verse.

23   Q.  How about IRS Code 417(e)(3)?

24    A. I know 417(e), in general, maximum benefit.

25    Q. All right. Are you aware of any provision in that

                                60


1    subsection that deals with interest rates?

2    A. Not off the top of my head.

3    Q. But you know that the IRS requires that lump sum

4    defined benefits have to be calculated using the annual

5    interest rate on 30 year Treasury securities for the

6    month before the date of distribution, right?

7    A. I wouldn't state it that way. Could be the year

8    before the date of distribution.  Could be some other

9    period.  But, yes, it's a variable rate that changes

10   probably at least once a year. Could change monthly like

11   you said.

12    Q. You don't know whether you're supposed to refer

13   to the month or the year before the date of

14   distribution?

15    A. I know you have the option. There are different

16   options you can choose.

17    Q. You can choose between the month or year, is that

18  right?

19    A.  That's my understanding. And you can choose the

20  month of the year in about a three month range that you

21  want to use.

22    Q.  Do you know what the 30 year Treasury rate is

23  today?

24    A.  Well, of course, 30 year Treasury aren't issued

25  anymore.  But there's still a rate that's disclosed.

61

1    Q.  Right.

2    A.  I don't know what it is today. I think it's

3  something like four to five percent. Maybe a little

4  more.

5    Q.  Can you tell me any long term security as safe as

6  a government security that's currently yielding 6.75

7  percent?

8    A.  Well, government securities are the most secured

9  securities, so there's no security that would be as safe

10  as a government security.

11    Q.  Do you know any, including municipal bonds, do

12  you know any municipal bonds paying a rate around 6.75

13   percent?

14   A.  Not off the top of my head.

15   Q.  Any 30 year publicly traded mortgages paying that

16   rate?

17   A.  Again, off the top of my head I don't know of

18   any. I just don't know.

19   Q.  Can you name any specifically safe, virtually

20   safe as government securities?

21        MR. SHEA:  Objection to form.

22   Q.  Long term security yielding a rate of 6.75

23   percent.

24   A.  Again, you know, I haven't checked the paper

25   today and they vary. But right off, I couldn't name any.

                                62

1   Q.  Would you agree with me that the 30 year Treasury

2   rate that's now extrapolated is based on an issue that

3   the intent of using it is to indicate a likely interest

4   rate environment over the next 30 years?

5        MR. SHEA:  Objection to form.

6   A.  And I wouldn't agree with you. It is the likely

7    rate to be paid on long term Treasury bonds, but that's

8    all.

9      Q.  What is it supposed to reflect?

10     A.  It reflects the rate on long term Treasury bonds.

11     Q.  What do long term Treasury bonds do?  What is the

12   return of them supposed to be?

13        MR. SHEA:  Objection to form.

14     A.  What is it supposed to be or what is it?

15     Q.  Tell me what it is.

16     A.  I don't know. I think, as I said before, I think

17   it's around --

18     Q.  I don't mean what the rate is.

19        MR. SHEA:   That was part of the objection.

20   It's pretty vague.

21     Q.  I'll withdraw it. The 30 year Treasury rate is

22   frequently referred to as an economic indicator, isn't

23   it?

24        MR. SHEA:   Objection as to form.

25     A.  It is one economic indicator, yes.

63

1      Q.  And it's supposed to be an indicator, in part, of

2  investments that are made over the long term, 30 years,

3  right?

4    A.  In government securities, yes.

5    Q.  Would you agree with me that the IRS' choice of

6  the 30 year Treasury rate for calculating lump sum

7  reflected its judgment that the 30 year Treasury rate is

8  a reasonable rate of interest for determining actuarial

9  equivalency?

10    A.  I would disagree with that.

11    Q.  You think they chose it as an unreasonable rate?

12    A.  No.

13    Q.  They deliberately chose it to be an unreasonable

14  rate to determine actuarial equivalency?

15    A.  No.

16    Q.  What are you saying?

17    A.  They chose it as a rate to determine a benefit.

18  They never said this is actuarial equivalent. They don't

19  use those words. They said we want you to use this rate

20  because we want plans to pay out higher lump sum

21  benefits. It was a policy decision.  It was a benefit

22  decision.  I don't think it involved actuarial

23    equivalence matters, as far as I know.

24    Q. As far as you know a lump sum payout of a normal

25    retirement benefit doesn't have to be the actuarial

64

1    equivalent of the normal retirement benefit, is that

2    your understanding?

