UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

ORIGINAL

| | |
|---|---|
| MARY McCARTHY, CLAYTON BOROWSKI, individually and on behalf of others similarly situated, and individually, GAIL ADAMS, DONALD BAKERT, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE DUN & BRADSTREET CORPORATION, THE DUN & BRADSTREET CORPORATION RETIREMENT ACCOUNT, and THE DUN & BRADSTREET CAREER TRANSITION PLAN, <br><br> Defendants. | CIVIL ACTION NO. 3:03 CV 0431 (SRU) <br><br><br> JANUARY 14, 2005 |

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AS TO COUNT FOUR

Patrick W. Shea (ct07071)
Sandra K. Lalli (ct25805)
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT  06901-2217
Telephone:    (203) 961-7400
Facsimile:    (203) 359-3031
patrickshea@paulhastings.com

Counsel for Defendants
THE DUN & BRADSTREET CORPORATION,
THE DUN & BRADSTREET CORPORATION
RETIREMENT ACCOUNT, and THE DUN &
BRADSTREET CAREER TRANSITION PLAN

A.  **An Interest Rate of 6.75 Percent is Historically Reasonable as a Matter of Law.**

It is undisputed that a defined benefit pension plan represents a long-term undertaking over several decades. See Defs.' and Pls.' Rule 56(a) Stmt. ¶ 3. It is also undisputed that an interest rate between 5 and 7 percent reflects industry standard[1] and continues to receive approval from the Internal Revenue Service as a reasonable rate of interest for calculating actuarially equivalent benefits.[2] Id. ¶¶ 10-12. It is also undisputed that, to the parties' knowledge, neither the IRS nor any court has declared an interest rate of 6.75 percent unreasonable. Id. ¶ 13.

Nevertheless, Plaintiffs attempt to attack the Master Retirement Plan interest rate of 6.75 percent by making an apples-to-oranges comparison of that rate to the current (not historic) 30-year Treasury bond rate. In support of their argument, Plaintiffs contend that (i) the current 30-year Treasury bond rate is the only reasonable rate for calculating actuarially equivalent benefits, and (ii) because the current 30-year Treasury bond rate is allegedly at an all-time low of 4.89 percent, the

---

[1]  Plaintiffs' expert, Mr. Poulin, himself testified that, "I've seen the rate of 5 percent, 6 percent, 7 percent, maybe a little higher." Poulin Dep. at 45-46; 49-50 (emphasis added) (excerpts to Poulin Dep. are attached at Exh. L hereto). In an attempt to downplay this industry standard, Plaintiffs attempt to distort Defendants' expert's report concerning the ratio of plans that use an actuarial reduction rate between 6 and 8 percent. Plaintiffs contend that "just 4 of the 84 defined benefits plans [Mr. Brown] consults for have interest rates as high as Dun & Bradstreet's" and "just 11 of the 149 plans he surveyed have such rates." Pls.' Opp. at 11. What Plaintiffs fail to mention is that of those 233 plans, only 27 used an actuarial reduction (the vast majority used a formula reduction) and are thus proper comparators in this case. Of the 27 plans using an actuarial reduction, 21 of them (i.e., 78 percent) utilized an interest rate of between 6 and 8 percent. Brown Decl. at pp. 5-6, ¶¶ 4-5 (attached at Exh. F to Shea Aff. in Support of Defs.' Mem.).

[2]  Plaintiffs likewise try to downplay the significance of the IRS determination letter approving the Master Retirement Plan's assumptions, including its interest rate of 6.75 percent, as reasonable. Whatever weight the Court chooses to afford a single determination letter (and the Second Circuit has held that such letters are entitled to at least "some weight" (Amato v. Western Union Int'l, Inc., 773 F.2d 1402, 1412-13 (2d. Cir. 1985); Esden v. Bank of Boston, 229 F.3d 154, 175-76 (2d. Cir 2000), quoting Amato)), it is undisputed that the IRS continues generally to issue favorable determination letters for plans using interest rates between 5 and 7 percent. Poulin Dep. at pp. 53-55, (Exh. L); Brown Dep. at 40-42 (excerpts to Brown Dep. are attached at Exh. M hereto)  This
(continued...)

