# EXHIBIT L

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF CONNECTICUT
 3      *   *   *   *   *   *   *   *   *   *   *
     MARY McCARTHY, CLAYTON BOROWSKI,
 4   individually and on behalf of        *     COPY
     others similarly situated, and
 5   individually, GAIL ADAMS, DONALD  *
     BAKERT, et al,
 6                    Plaintiffs,        *
                  VS.                          CIVIL ACTION NO.
 7                                       *      3:03 CV 0431
     THE DUN & BRADSTREET CORPORATION,          (SRU)
 8   THE DUN & BRADSTREET CORPORATION  *
     RETIREMENT ACCOUNT, and THE DUN
 9   & BRADSTREET CAREER TRANSITION    *
     PLAN,
10                    Defendants.       *
     *   *   *   *   *   *   *   *   *   *   *
11
                                    Stamford, CT
12
                                    May 27, 2004
13
                                    9:30 a.m.
14                       -   -   -
15         DEPOSITION OF CLAUDE POULIN
                         -   -   -
16
     APPEARANCES:
17
          FOR THE PLAINTIFFS:
18
          MOUKAWSHER & WALSH, LLC
19        BY: THOMAS G. MOUKAWSHER, ESQ.
              21 Oak Street, Suite 209
20            Hartford, CT 06106
21
          FOR THE DEFENDANTS:
22
          PAUL HASTINGS, JANOFSKY & WALKER, LLP
23        BY: PATRICK W. SHEA, ESQ.
              1055 Washington Boulevard, 9th Floor
24            Stamford, CT 06901-2217
25
```

1    I may have asked for the actual mortality

2    table of the 2001 plan, if it existed, to be

3    told by Mr. Moukawsher that it did not

4    appear to be available.

5        Q.   Do you recall any other work you've

6    done in this engagement other than what you

7    testified to?

8        A.   I did the work related to the

9    preparation of Exhibits C and D, which

10   involved actual calculations based on

11   certain interest rates and mortality tables.

12       Q.   I understand that.  Anything else?

13       A.   No, not that I recall.

14            MR. SHEA:  All right.  Let's

15   take a break.

16            (Whereupon a break was taken.)

17   BY MR. SHEA:

18       Q.   Mr. Poulin, the ERISA plan we're

19   dealing with is a defined benefit plan,

20   correct?

21       A.   Yes.

22       Q.   Is it fair to say that over your

23   career you've seen many defined benefit

24   plans?

25       A.   Yes, it is.

1      Q.   Hundreds, perhaps thousands; isn't

2  that right?

3      A.   Probably thousands, yes.

4      Q.   And we're dealing here with a

5  provision for early retirement benefits to

6  be paid to deferred vested employees,

7  correct?

8      A.   Yes.

9      Q.   And that's a relatively common

10  feature of defined benefit plans; isn't it?

11      A.   Yes.

12      Q.   And in this particular case the

13  plan provides that benefits will be the

14  actuarial equivalent of the normal

15  retirement benefit; isn't that right?

16      A.   Yes.

17      Q.   And that is a fairly common

18  provision in ERISA defined benefit plans for

19  deferred vested retirees?

20      A.   Yes, it is.

21      Q.   Now, if I understand your opinion,

22  in this matter, as summarized in paragraph

23  22 of your report, you believe that the Dun

24  & Bradstreet plan should be calculating the

25  actuarial equivalent of that early

47

1    retirement benefit for deferred vested

2    retirees using a variable interest rate; is

3    that correct?

4            MR. MOUKAWSHER:  Objection to

5    the form.

6            THE WITNESS:  Sorry.  Can you

7    repeat the question?  I missed the

8    beginning.

9    BY MR. SHEA:

10       Q.   Let me try it again.  Your opinion

11   in this case is reflected in paragraph 22?

12       A.   Yes.

13       Q.   In calculating the actuarial

14   equivalent of the normal retirement benefit

15   for deferred vested retirees who retired

16   early at Dun & Bradstreet, you should be

17   using a variable interest rate, correct?

18            MR. MOUKAWSHER:  Objection to

19   the form.

20       Q.   Correct?

21       A.   Yes.

22       Q.   Of those hundreds or thousands of

23   plans, defined benefits plans that you've

24   seen that have a similar provision - -I

25   think you indicated it is relatively common

48

1    -- how many of those use a variable interest

2    rate in making that calculation?

3         A.    None that I know of.

4         Q.    You said none that you know of?

5         A.    None.

6         Q.    Not a single one that you can think

7    of?

8         A.    I cannot name one.  Over the years

9    there have been actuarial reductions based

10   on the index.  I could not name the plan.

