# EXHIBIT B

```
                                                                    1

 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF CONNECTICUT

 3   *  *  *  *  *  *  *  *  *  *  *  *
     MARY McCARTHY, CLAYTON BOROWSKI,
 4   individually and on behalf of    *
     others similarly situated, and
 5   individually, GAIL ADAMS, DONALD *
     BAKERT, et al,
 6             Plaintiffs,            *
            VS.                            CIVIL ACTION NO.
 7                                    *     3:03 CV 0431
     THE DUN & BRADSTREET CORPORATION,       (SRU)
 8   THE DUN & BRADSTREET CORPORATION *
     RETIREMENT ACCOUNT, and THE DUN
 9   & BRADSTREET CAREER TRANSITION   *
     PLAN,
10             Defendants.            *
     *  *  *  *  *  *  *  *  *  *  *  *
11
                                     Stamford, CT
12
                                     May 27, 2004
13
                                     9:30 a.m.
14                     -  -  -

15          DEPOSITION OF CLAUDE POULIN
                       -  -  -
16
     APPEARANCES:
17
         FOR THE PLAINTIFFS:
18
         MOUKAWSHER & WALSH, LLC
19       BY: THOMAS G. MOUKAWSHER, ESQ.
             21 Oak Street, Suite 209
20           Hartford, CT 06106

21
         FOR THE DEFENDANTS:
22
         PAUL HASTINGS, JANOFSKY & WALKER, LLP
23       BY: PATRICK W. SHEA, ESQ.
             1055 Washington Boulevard, 9th Floor
24           Stamford, CT 06901-2217

25
```

```
 1              MR. MOUKAWSHER:  Objection.
 2       A.   No.
 3   BY MR. SHEA:
 4       Q.   What did you understand the
 5   reference to count 4?
 6              MR. MOUKAWSHER:  Let me
 7   interpose an objection.
 8              I instruct the witness, to the
 9   extent that you're testifying of what you
10   understood, what you believed and came to
11   believe and what you understand the
12   complaint to mean, that's fine.
13              I instruct you not to testify
14   as to what I said to you, what you said to
15   me, or anything else in these
16   communications.
17              Just confine it to what your
18   statements were.  That's what the question
19   calls for, so I don't have to object to it.
20              THE WITNESS:  I would not be
21   able to distinguish at this point without
22   looking at the document.
23       Q.   Other than the issue of the matter
24   that you've testified you were asked to form
25   an opinion or initially, i.e. to ascertain
```

```
 1    whether the interest rate used by Dun &
 2    Bradstreet to calculate early retirement
 3    benefits for the deferred vested retirement
 4    was a reasonable rate, were you asked to
 5    form an opinion on any other aspect of this
 6    case?
 7         A.   I believe it follows after
 8    ascertaining whether the interest rate is
 9    reasonable, whether the values produced by
10    this interest rate would represent actuarial
11    equivalence of the normal retirement
12    benefit.
13              But as I mentioned earlier, I also
14    said that this determination has to be done
15    in conjunction with the mortality table that
16    is used by the plan in order to compute
17    these factors.
18         Q.   Other than that, have you been
19    asked to form an opinion on any other issue
20    in this case?
21         A.   I don't think so.
22         Q.   Back to written communication.
23    Other than this -- well, let me ask the
24    question, just to make a record?
25              What was the substance of the communication
```

52

```
1        Q.   What is your understanding of what
2    it says?
3        A.   I believe that the statutes and/or
4    the regulations stipulate that the benefits
5    must be actuarially equivalent or the
6    actuarial equivalent or actuarial
7    equivalencies are based on two factor:  One
8    being the interest rate; the other one being
9    the mortality table.
10            I understand that the statute does not
11   specify which mortality table or which interest rate
12   is to be used.  The requirement is that it be an
13   actuarial equivalent, and it could be that a certain
14   interest rate, that in isolation, in a vacuum, would
15   be unreasonable, would be tempered or the impact of
16   that rate would be mitigated by a mortality table
17   that would offset it.  If this happened, it would
18   offset the impact of the interest rate and
19   vice-versa.
20       Q.   But overall, the plan must use
21   reasonable assumptions of mortality and
22   interest to arrive at the actuarial
23   equivalent?
24       A.   Reasonable assumptions that would
25   lead to a benefit that would be actuarially
```

