```
 1   UNITED STATES DISTRICT COURT

 2   DISTRICT OF CONNECTICUT

 3   ---------------------------------------------- X

 4   MCCARTHY, ET AL,

 5                             Plaintiffs,

 6         - against -

 7   DUN AND BRADSTREET, ET AL,

 8
                               Defendants.
 9   ----------------------------------------------X

10                       Examination of EDWARD W. BROWN
                         Milliman USA
11                       4 Corporate Plaza
                         250 Washington Ave. Ext.
12                       Albany, New York   12203

13                       October 6, 2004 at 10:00

14   APPEARANCES:         By Phone:
                         MOUKAWSHER & WALSH, LLC
15                       THOMAS MOUKAWSHER, Esq., of Counsel
                         21 Oak Street
16                       Hartford, Connecticut 06106
                         Attorneys for Plaintiffs
17
                         PAUL, HASTINGS, JANOFSKY & WALKER,
18                       PATRICK W. SHEA, Esq., of Counsel
                         1055 Washington Blvd - 9th Floor
19                       Stamford, Connecticut  06901-2217
                         Attorneys for Defendants
20

21

22

23

24

25
```

P.O. Box 12459
Albany, NY 12212-2459

ALLIANCE
REPORTING SERVICE, LLC

Schenectady (518) 355-9216
Toll Free (800) 292-0224
Fax (518) 452-0610
alliancereporting@hotmail.com

```
 1    A.  But the whole plan isn't.
 2    Q.  So the mortality tables would apply here?
 3    A.  They would apply to this one provision.
 4    Q.  Okay. And if you were asked today to determine an
 5  actuarial equivalence benefit of a normal retirement
 6  benefit, say a lump sum issue, what mortality table
 7  would you use to do that?
 8         MR. SHEA:  Object to form. You can answer.
 9    A.  Okay. I have no choice.  The IRS tells us what
10  mortality tables to use for lump sum, and I would use
11  that table.
12    Q.  What's that?
13    A.  It's a GATT table.  Which came from the GATT
14  legislation.
15    Q.  And that's mandated by the IRS for lump sums?
16    A.  Right.
17    Q.  All right. If you were asked with respect to an
18  early retirement plan where you were supposed to
19  calculate actuarial equivalence and the plan did not
20  stipulate to a specific mortality table, what mortality
21  table would you use to make the calculation today?
22    A.  There's various tables that I use. The GATT could
23  be one of them. There's a table called the RP 2000.
24  There's another, I think it's 93 GAR table.
25    Q.  93 GAR?
```

P.O. Box 12459
Albany, NY 12212-2459


ALLIANCE REPORTING SERVICE, LLC

Schenectady (518) 355-9216
Toll Free (800) 292-0224
Fax (518) 452-0610
alliancereporting@hotmail.com

1   A.  Yes, I think it's 93.  Yes, 93.

2   Q.  Is there a 94 GAR?

3   A.  There could be. It's either 93 or 94.

4   Q.  Okay. In accordance with professional actuarial
5   standards, those are three you would deem appropriate to
6   use in determining actuarial equivalence?

7       MR. SHEA:  I object.  The witness is not
8   here to express any opinion on mortality tables.  I
9   think, therefore, that exceeds the scope of the report.
10  I'll let you go on with it a little bit.  At some point
11  I have a protective order if you turn it into a
12  deposition not about the opinion the witness has been
13  retained to testify on, but on a separate issue that is
14  not mentioned in the complaint, not mentioned at the
15  motion to dismiss stage that led to this round of
16  briefing, and is not in the case.

17  Q.  Do you remember my question, Mr. Brown?

18  A.  Could you repeat it again?

19  Q.  If you were to determine actuarial equivalency
20  today for an early retirement benefit you'd testify that
21  in accordance with sound actuarial principals you would
22  use the GATT table, 94 GAR -- or 93, you think it might
23  be -- and then you mentioned one other, RP 2000?