3    A. That's absolutely my understanding.

4        MR. MOUKAWSHER: Let's take a break.

5        (Whereupon a short recess was taken.)

6    BY MR. MOUKAWSHER:  (Continuing.)

7    Q. Why don't we go back on the record.  Mr. Brown, I

8    ask you to turn to Exhibit 2, page five of your report.

9    A. Okay.

10    Q. You refer there in paragraph four to nine plans

11    that use an actuarial reduction. See that in paragraph

12    four?

13    A. I see it.

14    Q. Can you tell me whose plans are the nine plans

15    that you list on that page?

16        MR. SHEA:  I think that's going to have the

17    same issue we raised previously in terms of confidential

18  information of Milliman clients. I think if you look at

19  the spreadsheet, Tom, they have been identified in

20  Exhibit 3, when it comes through by the client code,

21  which is in the left-hand column.

22      MR. MOUKAWSHER:  But if I understand what

23  this witness has done, he's examined these plans and

24  he's relied on them in his opinion.

25      MR. SHEA:   He has.

65

1      MR. MOUKAWSHER:  And it's something that

2  should have been covered by the notice.  If he relied on

3  these plans and consulted them, I should have copies of

4  them. Now you're telling me you won't even tell me whose

5  plans they are. I should have the right to study those

6  plans and determine the context in which these interest

7  rates are used. How old the plan is. You know, what is

8  the rate used for.  And what else about the plan can I

9  discover that will tell me, for instance, that will tell

10  me about other factors that affect actuarial

11  equivalence.

12          MR. SHEA:  I think there is another way to

13   address that issue. That is, I certainly think we will

14   be willing to provide a redacted version of the plan

15   provision.  I have to redact out enough so you can't

16   identify who the identity of the specific client is.

17   And, therefore, I think that protects the interest that

18   the Milliman firm has in keeping its clients'

19   confidentiality secure, but gives you the opportunity to

20   do that type of investigation.

21          MR. MOUKAWSHER:  As a preliminary step I'd

22   agree if I were given all nine plans, the complete plan,

23   with the names of the companies blacked out.  I'll take

24   a look at it and see if for any reason I would need the

25   name.

                          66


1          MR. SHEA:   Okay.

2          MR. MOUKAWSHER:  I should have had them at

3   this point, and today is the cut off of discovery.  What

4   are we going to do about this?

5          MR. SHEA:   Well, if you want -- the bottom

6   line is we were asked to produce them here.  And so I

7   suppose, if you want to, we can take a break and pull

8   out the plans and look at blacking them out, and produce

9   them as requested in the notice.

10      A.  You realize each plan is 80 or 90 pages?

11          MR. SHEA:  Right.  It will be an expensive

12   and extensive redaction process, which is part of the

13   deposition that you're asking of this witness, and will

14   be on your nickel. I don't know, I think you might want

15   to think about the cost effectiveness of that. I think

16   the better place to start would be for us to pull out

17   the relevant plan dealing with this.  That would be more

18   like two or three pages. We could fax that to you, which

19   would be less expensive than the whole plan.

20          MR. MOUKAWSHER:  There is simply no way,

21   whatever approach we take, that we could get done with

22   this process today. In terms of my getting copies of

23   these plans that he relied on and my being able to use

24   them to take his deposition. They're not readily

25   available.  They're not offered in any form they can be

67

1  used. The deposition can't be completed today in a way

2  to use them.

3        MR. SHEA:   Tom, you only asked for us to

4  have them at the deposition.  I'm telling you we can

5  have them at the deposition.

6        MR. MOUKAWSHER:  You have to redact all nine

7  of them, all hundred pages of each.

8        MR. SHEA:   Only if you insist on getting

9  the whole plan, which I think is an unreasonable thing

10  to ask for.  Especially in the first instance. So it

11  seems to me we have two choices.  We can see if during

12  the lunch break we can grab the plans and send you the

13  relevant pages redacted.  And that's something we can do

14  here today. Or, if you insist, we'll get somebody

15  working on redacting right away and I think we could

16  probably have them to you tomorrow or Thursday. Either

17  way, I think you'll get essentially what you asked for

18  when you asked them to be produced at today's

19  deposition.