Master Retirement Plan interest rate of 6.75 percent is <u>per se</u> unreasonable. Plaintiffs' theory suffers from several fundamental flaws.

1. **Actuarial Equivalence is Calculated Based on the Expected Long-Term Performance of the Plan, Not Individual Interest Rates at any Given Time.**

Plaintiffs contend that while ten years ago, "Dun & Bradstreet's 6.75 percent rate fit comfortably among the rates on long term government securities, . . . [t]oday, however, this rate is an aberration." Pls.' Opp. at 5-6. Specifically, Plaintiffs compare the Plan's 6.75 percent interest rate to the 30-year Treasury bond rate as of November 2004, which stood at 4.89 percent – a difference of "nearly two full percentage points" – and conclude that Dun & Bradstreet's rate is unreasonable. Plaintiffs' argument is short-sighted and ignores the fundamental principles of actuarial equivalence in the context of defined benefit pension plans.

Both experts agree that, in calculating early retirement benefits, actuarial equivalence must be determined from the perspective of what <u>the plan as a whole</u> can expect to earn over the long term, not from the perspective of what an individual participant expects to collect at the time he or she retires. As Defendants' expert has explained,

> In determining an appropriate interest rate, the actuary considers the value of the plan liabilities for all participants covered by the plan. . . . In establishing an appropriate interest rate, an actuary will typically consider the mix of plan assets and <u>the returns historically enjoyed by pension plan portfolios</u>. [Therefore], [i]n choosing an appropriate interest assumption, the actuary must determine <u>the average investment return</u> that the plan may reasonably expect to earn <u>over the long term</u>. The fact that some participants may be able to earn more or less than the plan return may play a role in an individual participant's decision as to which benefit to elect, but does not affect the selection of an appropriate interest rate for purposes of actuarial equivalence.

---

(…continued)
general practice of the expert agency entrusted by Congress to enforce this requirement should be accorded substantial weight.

-2-

Declaration of Edward W. Brown ("Brown Decl.") at pp. 4-5, ¶¶ 5, 7 (emphases added) (Exh. F to Shea Aff.). Plaintiffs' expert concurs that actuarial equivalence is determined by considering investment returns earned by the Plan:

> Early retirement benefits are said to be "actuarially reduced" or "actuarially equivalent" when a pension plan calls for a reduction of early benefits due to the facts that the benefit payments begin earlier than at the normal retirement age under the plan and therefore extend over a longer period of time, the assets supporting the benefits earn less investment income before payments commence, and there will be no "gains" to the plan from participants dying before benefit payments commence (the benefit of survivorship).

See Declaration of C. Poulin ("Poulin Decl.") at p. 3, ¶ 9 (Exh. I to Shea Aff.). See also Deposition of C. Poulin ("Poulin Dep.") at 97-101 (Exh. L) (actuarial equivalence is based on expected earnings from the perspective of the plan).

    2.    **The Plan Has Far Out-Performed Both the Average Return on 30-Year Treasury Bonds and Its Own Rate of 6.75 Percent, Therefore, Plan Participants Have Not Experienced a Prohibited Forfeiture of Benefits.**

Given that actuarial equivalence is determined from the perspective of the Plan, it makes sense to review the Plan's actual performance in assessing whether its interest rate assumption is, in fact, reasonable. As any competent financial manager knows, diversification is crucial to maximizing long-term earnings. Like most plans (at least those that are well-managed), the Master Retirement Plan does not invest solely in the most conservative of government securities, but has a mixed portfolio of stocks, bonds, equities, fixed income, real estate, and other assets. See Brown Dep. at 89 (Exh. M) (the Master Retirement Plan's mix of investments is "very similar" to that of typical defined benefit plans).[3]

---

[3]     Mr. Poulin's own pension plan for his employees utilizes an "institutional investor, Sullivan Smith Barney" to manage the appropriate mix of plan assets. Poulin Dep. at 110 (Exh. L).