11        And also, the important thing that

12   is evident in my report is the impact of the

13   interest rate assumption in conjunction with

14   the mortality table used by the plan.

15             MR. SHEA:  I move to strike the

16   second portion of that answer as

17   unresponsive.

18   BY MR. SHEA:

19        Q.   Mr. Poulin, is it fair to say that

20   at least the overwhelming majority of

21   defined benefit plans that have an interest

22   rate that is used to calculate an actuarial

23   equivalent for early retirement benefits

24   used a fixed rate used in the D & B plan; is

25   that right?

1          A.    Yes.

2          Q.    And are you familiar with the types

3     of fixed rates that plans employ?

4                    MR. MOUKAWSHER:  Objection to

5     the form.

6          A.    Yes.

7     BY MR. SHEA:

8          Q.    The rate in this case is 6 3/4s

9     percent, correct?

10          A.    This is correct.

11          Q.    How does that compare with the rate

12     that most defined benefit plans employ?

13          A.    Well, many plan rates are lower or

14     maybe slightly higher.

15          Q.    Could you quantify that for me at

16     all?

17          A.    I cannot quantity it, but I've seen

18     the rates of 5 percent, 6 percent, 7

19     percent, maybe a little higher.

20          Q.    What is the highest you've seen?

21                    MR. MOUKAWSHER:  Objection to

22     the form.

23          A.    I don't know.

24     BY MR. SHEA:

25          Q.    But you've certainly seen defined

50

1   benefit plans that use rates higher than 7

2   percent in this context?

3      A.   In the past, yes.

4      Q.   Now you said that to prepare for

5   the deposition you reviewed the relevant

6   provision of the ERISA code and the treasury

7   regulations?

8      A.   Yes.

9      Q.   In some instances either Congress

10  by statute or the treasury regulations has

11  specified the interest rate factor to be

12  used in calculating equivalent benefits;

13  isn't that right?

14     A.   Yes.

15     Q.   Most particularly in determining

16  what the lump sum benefit should be

17  associated with a particular benefit, there

18  is a rate specified; isn't that right?

19     A.   Yes.

20     Q.   Specified in the code or

21  regulations; if you remember?

22     A.   I believe it's both.

23     Q.   Okay.  By contrast there are also

24  regulations that deal with this interest

25  rate that we're discussing here today,

1    equivalent to normal retirement benefits.

2        Q.    Now all of those defined benefit

3    plans that use a fixed rate -- and I think

4    you said they range from 5 percent to 7

5    percent -- they have all been reviewed by

6    the Internal Revenue Service to determine

7    whether they comply with the Internal

8    Revenue Code, correct?

9            MR. MOUKAWSHER:  Objection to

10    the form.

11        A.    I would say most of them.

12    BY MR. SHEA:

13        Q.    And in all of the defined benefit

14    plans that you've seen that employ these

15    fixed rates, between 5 and 7, the IRS has

16    approved the plan; isn't that right?

17            MR. MOUKAWSHER:  Objection to

18    the form.

19        A.    Probably, I assume so, but I do not

20    know if the IRS has approved all these

21    plans.

22        Q.    Isn't it fair to say that the IRS

23    and Department of Treasury only specified

24    the use of reasonable assumptions, hasn't

25    restricted to specify a particular interest

1    rate, as they do in the case of lump sum

2    regarding the use of a fixed rate between 5

3    percent and 7 percent as reasonable?

4             MR. MOUKAWSHER:   Objection to

5    the form.

6        A.    I do not know when the Dun &

7    Bradstreet pension plan received its

8    favorable determination letter.

9             We do know that 20 years ago the interest

10   rates and, of course, also the mortality as

11   experienced by plan participants was different than

12   it is today.

13            There certainly was a time when a 6 3/4s

14   percent rate, even with this mortality table, may

15   have been deemed to be reasonable or was deemed to

16   be reasonable.  But I do not see this as a static

17   situation.

18            As I mentioned in the report, there are

19   many factors in pension plans that have not been

20   reviewed for several years and many factors that

21   have been accepted in the past, but in a fluctuating

22   environment may at one point not be reasonable or

23   not be acceptable.

24            When I reviewed this interest rate and

25   performed the calculation, in order to determine the

55

1  actual equivalency in conjunction with the mortality

2  table used by the old plan, 1994 plan, I realized

3  that there was a large discrepancy in the values and

4  in the reduction factors that needed to be looked

5  at.

6            MR. SHEA:  I'm going to move to

7  strike as unresponsive.

8  BY MR. SHEA:

9      Q.    Let me try the question again.

10           The IRS continues to review plans

11  and issue a determination letter?