53

```
 1    equivalent to normal retirement benefits.
 2         Q.   Now all of those defined benefit
 3    plans that use a fixed rate -- and I think
 4    you said they range from 5 percent to 7
 5    percent -- they have all been reviewed by
 6    the Internal Revenue Service to determine
 7    whether they comply with the Internal
 8    Revenue Code, correct?
 9              MR. MOUKAWSHER:  Objection to
10    the form.
11         A.   I would say most of them.
12    BY MR. SHEA:
13         Q.   And in all of the defined benefit
14    plans that you've seen that employ these
15    fixed rates, between 5 and 7, the IRS has
16    approved the plan; isn't that right?
17              MR. MOUKAWSHER:  Objection to
18    the form.
19         A.   Probably, I assume so, but I do not
20    know if the IRS has approved all these
21    plans.
22         Q.   Isn't it fair to say that the IRS
23    and Department of Treasury only specified
24    the use of reasonable assumptions, hasn't
25    restricted to specify a particular interest
```

60

1   Q.   You'd have to say:  Well, Mr. Shea,
2   we can give you some ranges, but what you're
3   actually going to get at age 55 under the
4   circumstances is going to depend on what
5   interest rates look like when you turn 55,
6   eight years down the road; is that what you
7   have to say?
8       A.   This is correct.
9       Q.   In determining a reasonable
10  interest rate to use in this context, to
11  determine the actuarial equivalent of an
12  optional form of benefit, you would agree
13  with me that there is no one single fixed
14  rate that is the only reasonable rate; isn't
15  that right?
16          MR. MOUKAWSHER:  Objection to
17  the form.
18      A.   In order to make that determination
19  of actuarial equivalency, as an actuary I
20  cannot look at a rate in a vacuum, interest
21  rate in isolation, without also looking at
22  the mortality table.
23          And to the extent that the mortality under
24  a certain mortality table would offset the impact of
25  the interest rate, then the actual values that

61

 1   result from the calculation is maybe, quote/unquote,
 2   actuarially equivalent.
 3           For instance, in 1994 I believe ERISA,
 4   they got legislation that changed both the interest
 5   rate and what is called the applicable interest rate
 6   and applicable mortality table for lump sum
 7   purposes.
 8           Before 1994 there was a very old mortality
 9   table called UP84, which, in fact, was based on the
10   experience of the '60s, which resulted in lower
11   values in conjunction with an interest rate that was
12   very low.  But in that case it provided higher
13   values like 4 percent.
14           But together for a number of years they
15   were deemed to be reasonable and they were replaced
16   by the GATT mortality table that provided higher
17   values in conjunction with a 30-year treasury rate
18   that provided lower values.  So in tandem they were
19   deemed to be reasonable.
20       Q.   Well, let me see if I can creep up
21    on the question this way.  Let's assume that
22    the mortality table that is being used is
23    the one employed by the Dun & Bradstreet
24    plan.  Okay?
25       A.   Yes.

122

```
 1   attempt to re-ask the questions today.  With that, I
 2   have a couple questions.
 3   CROSS-EXAMINATION BY MR. MOUKAWSHER:
 4       Q.   Mr. Poulin, in Mr. Shea's questions
 5   to you he spoke to you at one point about
 6   what you considered the preferable approach
 7   to making the calculations.  I want to ask
 8   you a couple clarifying questions about
 9   that.
10            Is it your opinion that the interest rate,
11   under the circumstances that it's applied here, is
12   reasonable or unreasonable?
13            MR. SHEA:  Objection to form.
14   Leading.  The federal rules are clear, you
15   can't lead in this situation.  I've made my
16   objection.
17            MR. MOUKAWSHER:  You already
18   said he's not my client.  Your objection is
19   on the record.
20            THE WITNESS:  I believe that
21   the interest rate in conjunction with the
22   mortality tables are unreasonable in
23   determining actuarial equivalency.
24   BY MR. MOUKAWSHER:
25       Q.   And other than through using the
```