24  A.  That's correct.

25  Q.  Those would be the three options you would

P.O. Box 12459
Albany, NY 12212-2459

ALLIANCE
REPORTING SERVICE, LLC

Schenectady (518) 355-9216
Toll Free (800) 292-0224
Fax (518) 452-0610
alliancereporting@hotmail.com

1  consider?
2              MR. SHEA:  Objection to form.  I think that
3  misstates the prior testimony, the prior question you
4  asked him.
5     Q.  Mr. Brown, do you understand my question?
6     A.  Yes.  And I think you asked two different
7  questions.  First, I would consider what the plan
8  document said.
9     Q.  I'm telling you the assumption.  If I ask you to
10 make the assumption that the plan document doesn't tell
11 you what mortality table to use.  And you have been
12 instructed to achieve actuarial equivalence for early
13 retirement benefits and you must pick, in order to
14 achieve actuarial equivalence, a mortality table to use,
15 I'm asking you, in accordance with the professional
16 standards that govern your work, what mortality table
17 would you use today if you were asked to do that?
18    A.  So this wouldn't be with respect to a qualified
19 plan.  It would be just doing an actuarial equivalency
20 without any direction.
21    Q.  Without any direction as to what table to use.
22 Just doing it to achieve actuarial equivalence.
23    A.  And the first time I was asked to do it?
24    Q.  Yes.
25    A.  I would use one of those three tables, most

P.O. Box 12459
Albany, NY 12212-2459
ALLIANCE REPORTING SERVICE, LLC
Schenectady (518) 355-9216
Toll Free (800) 292-0224
Fax (518) 452-0610
alliancereporting@hotmail.com

```
 1  likely.  I'd have to examine the facts, but those, most
 2  likely, are the first place to look.
 3      Q.  Because they're current tables?
 4      A.  Right.
 5      Q.  And in fact mortality tables have changed over
 6  time as people have been living longer, right?
 7      A.  That's correct.
 8      Q.  And mortality tables have been adopted in recent
 9  years to reflect that, right?
10      A.  That's right.
11      Q.  According to your report you read Mr. Poulin's
12  deposition, didn't you?
13      A.  I did.
14      Q.  And you saw that he expressed an opinion with
15  respect to mortality tables, didn't he?
16      A.  I think there's mention in there about mortality
17  tables.
18      Q.  But Dun & Bradstreet did not ask you to give any
19  opinion about mortality tables with respect to your
20  report, right?
21      A.  They did not.
22      Q.  And the three tables you named, would those be
23  the three tables that are most widely used by actuaries
24  today?
25      A.  For determining early retirement benefits?
```

P.O. Box 12459
Albany, NY 12212-2459

ALLIANCE
REPORTING SERVICE, LLC

Schenectady (518) 355-9216
Toll Free (800) 292-0224
Fax (518) 452-0610
alliancereporting@hotmail.com

1    Q.  Right.

2    A.  I'd say no.

3    Q.  For determining actuarial equivalence under the
4 circumstances I just described?

5    A.  For determining early retirement actuarial
6 benefits?

7    Q.  Actuarial equivalence where the plan doesn't
8 stipulate a table.

9    A.  It has to do with if it's a qualified plan. We
10 went outside that area and said it's not in the plan,
11 which means it's a non qualified plan of some kind.

12   Q.  All right. I'll withdraw that question. I notice,
13 Mr. Brown, in your report you also discussed the
14 determination letters. Would you agree with me that a
15 favorable determination letter indicates only that an
16 employee retirement plan qualifies for favorable tax
17 treatment by meeting the formal requirements of the
18 Internal Revenue Code, Section 401(a)?

19   A.  I would agree with that, I believe.

20   Q.  So that's all the favorable determination letter
21 does, it indicates only that an employee retirement plan
22 qualifies for favorable tax treatment, correct?