20        MR. MOUKAWSHER: The real question is if I

21  get them after today I need to follow up with questions

22  with Mr. Brown.  I don't think it's practical or anyone

23   would expect it to be reasonable to try to do that under

24   these circumstances. Part of what I have to do is to

25   look at the full plan to determine what part of the

                                68

1   document I want to look at.  Things that show me

2   effective dates, when plan amendments were adopted.

3           I could probably formulate some limited

4   version of it.  But the question I would ask is whether

5   you would agree to a limited resumption of the

6   deposition to ask any remaining questions I have.

7           MR. SHEA:  I'm not sure that I could. And I

8   certainly couldn't guarantee in advance that I would do

9   that. Frankly, I think that's something you and I could

10   meet and confer and work out. Why don't we proceed this

11   way:  We will redact the full plans at your expense, and

12   send those to you. You can then look them over.  And you

13   and I will meet and confer on whether it's appropriate

14   for you to resume the deposition. I would only note that

15   this is not something that was asked for in advance of

16   the deposition.  It certainly could have been. We were

17  asked only to have them here. And had we known about

18  this in advance we could have dealt with it.

19      MR. MOUKAWSHER:   I don't think that's an

20  accurate statement in the fact you don't have them there

21  and were going to go find them and have to redact them.

22  They weren't present as they were supposed to be.  No

23  point disputing it, they're just not there. Let me

24  suggest one modification of what you just said. And that

25  is that, as I said when I first proposed it, I think the

69

1  thing to do is for me to try to reduce the scale of the

2  request from the copies down to those sections that I

3  think are necessary.  With some time I might be able to

4  say, well, give me these pages or these sections of each

5  plan.

6      In other words, I want the plan section that

7  states the rate. I want the other actuarial assumptions.

8  I want the effective dates. Maybe that will limit what

9  really needs to get accomplished. Then I review them and

10  determine whether I need to resume the deposition.

11  Maybe I won't.  But at least I'd have the information.

12      MR. SHEA:  How fast can you tell us which

13  type of sections, because it's going to take some time.

14  We have to assign personnel to go through and review the

15  sections.

16      MR. MOUKAWSHER:  I can give you a written

17  description by Monday.

18      MR. SHEA:  We have summary judgment due the

19  middle of November and we already extended this twice.

20  So I think you need to have it Monday, no later.  And,

21  again, with the understanding that it is at your

22  expense.  I'm willing to let you have a look at redacted

23  versions and then we can decide whether you need to have

24  a further deposition.  I'm not agreeing in advance to do

25  this.

70

1      MR. MOUKAWSHER:  I'm telling you if you

2  charge me for the hours it takes for somebody to redact

3  that, I can't agree to pay that.  I don't think you have

4  any right to redact them. I don't know if we can avoid a

5  dispute over that because you're going to charge some

6   staff person to bill by the hour to redact these things

7   when I don't think you have any right to redact them.

8          MR. SHEA:  Again, I think that depends if

9   you ask for all of the plans.

10         MR. MOUKAWSHER:   Every page and every page

11  redacted, I wouldn't agree to do that unless we come up

12  with a reasonable proposal.

13         MR. SHEA:  You can come up with a reasonable

14  proposal.  I think the time searching and retrieving is

15  definitely on your nickel, something you would have to

16  pay for. If we're dealing with limited redaction for a

17  few pages --

18         MR. MOUKAWSHER:  You mean, searching and

19  retrieving as far as finding the page number of the

20  plan?

21         MR. SHEA:  Yes.  You're not going to

22  designate it by plan number, you're going to say it

23  deals with this and that and that.  Somebody has to go

24  through and look, and that takes time.  I think if that

25  is part of your deposition request, under the rule you

71

1  have to pay for it.

2      MR. MOUKAWSHER:  I think under those

3  circumstances just someone finding the page number it

4  might be true.  But, of course, we're trying to do this

5  by cooperation so I don't demand a copy unredacted of

6  the whole plan, and then all you have the right to do is

7  charge for the copying cost. I can also send somebody up

8  there and say, I'll have my person go through there and

9  decide what pages we want copies of.

10      Bottom line, I think it's better served for

11  me to make a proposal for you to evaluate it and

12  determine whether we can resolve this amicably because I

13  need the information.  I'm not doing it just to make

14  somebody make a bunch of photocopies. I'll try to come

15  up with what I need and we can perhaps come up with the

16  least burdensome way to get what I need.