As a result of such diversification, the rate of return on the Plan's portfolio of investments over time has far exceeded 6.75 percent, and has far out-performed the average rate of return on 30-year Treasury bonds. See Brown Dep. at 89 (Exh. M) (Plan earnings have been "much higher" than the yield on the 30-year Treasury rate,[4] and also "much higher" than the 6.75 interest rate utilized in the Plan). For example, over the past two years, the Plan has earned returns of 9.63 percent, and over the past year, returns have been 15.91 percent. See Exh. 7 to Brown Dep. (attached hereto at Exh. N). The Plan's long-term rate of return has likewise exceeded the average long-term rate of return on 30-year Treasury bonds, as well as the 6.75 rate. For example, over the past 10 years, the Plan has earned average annual returns of 10.78 percent, and 10.27 percent for the past 15 years. Id.

Thus, when early retirement benefits are calculated using the 6.75 percent factor, it likely results in an actuarial loss to the Plan and a gain to the Plan participants, since historical trends suggest the Plan would have earned well in excess of a 6.75 percent return had the funds remained invested in the Plan. See Poulin Dep. at 101 (Exh. L) (agreeing that if the discount rate is less than what the plan is earning, the result is a gain to the participants and a loss to the plan.). In short, Plaintiffs have not experienced any prohibited forfeiture of benefits with the application of a historically reasonable interest rate of 6.75 percent. To the contrary, the strong performance of the Plan suggests that a rate of 6.75 percent has been a conservative discount rate that has benefited Plan participants over the Plan itself.

---

[4] The average annual yield on 30-year Treasury securities was 6.95 percent for the 15-year period ending December 31, 2002, and 8.41 percent for the 25-year period ending December 31, 2002. See Poulin Decl., p. 5, ¶ 17 (Exh. I to Shea Aff.) (acknowledging that these figures are "true historically").

3. **Even Assuming That the 30-Year Treasury Bond Rate is the Appropriate Measure of Reasonableness, a Rate of 6.75 Percent Still Falls Comfortably Within the Average Historical Rate on Such Bonds.**

Even if the reasonableness of a 6.75 percent interest rate could be determined only by comparison to the 30-year Treasury rate as Plaintiffs contend, there is no merit to the argument that the current 30-year Treasury rate is the appropriate measure of comparison.

First, neither Congress nor the Treasury has specified the interest rate to be used in calculating actuarially equivalent benefits in this context. See Defs.' Mem. in Supp. of Summ. Judg. at 7-8; see also Pls.' Opp. at 6 ("ERISA doesn't dictate the interest rates Dun & Bradstreet must use for early retirement calculations"). Rather, the only limitation is that the rate not be "unreasonable".[5] Plaintiffs nonetheless insist that, because qualified retirement plans must use the annual interest rate yield on 30-year Treasury securities for determining certain lump-sum distributions (which are not at issue in this case),[6] the same rate should be applied to calculate actuarially equivalent benefits for early retirees. Pls.' Opp. at 9 (Plaintiffs' expert "prefers" that plans adopt "the 30-year Treasury rate that IRS Code §417 (e)(3) already requires plans to use when reducing pension benefits to a lump sum."). This argument only underscores the point that when Congress or the Treasury wanted to mandate the use of a particular interest rate, they knew how to do so. That no such rate has been similarly specified for actuarially equivalent benefits in this context militates against finding that only the current 30-year Treasury bond rate can be deemed reasonable. This Court should decline to legislate in the shoes of Congress and the Treasury by taking away the latitude afforded employers in selecting the appropriate interest rate.

---

[5]   Treasury Regulation Section 1.411(a)-4

[6]   26 U.S.C. § 417(e)(3)(A)(ii)(II). See also Treasury Regulation § 1.417(e)-1(d)(3); IRS Notice 2003-58 (Exh. J to Shea Aff.).