12     A.    Yes, it does.

13     Q.    Have you been involved in the

14  determination processes for defined benefit

15  plans in the past two or three years?

16     A.    No.

17     Q.    To your knowledge, has the IRS

18  continued to issue favorable determination

19  letters with respect to plans that use a

20  fixed rate in the range we've been talking

21  about, 5 percent to 7 percent, to use as a

22  factor to determine actuarial equivalents?

23     A.    To my knowledge it does.

24     Q.    The IRS is the same agency that is

25  enforcing the regulation dealing with the

1    plan is fully kosher or acceptable --

2              MR. SHEA:  All right.  Mid way

3    through your answer, when I said it was

4    unresponsive, I move to strike the

5    unresponsive part.

6    BY MR. SHEA:

7        Q.   The simple question is:  The IRS

8    issues a determination letter and the

9    Department of Treasury issues the

10   regulations that sets forth the reasonable

11   requirements for assumptions used to

12   determine actuarial equivalence?

13       A.   Yes.

14             MR. MOUKAWSHER:  Objection to

15   the form.

16       Q.   Is it your testimony here today

17   that any plan that does not employ a

18   variable interest rate in determining

19   actuarial equivalence is not using

20   reasonable assumptions as required by ERISA

21   and the code?

22       A.   No.

23       Q.   If that were true, every single one

24   of these plans you reviewed would be out of

25   compliance?

1    A.    Yes.

2    Q.    What you're really saying about

3    variable interest rates in that regard is

4    the preferred method, but not one that is

5    required by ERISA or the code; isn't that

6    fair?

7    A.    For this particular case this

8    particular interest rate and this particular

9    mortality table, yes, it would be the

10   preferred approach by having a fixed

11   interest rate and old mortality table.

12   Q.    Okay.  And I just want to review

13   with you briefly some of the issues that

14   would arise if Dun & Bradstreet were now to

15   convert using a variable rate.

16         If it were to do that, and if that variable

17   rate were to rise above 6.75 percent, in that

18   situation Dun & Bradstreet would be required to do

19   additional calculations because there would be an

20   accrued benefit based on the old rate that would

21   have to be protected; isn't that right?

22   A.    Yes.

23   Q.    So if the interest rate goes above

24   6.75 percent and Dun & Bradstreet has

25   adopted a variable approach, that

59

1    calculation of benefits becomes

2    significantly more complicated; isn't that

3    right?

4        A.    It would be.

5        Q.    The other issue with this variable

6    rate approach is:  I'm 47 years old and I'm

7    planning to retire at age 55.  If I'm a

8    participant in a benefit plan that uses a

9    fixed rate, I could call up the recordkeeper

10   and have them do an estimate on my pension

11   benefits; isn't that right?

12       A.    Yes.

13       Q.    And with a fixed rate they can tell

14   me exactly how much of a reduction I'm going

15   to take by retiring on a deferred basis at

16   age 55; isn't that right?

17       A.    Yes.

18       Q.    If I made a similar inquiry as a

19   participant and Dun & Bradstreet were

20   employing this variable process, you

21   couldn't give me a definite answer, could

22   you?

23       A.    To the same extent at the time an

24   employee wants to elect a lump sum as a

25   range of answers, yes.

60

1    Q.   You'd have to say:  Well, Mr. Shea,

2   we can give you some ranges, but what you're

3   actually going to get at age 55 under the

4   circumstances is going to depend on what

5   interest rates look like when you turn 55,

6   eight years down the road; is that what you

7   have to say?

8    A.   This is correct.

9    Q.   In determining a reasonable

10   interest rate to use in this context, to

11   determine the actuarial equivalent of an

12   optional form of benefit, you would agree

13   with me that there is no one single fixed

14   rate that is the only reasonable rate; isn't

15   that right?

16           MR. MOUKAWSHER:  Objection to

17   the form.

18    A.   In order to make that determination

19   of actuarial equivalency, as an actuary I

20   cannot look at a rate in a vacuum, interest

21   rate in isolation, without also looking at

22   the mortality table.

23           And to the extent that the mortality under

24   a certain mortality table would offset the impact of

25   the interest rate, then the actual values that

1    Q.   And, indeed, when we're doing an

2  actuarial equivalency calculation, I'm

3  retiring now at age 55 as opposed to waiting

4  ten years to take my normal retirement

5  benefit, what the interest rate assumption

6  is really trying to capture is a time value

7  of money over a period of payment that will

8  extend out a considerable length of time;

9  isn't that right?