23   A.  Yes.  You know, it's a pretty concise statement.
24 That is the primary purpose of it.  But it certainly
25 helps employers rely on the provisions of the plan and

P.O. Box 12459
Albany, NY 12212-2459

ALLIANCE
REPORTING SERVICE, LLC

Schenectady (518) 355-9216
Toll Free (800) 292-0224
Fax (518) 452-0610
alliancereporting@hotmail.com

it's 40 percent. What's the six percent per year number to the right of that in the first line?

A. That's the way the plan document defines your early retirement benefit. It's not an actuarial equivalent, as we're talking about here. For each year early you get six percent less. These are all ten percent [years] early, so the he reduction is sixty percent.

Q. So that's 1 set number?

A. That's right.

Q. And that's true all the way down that far right column?

A. No.

Q. Where does it stop being true?

A. The last time you see a six percent.

Q. What's the seven percent in the other?

A. Those plans where you have some sevens, sixes, and five and a half, are plans that use an actuarial reduction for determining the amount of the benefit.

Q. All right. And what about the ones that don't have anything to the right?

A. They're all set formulas which are described on the left-hand side. And the result of that formula is in the next to the last column for people that retire 120 months early.

Q. I want to ask you briefly about the relationship

P.O. Box 12459
Albany, NY 12212-2459
ALLIANCE REPORTING SERVICE, LLC
Schenectady (518) 355-9216
Toll Free (800) 292-0224
Fax (518) 452-0610
alliancereporting@hotmail.com

1  between interest rates and mortality tables when
2  determining actuarial equivalency as, again, we're
3  determining actuarial equivalency without record of what
4  the plan says.  We're just trying to determine a number
5  actuarial equivalence.  Would you agree with me, over
6  estimating mortality in such a calculation would reduce
7  the amount a plan participant would receive.
8      A.  You know, I hate to make general statements
9  without doing the calculations.  And I really didn't
10 look at that.
11     Q.  Well, as a general actuarial principle, wouldn't
12 you agree that if you make an over estimate you assume a
13 much higher mortality rate than is reasonable it's going
14 to, you know, the higher the mortality rate you assume
15 -- withdrawn. The higher the mortality rate you assume
16 the smaller the resulting benefit, isn't that right?
17     A.  If it's consistent, if it's not just one or two
18 years.  But overall, it works like life insurance.  If
19 you think someone is going to die sooner, you charge
20 more for it. These tables, it's the slope of the table
21 that determines a lot of this.  And it's not as easy as
22 discussing the impact of interest rates because I know
23 from experience I would never guess without doing the
24 calculation unless it's very extreme, say, huge
25 unreasonable mortality rate, you'll get an unreasonable

P.O. Box 12459
Albany, NY 12212-2459
ALLIANCE REPORTING SERVICE, LLC
Schenectady (518) 355-9216
Toll Free (800) 292-0224
Fax (518) 452-0610
alliancereporting@hotmail.com

1  result.

2  Q.  At some point, though, the higher the mortality
3  assumption, the lower the benefit that's going to
4  result?

5  A.  If it's consistent, yes.

6  Q.  Generally speaking, though, if you're trying to
7  just reach actuarial equivalence if you over estimate
8  mortality and then use an artificially low interest
9  rate, can you conceive of a circumstance where you could
10 still yield actuarial equivalence?

11 A.  By over estimating mortality you assume that
12 people die sooner than later?

13 Q.  Yes, right.

14 A.  And what was the other part of the question?

15 Q.  Can you still achieve actuarial equivalence under
16 those circumstances by, say, having an artificially low
17 interest rate to offset it?

18 A.  It's possible.

19         MR. MOUKAWSHER:  Let's go off the record a
20 moment.

21         MR. SHEA:  Okay.

22     (Whereupon a short recess was taken.)

23         MR. MOUKAWSHER:  I have no further
24 questions.

25         MR. SHEA:  I want to clarify something from

P.O. Box 12459
Albany, NY 12212-2459
ALLIANCE REPORTING SERVICE, LLC
Schenectady (518) 355-9216
Toll Free (800) 292-0224
Fax (518) 452-0610
alliancereporting@hotmail.com