17      MR. SHEA:   I'll listen to your proposal and

18  see where we go.

19      MR. MOUKAWSHER:  Okay.

20  BY MR. MOUKAWSHER:  (Continuing.)

21  Q. Mr. Brown, do you use mortality tables in your

22  work?

23    A.  Yes, I do.

24    Q.  What role does mortality tables play in

25   determining actuarial equivalence?

72

1    A.  They're one of the assumptions or one of the

2   factors that go into the calculation of predicting how

3   long benefits would be paid.

4    Q.  Based on a projected life span, is that right?

5    A.  They're based on probabilities of dying at each

6   age. They don't actually have a life span.

7    Q.  And do they have a role in calculating lump sums

8   that are actuarial equivalent to pension benefits

9   payable for normal retirements?

10    A.  Yes, they do.

11    Q.  And they play a role in early retirement benefits

12   as well?

13    A.  Some early retirement. Generally they don't, but

14   in others they do.

15    Q.  And which ones do they play a role in and which

16   don't?

17    A.  If the early retirement is based on an actuarial

18    equivalence, then they play a role. If based on a

19    formula, that might be a very indirect role.  But not a

20    direct for sure.

21    Q.  The plan we're talking about here is an actuarial

22    equivalence plan?

23    A.  The provision of the plan we're talking about for

24    this one narrow scope is.

25    Q.  Right.

73

1    A.  But the whole plan isn't.

2    Q.  So the mortality tables would apply here?

3    A.  They would apply to this one provision.

4    Q.  Okay. And if you were asked today to determine an

5    actuarial equivalence benefit of a normal retirement

6    benefit, say a lump sum issue, what mortality table

7    would you use to do that?

8        MR. SHEA:   Object to form. You can answer.

9    A.  Okay. I have no choice.  The IRS tells us what

10    mortality tables to use for lump sum, and I would use

11  that table.

12  Q.  What's that?

13  A.  It's a GATT table.  Which came from the GATT

14  legislation.

15  Q.  And that's mandated by the IRS for lump sums?

16  A.  Right.

17  Q.  All right. If you were asked with respect to an

18  early retirement plan where you were supposed to

19  calculate actuarial equivalence and the plan did not

20  stipulate to a specific mortality table, what mortality

21  table would you use to make the calculation today?

22  A.  There's various tables that I use. The GATT could

23  be one of them. There's a table called the RP 2000.

24  There's another, I think it's 93 GAR table.

25  Q.  93 GAR?

                                    74


1  A.  Yes, I think it's 93.  Yes, 93.

2  Q.  Is there a 94 GAR?

3  A.  There could be. It's either 93 or 94.

4  Q.  Okay. In accordance with professional actuarial

5  standards, those are three you would deem appropriate to

6  use in determining actuarial equivalence?

7       MR. SHEA:  I object.  The witness is not

8  here to express any opinion on mortality tables.  I

9  think, therefore, that exceeds the scope of the report.

10  I'll let you go on with it a little bit.  At some point

11  I have a protective order if you turn it into a

12  deposition not about the opinion the witness has been

13  retained to testify on, but on a separate issue that is

14  not mentioned in the complaint, not mentioned at the

15  motion to dismiss stage that led to this round of

16  briefing, and is not in the case.

17     Q.  Do you remember my question, Mr. Brown?

18     A.  Could you repeat it again?

19     Q.  If you were to determine actuarial equivalency

20  today for an early retirement benefit you'd testify that

21  in accordance with sound actuarial principals you would

22  use the GATT table, 94 GAR -- or 93, you think it might

23  be -- and then you mentioned one other, RP 2000?

24     A.  That's correct.

25     Q.  Those would be the three options you would

75

1   consider?

2        MR. SHEA:   Objection to form.  I think that

3   misstates the prior testimony, the prior question you

4   asked him.

5   Q.  Mr. Brown, do you understand my question?

6   A.  Yes.  And I think you asked two different

7   questions.  First, I would consider what the plan

8   document said.

9   Q.  I'm telling you the assumption.  If I ask you to

10  make the assumption that the plan document doesn't tell

11  you what mortality table to use.  And you have been

12  instructed to achieve actuarial equivalence for early

13  retirement benefits and you must pick, in order to

14  achieve actuarial equivalence, a mortality table to use,

15  I'm asking you, in accordance with the professional

16  standards that govern your work, what mortality table

17  would you use today if you were asked to do that?