-5-

Moreover, it is inappropriate to take a single snapshot of today's Treasury bond rate, which fluctuates monthly,[7] and compare that temporary rate to the long-term, historical rate of investment return the Plan can expect to earn.[8] Rather, any comparison to 30-year Treasury rates would need to involve comparing the Plan rate of 6.75 percent to the average long-term, historical rate for government securities which, as Plaintiffs' expert concedes, has historically been higher than 6.75 percent. Specifically, the average annual yield on 30-year Treasury securities was 6.95 percent for the 15-year period ending December 31, 2002, and 8.41 percent for the 25-year period ending December 31, 2002. See Poulin Decl., p. 5, ¶ 17 (Exh. I to Shea Aff.) (acknowledging that these figures are "true historically"). And while Plaintiffs declare that, "in the 28 years of historical data available from the Federal Reserve, the rate on 30-year Treasury securities has never been lower than it is today," there is no evidence that the rate on such securities will continue to remain as low over the long run.[9] To the contrary, as Defendants' expert testified, "We haven't had historically

---

[7] As Mr. Poulin acknowledges, the 30-year Treasury rate "has moved up and down over time". Poulin Dep. at 68 (Exh. L). As Plaintiffs' own exhibit demonstrates, 30-year Treasury rates have fluctuated widely over relatively short periods of time. For example, in November 1994, the rate was at 8.08 percent; 14 months later, it fell by over 2 percentage points to 6.05 percent. 15 months later, the rate jumped back up over 1 percentage point to 7.09 percent, only to fall again over the next 18 months by over 2 percentage points to 5.01 percent. Ex. D to Pls.' Opp. (attached hereto at Exh. O).

[8] Plaintiffs' expert never stated that a rate of 6.75 percent is per se "incapable of providing an actuarially equivalent value to the basic normal retirement benefit." Pls.' Opp. at 7. Rather, Plaintiffs' expert stated, in support of his novel variable interest rate method, that "a fixed interest rate of 6¾% [or any fixed interest rate, for that matter], is an unreasonable rate of interest because it is incapable of providing at all times a truly actuarially equivalent value." Poulin Decl., pp. 6-7, ¶ 22 (Exh. I to Shea Aff.). As discussed, however, long-term plan performance, not minute-by-minute economic conditions, determines actuarial equivalence.

[9] Mr. Brown did not "admit[ ] that actuarial equivalency can't be calculated without taking account of current trends in long-term interest rates" or in any way suggest that current long-term rates must always prevail. Rather, Mr. Brown testified that "many factors" are taken into account in setting reasonable interest rates: "One of them would be interest rates earned today and yesterday and the last couple of years. But we look at a much longer term period in setting interest rates." Brown Dep. at 55-56 (emphasis added) (Exh. M).

low interest rates. We had a temporary period. We haven't had a long history of low rates, we had a short time." Brown Dep. at 55; see also Brown Dep. at 88 (Exh. M). In fact, Plaintiffs' own expert and evidence reveal that, even as of January 2000, a mere three years before the Complaint was filed, the 30-year Treasury rate was at 6.63 percent. Ex. D to Pls.' Opp. (attached hereto as Exh. O); Poulin Decl., p.4, ¶ 14 (Exh. I to Shea Aff.) (opining that plan participants have not experienced an annual yield of 6.75 percent on investments since "at least the year 2000"). It is therefore a far cry to claim that a short-term dip in rates over a few years necessarily invalidates an interest rate of 6.75 percent – a rate that appropriately reflects the expected long-term earnings of the plan over several decades.