10    A.   Yes.

11    Q.   And nobody in this room or anyplace

12  else could tell us where interest rates are

13  going to be during the 10-year period of

14  time?

15    A.   No, we could not.  But there is an

16  existing instrument that is a 30-year

17  treasury rate that attempts to determine

18  what that risk-free rate is now for the next

19  30 years.

20    Q.   Attempts to, but that figure has

21  moved up and down over time as well; isn't

22  that right?

23    A.   That's right, yes.

24    Q.   And in deciding what would be an

25  appropriate time value of money to use over

97

1   you know, Financial Accounting Standard

2   5-something, along those lines?

3       A.   I believe that there is a standard

4   on the selection of economic assumptions.

5       Q.   Do you know what that standard is

6   called?  Does it have a number?

7       A.   Selection of economic assumptions.

8   I cannot be more precise than that.  They're

9   not numbered as they are in FASB.  The FASB

10  is one section that everyone knows.  As I

11  understand the, numbering system has changed

12  over the years.

13      Q.   Take a moment.  You should still

14  have available to you Poulin Exhibit 1, that

15  document right there.

16           Turning to page 3, paragraph 9.  Paragraph

17  9 states, and I quote:  "Early retirement benefits

18  are said to be 'actuarially reduced' or 'actuarially

19  equivalent' when the pension plan calls for

20  reductions of early benefits due to the fact that

21  the benefit payments begin earlier than at the

22  normal retirement age under the plan and, therefore,

23  extends over a longer period of time.

24           The assets supporting the benefits earn

25  less investment income before payments commence and

98

1    there will be no, 'gains' to the plan for

2    participants dying before benefit payments commence

3    (the benefit of survivorship)."

4            Do you see that?

5        A.    Yes.

6        Q.    What do you mean by the reference

7    to "assets including benefits income?"   How

8    does that relate to the definition of

9    actuarially reduced and actuarially

10   equivalent?

11       A.    Well, if I'm interested in benefits

12   payable at the age of 65, and I'm currently

13   age 55, there is, theoretically, a sum of

14   money representing the benefits that I will

15   receive upon retirement age starting ten

16   years from now.

17           If I decide that this benefit will start

18   immediately when I'm age 55, then the fund will not

19   have the benefit of the pension payments that I

20   receive for the next ten years.  And, therefore,

21   there must be reductions in the benefits that I

22   would get at normal retirement age.

23       Q.    To reflect the investment income

24   that the plan is not going to get because

25   those benefits left the fund earlier?

99

1       A.   Yes.

2       Q.   And what is the reference to -- you

3    explain the last reference to there being

4    gains to the plan from participants for

5    dying before the benefits commence; what do

6    you mean by that?

7       A.   Again, I'm 55 years old.  I'm

8    interested in benefits of a thousand dollars

9    a month starting age 65.  If I die two years

10    from now without receiving any benefits,

11    then I'll be a gain to the fund in that the

12    full amount of pension benefit will never

13    have been paid.

14          Whereas, if I start receiving benefits now

15    and I die in the interim, there would be a larger

16    liability to the fund for the payments that I will

17    have received between the date of retirement and my

18    date of death.  So that is the benefit of

19    survivorship.

20       Q.   So by actuarially reducing that

21    into account mortality, you would do that?

22       A.   The way that it would eliminate any

23    change in the gains from the plan from a

24    person dying, calculations of pension

25    liabilities and the determination of pension

100

1    benefits are based on actuarial assumptions.

2         To the extent that the actuarial

3    assumptions are not fully realized in the

4    actuarial parlance, there is an actuarial

5    gain and actuarial loss.

6         So that a 65-year old retiree dying one

7    month after the date of retirement generates an

8    actuarial gain, because in that case that person's

9    pension plan will not have paid the expected

10   benefit.

11        Conversely, a participant retiring at age

12   65 and living to age 100 would create an actuarial

13   loss.  So that actuarial equivalence eliminates

14   those gains and losses, if you will.

15        Q.   Okay.  Now, if somebody retires

16   early and you have a situation where the

17   discount rate, the interest rate you used to

18   determine actuarial equivalence is higher

19   than what that plan is actually earning, in

20   that situation, actually, it turns out to be

21   a loss to the participant.  That is a net

22   gain, using your definition for the plan,

23   which rate is higher than, if the percentage

24   rate you're using to discount those early

25   retirement benefits, is higher than what the

101

1    plan is actually earning?

2        A.    Yes.

3        Q.    That is going to be a loss on

4    principal and gain to the plan under the

5    analysis, correct?