18  A.  So this wouldn't be with respect to a qualified

19  plan.  It would be just doing an actuarial equivalency

20  without any direction.

21  Q.  Without any direction as to what table to use.

22  Just doing it to achieve actuarial equivalence.

23     A.  And the first time I was asked to do it?

24     Q.  Yes.

25     A.  I would use one of those three tables, most

76

1  likely.  I'd have to examine the facts, but those, most

2  likely, are the first place to look.

3     Q.  Because they're current tables?

4     A.  Right.

5     Q.  And in fact mortality tables have changed over

6  time as people have been living longer, right?

7     A.  That's correct.

8     Q.  And mortality tables have been adopted in recent

9  years to reflect that, right?

10     A.  That's right.

11     Q.  According to your report you read Mr. Poulin's

12  deposition, didn't you?

13     A.  I did.

14     Q.  And you saw that he expressed an opinion with

15  respect to mortality tables, didn't he?

16    A.  I think there's mention in there about mortality

17   tables.

18    Q.  But Dun & Bradstreet did not ask you to give any

19   opinion about mortality tables with respect to your

20   report, right?

21    A.  They did not.

22    Q.  And the three tables you named, would those be

23   the three tables that are most widely used by actuaries

24   today?

25    A.  For determining early retirement benefits?

                              77


1    Q.  Right.

2    A.  I'd say no.

3    Q.  For determining actuarial equivalence under the

4   circumstances I just described?

5    A.  For determining early retirement actuarial

6   benefits?

7    Q.  Actuarial equivalence where the plan doesn't

8   stipulate a table.

9    A.  It has to do with if it's a qualified plan. We

10   went outside that area and said it's not in the plan,

11    which means it's a non qualified plan of some kind.

12    Q.  All right. I'll withdraw that question. I notice,

13    Mr. Brown, in your report you also discussed the

14    determination letters. Would you agree with me that a

15    favorable determination letter indicates only that an

16    employee retirement plan qualifies for favorable tax

17    treatment by meeting the formal requirements of the

18    Internal Revenue Code, Section 401(a)?

19    A.  I would agree with that, I believe.

20    Q.  So that's all the favorable determination letter

21    does, it indicates only that an employee retirement plan

22    qualifies for favorable tax treatment, correct?

23    A.  Yes.  You know, it's a pretty concise statement.

24    That is the primary purpose of it.  But it certainly

25    helps employers rely on the provisions of the plan and

78

1    the administration of the plan.

2    Q.  An IRS determination letter isn't a determination

3    regarding the effect of other federal or local statutes,

4    is it?

5    A.  That's correct.

6    Q.  It's not, right?

7    A.  Right.

8    Q.  And even if the plan can rely on a favorable

9   determination letter as a defense against an IRS

10   challenge to its qualified status, determination letters

11   do not bar plan participants from asserting their rights

12   under ERISA, do they?

13        MR. SHEA:   Objection.  No foundation.

14    A.  Not that I am aware of.

15        MR. MOUKAWSHER:   All right. Let me see

16   where we are with the other documents.  I'll put you on

17   hold for a second.

18        (Whereupon a short recess was taken.)

19        MR. MOUKAWSHER:  First of all, why don't we

20   mark this document.

21        MR. SHEA:   On that point, this would be

22   Exhibit 6.  Let me just advise you, and ask how you want

23   to proceed.  The particular exhibit that we have in

24   front of us has -- I believe it's also the same one

25   faxed to you.  It may be showing up on the fax.  It has

79

1  certain pages that have been yellow highlighted by Mr.

2  Brown. If you want, I can go out and have someone do a

3  clean copy for you.  And/or we can simply mark this one.

4  I have no objection.

5        MR. MOUKAWSHER:  Let's mark that one and

6  I'll ask some questions.  If I think there's any concern

7  about the yellow highlight, we can address them.

8      (ASOP marked Exhibit 6 for identification.)

9    Q.  Mr. Brown, referring you to Exhibit 6 now, the

10  Actuarial Standard of Practice, number 27. Is there some

11  specific place in this document, some specific section

12  of this document that you relied upon in reaching the

13  opinion you reached in this matter?

14    A.  Let me say, this document was published in

15  December of 1996. And in preparing for today I printed

16  it out, read through it.  But in forming my initial

17  opinion I relied on my memory of the document and the

18  standards, and didn't actually use this.