**B.     Plaintiffs' Proposals for Calculating Actuarial Equivalence are Neither Mandated by Law Nor Workable in Practice.**

Plaintiffs' expert proposes three ways in which pension plans can "respond to changing interest rates": (1) subsidize early retirement benefits by adopting an "artificially low fixed rate," thereby avoiding the need to worry about the interest rate becoming unreasonable for an indefinite period of time; (2) adopt a fixed rate and adjust it every several years to reflect the latest economic environment; and (3) apply "a variable interest rate assumption adjusted yearly on the basis of a recognized index." Pls.' Opp. at 8; Poulin Dep. at 122-23 (Exh. L). None of these methods is required or endorsed by ERISA or the tax laws, and none is workable.

As to the "artificially low fixed rate" method, Mr. Poulin straightforwardly admits that is not a method ERISA requires, and that it would result in "providing additional benefits to the plan participants above and beyond what the law provides." Id. at 135-36 (emphasis added) (Exh. L).

As to the second, periodic adjustment method, Plaintiffs' expert readily concedes that such a method would create "significant workability problems" because employers would have to run multiple calculations for individual participants to avoid potential violations of ERISA's "anti-

-7-

cutback rule"[10] (i.e., each time an employer amended the plan's interest rate to reflect the latest economic trends, the employer would have to ensure that the amendment would not result in a reduction of accrued early retirement benefits to any individual participant).[11]

Finally, as to the variable interest rate method that their expert advocates, Plaintiffs attempt to divert attention from the serious problems plaguing this method by directing inconsequential barbs at Defendants' expert for disapproving of the method. The bottom line remains, however, that a variable interest rate approach is not required by ERISA, as Plaintiffs and their expert agree,[12] and would raise serious workability issues, which Plaintiffs' expert concedes and Plaintiffs do not refute. Poulin Dep. at 57-60 (Exh. L). Specifically, Mr. Poulin acknowledges that applying a variable interest rate would make calculating benefits "significantly more complicated" and would make it difficult for plan participants or beneficiaries to obtain definitely determinable benefits as the IRS requires. Id.; see also Brown Dep. at 46-47 (Exh. M). It is not surprising, then, that of the thousands of defined benefit plans Mr. Poulin has reviewed, not one has utilized a variable interest rate to make actuarial equivalent calculations. Poulin Dep. at 47-48 (Exh. L). Therefore, although Mr. Poulin's novel variable interest rate method might make for an interesting experiment for an employer willing to put up with the "significant complications" it will generate, that method is by no means the standard-bearer and provides no basis for striking down an historically reasonable fixed interest rate of 6.75 percent.

---

[10]   29 U.S.C. § 1054(g); I.R.S. Code § 411(d)(6).

[11]   Plaintiffs implicitly concede that "anti-cutback problems [would be] caused by periodically changing fixed rates by amending the plan." Pls.' Opp. at 16.

[12]   Plaintiffs acknowledge that "plans [need not] use a variable rate. ERISA doesn't require it. Plans are free to use fixed rates and change them periodically to make sure they produce actuarial equivalence." Pls.' Opp. at 18, n. 56. But, as discussed, Plaintiffs and their expert also admit that changing rates periodically would also create serious workability problems, particularly with respect to avoiding violations of ERISA's anti-cutback rule.

C.  **Plaintiffs Cannot Avoid Summary Judgment By Making New Attacks on Different Plan Assumptions.**

Count Four alleges only that "the MRP plan interest rate of 6 3/5 percent per annum [sic], compounded annually, used when actuarially reducing former employee's early retirement benefits is not a reasonable rate of interest." First Am. Compl. ¶ 95. Nowhere in Count Four or anywhere in the Amended Complaint do Plaintiffs even reference the Plan's mortality rates, much less challenge the reasonableness of such rates or any plan assumption other than the interest rate.[13] The issue of mortality rates was also not brought up during either the motion to dismiss briefing or the subsequent hearing, which led to expert discovery and the present briefing on the interest rate issue. Having never raised a claim before with respect to mortality rates, Plaintiffs cannot now bring up this new theory of liability to defeat summary judgment.[14]