6        A.    Yes.

7        Q.    Conversely, if the discount rate

8    you're using is less than what the plan is

9    earning, using your definition, that's a

10   gain to the participant and loss to the

11   plan; isn't that right?

12       A.    Yes.

13       Q.    And in this particular case are you

14   familiar with what the actuarial assumptions

15   were for the Dun & Bradstreet funding of the

16   D&B plan?

17       A.    No.

18            MR. SHEA:  Let's have that

19   marked as 4.

20            (Defendant's exhibit for

21   identification marked No. 4:  Dun &

22   Bradstreet Corporation Audited Financial

23   Statements.)

24   BY MR. SHEA:

25       Q.    Mr. Poulin, showing you a document

122

1    attempt to re-ask the questions today.  With that, I

2    have a couple questions.

3    CROSS-EXAMINATION BY MR. MOUKAWSHER:

4        Q.    Mr. Poulin, in Mr. Shea's questions

5    to you he spoke to you at one point about

6    what you considered the preferable approach

7    to making the calculations.  I want to ask

8    you a couple clarifying questions about

9    that.

10            Is it your opinion that the interest rate,

11    under the circumstances that it's applied here, is

12    reasonable or unreasonable?

13            MR. SHEA:  Objection to form.

14    Leading.  The federal rules are clear, you

15    can't lead in this situation.  I've made my

16    objection.

17            MR. MOUKAWSHER:  You already

18    said he's not my client.  Your objection is

19    on the record.

20            THE WITNESS:  I believe that

21    the interest rate in conjunction with the

22    mortality tables are unreasonable in

23    determining actuarial equivalency.

24    BY MR. MOUKAWSHER:

25        Q.    And other than through using the

123

1    30-year treasury rate, are there other ways

2    that could yield a reasonable interest rate?

3        A.   Well, as I said, I believe the

4    30-year treasury would be a preferred

5    approach.

6            It would be possible, for instance, to

7    choose such a rate, that it would include a slight

8    amount of subsidy to such an extent that it would

9    not necessitate amending the plan every five years

10   or ten years.

11           If the rate of interest were to be 3 1/2

12   percent, it is unlikely, although not certain, that

13   the rates will be that low over the next foreseeable

14   future.  It is not impossible, but it is unlikely,

15   and then this would provide a certain amount of

16   subsidy.

17           Alternatively, it would also be possible to

18   choose a rate that would be valid until the economic

19   environment changes.  So that it might necessitate

20   periodic amendments to the pension plan.

21           But as I said, my preferred approach would

22   be a variable index such as the 30-year treasury.

23       Q.   Do I understand then that, when you

24   say the 30-year treasury is a preferable

25   approach, that you're saying that is the

135

1      Q.   If you had significantly lower

2   interest rates than the current interest

3   rate environment, could you lower the rate

4   so much that, for instance, you could use an

5   out-of-date mortality table?

6           MR. SHEA:  Objection to form.

7      A.   At the present time perhaps.

8   BY MR. MOUKAWSHER:

9      Q.   Conversely, could you have a higher

10   interest rate than prevailing market

11   conditions, but have a mortality rate

12   assumption that would offset it?

13      A.   Yes.

14           MR. SHEA:  Objection to the

15   form.

16           MR. MOUKAWSHER:  I have no

17   further questions at this time.

18   REDIRECT EXAMINATION BY MR. SHEA:

19      Q.   First off, Mr. Moukawsher asked you

20   about the idea of using a lower interest

21   rate to subsidize your early retirement

22   benefits for deferred vested retirees.

23   That's not something ERISA requires?

24      A.   No.  That would be decided to

25   address the problem by providing additional

136

1   benefits to the plan participants above and

2   beyond what the law provides.  It provides a

3   certain element of subsidy.

4      Q.    The second alternative of adjusting

5   the rate every five years to continue the

6   use of a fixed rate, that would have

7   significant workability problems because

8   then you would conceivably have to calculate

9   the accrued benefit protected under the

10   anti-cutback rule and they have to do three

11   or four separate calculations to decide what

12   somebody's accrued benefit was; isn't that

13   right?

14      A.    Precisely, that is why we prefer an

15   index.

16      Q.    In terms of an indexing approach, I

17   just want to make sure I understand your

18   position.  Suppose I'm a D&B plan

19   participant and I've worked 30 years

20   accruing benefits with an interest

21   entitlement to retire at 55 as a deferred

22   vested retiree using the 6.75 percent

23   interest rate.  I'm 54 and turn 55 next

24   year.

25       Let's suppose that two things happen:  One,