19    Q.  Is your testimony today in any way reliant on

20  what you read in this document?

21    A.  Yes, it is.

22    Q.  And what about this document is your testimony

23  today reliant on?

24    A.  Again, it's a document that outlines the

25  principals, and I read through the document. I would say

80

1  one of the important things was the method for selecting

2  an interest assumption.

3    Q.  And where is that in the document?

4    A.  That's on pages 5, 6, 7.

5    Q.  Why don't we turn to page 5, 6 and 7.

6        MR. SHEA:  Do you have the document?

7    Q.  I have 32 pages of it.  If you don't go beyond

8  that I'll be fine. Let's look at page 5, section 3.6.

9    A.  Actually, go to page 6, to 3.6.2, constructing

10  the investment return range.

11    Q.  What about 3.6.2 did you rely on in your

12  testimony today?

13    A.  It's called the building block method under

14  section (a), which just outlines the acceptable method

15  of determining an interest rate for measuring pension

16  obligation. This does not apply to early retirement

17  calculations, but I did look at this and refresh my

18  memory on the standard.

19     Q.  Anything else in the document?

20     A.  Maybe page 8, the purpose of the measurement is

21  an important factor.

22     Q.  Is that 3.6.3?

23     A.  Yes, 3.6.3.

24     Q.  And what about that did you rely on in your

25  testimony today?

81

1     A.  That you have to take into account the purpose of

2  what you're measuring in selecting an interest rate.

3     Q.  Anything else?

4     A.  Page 10, 3.6.3 (h).

5     Q.  What about 3.6.3 (h) did you rely on?

6     A.  That says, benefit volatility could be a factor

7  in selecting an interest rate, especially if you highly

8  subsidized early retirement factors.

9     Q.  Anything else?

10    A.  Maybe 3.6.5 on page 11.

11    Q.  What about 3.6.5 did you rely on?

12    A.  The form of benefit such as early retirement

13  benefits may be based on interest rates that are

14  unrelated to the assumed rate used to measure the

15  obligation.

16    Q.  Anything else?

17    A.  I think that's it.

18    Q.  So we don't need to get beyond 32?

19    A.  Towards the end there's a lot of references and

20  things like that.

21         MR. MOUKAWSHER:  Okay.  Go off the record a

22  moment.

23         (Discussion off the record.)

24  BY MR. MOUKAWSHER: (Continuing.)

25    Q.   Referring you to Exhibit 3.

82

1    A.  Okay.

2    Q.  Can you tell me what this document is?

3    A.  This is an Excel spreadsheet that summarizes the

4  early retirement reductions for plans that are

5  administered here by the Milliman Albany Office.

6    Q. How do I tell looking at this how many different

7  plans I'm looking at?

8    A. There's one plan, basically, one plan per line.

9  You count the number of lines.

10    Q. So each line is a different plan?

11    A. Right.

12    Q. And "months early" refer to the number of months

13  before early retirement?

14    A. Right.

15    Q. Early retirement reduction, you have a column

16  showing that?

17    A. Yes.

18    Q. What does that column show?

19    A. This would show the percentage of your normal

20  retirement benefit that you get at early retirement. So,

21  the first plan here says .4. If your normal retirement

22  benefit was a hundred dollars, at early retirement

23  benefit you would get forty dollars.

24    Q. How does this reflect -- oh, I see you have a

25  stipulated number of months early.  120 months early

1   it's 40 percent. What's the six percent per year number

2   to the right of that in the first line?

3     A.  That's the way the plan document defines your

4   early retirement benefit. It's not an actuarial

5   equivalent, as we're talking about here. For each year

6   early you get six percent less. These are all ten

7   percent early, so the he reduction is sixty percent.

8     Q.  So that's 1 set number?

9     A.  That's right.

10    Q.  And that's true all the way down that far right

11  column?

12    A.  No.

13    Q.  Where does it stop being true?

14    A.  The last time you see a six percent.

15    Q.  What's the seven percent in the other?

16    A.  Those plans where you have some sevens, sixes,

17  and five and a half, are plans that use an actuarial

18  reduction for determining the amount of the benefit.

19    Q.  All right. And what about the ones that don't

20  have anything to the right?

21   A.  They're all set formulas which are described on

22   the left-hand side.  And the result of that formula is

23   in the next to the last column for people that retire

24   120 months early.