D.  **There are No Disputed Issues of Material Fact, Therefore, No Trial is Necessary.**

Plaintiffs claim that summary judgment is inappropriate because there are genuine issues of material fact that can only be resolved at trial. The parties' Local Rule 56(a) statements of undisputed material fact, however, reveal that Plaintiffs admit all the pertinent underlying facts. There is no factual dispute, for example, regarding the relevant terms of the Plan, its interest rate (6.75 percent), or that the IRS issued the Plan a favorable determination letter. Moreover, it is also undisputed that "[e]mployers and professional plan managers continue to use interest rates between

---

[13] Because the Complaint did not reference the mortality rate assumptions, Plaintiffs have recently moved to amend the Complaint to allege that those assumptions are unreasonable. That motion was granted (likely because it gave the impression of being unopposed) before Defendants' time to respond had expired. Defendants have therefore filed a consent motion for reconsideration and an opposition to the motion to amend.

[14] "It is black letter law that a party may not raise new claims for the first time in opposition to summary judgment." Martinez v. City of New York, No. 00Civ.7914(WHP), 2003 WL 2006619, at *4 (S.D.N.Y. Apr. 30, 2003), aff'd, 82 Fed. Appx. 253, 203 WL 22879401 (2nd Cir. 2003). See also Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp., 963 F. Supp. 1342, 1359

(continued...)

5 and 7 percent (and higher) in calculating actuarially equivalent benefits for defined benefits pension plans" (Defs.' Rule 56(a) Stmt. ¶ 11); that "the IRS is still approving rates in the range of 5% to 7%" (Pls.' Rule 56(a) Stmt. ¶ 12); and that the parties are not aware of "any instance in which the IRS or any court has deemed a rate of 6.75 percent unreasonable" (Defs.' Rule 56(a) Stmt. ¶ 13). Indeed, Plaintiffs assert that the only triable issue of fact is whether an interest rate of 6.75 percent is reasonable (Pls.' Rule 56(a) Stmt. at 3).

That is not an issue for which a trial is necessary. Unlike the discrimination case cited by Plaintiffs, there is no disputed issue of fact with respect to intent or motive. There is only a legal determination to be made based on undisputed facts. The Court should resolve this case on summary judgment.[15]

Respectfully submitted, this 14th day of January 2005.

By: /s/ Patrick Shea
Patrick W. Shea (ct07071)
Sandra K. Lalli (ct25805)
Paul, Hastings, Janofsky & Walker, LLP
1055 Washington Boulevard
Stamford, CT 06901-2217
Tel.: (203) 961-7400; Fax: (203) 359-3031
patrickshea@paulhastings.com
Counsel for Defendants

---

(…continued)
(S.D.N.Y.1997) ("[A]ttempting to add a claim never addressed, or even hinted at, in the complaint . . . is inappropriate at the summary judgment stage . . .").

[15] If the Court declines to grant summary judgment, Defendants submit that the only evidence taken at trial would be the expert deposition testimony already fully taken by the parties. And given that any trial must be a bench trial under ERISA, Defendants respectfully submit that the Court should treat the deposition testimony as the trial record and proceed with ruling on this issue as a trial matter. See U.S. Fire Ins. Co. v. SS "Lion Gate Bridge", No. 88 CIV. 9188 MJL MHD, 1997 WL 10923, at *5 (S.D.N.Y. Jan. 10, 1997) ("The Second Circuit has expressly approved the procedure for conducting bench trials based on a written record.") (citing Ball v. Interoceanica Corp., 71 F.3d 73, 77 (2d Cir.)).

## CERTIFICATE OF SERVICE

This is to certify that on this 14th day of January 2005, a copy of the foregoing Defendants' Reply Brief in Support of Their Motion for Summary Judgment as to Count Four was served by overnight express mail on the following counsel of record:

> Thomas G. Moukawsher, Esq.
> Moukawsher & Walsh, LLC
> 21 Oak Street, Suite 100
> Hartford, Connecticut 06106

*Sandra Lalli*
Sandra K. Lalli

STM/288184.2