25   Q.  I want to ask you briefly about the relationship

84

1    between interest rates and mortality tables when

2    determining actuarial equivalency as, again, we're

3    determining actuarial equivalency without record of what

4    the plan says.  We're just trying to determine a number

5    actuarial equivalence.  Would you agree with me, over

6    estimating mortality in such a calculation would reduce

7    the amount a plan participant would receive.

8    A.  You know, I hate to make general statements

9    without doing the calculations.  And I really didn't

10   look at that.

11   Q.  Well, as a general actuarial principle, wouldn't

12   you agree that if you make an over estimate you assume a

13   much higher mortality rate than is reasonable it's going

14   to, you know, the higher the mortality rate you assume

15  -- withdrawn. The higher the mortality rate you assume

16  the smaller the resulting benefit, isn't that right?

17      A.  If it's consistent, if it's not just one or two

18  years.  But overall, it works like life insurance.  If

19  you think someone is going to die sooner, you charge

20  more for it. These tables, it's the slope of the table

21  that determines a lot of this.  And it's not as easy as

22  discussing the impact of interest rates because I know

23  from experience I would never guess without doing the

24  calculation unless it's very extreme, say, huge

25  unreasonable mortality rate, you'll get an unreasonable

85

1  result.

2      Q.  At some point, though, the higher the mortality

3  assumption, the lower the benefit that's going to

4  result?

5      A.  If it's consistent, yes.

6      Q.  Generally speaking, though, if you're trying to

7  just reach actuarial equivalence if you over estimate

8  mortality and then use an artificially low interest

9  rate, can you conceive of a circumstance where you could

10   still yield actuarial equivalence?

11     A.  By over estimating mortality you assume that

12   people die sooner than later?

13     Q.  Yes, right.

14     A.  And what was the other part of the question?

15     Q.  Can you still achieve actuarial equivalence under

16   those circumstances by, say, having an artificially low

17   interest rate to offset it?

18     A.  It's possible.

19          MR. MOUKAWSHER:  Let's go off the record a

20   moment.

21          MR. SHEA:   Okay.

22      (Whereupon a short recess was taken.)

23          MR. MOUKAWSHER:   I have no further

24   questions.

25          MR. SHEA:   I want to clarify something from

                                86

1   an exhibit perspective that you should be aware of.  I'm

2   not sure this would have come through on the fax.  But

3   Exhibit 3, on the original all of those plans that have

4  the six percent per year in the right-hand column, they

5  all have a green shading. And all the plans that have

6  the rest of the interest ratings has a yellow shading.

7        MR. MOUKAWSHER:  The seven percent?

8        MR. SHEA:   It has 7, 7, 7, 7, 6, 6, 6, 5.5

9  and 5.5.

10        MR. MOUKAWSHER:  That's fine.

11        MR. SHEA:  I just have a couple of very

12  brief questions.

13  CROSS EXAMINATION

14  BY MR. SHEA:

15    Q.  Mr. Brown, do you recall Mr. Moukawsher asking

16  you at the beginning of the deposition if you looked at

17  any other documents in formulating the opinion you gave

18  today.  Do you recall that?

19    A.  I do.

20    Q.  Have you subsequently recalled any other

21  documents you looked at in formulating the opinion you

22  formulated here today?

23    A.  Yes, I have.

24    Q.  And what documents were those?

25    A.  I received an email yesterday from you giving me

1  additional information about the Dun & Bradstreet

2  investment experience of the plans and the assets

3  allocation between stocks and bonds of the plans.

4     Q.  Had you requested that information?

5     A.  Yes, I had.

6        MR. SHEA:  I'd like to have this document

7  marked as Exhibit 7.  How many pages is it?

8     Q.  Seven pages.

9        MR. SHEA:  We'll mark it and fax it.

10        MR. MOUKAWSHER:   Do you have any questions?

11        MR. SHEA:  I have a couple of questions on

12  this document and then we'll be done.  Why don't I fax

13  it to you.  Examine it and call us back.

14  (10/5/04 email marked Exhibit 7 for identification.)

15        (Whereupon a short recess was taken.)

16        MR. MOUKAWSHER:  Go ahead.

17  BY MR. SHEA:  (Continuing.)

18     Q.  I direct your attention to the document marked

19  Exhibit 7. Is this the email transmittal containing the

20   spreadsheets?

21     A.  Yes, it is.

22     Q.  Turning your attention to the spreadsheet labeled

23   performance page, what information does this page

24   provide?

25         MR. MOUKAWSHER:   Objection to form.

88

1     Q.  Go ahead.

2     A.  This page shows the actual investment performance

3   of the Dun & Bradstreet Corporation for one, two, three,

4   five, ten, fifteen years, and since the inception of the

5   fund.

6     Q.  And do you recall Mr. Moukawsher asked you some

7   questions about the performance of the fund in periods

8   of historically low interest rates?  Do you recall that?

9     A.  Yes.

10    Q.  Would that include the period for the past two

11   years, in your opinion?

12    A.  The one or two year periods here are not

13   historically low interest rates.

14    Q.  In terms of market interest rates shown by the

15    D&B performance sheets, have the past two years also

16    showed market rates were low?

17       A.  '03 was very high interest rates. And I think

18    this is ended June 30, '04.  So, that period of one and

19    two years would not be historically low interest rates.

20    They were pretty good during that period.

21       Q.  In terms of long term interest rates, were they

22    relatively low?

23       A.  Long term, they were not.  As shown here, this is

24    kind of typical for ten and fifteen year periods, ten

25    percent return.

                                89


1        Q.  Focusing on the question of interest rates

2    provided by long term government securities, over the

3    past two years where have those interest rates been?

4        A.  They've been low.

5        Q.  In contrast to the 30 year T bill rate, how would

6    you characterize Dun & Bradstreet's return in the past

7    two years?

8        A.  They're much higher.

9      Q.  And higher or lower than the 6.75 interest rate

10    that's assumed for at issue in this case?

11      A.  Much higher.

12      Q.  Okay. And would that also be true if we look out

13    over a longer term?

14      A.  Yes.

15      Q.  And in assessing an appropriate interest rate do

16    you look short run or long run?

17      A.  Long run.

18      Q.  For the record, the last two pages of the

19    spreadsheet, what do those indicate?

20      A.  They show the amount of fund investments in

21    various assets classes; U.S. Equities, Non-US Equities,

22    fixed income and real estate.

23      Q.  In your opinion, how do they compare with the

24    typical defined benefit plan?

25      A.  They're very similar.

90

1          MR. SHEA:  No further questions.

2          MR. MOUKAWSHER:  Just a couple quick ones.

3    REDIRECT EXAMINATION

4   BY MR. MOUKAWSHER:

5     Q.  Mr. Brown, you didn't prepare Exhibit 7, the

6   spreadsheets, did you?

7     A.  No, I didn't.

8     Q.  And do you know whether Dun & Bradstreet has more

9   than one pension plan?

10    A.  I seem to recall in some of the materials there

11  was mention of more than one pension plan.

12    Q.  And do you know which pension plan this reflects?

13    A.  "This" being these assets?

14    Q.  In other words, if they had more than one pension

15  plan, do you know which one this reflects?

16    A.  I do not, no. I assumed that it's the one that

17  we're dealing with.

18    Q.  You don't know?

19    A.  But I don't know. And it's not labeled.

20        MR. MOUKAWSHER:  No further questions.

21        MR. SHEA:  We would like to read and sign.

22        (Whereupon the deposition was concluded.)

23        *        *        *

24

25

91

1              I N D E X

2

3   Exhibits:

4   1  Deposition notice              3

5   2  Brown opinion report              3

6   3  Spreadsheet              13

7   4  Milliman offices info              14

8   5  Hewitt Results              16

9   6  ASOP              78

10  7  Email              87

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

92

1  STATE OF

2  COUNTY OF

3

4

5        I have read the foregoing record of my

6  testimony taken at the time and place noted in the

7  heading hereof, and I do hereby acknowledge it to be a

8  true and correct transcript thereof.

9

10

11        _____

12

13  Sworn to before me this

14    _____ day of _____, 2004

15

16    _____

17

18

19

20

21

22

23

24

25

93

1    STATE OF NEW YORK          COUNTY OF RENSSELAER

2

3

4

5         I, Maryann Rizzi Francis, a Shorthand

6    Reporter and Notary, in and for the State of New York,

7    do hereby CERTIFY that I recorded the foregoing

8    testimony at the time and place herein stated and that

9   the preceding statements are a true and correct

10   transcript thereof to the best of my knowledge and

11   ability.

12

13

14                    _____

15

16

17

18

19

20

21

22

23

24

25